UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

"IN ADMIRALTY"

JTR ENTERPRISES, LLC,

                    Plaintiff,

vs.                                       CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY etc.,

                *In Rem* Defendant,

_____/

## JTR'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION'S MOTION FOR SANCTIONS (D.E. 123)

Plaintiff, JTR Enterprises, LLC ("JTR"), by and through its undersigned counsel and pursuant to Local Rule 7.1, hereby submits its Response and Memorandum of Law in Opposition to Motivation, Inc.'s, Motion for Sanctions (D.E. 123), and states:

## I.      INTRODUCTION

*A.    Preliminary Statement.*

JTR lawfully and commendably has enlisted the aid of this Court to determine the ownership of tens of thousands of emeralds that JTR's founder, Jay Miscovich, discovered in International Waters in the Gulf of Mexico of a point located at coordinates 24°57.79" North Latitude and 81°55.54" West Longitude (the "Discovery Site"). In its Verified Claim, JTR alleged nothing more than that Jay discovered the emeralds at the Discovery Site. JTR made no claim as to the origin, original ownership, or value of the emeralds – all of which are issues that JTR continues to investigate.[1]

_____

[1]    A detailed and somewhat lengthy discussion of the facts supporting the legitimacy of JTR's claim appears in the Affidavit of Bruce L. Silverstein, Esquire (the "Silverstein Affidavit"), which is submitted in support of JTR's

Motivation injected itself into this action, asserting a factually and legally frivolous claim that the emeralds belonged to Motivation because they were once cargo on the *Atocha*, which Motivation claimed to have floated forty miles away from the *Atocha* wreck-site in a barrel, against prevailing currents, until the barrel broke up and deposited the emeralds at the Discovery Site. When it was apparent that Motivation's barrel theory would not float, Motivation made up a new claim that a former employee stole millions of dollars of *Atocha* emeralds from the wrecksite and gave them to one of JTR's divers. The theft however, is equally implausible and entirely based on the unsworn statement and conjecture of a convicted felon. After a year of pursuing its frivolous claims, Motivation has finally conceded the emeralds did not come from the *Atocha*. Before doing so, Motivation's putative emerald "expert" publicly disparaged JTR's emeralds in a parting shot calculated to preserve Motivation's virtual monopoly in the "treasure emerald" market.

As shown below, Motivation made up the "floating barrel theory" both (i) to provide Motivation a public forum to disparage and defame its new business competitor, and (ii) to placate Motivation's investors, who have been misled for years by Motivation that there are between "60 and 500" pounds of so called *Atocha* emeralds "yet to be found."[2] The emeralds are the "hook" for Motivation to lure its investors to continue to fund its decades long ongoing hunt for *Atocha* treasure, following the late Mel Fisher's discovery of the "Motherlode" in 1985.

As shown by JTR's affidavits, exhibits and for the many reasons discussed *infra*, Motivation's sanctions motion is entirely frivolous and should be summarily denied. Additionally,

---

Opposition to Motivation's Motion for Sanctions, and which is attached hereto as ***Exhibit "U"***. JTR encourages the Court to read the Silverstein Affidavit with care, as it provides substantial details that have not previously been discussed in this proceeding, and lays bare Motivation's frivolous claim of a fraud on the court.

[2]   JTR's counsel does not make this charge lightly, but cannot ignore the extant body of academic research and specifically, Professor Kris Lane's academic research (discussed *infra*) concerning emerald mining production in Muzo in the early 1600s leading up to 1600 that flatly contradicts the unfounded claims made by Motivation and forming the basis of its bad faith intervention in this case.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

JTR should be awarded its attorneys' fees and expenses incurred in responding to Motivation's frivolous motion.

**B.**     ***Procedural Background***

For a full discussion of the procedural background pertinent to Motivation's Motion for Sanctions, JTR respectfully refers the Court to pages 1 through 6 of JTR's Response in Opposition to Motivation's Motion to Compel (D.E. 135) and paragraphs 34 through 70 of the Silverstein Affidavit.  The most pertinent procedural background for present purposes is as follows:

On February 7, 2012, the Court granting JTR's motion to stay discovery, pending the Court's determination of whether Motivation's claim was legally viable.   (D.E. 69).  On June 18, 2012, the Court lifted its stay of discovery.   (D.E. 92).  On July 17, 2012, the Court issued a Scheduling Order setting a discovery deadline of December 5, 2012. (D.E. 100).   On August 7, 2012, the Court entered an Order requiring JTR, as substitute custodian, to provide Motivation's expert, Manuel Marcial, access to the instant emeralds by August 29, 2012.  (D.E. 117).  The Court also ordered Kim Fisher to appear for deposition on August 21, 2012, which was prior to the August 29, 2012 deadline for the inspection.[3]  (D.E. 116).  Despite the fact that Motivation had delayed Kim Fisher's deposition,[4] JTR voluntarily provided Mr. Marcial with access to the emeralds before the scheduled deposition and he inspected them on August 14, 2012.

Several days prior to the inspection, Motivation's public relations representative, Joe Sweeney, had told Jay Miscovich (while transporting the Citibank tranche of emeralds) on a flight from Ft. Lauderdale to Key West, that Kim Fisher had filed the lawsuit because

---

[3]     Based on Motivation's counsel's agreement with JTR's counsel at the August 14, 2012 inspection that the instant emeralds were not from the *Atocha* or *Margarita*, JTR canceled Mr. Fisher's August 21, 2012 deposition, as JTR then thought a joint stipulation of dismissal of Motivation's claim would be forthcoming and any further discovery efforts and litigation between the parties would be unnecessary.

[4]     Kim Fisher's deposition was postponed so that he could take a trip to Brazil for alternative holistic medical treatment for knee pain.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

Case 4:11-cv-10074-JLK   Document 142   Entered on FLSD Docket 10/10/2012   Page 4 of 33

CASE NO.4:11-CV-10074-JLK
*JTR's Response to Motion for Sanctions*

Motivation's investors had brought JTR's find to his attention after reading about it in the newspaper and thought JTR's find might be the missing *Atocha* emeralds that they had been searching for, and that Kim did not believe the emeralds were from the *Atocha* and was looking for a "graceful way out" of the lawsuit and as soon as Motivation's emerald expert, Manuel Marcial, confirmed JTR's emeralds were not from the *Atocha,* Motivation would withdraw its claim.[5]  *See* Affidavit of Jay Miscovich (copy attached as ***Exhibit "A"***).

Expectedly, on August 15, 2012, Mr. Marcial issued his report finding the instant emeralds were not from the *Atocha* or *Margarita*.  (D.E. 118-1).  Accordingly, on August 17, 2012, Motivation moved to dismiss its own Claim, but requested the Court reserve jurisdiction for a period of 60 days to consider a motion for sanctions.[6]  (D.E. 118-1).  On August 20, 2012 (within minutes of JTR's emailing of its Notice of Cancellation of Kim Fisher's deposition), Motivation filed a Secondary Report by Mr. Marcial, in which he raised a number of new issues, including what he believes to be the "possible" use of Krazy Glue on three matrix specimens and his putative appraisal of the total find, which he claims to be less than $50,000.  (D.E. 119-1).  Mr. Marcial's "findings" stand in stark contrast with prior evaluations and analysis of the Salvaged material by, among others, the Smithsonian Institute, experts engaged by CBS News / 60 MINUTES, Fred Leighton Jewelers, Sotheby's, and various other persons who have examined the emeralds and who are unaffiliated with JTR.

On August 20, 2012, JTR filed a response to Motivation's motion to voluntarily dismiss its claim.  (D.E. 120).  JTR did not oppose Motivation's voluntary dismissal of its claim, but noted any motion for sanctions by Motivation would itself, be sanctionable.  (D.E. 120 at 2).  JTR further

---

[5]  Mr. Sweeney confirmed the same information to the undersigned the morning of Mr. Marcial's inspection.

[6]  Motivation's counsel, Buster White told the undersigned that Motivation was seeking sanctions instead of simply withdrawing because it had spent close to $300,000  in attorney's fees on the claim and that Motivation felt it had some duty to "police" the treasure business.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

noted its own intention to pursue sanctions – including attorneys' fees and expenses – from Motivation for its frivolous interference with JTR's efforts to obtain an award of title or salvage award.  (D.E. 120 at 2-3).  In that connection, JTR noted, among other things, the following: "[f]or reasons likely related to Motivation's ongoing business of selling emeralds it claims to have come from the *Atocha* at a high premium to the price of an ordinary emerald, Motivation has elected to assert many misstatements and mischaracterizations in its Motion which are designed to disparage JTR and its discovery – to the competitive advantage of Motivation."  On August 21, 2012, the Court denied Motivation's motion to voluntarily dismiss its claim without prejudice to reconsider after Motivation filed "a possible Rule 11 motion for sanctions."  (D.E. 121).

On August 27, 2012, Motivation filed its Motion for Sanctions.  (D.E. 123).  Motivation is now trying to assert a theory that it should somehow be entitled to sanctions because it has exposed a "fraud on the court."  (D.E. 124).  Motivation never sent any Rule 11 letter to JTR, which is a fundamental prerequisite for the filing of the Rule 11 Motion that the court delayed dismissal of Motivation's claim.  (By contrast, JTR has complied with Rule 11, and will be submitting a claim for sanctions at the conclusion of the litigation).

## C.   *JTR's Distrust of Motivation Developed Early*

As stated above, JTR voluntarily filed this admiralty claim and submitted itself to the Court's admiralty jurisdiction.  JTR has repeatedly and voluntarily made its emeralds available to a number of unaffiliated experts and third parties for inspection, testing and analysis, including, Ecole Nationale Superieure de Geologie de Nancy (French Lab), the Smithsonian Institute, the Gemological Institute of America, Sotheby's, Christie's Auction, CBS News, Fred Leighton Jewelry, Gemtechlab Laboratory and others.   JTR certainly would have voluntarily shown its emeralds to Motivation and its experts as well, but was given a good reason not to trust them.  Early

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

in the case and during a teleconference in which JTR's representative, Paul Sullivan, was attempting

to work out with Motivation's representatives (Kim Fisher, Sean Fisher and Buster White) a

mutually agreeable inspection of the emeralds by Dr. Eugene Lyon to confirm the emeralds were

not from the *Atocha*, either Kim Fisher or Sean Fisher suggested to Mr. Sullivan that the parties

should just "skip the inspection" process altogether and "just say that JTR's emeralds were from the

*Atocha*" and market them together as *Atocha* emeralds.   *See* Affidavit of Paul Sullivan, a copy of

which is attached as ***Exhibit "B."***   Mr. Sullivan refused to become involved in such a scenario,

terminated the discussion and instantly became distrustful of Motivation.  *See **Exhibit "B."***

**D.      *Motivation's Floating Barrel Theory***

The primary basis for Motivation's initial claim was that the emeralds were cargo from the

*Atocha* and floated in a barrel to JTR's site.  (D.E. 10, ¶15).  In its next pleading, Motivation

attached a diagram/ map of the scatter trail depicting a sharp turn to the Northeast, apparently to

support its position the instant emeralds must have floated Northeast to JTR's site.  (D.E. 27-1).

Although Motivation has conceded the emeralds are not from the *Atocha*, it incredibly continues to

espouse its floating barrel or debris claim today.  *See* Motivation's Amended Verified Claim and

Motion for Sanctions.  (D.E. 94, ¶11),  (D.E. 123, ¶ 3).

The "scatter trail" for the *Atocha* was actually West Northwest, and not Northeast, as

Motivation has misrepresented to this Court.  *See* diagram of scatter trail by Mel Fisher's Marine

Archaeologist, Duncan Matheson, PhD, from his book *Search for the Atocha*, a copy of which is

attached as ***Exhibit "C."***  Notwithstanding the direction of the *Atocha* or *Margarita's* scatter trials,

it is scientifically implausible that a barrel of emeralds (even assuming one could float) or other

emerald carrying debris traveled from the *Atocha* or *Margarita* wreck sites across the Marquesas

against the prevailing currents to JTR's site in the Gulf of Mexico, as a result of any windstorm, or

otherwise.  *See* Report by meteorologist, Lee Branscome, PhD, a copy of which is attached as

*Exhibit "D."*

Moreover, in view of the statements made by Motivation's principals and agents discussed

below, Motivation never had an objective factual basis for its floating barrel claim.   Recounting the

first rough emerald find which followed the finding of some silver coins and emerald mounted

gold jewelry in late May 1985, the Fisher's archaeologist, Duncan Matheson wrote:

> Mel immediately went out to the site to congratulate the divers. He urged them to
> search the area thoroughly, and carefully record where they found each artifact.
> Before he left, he joked with the divers, telling them to be sure to find more
> emeralds.  **Mel had always believed that a large shipment of uncut emeralds
> had been smuggled on board the *Atocha*.   Though he claimed he'd seen
> documents proving this illicit shipment many years ago, <u>the historical
> evidence had never surfaced.</u>  Mel's story about how the emeralds came to be
> secretly stashed on board was intriguing.  But like most treasure stories, it
> was difficult to separate fact from fantasy.**
>
> The next day, diving off the *Saba Rock*, K.T. Budde-Jones and her husband, Syd
> Jones, found exactly what Mel had asked for – uncut emeralds.  This was the first
> group of many exquisite emeralds that would be revealed along other parts of the
> trail.  Mel's emerald story had become far more real than anyone could have
> imagined.

*See* excerpt from *Treasure of the Atocha* (NCSR 2004 ed.) by Duncan Matheson, PhD, a copy of

which is attached as *Exhibit "E."*

Perhaps unaware of Mel Fisher's prescient May 1985 proclamations to Duncan Matheson,

long time Fisher diver and *Atlanta Journal Constitution* writer, Jedwin Smith, recounts in his book,

*Fatal Treasue*, an eerily similar episode from November, 1985 in which Mel Fisher pointed divers

to the precise location of a quantity of the "Admiral's emeralds:"

> The first of these were discovered in November 1985 with the onslaught of a winter
> front that produced 45-knot winds and turbulent seas. Once the bad weather struck,
> Mel Fisher ordered the mother lode site sealed. The *Atocha*'s exposed timbers were
> covered with plastic tarps and weighted down with ballast. **When Kane Fisher
> complained to his father, asking what he and his crew were to do now, Mel
> responded in typical fashion: go for the emeralds.**

"Of course," Fisher told me, "Kane didn't know what I was talking about. Maybe even *he* didn't believe me when I told him there were emeralds out there."

**"Mel liked to say that he remembered someone, he didn't say *who*, reading to him from a document, he didn't say w*here* the document came from, about a court-martial that occurred in Havana right after the *Atocha* and the *Margarita* survivors were brought back to port," said Don Kincaid, smiling at the absurdity of the story.  According to Mel, one of the surviving sailors was reprimanded for smuggling emeralds aboard the *Atocha*. The sailor, knowing he would be hanged if found guilty, defended himself by saying: "Why are you bothering me about a little smuggling, when I helped the fleet's admiral smuggle a 70-pound box of emeralds onto the *Atocha*?"**

Kincaid said that the story sounded credible enough, especially in light of the fact that Spain's admirals were every bit as corrupt as their passengers and crew. **Then again, Eugene Lyon, who had transcribed every known document pertaining to the *Atocha* in the Archives of the Indies in Seville, was forced to plead ignorance when asked to verify Mel's emerald story.**

Nonetheless, Mel kept insisting that the story was true.

Kane told Mel that it was seven miles from the mother lode to where the cannons were found, and another three miles from there to Quicksands. So where, exactly, should he begin looking for those emeralds? Mel responded as only he could, telling his son: "If I were the admiral, I'd be keeping those emeralds under my bed."

Because the *Atocha* probably capsized when it broke apart and the trail of recovered artifacts pointed toward the northwest, Mel told Kane that he should start looking about 100 yards or so northwest of the mother lode.

Mel told me that Kane humored him by moving the *Dauntless* 100 yards to the northwest of the main pile, diving down, and promptly finding a thumb-size emerald worth $800,000. Later that day he found a 70-carat stone valued at $1.2 million. Soon the crew recovered 315 of the brilliant stones, ranging from 0.5 to 77 carats each, the total value of which was placed at almost $30 million. Given that Mel claimed there were at least 70 pounds of emeralds smuggled onto the *Atocha*, they would be worth several billion dollars.

*        *        *

**Needing an unbiased observer, I tracked down Don Kincaid.** Although Key West was still his port of call, he no longer was a treasure salvor.  The 54-year old maritime scholar said he had finally grown up.  He merely sailed for a living now.  It's a pleasant, unencumbered way to earn a living, light years removed from the seemingly eternal saga of the *Atocha.*

**Nonetheless, to this day he continues to be the most authoritative reference when it comes to the grand Ghost Galleon.** Not really wishing to rain on anyone's parade, **he said, what remained to be found from the *Atocha* was purely speculation.**

"Thirty-five boxes of church gold? The ship's manifest says there were 35 boxes earmarked for the Catholic Church, but we have no way of knowing exactly what was inside those boxes," Kincaid said. **"Emeralds? Yes, Mel always talked about a 70-pound box of emeralds being smuggled aboard, but nothing is listed on the manifest."**

**As for the alleged missing sterncastle, Kincaid spent months diving in the Quicksands between 1971 and 1975, bringing up arquebuses, swords, and daggers, all of which most certainly would have been in the ship's stern area, packed away directly below the captain's quarters.** The majority of wondrous gold chains, cups, and plates also were extracted from the area's deep sands. **Kincaid said it was obvious to him that they had found not only the stern but also the stern's anchors and the upper-**deck cannons in the same area. Then again, perhaps the confusion was a matter of semantics. **The divers of yesteryear had a fairly good idea of what they were searching for, based on noted historian Eugene Lyon's meticulous research.**

**"But what the majority of present-day divers are clutching onto," Kincaid said, "is myth or legend based on theories."**

Jedwin Smith, *Fatal Treasure*, at 158-60, 199-200 (John Wiley & Sons, 2003 (emphasis added)

(excerpts attached as ***Exhibit "F."***)

In 1999, while under criminal indictment for selling counterfeit gold coins,[7] and testifying under oath as a defendant in an unrelated federal claim for civil fraud and conversion styled, *Stickelber v. Fisher, Motivation, Inc. et al*, Case No. 4:97 10014 HIGHSMITH, Mel Fisher wisely abandoned claims he had previously made concerning the "admiral's smuggled 70 pound box of emeralds."   Notably, Mr. Fisher testified that whatever was left of the *Atocha*'s stern probably floated out into the Atlantic and got caught up in the Gulfstream, <u>not</u> the Gulf of Mexico as MOTIVATION has "verily" claimed in the instant action.   In particular, Mr. Fisher testified in pertinent part, as follows:

    Q.  Is there, from your knowledge of the "Atocha" is there still treasure out there to be salvaged.

    A.  Oh I'm sure.

---

[7]  *See* N.Y. Times, "Hunter Admits Sale of Fake Gold Coins" (Nov. 27, 1998) (noting that Kim Fisher signed the plea bargain on his father's behalf) (reproduced at http://www.nytimes.com/1998/11/27/business/international-business-hunter-admits-sale-of-fake-gold-coins.html).

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

Q. Can you tell me how much?

A. I'd hate to make a stab at it.  The "Margarita" has a substantial pile, but the "Atocha" I'm not sure.

**Q. What in your judgment would be left there to salvage?**

**A. Perhaps some emeralds around where the ship finally sank in the fuselage.**  And then there's a long 10 mile trail that may or may not have something that dribbled out while it was drifting for ten miles with nobody aboard, might be a scattering here and there of stuff that fell out of the holes in the bottom of the ship.

Q. Was that after the sinking and the first storm?

A. Yeah.  It, it broke loose from the main pile of silver 30 days after it sank, and there was a couple of hundred bales of tobacco which had been waterproofed loaded on top of the treasure, so that came up under the decks of the ship and floated it away.

Q. And it floated for about 10 miles you say?

A. Yeah.  So –

Q. Then sunk again?

A. Yeah, broke up.

*        *        *

**Q. Now, were the emeralds listed on the manifest.**

**A. No.**

**Q. What is your best explanation of how there came to be a substantial number of emeralds on the ship without being on the manifest.**

**A. The best evidence is we've been bringing them up in dribs and drabs.**

**Q. And where, whose property were they on the ship or can you tell?  I don't mean a man's individual name, but was it part of what was being sent back to the King or was it –**

**A. No.**

**Q. Did it belong to some crew members or the captain or who?**

**A. It was not listed with anybody.**

*        *        *

Q. Have you located the stern castle of the "Atocha"?

A. No, not per se.  Just a few odds and ends.

**Q. Do you think it's still out there?**

**A. I'm not sure.  It appears it may have drifted, went ahead and kept floating <u>out to the Sargasso Sea in the middle of the Atlantic</u>.  Got caught in a current in the Gulf Stream and went around Florida and out in the ocean and out there with all the rest of the driftwood floating around.**

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

\*        \*        \*

Q.  Do you think the whole ship floated or just the stern castle into the Atlantic?

A.  I think the whole ship did.

Q.  And the silver, and how can you account for the silver and the emeralds being found, did they fall out of the ship somehow?

A.  It appears so.  There were two huge holes in the bottom.

*See* 4/20/99 transcript of Mel Fisher's deposition, at 50:1- 51:24; 52:5-22; 65:14–23; 66:12-19

(emphasis added) (copy of which is attached as ***Exhibit 'G."***)

Since Mel Fisher's passing, Motivation is, again, making up wild misrepresentations as to the nature and extent of treasure "yet to be found."  Among other false statements, Motivation has made claims that the so-called *Atocha* emeralds are now on the ship's manifest.[8]   In particular, Motivation's agents have publicly made the following statements:

Nonetheless, **Kim [Fisher] took the hint and started talking hard figures: According to the ship's manifest, what had yet to be discovered were** 297 silver bars, 35 boxes of church gold, 100,000 silver coins **and at least 68 pounds of emeralds.**

*Fatal Treasure*, at 197 (emphasis added) (excerpt attached as ***Exhibit "H"***).

\*        \*        \*

Welcome to the Investor relations department, I'm Shawn, this is Grant, and this is Chris. And we're still missing the sterncastle of the *Atocha*.  The sterncastle is the rear end of the ship.  This is where all the very wealthy would have been; the clerics, the clergymen, the officers, the Captain's Quarters and **according to the** *Atocha's* **manifest we know there are still** seventeen tons of silver bars missing, 128,000 silver coins, **sixty pounds of emeralds** and about thirty-five boxes of church gold.

Transcript of Motivation's infomercial video titled *Meet the Investor Relations Team*, (Statements by Shawn Cowles, Director of Investor Relations) (copy attached as ***Exhibit "I."***)

(also available at http://www.melfisher.com/investors/invHome.asp).

---

[8]    Motivation also claims there are thirty five boxes of "church gold" on the manifest that have never been found. This is also not true.  "The ship's manifest says there were 35 boxes earmarked for the Catholic Church, but we have no way of knowing exactly what was inside those boxes,' Kincaid said."  *See* ***Exhibit "D."***

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

\*     \*     \*

**It's feasible that there's hundreds and hundreds of pounds of these emeralds that were smuggled on board** …. And a few emeralds are worth as much as a few chests of coins.

*See* transcript of infomercial video titled *Meet the Investor Relations Team*, pgs.  (statement by Sean Fisher, Director of Marketing and Sales) a copy of which is attached as ***Exhibit "J."*** (Emphasis added).

\*     \*     \*

As we know, the Atocha sank in September of 1622.  Three months before at Muzo Mine, the Spaniards had the largest recovery of emeralds they had ever had in their history of their operation of the mine.  That was in June of 1622.  **It's been said that the number sixty-nine pounds, but I think actually the number is much more than that**, because even I, as young man, used to ship to India, seventy, eighty, ninety pounds of emeralds.  So, if this was the largest recovery of emeralds the Spaniards ever had, **it's conceivable that there could be 500 pounds of emeralds somewhere there on the sea bottom.**

Transcript of Motivation's infomercial video titled *Atocha Emeralds*, at __ (statement by Manuel Marcial de Gomar, Motivation' *Atocha* emerald expert) (copy attached as ***Exhibit "K."***)

\*     \*     \*

**According to emerald expert Manuel Marcial emeralds were generally transported in 70 pound drums which means that there should be another 64 pounds of emeralds totaling over one billion dollars yet to be found.**

*See*  http://www.melfisher.com/SalvageOperations/RecentFinds/Emeralds_0708.asp   (emphasis added) (copy attached as ***Exhibit "L."***).  *See also* Certification of Authenticity by Kim Fisher of *Atocha* Emerald, dated September 14, 2001 ("The sixty-nine pounds of emeralds smuggled aboard the *Atocha* never reached their intended destination.") (copy attached as ***Exhibit "M."***) Notably, Mr. Marcial purportedly "appraised" this 3.17 carat bluish Muzo emerald as being valued at $168,110.  *See Exhibit "M."*

Motivation's "floating barrel theory" is dispelled as pure speculation by the sworn deposition testimony of Mel Fisher, and statements made by Mssrs. Lyon, Matheson, Smith and

Kincaid -- all long time insiders of Treasure Salvors, Inc. (the original Fisher entity to which Motivation claims to be the successor in interest).   As such, Motivation never had any right whatsoever, to assert itself in the instant admiralty action.   Motivation now claims it is somehow entitled to sanctions for "uncovering a fraud on the court."   As discussed below, and in the accompanying affidavits and other exhibits, JTR has not committed a fraud on the Court, and Motivation's claim of fraud is based on rumor and innuendo – largely supported by a crew of untrustworthy affiants – including a trio of convicted felons.   Moreover, and ironically, in defending itself from the instant Motion, JTR has discovered the fraudulent statements of Motivation's agents referenced above.

### E.   *Motivation's Alternative Theft Theory*

In support of its' alternative theft theory, Motivation relies on the July 2, 2012 "affidavit" of Gerald Edwards.  (D.E. 94-10).  Mr. Edward's "affidavit" is not notarized.  (D.E. 94-10).  Mr. Edwards' "affidavit" states that he resides at 4715 Ganns Corral, Mariposa, California.  (D.E. 94-10).   JTR's process server reported in his July 16, 2011 Return of Non-Service, that the residential address given in Mr. Edwardwas vacant, and had been since December, 2011, a copy of which is attached as *Exhibit "N."*   Thereafter, JTR learned Mr. Edwards was a convicted felon.   *See* criminal conviction and probation records from San Luis Obispo County Superior Court, a copy of which is attached as *Exhibit "O"* and criminal records from Santa Barbara Municipal Court attached as *Exhibit "P."*   In 1982, Mr. Edwards was convicted of knowingly having unlawful sexual intercourse with his daughter.[9]   *See Exhibit "P."*  Additionally, in 1965, Mr. Edwards pled guilty to two felony counts for burglary and theft.   *See Exhibit "O."*

---

[9]   Mr. Edwards violated his probation by failing to make restitution and fine payments.  *See Exhibit "L"*.  The deputy probation officer further reported that while on probation, Mr. Edwards failed to register as a sex offender, bounced one of his restitution checks, was arrested for taking personal property of another and cited twice for driving with a suspended or revoked license.  *See Exhibit "N."*

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

Nonetheless even assuming the "affidavit" was properly notarized and the affiant was credible (which is not the case), it merely alleges that Mr. Van Raalte told Mr. Edwards that "when [Van Raalte] had been a diver for the Fisher family, that he got a lot more out of the Fishers than they will ever know".   (D.E. 94-10).  This hearsay statement is not a sufficient basis to claim the Mr. Van Raalte stole millions of dollars in so called *Atocha* emeralds.  Further, in response to JTR's requests for all communications between Motivation (including anyone on its behalf) and Mr. Edwards, Motivation objected on the basis of attorney-work product.  *See* paragraph 24 of MOTIVATION's Response to JTR's First Request for Production, a copy of which is attached as **Exhibit "Q."**  Motivation cannot rely on Edwards' so-called "affidavit" and at the same time, claim work-product as to its lawyer's communications with him.

On March 21, 2012, Mr. Van Raalte gave his sworn statement under oath, a copy of which is attached as **Exhibit "R."**  Mr. Van Raalte never took any *Atocha* emeralds. (5:17-19). Mr. Van Raalte does not have any interest in JTR.   (3:15-18; 7:14-18).  Mr. Van Raalte does not work for JTR.  (7:19-24).  Mr. Van Raalte is not aware of anyone at all that has ever been associated with JTR or Mr. Miscovich's group as having taken any emeralds from the *Atocha* site and claiming that they were JTR's emeralds.  (7:5-8 and 7:9-12).

In its Motion for Sanctions, Motivation also submitted a purported affidavit dated August 18, 2012 from Scott Wilding in further support of its claim JTR had taken, or recovered, *Atocha* emeralds.  (D.E. 123-3).  The affidavit is defective on its face because the notary failed to indicate she had taken an oath or affirm that the affiant had attested to the truthfulness of the facts contained within the affidavit.[10]  Mr. Wilding's "affidavit" states that he resides at 688 N.W

---

[10]   Section 117.003, *Florida Statutes*, provides: "Administration of Oaths - A notary public may administer an oath and make a certificate thereof when it is necessary for the execution of any writing or document to be published

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

156th Avenue, Pembroke Pines, Florida.  (D.E. 123-3).  Like Edwards, the address given for Mr. Wilding was completely vacant.  *See* Affidavit of Non Service, a copy of which is attached as ***Exhibit "S."***  Mr. Wilding is also a convicted felon.[11]  *See* WestLaw Report for Scott Wilding, a copy of which is attached as ***Exhibit "T."***  Mr. Wilding pled guilty in 2001 for felony possession of cocaine.  *See* ***Exhibit "T."***  On February 17, 2004, the Securities and Exchange Commission entered an Order imposing sanctions against Mr. Wilding for his violations of Sections 5(a) and 5(c) of the Securities Act and fined him $121,715 and prejudgment interest from August 1, 2002.  *See* SEC Admin. Pro. File No. 3-11307.  http://www.sec.gov/litigation/admin/33-8387.htm.

The defective "affidavit" claims that Mr. Miscovich visited Mr. Wilding's home in June or July of 2010 and allegedly told Mr. Wilding the emeralds had come from the *Atocha*. (D.E. 123-3).  Mr. Wilding claims to have thought the "whole idea" was a scam.  (D.E. 123-3).  Mr. Wilding's "affidavit" further alleges that Mr. Miscovich said "that CBS new [sic] program 60 Minutes was going to do a story and that he 'better get in now.'"  (D.E 123-3).  Mr. Wilding's "affidavit" is untrue.  Mr. Misovitch does not believe any of the emeralds he found are from the *Atocha*, and did not tell Mr. Wilding that the emeralds were from the *Atocha*.  *See* ***Exhibit "A."*** Moreover, on February 19, 2011, Armen Keteyian, the Chief Investigative Correspondent of CBS News and Len Tepper, the Chief of Investigative Projects for CBS News, showed up at Mr. Miscovich's home in Pennsylvania and attempted to interview him for the first time, about his Delaware litigation with Dean Barr and Neil Ashe, which is discussed further *infra*.  *See* Affidavit of Bruce Silverstein, Esq., a copy of which is attached as ***Exhibit "U."***  This was Mr.

---

under the seal of a notary public. **The notary public may not take an acknowledgment or execution in lieu of an oath if an oath is required."**  (Emphasis added).

[11]   JTR has ordered Wilding's criminal records from the Broward County Clerk of Court and has told by the Clerk that they will be available to pick up on October 18, 2012.  JTR will file the conviction records as soon as it receives them.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

Miscovich's <u>initial</u> contact with 60 Minutes. *See* **Exhibit "U."**   Accordingly, Mr. Miscovich could not possibly have made any statements to Mr. Wilding about "60 Minutes doing a story" in June, 2010, as that did not occur until February 19, 2011.   Further, there is no evidence Motivation had any knowledge of Mr. Wilding or knew of his alleged claim concerning Mr. Miscovich, before Motivation's intervention in this admiralty lawsuit in October, 2011.   Indeed, Mr. Wilding's "affidavit" is dated August, 18, 2012 and as such, does not provide any support for Motivation's initial intervention.  (D.E. 123-3).

MOTIVATION further relies on an alleged email from Dean Barr, which Motivation claims to state that Mr. Miscovich had "stolen the emeralds from the *Atocha*."  JTR is not aware of any such email and doubts it exists.   Nonetheless, JTR specifically requested MOTIVATION produce the email.  MOTIVATION responded as follows:

> 34.     The "email from Dean Barr" referenced in paragraph 55 of your Amended Verified claim.
>
> **Motivation did not undertake such communications, etc., all documents responsive to this request are privileged attorney-work product.  Motivation's counsel however, are discussing a means for Plaintiff to obtain a copy of the document without Motivation abandoning the privilege.**

*See* **Exhibit "U."**  Once again as with Edwards purported "Affidavit", MOTIVATION cannot rely on the alleged email to support its claim and at the same time, refuse to produce the alleged "email" or communications with witnesses concerning the email.  Moreover, even if there were such an email, it would be hearsay, and inadmissible without Mr. Barr's testimony.

**F.     *Manuel Marcial***

Manuel Marcial is Motivation's putative emerald expert and has authored several reports in this case on Motivation's behalf.  (D.E. 118-1), (D.E. 119-1) and (D.E. 137-3).  JTR has researched Mr.Marcial and has been unable to find any professional degrees, certifications or licenses

CASE NO.4:11-CV-10074-JLK
*JTR's Response to Motion for Sanctions*

establishing his credentials or qualifications, other than his membership in a trade association.[12]  Mr.

Marcial relationship's with the Fishers dates back to at least a September, 1985 episode in which

Mr. Marcial's jewelry shop provided a "5.96 carat emerald from the Muzo Mine in Colombia" and

Mel Fisher provided a "$50,000 gold bar" as the grand prize in a well publicized Key West treasure

hunt.  The winner of the treasure hunt later sued Messrs. Fisher and Marcial for fraud alleging the

emerald  "was instead a lower quality 5.27 carat Brazilian emerald of much less quality and value"

and that the "gold bar had a value much less than stated."  *See* Complaint styled, *Benedict v. Mel

Fisher*, *et al*., a copy of which is attached as ***Exhibit "V."***  Subsequently in October, 1990, Mel

Fisher signed an Agreement to "pay any and  all legal costs of any nature resulting from litigation of

any kind arising from or resulting from appraisals or evaluations done by Manuel J. Marcial and/or

Emeralds International, Inc. for and on behalf of the aforementioned Mel Fisher .. or any other

companies related to Mel Fisher."  *See* October 13, 1990 Agreement, a copy of which is attached as

***Exhibit "W."***  Mr. Marcial has appraised for Motivation in relation to its business, and likely has

appraised many more *Atocha* emeralds.  *See* January 25, 1995 appraisal of 3.17 carat Muzo emerald

for  $168,010 at  ***Exhibit "M."***  Mr. Marcial has recently appeared in an investor relations

infomercial video for Motivation touting the superior quality of Atocha Emeralds and stating

"[t]hree months before Muzo Mine, the Spaniards had the largest recover of emeralds they had ever

had in their history of the operation of the mine.  That was in June of 1622" and "its been said the

number sixty-nine pounds, but I actually think the number is much more than that…it's conceivable

that there could be 500 pounds of emeralds somewhere there on the sea bottom."  *See **Exhibit "K."***

Motivation has also stated on its website that "[a]ccording to emerald expert Maunel Marcial

---

[12]    Apparently, Mr. Marcial's qualifications are based on his approximate six years in Colombia as an independent miner, and that he has owned and operated emerald retail jewelry stores in the Bahamas, Hawaii and Key West for many years. *See* http://www.marcialdegomar.com/About/About.html.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

emeralds were generally transported in 70 pound drums which means there should be 64 more pounds of emeralds totaling over one billion dollars yet to be found." *See Exhibit "L."* In view of the long standing business relationship between Motivation and Mr. Marcial, he is neither independent nor unbiased. His reports in this case were clearly designed to simply disparage JTR's principals and emeralds. .

Mr. Marcial raised a number of issues in his report, including valuation, underwater submersion and the "possibility" that there is "Krazy Glue" on two of the emerald specimens. In view of this, JTR has sent a number of emeralds to the American Gemological Laboratory (the "AGL") in New York City for further analysis and testing. Due to a back up at AGL, its report on these stones is not expected for another two weeks, but will be filed with the Court when it is received. JTR also continues to investigate the value of the emeralds (as previously stated). JTR has no doubt, however, that there is no merit to Mr. Marcial's frivolous, disparaging and defamatory claim that the entirety of the emeralds are worth no more than $50,000. JTR's belief as to the substantial value of the emeralds is premised on numerous bases, including those discussed in paragraphs 11-13 and 34 of the Silverstein Affidavit. Among other things, the emeralds have been examined by the Smithsonian, Sotheby's, the President of a high end jewelry store with showrooms in Beverly Hills and Madison Avenue, the owner of an emerald mine in Colombia who was working with CBS News / 60 MINUTES, and a GIA certified gem lab in New York City, and all of them have expressed the view that Jay's discovery is extraordinary, that some specimens are "museum quality."

Mr. Marcial argued in his second report that he did not believe a number of emeralds contained in an eleven and a half pound bag could have picked up from the seafloor because of their size. (D.E. 110-1). However, he noted in his third report that as he was examining an 8 to 10 carat

stone that had been recently recovered at JTR's site, that when he "gave it a gently squeeze" the emerald "disintegrated into many smaller pieces" (137-3). This is exactly what accounted for the tiny pieces of emeralds he had examined during the previous inspection. Some of the stones are in fact brittle. Mr. Marcial also noted in his third report that none of the stones shown to him "showed any evidence of clarity enhancement or polymers." (137-3). Mr. Marcial had also previously reported that other of JTR's emeralds were treated or oiled. JTR disagrees with this finding with regard to its uncleaned emeralds. Following its recovery of a number of its emeralds, JTR cleaned them with mineral spirits and other solvents in plastic bucket in an effort to clean them, which may account for the epoxy type treatment that the French, Swiss and American labs had reported. JTR notes that 15 of its uncleaned samples (having come straight out of the salt water and sent for testing) were randomly selected and that Matco and/or Chemir determined these samples were negative for an epoxy type resin or other modern substances. These reports were filed with the Court on October 1, 2012. (D.E. 131, and exhibits thereto).

Notwithstanding any of these findings, the indisputable fact remains that JTR's principals recovered the stones from the seafloor at JTR's site and believes its principals were the first to find them. ***See Exhibit "A."*** JTR is unaware of anyone having placed them there. JTR's counsel of record have dove the Discovery Site and recovered emeralds as well.

## G.    *The Red Atocha Emerald*

Early in the case there was an exchange between the parties' counsel in which JTR was adamantly trying to make the point that its emeralds could not possibly have come from the *Atocha* because they were found with amethysts and quart crystals. (D.E. 123-1) at pg. 9. For some reason, Motivation attached the November 1, 2011 email between counsel to its Motion for Sanctions. (D.E. 123-1). The exchange provides in pertinent part, as follows:

Dave: In the interest of time, **here are Kim's responses on behalf of Motivation** with our input to your statements of facts that should help in facilitating a prompt settlement.

\*          \*          \*

4. No amethyst or quartz crystals were found with emeralds recovered from the Atocha site.

a. Manuel can answer.  Just like our comment in No. 3, just because Motivation hasn't found it yet does not from the Atocha or Margarita.  Motivation has found amethyst jewelry on the Atocha and Margarita.  The quarts is most likely the matrix from the emeralds and amethysts; but Manuel would need to see it to know.

b. No matter where they were mined, they could have been on the Atocha or Margarita.  **Consider the fact that Motivation found a red emerald on the Atocha; that emerald reputedly only comes from one place in the world -- the mountains of Utah.**

(D.E. 123-1) at pg. 10.  (Emphasis added).

Red emerald is a trademarked designation of the mineral red beryl, or bixbite, and was discovered in the Thomas Mountain Range, Juab County, Utah in 1904 by mineralogist Maynard Bixby.  *See gen., Emeralds* by Fed and Charlotte Ward (Gem Book Publishers, 2010 3d) at pg. 62; *The Rare Gem Services: Bixbite* (Red Beryl/ Red Emerald) Sept. 4, 2012 by Houston Wade; and www.gemselect-com/other-info/bixbite-red-beryl.php; copies of which are attached as ***Composite Exhibit "X."***  W.F. Hildebrand, a geochemist from the National College in Washington, D.C., identified the mineral as a new type of beryl in 1905. This initial deposit contained an uneconomic quantity of low grade red beryl and it was not until Lamar Hodges happened upon a vein in the nearby Wah Wah mountains while prospecting for uranium in 1958, that the first gem quality red beryl was discovered.   Red beryl is among the rarest gemstones on Earth and has not been discovered in any other part of the world.  See ***Composite Exhibit "X."*** There are no known examples 'red emeralds' circulating prior to the modern era and certainly no record of any having been aboard 17th century Spanish treasure galleons.  Interestingly, Manuel

Marcial is one of a small number of dealers of 'red emeralds' and has a collection in his Key West shop for sale.

**H.    *Professor Kris Lane's Research – There Were No Rough Emeralds on the Atocha, Much Less 60 to 500 pounds of Emeralds!***

Kris Lane, PhD, is the Scholes Chair Professor of Colonial Latin American History at Tulane and the World's foremost expert on the Spanish Colonial emerald trade.[13]  A true and correct of Professor's Lane's *Curriculum Vitae* is attached as ***Exhibit "Y."*** Using original source material from Colombia's National Archive in Bogota, the Regional Archive of Boyaca, Tunja, Colombia, the Archivo Central del Cauca, Popayan, Colombia, The National Archive of Ecuador in Quito, Spain's Archive of the Indies and National History Archive, the National Libraries of Spain, Portugal and Great Britain, Portugal's Torre do Tombo National Archive, England's Parliamentary Archive and several other repositories, Professor Lane provides the most thoroughgoing treatment of the subject to date in his book *Colour of Paradise* (Yale University Press, 2010).  *See* (pg. 19) - the relevant portions of *Colour of Paradise* are attached as ***Composite Exhibit "Z"*** - and are being set forth herein for the following reason:  Motivation's intervention in this admiralty claim hangs upon the existential notion that a vast quantity of uncut Colombian emeralds were transshipped upon the 1622 *Flata de Indies* fleet from New Granada to Spain, via Havana, and were on board the *Atocha* or *Margarita* at the time of their sinking. The general, and sometimes very specific, assertions Motivation has posited as to the quantities

---

[13]   Mr.Lane has authored a number of academic books including:  *Colour of Paradise* (Yale University Press, 2010). *Pillaging the Empire: Piracy in Americas*, 1500-1750 (M.E. Sharp, Inc.,1998), *Quito 1599: City & Colony in Transition* (University of New Mexico Press, 2002) and *Piracy: Oxford Bibliographies Online Research Guide* (Oxford University Press, 2010), *Blood and Silver: A History of Piracy in the Caribbean and Central America* (Signal, 2010) ; and co-authored: *Riddle of Latin America*, (Wadsworth Publishing, 2011) *Latin America in Colonial Times* (Cambridge University Press, 2011), *The Atlantic World: A History 1400 to 1888* (Wiley-Blackwell, 2007); *The Indian Militia and Description of the Indies* (The Cultures and Practice of Violence) (Duke University Press, 2008); *The Crossroads and Cultures* A History of the World's Peoples (Bedford/ St. Martin's, 2012).

of emeralds and manner in which they came to be aboard the vessels are similar to those made for decades to establish the provenance of "*Atocha emeralds*" and to generate ongoing third party investments in its treasure hunting operation.

Using royal tax books, worker muster rolls, investigative reports and legal records of the day, Mr. Lane detailed emerald production in Colombia's Muzo mining district from its inception in 1564 to 1784.  (pg. 21, Appendix A).  The main premise of *Colour of Paradise* is that for the entirety of the Spanish occupation, emerald mining at Muzo remained a small-scale, hard scrabble affair, relying chiefly upon the native Amerindian population for its workforce.  Though it was a legally formalized and meticulously documented activity from the beginning, Colonial emerald mining employed the same primitive technologies and techniques practiced by local Muzo Indians and others in pre-Columbian times. (pg. 66, 72).  Concessions or 'mines' consisted of 25 by 16.7 meter rectangular plots of land lying seven kilometers up a narrow path from the village of Muzo on either side of the Itoco creek and on the adjacent Itoco Hill and were granted primarily to Muzo residents of Spanish blood. (pg. 67, 74).   Mining was accomplished by damming water from the creek then releasing it over the ground in order to loosen the topsoil - the muddy ground was then excavated using hand tools to expose rock veins where emeralds were sometimes present.  (pg. 69, 72).  Prior to the introduction of black powder blasting and tunneling in the late 18th century, the sole innovation introduced by the Spanish was the replacement of the native wooden hand tools with iron and steel implements.  (pg. 66, 72). Generally, there were roughly two dozen 'mines' operative at any given time, each staffed by a work gang of eight to twelve.  (pg. 68, 74).  As such, the entire Colonial Muzo mining district comprised an area the size of three modern American football fields and employed 200 to 300 souls.  (pg. 74, 75, 82, 83).

Emerald production at Muzo reached its zenith early on, in the late 1500's, and fell into fairly steep decline thereafter.  (pg. 79-84, Appendix A).  The actual largest Spanish emerald recovery at Muzo came in the bonanza year of 1596.  (pg. 90-91, Appendix A).  While many emeralds were shipped to Spain using the Flota de Indias shipment network, others remained in the Americas and were sought after by wealthy colonists in such cities as Bogota, Cartagena, Tunja, Popoyan, Quito, Mexico City, Potosi and Lima.  (pg. 66, 88, 90).  Still others made their way to the largest consumers of Colombian emeralds, royalty and wealthy merchants in Goa and throughout the Islamic world on Atlantic Portugese treasure fleets and Pacific Spanish Manilla galleons.  (pg. 66, 96, 101, 126, 148-51).

Though merchants and other private emerald owners were cautious and likely distributed transoceanic emerald shipments among vessels in order to mitigate risk of loss, the largest concentrated emerald shipments were those sent annually to the Spanish crown representing the quinto real (or 1/5 in kind tax payment) due on emeralds and other valuables extracted in the New World.  (pg. 48).  *See* October 3, 2012 email from Kris Lane and attached report, copies of which are attached as ***Exhibit "AA."***

The entire 1596 Muzo quinto collection of nearly sixty pounds of emeralds was shipped aboard a single vessel, the Santa Maria Juncal.  (pg. 90).  This is believed to be the largest known emerald shipment in Spanish Colonial history.

Following the relative bounty of late 16th century, a combination of steep indigenous population declines, punitive taxes and exhausted deposits left the Muzo emerald mines in a state of virtual collapse in the first decades of the 1600s. (pg. 66).  Claims were abandoned and by 1620 even proven, producing emerald concessions were selling for as little as 20 pesos, or the cost of a good riding horse. (pg. 83).  Based on the decade immediately preceding the *Atocha's*

sinking, monthly emerald production at Muzo averaged just 3.9 pounds.  (Appendix A)[14].  Of

this, 3.1 pounds were tercera suerte, or third class stones.  Over this entire ten year span, just two

primera suerte, or first class stones, were recovered.  (Appendix A).

Total quinto collections for 1621 were just 8.7 pounds.  (Appendix A).  Muzo production

rallied modestly from 1622 to 1624, to 7.4 pounds per month, before resuming terminal decline

in 1625.  (Appendix A).  However, **the records for 1622 "show no evidence of a big find in**

**June or at any other time in this tax year."** *See* October 3, 2012 email exchange between John

M. Siracusa and Kris Lane, a copy of which is attached as ***Exhibit "BB."***

Next, we turn to Manuel Marciel's and Motivation's claim that "emeralds were typically

transported in 70 pound drums."  The fact that a drum is described by measure of volume and not

weight notwithstanding, no evidence exists to support the notion that a drum, box, barrel or

container of emeralds weighing 70 pounds ever existed anywhere in the Colonial Spanish era,

much less that it was the 'typical' mode of emerald transport.   Given that 70 pounds represents

more than two years of typical Colonial Spanish emerald production, the idea that emeralds were

commonly transported in such quantities beggars the imagination given their rarity coupled with

their diasporic global movement and demand patterns.

Perhaps recognizing the absurdity of its own claim of a floating seventy pound barrel of

stones, Motivation tried to augment its claim as follows:

> According to the *Atocha* manifest of Gene Lyon, there are documented items of
> treasure and artifacts that have not been recovered to date.  **Probably every wealthy**
> **passenger** on the *Atocha* and *Margarita*, **who stopped in Columbia** [sic] **had some**
> **emeralds** they were taking back to Spain.  Most likely, a number of "persons of no
> significance managed to acquire a few too.  **Private citizens often owned substantial**

---

[14]    Professor Lane's Appendix A presents annual total emerald production in carat weight.  Carat weights are
converted to pounds by dividing the total carat weight by 2,267.  Monthly averages are derived by dividing
annual totals by 12.

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

> **hoards of emeralds** and other treasure that would not be reflected as being on the paid
> Averia list or any other official manifest.

*See* (D.E. 123-1, at 11).  Again Motivation attempts to conflate the actual manifest of the *Atocha*

and the legitimate work of Dr. Lyon, with historically unsubstantiated fairy tale.  While there is

evidence of contraband trade in emeralds for the purposes of tax avoidance in the first years of

mining at Muzo, Crown officials had moved tax collection on site to the base of Itoco Hill by the

mid 1590's. (pg.232)  It was even ordered that a magistrate be called and worked halted as soon

as stones of any value were unearthed, in part so that multiple witnesses would be on hand to

testify as to the value of any strike. (pg. 233)  As such, tax avoidance took the form of the 'ruse

of the worthless fifth', whereby knowledgeable claim owners would attempt to pay the 20%

quinto tax with low grade emeralds while keeping better stones for themselves.  (pg. 233).

   While elites in Spain and its New World colonies were eager emerald consumers,

emerald ownership generally took the form of polished and faceted gems set in jewelry and

religious objects. (66, 86-89,239). Within a few years of the discovery of the Muzo mines, a

class of emeralds cutters emerged from New Granda's (modern Colombia's) goldsmith

community.  (237).  Laws enacted in 1569 and expanded in 1614 forbade gem cutting at Muzo to

prevent tax evasion and required lapidaries elsewhere from handling rough emeralds without

proof of taxation. (237).   The international trade in rough emeralds required enormous expertise

and was not undertaken by the general populace. (94). On pages 94-95 of his book, Professor

Lane defines the Colonial rough emerald trade network as follows:

> Surviving evidence strongly suggest that most early modern intercontinental gem
> trading was carried out in far more organized and routine fashion by a few dozen
> Sephardic merchant families.  These families operated - always at great personal and
> communal danger - both inside and outside the far flung Luso-Hispanic sphere.
> Already by the time of Muzo's discovery in 1564, the Sephardim had formed a
> transglobal merchant community uniquely capable of profiting from such a risky trade
> over the long term.

\*   \*   \*

Although the bulk of surviving evidence is anecdotal rather than quantitative, it is clear that many, perhaps even most, Colombian emeralds moved east across the Atlantic and Indian Oceans through Sephardic Jewish and so-called New Christian family webs, initially based in Seville, Lisbon and Antwerp. After 1600, the centre of Sephardic gem trading shifted to Amsterdam, then to London following Cromwell's invitation to resettle.

Although there are recorded incidents of Colonial emerald smuggling among non-specialists, this 'anthill' trafficking was fairly minor and, according to investigative reports at the time, generally took the form of a small quantities of gems hidden in secret compartments of sea-chests, sewn into garments, hidden in hatbands and even swallowed. (93-94, special report).

The most notable exception to this documented smuggling is that of the "six pounds of rough emeralds" that Motivation recovered from the *Atocha*.   (pgs. 19,91-93,125-26, 207).

## I.      *The Delaware Litigation and the Kirby Site*

The issues Motivation tries to raise concerning the Delaware Litigation and the Kirby Site are red herrings.  The history and a full discussion of both the Delaware Litigation and the Kirby Site are discussed at length in the Silverstein Affidavit at *Exhibit "U."*  In summary, the Delaware litigation involved a business dispute between Jay Miscovich and certain New York investors over the control of an entity named Emerald Reef, LLC that was set up to control JTR's site and take title to the emeralds and other gemstones that are the subject of this action  *See Exhibit "U."*  The Delaware litigation was eventually settled and did not involve any claims that there was any wrongdoing with regard to the manner in which the emeralds were discovered.  *See Exhibit "U."*  Indeed, the parties to that litigation were fighting control of Emerald Reef.  *See Exhibit "U."*  With regard to the Kirby Site, Mr. Miscovich simply contracted to work that site to give him something to do during the pendency Delaware Litigation.  *See Exhibit "U."*

## II.    MEMORANDUM OF LAW

Motivation purports to seek sanctions pursuant 28 U.S.C. § 1927 and the court's "inherent power."  Notably, however, in denying Motivation's motion to voluntarily dismiss its claim, the court granted Motivation leave only to file a motion pursuant to Rule 11.   (D.E. 121) ("Motivation seeks dismissal without prejudice of its Amended Verified Claim (DE #94), but asks the Court to retain jurisdiction for sixty (60) days to entertain a possible Rule 11 motion for sanctions.  In consideration of the foregoing, the Court finds that the Motion to Dismiss should be denied without prejudice to reconsider after the issue of sanctions has been resolved.").  In any event, Motivation has failed to establish a basis for sanctions under any theory of recovery.

*Factually*, Motivation's Motion for Sanctions fails for lack of a valid premise – namely, JTR has not committed a "fraud on the Court" (which is the prime basis for the sanctions application).   JTR has simply filed a Verified Claim for an award of titled and/or a liberal salvage award respecting the Salvaged Material that JTR's founder, Jay Miscovich, found at the Discovery Site.  JTR made no claim as to the origin, original ownership, or value of the Salvaged Material – all of which are issued that JTR continues to investigate.  Motivation does not now claim that any allegation in JTR's Verified Claim is untrue.  For this reason, alone, Motivation's Motion should be summarily rejected.

Motivation also argues that JTR should be sanctions for refusing to permit Motivation to inspect the Salvaged Material.  It is a mystery to JTR how MOTIVATION can make this argument in good faith when the Court, itself, ruled that Motivation was not entitled to inspect the Salvaged Material.  (D.E. 69; D.E. 76, at 47-49).

*As a legal matter*, Motivation has not identified, and JTR is unaware of, any decision of any court granting sanctions to a party that (i) was not, itself, sued (i.e., a defendant), or (ii) did

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

not have an opposing party assert one or more frivolous defenses (i.e., a plaintiff whose claim was wrongfully opposed).  Motivation voluntarily injected itself into this case, was told from day one that it had no factually or legally viable claim, and now concedes that its intervention claim had no merit.  MOTIVATION cannot possibly obtain sanctions for having wasting JTR's time. If anyone is entitled to sanctions, it is JTR.

With particular respect to Rule 11, (i) Motivation also did not comply with the "safe harbor" requirement of Rule 11(c)(2), which require that it provide twenty-one (21) days advance notice of the Motion for Sanctions, and (ii) Rule 11 is not available to remedy alleged discovery abuse, in any event.  Sanctions against a party also are not available pursuant to Rule 11 when that party is represented by counsel of record.[15]  The decisional law supporting these points is discussed at pages 14 through 17 of JTR's Response in Opposition to Motivation's motion to compel "sanctions discovery."  (D.E. 135).  Additionally, "[t]he standard for imposing sanctions under rule 11 is fairly high, and all ambiguities are resolved in favor of the party bringing suit.  *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985).  It should go without saying that courts do not impose sanctions lightly pursuant to Section 1927 or the court's inherent powers, either.  *See*, *e.g.*, *Indianapolis Colts v. Mayor of Baltimore*, 775 F.2d 177, 182 (7th Cir. 1985) ("Because of its penal nature, § 1927 must be strictly construed," and "[b]efore a court may assess fees under section 1927, the attorney must intentionally file or prosecute a claim that lacks a plausible legal or factual basis.")

In its Motion for Sanctions. Motivation's legal argument is based entirely upon a discussion of sanctions set forth in the United States Supreme Court in *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991), and consists of a lengthy block quote from the decision, without any

---

[15]   The law is the same pursuant to Section 1927.  *See*, *e.g.*, *1507 Corp. v Henderson*, 447 F2d 540 (7th Cir. 1971) (sanctions not available against a party pursuant to Section 1927).

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

effort to explain how that case provides any support, whatsoever, to Motivation's motion herein. (*See* D.E. 123, at 9-11).  In essence, Motivation's "legal argument" is simply that the court possesses the inherent authority to impose sanctions on a party that commits a fraud on the court. JTR readily agrees with that non-controversial statement of the law.  As discussed above, however, and in the various affidavits and other exhibits submitted by JTR, there is no fraud on the court in this case – other than the fraud being perpetrated by Motivation.

Lastly, Motivation's request for sanctions against JTR's out-of-state counsel, Mr. Silverstein, runs contrary to decisional law pursuant to Rule 11, Section 1927, and the court's "inherent power."  This issue is discussed in greater detail both (i) at paragraphs Nos. 104-117 of the Silverstein Affidavit and (ii) on pages 17-18 of JTR's Opposition to Motivation's Motion to Compel (D.E. 135).  Accordingly, rather than repeat the foregoing discussion herein, JTR respectfully refers to the Court to those other filings.

There are many other problems with Motivation's Motion for Sanctions.  As the Seventh Circuit observed in a similar circumstance, however, "[movants] have other arguments, but displaying them would do little more than illustrate why some members of the public believe that 'shyster' and 'lawyer' are synonyms."  *Kale v. Obuchowski*, 985 F.2d 360, 363 (7th Cir. 1993).

\*　　　\*　　　\*

To the extent that Motivation believes it has some right to "police" JTR's filing – even though Motivation now admits it has no legal interest in the *res*, Motivation is mistaken.  As the Delaware Chancery Court recently observed:

> Under the adversary, common law model of litigation that Delaware inherited from Great Britain at the time of the separation of the colonies, the Court does not conduct a "judicial investigation."  Rather, the parties have the obligation to develop and present their case.  The investigatory model is used in some foreign countries, most notably the civil law jurisdictions of Europe.

*Mehta v. Smurjit-Stone Container Corp.,* Del. Ch. C.A. No. 6891-VCL (Sept. 21, 2012).  The foregoing observation applies with equal force in this Court, which similarly derives its jurisprudence from the British common law tradition.

In the final analysis, Motivation's Motion for sanctions should not only be denied, but JTR should be awarded its attorneys' fees for being forced to defend Motivation's frivolous motion for sanctions.  *See*, *e.g.*, *Diamond Sawblades Manufacturers' Coalition v. United States*, 2010 Ct. Intl. Trade LEXIS 15, at *8-9 (U.S. Ct. Int'l Trade Feb. 12, 2010) ("the movant [for sanctions] is considered to be on notice that the court may award fees to either party"); Advisory Committee Note, 28 U.S.C. Appx. at 112 (stating that "service of a cross motion under Rule 11 should rarely be needed" because fees may be awarded to the party that prevails, regardless of whether they were the movant or the respondent"). *See also Indianapolis Colts v. Mayor of Baltimore*, 775 F.2d 177 (7th Cir. 1985) (awarding attorneys' fees to appellant that was forced to defend frivolous appeal of trial court's denial of sanctions).

### III.     CONCLUSION

WHEREFORE, JTR requests the Honorable Court deny the Motion for Sanctions, award JTR its attorney's fees and costs of defending the Motion, and grant any other and further relief the Court deems just and proper.

*(Certificate of Service and Service List follow)*

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 10, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CMECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

JANSSEN & SIRACUSA, P.A.
Co-Counsel for Plaintiff
120 South Olive Ave., Suite 504
West Palm Beach, FL 33401
Tel. (561) 420-0583
Fax (561) 420-0576
Email mlazarchick@jasilaw.com
Email jjanssen@jasilaw.com
Email jsiracusa@jasilaw.com

By:    s/ John M. Siracusa
      MELISSA D. LAZARCHICK
      Florida Bar No. 43696
      JOSEPH W. JANSSEN, III
      Florida Bar No. 160067
      JOHN M. SIRACUSA
      Florida Bar No. 0159670

*(Service List follows)*

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

*Service List:*

**Arthur Eugene Lewis , Jr.**
Lewis & White, P. L. C.
222 W. Georgia Street
PO Drawer 1050
Tallahassee, FL 32301-1050
850-425-5000
Fax: 850-425-5004
Email: lawlaw@polaris.net

**Marlow V. White , Jr.**
Lewis & White
222 W Georgia Street
PO Drawer 1050
Tallahassee, FL 32030-1050
850-425-5000
Fax: 425-5004
Email: lawlaw@polaris.net

**Jessica L. Martyn**
Troutman Sanders, LLP
150 W. Main Street
Suite 1600
Norfolk, VA 23510
757-687-7706
Email: jessica.martyn@troutmansanders.com

**John E. Holloway**
Troutman Sanders, LLP
150 W. Main Street
Suite 1600
Norfolk, VA 23510
786-687-7724
Email: john.holloway@troutmansanders.com

**Craig Patrick Liszt**
McAlpin Conroy, P.A.
80 SW 8th Street
Suite 2805
Miami, FL 33130
305-810-5400
Email: cliszt@mcalpinconroy.com

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

**Michael Edward Conroy**
McAlpin & Conroy PA
80 SW 8th Street
Suite 2805
Miami, FL 33130
305-810-5400
Fax: 810-5401
Email: mconroy@mcalpinconroy.com

1029060

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576