## AFFIDAVIT OF BRUCE L. SILVERSTEIN, ESQUIRE

**Bruce L. Silverstein**, being duly sworn according to law, does hereby depose and state as follows:

1.  My name is Bruce L. Silverstein, and I submit this affidavit in support of the opposition by JTR Enterprises LLC ("JTR") to the Motion for Sanctions filed by Motivation, Inc. ("Motivation") in Case No. 4:11-cv-10074-JLK, pending in the United Stated District Court for the Southern District of Florida (In Admiralty) (the "Admiralty Action"). I am an adult, of sound mind and body, and I make this affidavit based on my personal knowledge, except where I note that my knowledge is based on information obtained from others.

2.  I apologize in advance for the length if this Affidavit. Unfortunately, I have no other opportunity to defend myself against the defamatory allegations made about me, personally, by Motivation and its counsel in the Admiralty Action. Specifically, Motivation's Motion for Sanctions states that "Silverstein was an active and knowing participant" in a "fraudulent scheme." (D.E. 123 at Opening Paragraph and ¶ 21). Motivation also asserts in its Reply to JTR's Response to Motion to Compel Discovery that "Silverstein is an actor in the fraud and not a member of the audience." (D.E. 137, at 7). Accordingly, I not only submit this Affidavit in support of JTR's opposition to Motivation's Motion for Sanctions, but I also submit this Affidavit as my sole opportunity within the Admiralty Action to clear my name in response to the defamatory assertions made by Motivation and its counsel. Additionally, I respectfully submit that the assertions are "immaterial, impertinent, or scandalous matter" that should be stricken from Motivation's filings pursuant to Rule 12(f) of the federal rules of civil procedure.

## A.    **Personal Background**

3.      I am a legal resident of the State of Delaware, and I am a Partner with the law firm of Young Conaway Stargatt & Taylor, LLP ("YCST"), where I have spent my entire career as an attorney since graduating law school more than twenty-five years ago, in 1986.  I also am a member of the firm's Management Committee.  YCST employs more than 100 attorneys, and has its principal offices in Wilmington, Delaware, with other offices in Georgetown, Delaware and New York City.  I am a member in good standing of the Delaware Bar, and have been since my admission thereto in December of 1986.[1]  I also am admitted to, and am a member in good standing of, the bars of the United States Supreme Court, the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Fourth Circuit, and the United States District Court for the District of Delaware.  I also have been admitted *pro hac vice* in other courts.

4.      I graduated *cum laude* from Villanova Law School in 1986, where I was an Associate Editor of the Law Review and inducted into the *Order of the Coif*.  I have been appointed to serve as *Master in Chancery Pro Hac Vice* by the Chancellor of that Court (*see SICPA Holdings, S.A. v. Optical Coating Lab., Inc.*, 1996 Del. Ch. LEXIS 137 (Del. Ch. Oct. 10, 1996), and I have lectured with members of the Court of Chancery on litigation practice in that

---

[1]    Because I am Delaware counsel to JTR, Jay Miscovich ("Jay"), Steve Elchlepp, Jr. ("Steve"), and Scott Miscovich ("Scott"), I have not set forth herein information protected by the attorney/client privilege, except to the limited extent necessary to defend accusations in Motivation's Motion for Sanctions (and other filings) that I have, somehow, assisted JTR in fraudulent conduct – which disclosure is expressly excluded from the scope of the privilege pursuant to Rule 502(d)(4) of the Delaware Uniform Rules of Evidence, which is titled "Accusations against a lawyer," and provides, as follows: "There is no privilege under this rule: . . [a]s to communication necessary for a lawyer to defend in a legal proceeding an accusation that the lawyer assisted the client in criminal or fraudulent conduct."  To my knowledge, neither Florida law nor federal law has a similar provision.  Fortunately for the other lawyers who represent or have represented JTR, Jay, Scott or Steve, however, I am the only one who Motivation and its counsel have seen fit to accuse of assisting the client in fraudulent conduct.

Court, as well as various substantive issues arising under the Delaware General Corporation Law. I am a member of the American Bar Association and the Delaware State Bar Association, and I am a former Associate Member of the Delaware Board of Bar Examiners. I also am a member of the Board of Advisors of the University of Pennsylvania Institute for Law and Economics. I have been recognized by *The Best Lawyers in America* for Corporate and Commercial Law for the past six years, and I also have been ranked by *LawDragon* as one of the top 500 lawyers in the country.

5.     The primary concentration of my legal practice is in the field of corporate law, and I have counseled numerous clients and litigated numerous claims involving transactions involving many billions of dollars (per transaction or claim in many cases). As such, I have had the privilege and honor to work with, for, and against some of the finest lawyers and best businesspersons in the country (if not internationally). My legal advice in a transaction has never been found to have been flawed by any court, and I have rarely lost a litigation matter in which I was lead counsel.

6.     In more than twenty-five years of practice, I have never had a motion for attorneys' fees filed against me, and I have never been the subject of any sanctions. I believe that I have an impeccable reputation, and I am deeply offended by the claims of fraud that have been asserted against me by Motivation and its counsel. The assertions are baseless, reckless and defamatory, and I am in the process of investigating my avenues for judicial redress.

## B.     General Background of Emerald Case

7.     As the Court is aware, Jay Miscovich ("Jay") claims to have discovered tens of thousands of Colombian emeralds in International Waters in the Gulf of Mexico within 3,000 yards of a point located at coordinates 24°57.79" North Latitude and 81°55.54" West Longitude (the "Discovery Site"). As I understand matters, Jay first came across the Discovery Site in

January of 2010, and Jay and Steve Elchlepp, Jr. ("Steve") salvaged tens of thousands of Colombian emeralds from the Discovery Site during numerous dives conducted over the course of the year that followed.

8.    I have no personal knowledge of how Jay first came across the Discovery Site, as I had never met, or even heard of, Jay or Steve until January of 2011. I do, however, have personal knowledge that Jay and Steve, along with David P. Horan, Esquire, recovered numerous emeralds from the Discovery Site at various times in 2011, including one occasion in which I traveled with them to the Discovery Site, along with a crew of persons from CBS News and 60 MINUTES, and witnessed Steve and David Horan dive into the water and come up with a number of emeralds. More recently, I was told by JTR's current lead counsel, John Siracusa, Esquire, that he also visited the Discovery Site with Steve, and that Mr. Siracusa personally discovered and salvaged a number of emeralds.

9.    Despite my lack of personal knowledge of how Jay first came across the Discovery Site, I have come to believe that Jay has, in fact, made an amazing discovery. My belief is informed by, among other things, the fact that various researchers from CBS News investigated the discovery for more than a year (beginning in February, 2011) and ultimately prepared a segment for 60 MINUTES, which was broadcast in April, 2012, and which was a positive story about the discovery and not a story about a fraud or a hoax (as Motivation claims to be the case). I have no doubt that 60 MINUTES would have prepared a far different segment than the one that was broadcast if CBS News believed Jay had fabricated the story of his discovery. Indeed, I was told as much by the CBS News personnel working on the story.[2]

---

[2]    By stating that I have come to believe that Jay has, in fact, made an amazing discovery, I do not mean to suggest that I have no knowledge of any privileged information from which someone might attempt to make a contrary argument. I do, however, mean to state, under oath, that I honestly believe Jay has made an amazing discovery, and that Motivation's claims that JTR is,

10.     Additionally, since January of 2011, more than ten attorneys at my firm and at two other firms (in Hawaii and Massachusetts) have reviewed thousands of pages of source documents, conducted numerous interviews, and performed substantial research, and we have been unable to uncover any evidence that caused us to believe that Jay has fabricated the story of his discovery of the emeralds.  Nor did the numerous attorneys representing the New York Investors ever assert such a claim.  Again, however, I have to state that I lack personal knowledge of how Jay first came across the Discovery Site, as I did not know Jay at that time, and I certainly was not with him when he made the discovery.

11.     Among the documents I personally have reviewed are (i) correspondence and photographs from a review of the emeralds by Jeff Post, the Curator of the National Gem and Mineral Collection at the Smithsonian Institution (the "Smithsonian"), with whom I also spoke by telephone to confirm the information in the correspondence, (ii) numerous "appraisals" from a laboratory in New York City, which reflect the opinion of the appraiser (who I later interviewed in person) that a group of less than 25 of the tens of thousands of emeralds in Jay's possession have an estimated retail value in excess of $100,000, plus some specimens that the appraiser found too rare to value, and (iii) numerous e-mails between and among a group of former potential investors (the "New York Investors") discussing their views of the emeralds.  I also have spoken extensively with the investigators from CBS News who prepared the 60 MINUTES segment featuring Jay and his discovery, and I have witnessed an examination of the emeralds by various experts – including (i) the owner of a Colombian emerald mine, (ii) an internationally

---

somehow, committing a fraud on the Court are unfounded. My belief is informed, in large part, by the non-privileged information I discuss herein. If knew that JTR was committing a fraud on the court (as alleged by Motivation), I would take actions consistent with Rule 3.3 of the Delaware Lawyer's Rules of Professional Conduct – titled "Candor toward the tribunal" – and I would not be submitting an affidavit such as this.

respected gem expert who has written a book about colored gemstones, (iii) a senior gemologist at Sotheby's, and (iv) an appraiser trained by the Gemological Institute of America (the "GIA") – all of whom have confirmed to me that the emeralds were mined in Colombia and include specimens that have substantial value. Indeed, I have been told by each of these individuals that some of the specimens are "museum quality." Additionally, I understand that Jeff Post was interested in a display featuring some of the emeralds at the Smithsonian. As one of the New York Investors wrote in an e-mail after meeting with Mr. Post on July 13, 2010:

> Just leaving Washington and the Smithsonian. It was a home run! Jeff Post who is the curator asked for a 5 year loan of a pile of emeralds for a major display near the Hope Diamond. he wants a permanent contribution as well. He said and I quote, "this has been a once in a lifetime experience for me". This guy has seen everything.
>
> There was one batch of the 5-30 carat emeralds that he knew had come from the Muzo mine but said that he had never seen before and thought that they could be the most rare type of emeralds he had ever seen. We have 20,000 of those emeralds. Jeff Post said that it is quite likely that those emeralds were specific to Columbia and were some of the first to come out of the mine. He again said, I don't believe the Smithsonian has ever seen this type before.
>
> Anyway, we were all taken aback at the enthusiasm. Jeff is taking this to the head of the entire Smithsonian, undersecretary position.

(E-mail from D. Barr to B. Toppe, dated July 13, 2010) (**Exhibit A** hereto). (*See also* e-mail from D. Barr to J. Post, dated July 13, 2010) (forwarding four color photos of Jeff Post examining the emeralds) (**Exhibit B** hereto).

12. At or following that meeting at the Smithsonian, Mr. Post asked Jay to provide additional samples of emeralds from the Discovery Site, which Mr. Post asked to be kept in sea water and sent that way to the Smithsonian for further analysis. Jay complied with this request, and sent the requested material to the Smithsonian on August 16, 2010. In a cover letter to Mr. Post, Jay wrote as follows:

> IT WAS WONDERFUL MEETING WITH YOU AND YOUR STAFF! AS PER OUR CONVERSATION, ENCLOSED FIND 36 ROUGH EMERALDS, 18 CLEANED AND 18 UNCLEANED. . . . THE 18 UNCLEANED EMERALDS ARE ALL IN THE WATER SPECIMEN JAR WITH SAND, SHELLS, PLANT LIFE ETC. I MADE EVERY ATTEMPT TO COLLECT WITH PROPER SCIENTIFIC TECHNIQUE ... SO NONE WERE TOUCHED WITH HUMAN HANDS OR CONTAMINATED IN ANY WAY. [THEY WERE NOT WEIGHED SO NOT TO CONTAMINATE, BUT I SELECTED ALL OF VERY SIMILAR SIZE, STRUCTURE, PYRITE CONTENT, SHAPE, COLOR AND OPACITY COMPARED WITH THE CLEANED CONTROL GROUP.] I AM VERY PLEASED TO DONATE THESE FINE SPECIMENS IN THE HOPE THAT THEY CONTRIBUTE IN A SMALL WAY TO OUR KNOWLEDGE OF PAST NATURAL HISTORY!!

(Letter from J. Miscovich to J. Post, dated August 11, 2010) (**Exhibit C** hereto).

13.     After Jeff Post examined the "uncleaned" emeralds Jay had provided, Mr. Post

sent the following e-mail to one of the New York Investors:

> Dean, I had a chance yesterday to look a[t] a couple of the uncleaned emerald crystals on the analytical scanning electron microscope, and I attached a couple of images. The images show fine-grained mineral "debris" in cracks and crevices in the surface of the emerald crystal. Not surprisingly most of these grains are calcite, halite, quartz, etc., minerals common in marine sediments. The images were taken using a back-scattered electron detector, meaning minerals with heavier elements will appear brighter than those composed mostly of lighter elements. You will notice that in the center of image 002 there is a very bright (white) grain, which is clearly composed of heavy elements. Interestingly, the grain is gold with minor amounts of silver and copper. As I looked around on the crystal, I found numerous similarly bright grains, and all were gold with some amounts of copper and silver (e.g. see two small bright grains in image 003). So where is the gold from? I did not clean or prepare the sample in any way before putting it into the microscope, so I do not see how it could be contamination. As the gold grains (they are very small, ~1-6 microns in size) are always associated with fine-grained mineral grains filling in the cracks in the crystal and are not actually attached to or in the emerald crystal, I assume they must be in the sediments in which the emeralds are buried. Ocean sediments typically do not contain gold grains. Perhaps in the vicinity of the emeralds there are or were gold coins or other objects that have been slightly abraded by

being rolled around in the sand and sediments, and this causes tiny grains of gold to be removed and mixed into the sediments. Obviously gold is soft, and the 1-6 micron grain size is consistent with what might expect from an abrasive or erosional process.

This might not be all that exciting to you, but I certainly wasn't expecting to find tiny gold flecks on these emeralds. Their presence seems consistent with the idea that these emeralds were on the seafloor associated with gold objects for some period of time. There might be other and better explanations, but I haven't thought of them yet. These are only preliminary results and I need to look at more crystals (and associated sediment) and do more thinking, but I wanted to let you know I found so far.

(E-mail from J. Post to D. Barr, dated Sept. 9, 2010) (**Exhibit D** hereto).

14.   A few weeks later, a rift developed between Jay and the New York Investors, which resulted in a "freeze" being placed on the safe deposit box in New York City in which the emeralds were being kept, and the New York Investors claiming the right to determine the best manner for seeking to obtain legal title to the emeralds.

## C.   The Delaware Litigation

15.   I was first contacted to represent Jay and Steve on January 18 or 19, 2011. The contact came from Mark Davis, Esquire.[3] Mr. Davis asked if I would be willing to represent Jay, Steve, and Jay's brother, Scott Miscovich ("Scott"), in a lawsuit the New York Investors had commenced in the Delaware Court of Chancery (the "Delaware Litigation").

---

[3]   Mark Davis is based in Hawaii, and has been recognized as one of the best trial lawyers in Hawaii and in the United States. Mr. Davis is listed in The Best Lawyers in America and was elected to membership by his peers in The American College of Trial Lawyers, The International Academy of Trial Lawyers, The International Society of Barristers, and The American Board of Trial Advocates. Mr. Davis also is one of only 100 lawyers in America who is a member of The Inner Circle of Advocates, and he is a twenty-year member of The Board of Governors of The American Association for Justice. For more information about Mr. Davis and the nature of his legal practice, *see* http://www.davislevin.com/markdavis.html. I have kept Mr. Davis apprised of all filings and all material developments and communications in the Admiralty Action (as defined later herein), and he has continued to provide legal advice and counsel to Jay, Scott and Steve in connection with their efforts to secure title and/or a liberal salvage award respecting the emerald discovery.

16. When I first learned that the litigation involved a discovery of thousands of emeralds in international waters, I was extremely skeptical. If the claims asserted against Jay, Steve, and Scott had been that they had misled the New York Investors into believing Jay had discovered a sunken treasure, I wouldn't have touched the case with a ten foot pole. Instead, however, the claim asserted by the New York Investors was that Jay had, in fact, discovered a fortune in emeralds, and that Jay had wrongfully refused to cede control over the treasure to the New York Investors – who claimed to have a superior plan for how to obtain title to and monetize Jay's discovery. The New York Investors and their counsel claimed that Jay's emeralds were of historical significance and of extraordinary value. Values for the "discovery" (once fully developed and properly marketed) were bandied about in the hundreds of millions of dollars, and possibly exceeding a half a billion dollars or more. Inasmuch as the plaintiffs were wealthy, sophisticated business persons, represented by high-priced New York counsel, it appeared that there may well be something worth fighting over, and I decided it was worth taking on the case on a contingent-fee basis – as Jay, Steve and Scott lacked the funds to pay for their defense. As Mark Davis was then fond of saying, Jay, Steve and Scott were "emerald rich, and cash poor."

17. The Delaware Litigation began with the New York Investors seeking a "Status Quo Order" – which is akin to a Temporary Restraining Order. Specifically, the New York Investors asked the Court of Chancery to enter an Order that would preclude Jay from exercising *de facto* control over the emeralds and/or conducting further salvage activity at the Discovery Site. In support of their motion for emergency relief, the New York Investors submitted a number of affidavits that made a number of scurrilous accusations about Jay, Scott and Steve. After a team of lawyers on our side interviewed Jay, Scott and Steve, poured through hundreds

of e-mails and other documentary evidence, and spoke with some other non-party witnesses, we prepared counter-affidavits for Jay and Scott, as well as Paul Sullivan ("Paul"), a friend and neighbor of Scott's, who had a long-standing relationship with Mark Davis, and who was serving as an unofficial "advisor" to Jay, Steve and Scott in their efforts to determine, among other things, (i) the origin of the emeralds, (ii) the best manner of obtaining title to the emeralds, and (iii) the best manner of protecting Jay, Steve and Scott from the "sharks" that tend to swarm when treasure is found.[4]

18.     As we stated in the Preliminary Statement to our brief in the Delaware Litigation:

> [REDACTED]  With the help of Jay's brother, Scott Miscovich
> ("Scott"), and friend, Stephen Elchlepp, Jr. ("Steve"), Jay is in the
> process of developing plans to use his discovery for significant
> philanthropic purposes.  If Jay, Scott and Steve are successful in
> their endeavors, their story [REDACTED] will show them to be
> honest, moral, hard-working individuals who do not remotely
> resemble the portrait painted by the reckless and slanderous
> allegations in Plaintiffs' pleadings.

Brief of Defendant Jay Miscovich in Opposition to Plaintiffs' Motions for Status Quo Order and Expedited Proceedings, at 2 (Jan. 31, 2011), filed in *AZALP LLC v. Miscovich*, Del. Ch., C.A. No. 6138-VCL (redacted copy attached hereto as **Exhibit F**).[5]

---

[4]     As set forth in an Affidavit filed in the Court of Chancery, Mr. Sullivan has been involved in government affairs and national politics since 1972, including service as (i) executive director of the Democratic National Committee, (ii) deputy administrator of the United States Small Business Administration, (iii) national campaign manager for George McGovern's presidential campaign, (iv) deputy campaign manager for President Clinton, and (v) deputy political director in the Office of the President-Elect, during which Mr. Sullivan was responsible for helping select and vet nominees for senior government positions including the U.S. State Department.  Mr. Sullivan also served in a variety of roles involving domestic public relations and international diplomatic relations, including assisting the United States Government to help in the rebuilding of Kuwait after the first Gulf War.  Additional information about Mr. Sullivan's background is set forth in his Affidavit in the Delaware Litigation, a redacted copy of which is attached hereto as **Exhibit E**.

[5]     An unredacted copy of the brief was filed "Under Seal" with the Court of Chancery, and can be submitted to other courts only pursuant to a Court Order compelling its production.

19.     Among other things, the New York Investors based their claims on information supplied in an affidavit by Gerry Edwards, a convicted felon, who had an axe to grind with Jay and Steve. *See* Criminal Record of Gerry Edwards (**Exhibit G** hereto).  Notably, Mr. Edwards also is one of Motivation's affiants in the Admiralty Action.

20.     Another convicted felon who has provided an affidavit to Motivation is Scott Wilding, a securities promoter who (i) has been found guilty of violating the federal securities laws, (ii) has been charged with multiple criminal offenses, (iii) was convicted of at least one felony, (iv) has a record of incarceration in the State of Florida, (v) has had a federal tax lien imposed on his real property, and who has been accused of various other improprieties.  *See* Public Records Information Obtained by John Siracusa, Esquire (**Exhibit H** hereto); *In the Matter of Research Investment Group, Inc., Scott Wilding, et al.*, File No. 3-11307 (S.E.C. Admin.   Proceeding   Feb.   17,   2004)   (Order)   (reproduced   at http://www.sec.gov/litigation/admin/33-8387.htm).

21.     Finally, to round out the trio of felons working to deny Jay his treasure, I understand that another source of information to both the New York Investors and Motivation is Edward Krajewski, a friend of Gerry Edwards, and another convicted felon.  *See* S. Ritea, "Former Officer Found Guilty of 14 Charges Edward Krejewski Was Convicted of Conspiracy to Rob a Philadelphia Drug Dealer to Pay for a Treasure Hunt" (Oct. 10, 1996), reproduced at http://articles.philly.com/1996-10-10/news/25664878_1_treasure-hunt-police-force-philadelphia-drug-dealer.

22.     After conducting a hearing, the Court of Chancery (i) declined to grant the relief requested by the New York Investors, and (ii) determined to hold a trial within 90 days on the merits of the "control contest."   Thereafter, the parties began to engage in discovery, which

included the disclosure of the location of emeralds held by the various parties and inspections and inventories conducted by a Court-appointed Special Master.

**D.** **CBS News Enters the Picture**

23.     On February 19, 2011, Armen Keteyian, the Chief Investigative Correspondent of CBS News, showed up at Jay's home with Len Tepper, the Chief of Investigative Projects for CBS News, and attempted to interview Jay about the Delaware Litigation. Jay called me for advice on how to handle the situation, and I spoke with Messrs. Keteyian and Tepper over the telephone. I explained that the litigation was at a sensitive stage and that the emerald discovery was equally sensitive, and Messrs. Keteyian and Tepper agreed to hold off on publicizing the limited information they already had in consideration with our agreeing to meet with them at their offices in New York City to discuss the possibility of moving forward with CBS News on an exclusive basis.

24.     Following the initial contact by CBS News, and after Messrs. Keteyian and Tepper learned more about Jay's discovery, their interest in the Delaware Litigation waned, and they became more interested in investigating and reporting on Jay's emerald discovery. Additionally, Len Tepper took the story of Jay's discovery to 60 MINUTES, which expressed interest in the story. Accordingly, our meeting in New York was changed to a meeting with Bill Owens, the Executive Director of 60 MINUTES.

25.     Paul Sullivan and I met with Len Tepper and Bill Owens in New York City on February 22, 2011. At that meeting, Mr. Owens expressed interest in having 60 MINUTES investigate and produce a segment respecting Jay and his discovery, and I thereafter negotiated an agreement with the Deputy General Counsel of CBS Broadcasting, which provided CBS News with broad access to Jay and the discovery, subject to an obligation by CBS to maintain

the story in confidence until sometime after an admiralty claim could be filed and the Discovery Site could be secured.

26.     Thereafter, CBS News and 60 MINUTES launched an extensive joint investigation, which lasted for more than a year.  In that time, CBS News and 60 MINUTES were provided virtually unrestricted access to Jay and Steve.  I understand from CBS News and 60 MINUTES that they also contacted and interviewed numerous people, but they did not discuss the details of their investigation with me.

27.     Significantly, the materials submitted by Motivation in support of its Motion for Sanctions includes a short affidavit of Scott Wilding – a convicted felon and stock promoter who the SEC has found guilty of violating the federal securities laws – in which Mr. Wilding claims that Jay met with Mr. Wilding in June or July of 2010 and that Jay allegedly told Mr. Wilding that "CBS news program 60 Minutes was going to do a story on this discovery and that 'I better get in now.'"  (D.E. 123-3, at ¶ 5).  I believe that Mr. Wilding is making this up.  I say this both because (i) Jay has denied that he ever made such statement to Mr. Wilding, and (ii) as discussed herein, CBS News first contacted Jay on February 19, 2011, and 60 MINUTES did not become involved until February 22, 2011, which is the day Paul, Ben and I met with the Bill Owens in New York City.  Thus, Mr. Wilding goes too far in seeking to guild the lily to make his story sound credible and fit with Motivation's conspiracy theory.  The trouble with Mr. Wilding's story, however, is that 60 MINUTES was not in the picture until more than six months after Mr. Wilding says he spoke with Jay.

**E.     Settlement of the Delaware Litigation and Decision to Pursue an Admiralty Claim**

28.     The parties to the Delaware Litigation reached agreement to settle the matter on March 29, 2011.  The agreement was reached near midnight, following an all-day mediation session in New York City, which was facilitated by a former United States District Court Judge.

It was the second such mediation session in which the parties participated. Pursuant to the settlement – which was subject to the approval of the Court of Chancery – the New York Investors both (i) abandoned their claims to control the disposition of the emeralds, and (ii) confirmed that Jay had exclusive control over that issue

29.     Thereafter, the Court of Chancery directed that Notice of the proposed settlement be provided to various non-parties having a potential interest in the dispute, and scheduled a hearing to consider the settlement on August 9, 2011 – which was later continued to August 19, 2011 on account of the Judge's lack of availability resulting from a scheduling conflict.

30.     In the months between the agreement to settle the Delaware Litigation was reached and the hearing on the proposed settlement was held, Jay formulated a plan of action for seeking to obtain title to his discovery. Jay was assisted in this planning by a number of legal and business advisors, as well as by friends and family. Among the legal advisors who worked with Jay during between March and August of 2011 was David P. Horan, who had called Jay in February, 2011, after learning of Jay's discovery, and volunteered his services on a contingent fee basis.[6] After substantial deliberation, the plan of action that ultimately was adopted was to wait for the Court of Chancery to approve the settlement, and then promptly commence an admiralty proceeding in the United States District Court in the Southern District of Florida. While various other alternatives were explored and considered throughout the summer, none appeared superior to allowing the United States Justice System to sort out the ownership issue.[7]

---

[6]     After being contacted by David Horan, Jay asked us to interview David to serve as admiralty counsel. Thereafter, David Horan was formally engaged on a contingency-fee basis, pursuant to a written agreement, dated March 15, 2011.

[7]     At one point, with the assistance of Paul Sullivan, Jay explored the potential of coordinating an Admiralty filing with a consensual intervention by Colombia. Depending on the outcome of the Admiralty action, and the ultimate determination of the history and value of the emeralds, it is still a possibility that JTR will pursue some form of charitable venture involving Colombia –

31.     Jay would have preferred to commence the Admiralty proceeding sooner, but the New York Investors were claiming (incorrectly we contended) that Jay had legally assigned, transferred and relinquished whatever personal rights he had to assert a claim to the discovery to an entity formed by the New York Investors, which they claimed to control.  Moreover, the New York Investors had engaged admiralty lawyers to provide extensive analysis of the legal issues associated with seeking an award of title respecting Jay's discovery, and the New York Investors were against filing an Admiralty claim in United States District Court, and favored taking Jay's discovery off-shore.  Accordingly, unless and until the Delaware Litigation was finally resolved, Jay's filing of an Admiralty claim risked liability to the New York Investors.

## F.     The "Ken Rose" Agreement / The "Kirby Site"

32.     Needless to say, Jay and Steve were fairly restless waiting to learn whether the Court of Chancery would approve the proposed settlement of the Delaware Litigation. Accordingly, it was important for them to find something productive to do in the interim.  While it would have been optimal if Jay and Steve could have spent the bulk of that time working at the Discovery Site, there was substantial concern that repeated visits to the Discovery Site might draw attention to its location.  Because Jay was not yet in a position to commence an Admiralty action, and secure an injunction against other divers working the Discovery Site, it was determined that it would be best for Jay and Steve to work at a dive site other than the Discovery Site.  In that connection, two different locations were considered: (i) the "Kirby Site" (also known as the "Ken Rose Concession") – which had a number of wrecks, including a civil war era wreck that was of interest to Jay and Steve, and (ii) the Jupiter Inlet Site – where David Horan had good relations with the salvers-in-possession.  Ultimately, the Kirby Sight was

---

especially the Muzo district, which is relatively impoverished and where many of the residents are in need of assistance.

selected as the better choice, and I was tasked with negotiating an agreement with Ken Rose and his counsel.

33.     In June of 2011, I personally negotiated the agreement that would permit Jay and Steve (through an entity named "J&S Keys") to work at the Kirby Site.   The Agreement (i) authorized Jay and Steve to conduct exploratory work at the Kirby Site, (ii) provided for a 50/50 split with the Kirby Group of anything found through their efforts, and (iii) provided the Kirby Group with "Observation Rights."   (A copy of the Agreement is attached hereto as **Exhibit I**).

### G.     Visit to Sotheby's

34.     On June 8, 2011, I attended a meeting at Sotheby's offices in New York City. Also in attendance at the meeting were Ben Kincannon (a public relations professional), Sotheby's President, a senior in-house gemologist, and an in-house lawyer.   Mr. Kincannon showed the individuals from Sotheby's a small sampling of the emeralds, and the Sotheby's gemologist expressed the opinion that just one of the various emeralds Mr. Kincannon had brought to the meeting had an auction value of forty thousand dollars ($40,000.00).   Notably, this same emerald previously had been appraised by the laboratory in New York City at less than twenty-five thousand ($25,000.00).

### H.     Second Thoughts & Last-Minute Butterflies

35.     On Sunday, August 14, 2011, with the settlement hearing before the Court of Chancery scheduled for that coming Friday, a final decision was made to commence an action in the United States District Court promptly following the approval of the settlement.

36.     Sometime in the following few days, Jay was advised that he should take the Recovered Material to a foreign country, and seek the aid of that country to obtain title (*i.e.*, the same strategy that had been explored by the New York Investors).   I disagreed with this new

advice, encouraged Jay to "steer the course that was set prior to the settlement hearing in Delaware" and proceed with an Admiralty Court filing promptly following approval of the settlement of the Delaware Litigation, and said that I would not continue to devote any further legal assistance with the matter beyond any "clean up work" needed to help comply with the settlement of the Delaware Litigation if Jay did not proceed with an Admiralty action. (E-mail from B. Silverstein to J. Miscovich, dated August 21, 2011) (**Exhibit J** hereto).

37.    After considering his options, Jay reaffirmed his prior decision to put his faith in the United States Justice System and proceed with an Admiralty filing in district court.

## I.    The Formation of JTR

38.    On August 25, 2011, Jay, Scott and Steve formally contributed, assigned, and transferred all right, title and interest they may possess regarding the emeralds and other items discovered at the Discovery Site, including but not limited to their knowledge of the GPS coordinates of the Discovery Site, all items Jay, Steve and others working with or for them have salvaged from the site and all items they may salvage in the future to JTR, with the understanding that JTR would, shortly thereafter, commence an Admiralty action, seeking an award of title and/or a liberal salvage award respecting the emeralds and other items discovered at and salvaged from the Discovery Site.

## J.    The Admiralty Action

### 1.    JTR's Verified Claim

39.    On September 6, 2011, JTR filed a Verified Complaint for Maritime Salvage in the United States District Court for the Southern District of Florida (in Admiralty), seeking an award of title or a liberal salvage award respecting certain emeralds, amethysts and quartz crystals that JTR's Managing member, Jay Miscovich, discovered in International Waters in the Gulf of Mexico (the "Salvaged Material"). (D.E. 1).  JTR's Verified Complaint in the Admiralty

Action makes no assertion respecting the origin, quality or value of the Salvaged Material – all of which are issues JTR has been investigating and continues to investigate. Rather, the Verified Claim alleges only that (i) Jay discovered the Salvaged Material at the Discovery Site, (ii) the Salvaged Material was salvaged from the Discovery Site, and (iii) the Salvaged Material consists of emeralds, amethysts, and quartz crystals. (*See generally* D.E. 1).

40.     On September 9, 2011, David Horan traveled to the Discovery Site with Steve Elchlepp, Jr. After returning to shore, David reported that he personally dove the site and salvaged some emeralds, which were added to the collection for which JTR is seeking an award of title. This gave me great comfort, as I lacked personal knowledge of the Discovery Site, and I was pleased that David Horan had provided first-hand verification that he had salvaged emeralds from the Discovery Site. I know that Paul Sullivan, and even Scott Miscovich, also were pleased – as neither of them had ever visited the Discovery Site, either.

### 2.     Motivation's Competing Claim

41.     As is typical of the modern press, which is quick to publish sensational news without conducting appropriate investigation, the Key West Citizen published an article on October 9, 2011, which begins with the following sentence: "If you lost a cache of Colombian gems worth a reported half-billion dollars in shallow waters about 30 miles off Key West, now is the time to claim it." (A. Linhardt, "Filing seeks sole ownership of treasure," Key West Citizen (Oct. 9, 2011), reproduced at http://keysnews.com/node/35094). To the best of my knowledge, neither JTR nor anyone authorized to speak for JTR provided this putative valuation to the Key West Citizen. Certainly, there is no such value asserted in JTR's Verified Complaint.

42.     Relying on the Key West Citizen (and not the content of JTR's Verified Pleading), Motivation injected itself into JTR's Admiralty proceedings by filing a Verified Statement of Right and Interest and Claim on October 16, 2011. (D.E. 10). In that pleading,

Motivation alleged that the emeralds Jay had discovered were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site. (D.E. 10 at ¶ 15). This claims seemed preposterous inasmuch as the Discovery Site is 40 miles from the wreck-site of *Atocha* and 30 miles from the outer-most bound of the debris trail from the *Atocha*. Moreover, I understand that the prevailing currents would have been in the opposite direction that Motivation alleged the barrel had floated. Of even greater significance, the sole legal support for Motivation's claim was a 1976 Order of this Court, which had been modified on appeal by the Fifth Circuit in a manner that contradicted Motivation's claim that it owned the *Atocha* and its cargo wherever it might be found. (D.E. 10 at ¶ 8). *See also Treasure Salvors, Inc. v. Unidentified Wreck & Abandoned Sailing Vessel*, 569 F.2d 330, 335-36 (5th Cir. 1978) ("*Treasure Salvors I*") ("In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation."); *Treasure Salvors, Inc. v. Unidentified Wreck & Abandoned Sailing Vessel*, 640 F.2d 560, 569 n.6 (5th Cir. 1981) ("[W]e think it impossible to understand *Treasure Salvors I* as saying anything other than that we disapproved the district court's determination that Treasure Salvors had title to the *Atocha* and modified the judgment accordingly to omit any such decree."). As such, even if the emeralds at the Discovery Site had once been cargo on the *Atocha*, Motivation still would lack any legally viable claim to them.

### 3. JTR's Efforts to Persuade Motivation to Voluntarily Withdraw its Claim

43. Within days of the filing of Motivation's competing claim to the emeralds, David Horan wrote a letter to Motivation's counsel encouraging the voluntary withdrawal of Motivation's claim. In his letter, Mr. Horan explained that the emeralds subject to JTR's Admiralty claim "have nothing whatsoever to do with *Atocha/Margarita*." (D.E. 123-1, at 2).

Among other things, Mr. Horan also wrote that Motivation's failure to withdraw its baseless claim will force JTR "to spend considerable costs/fees defending what the Court will find is bad faith litigation." (*Id.*).

44. The next day, Motivation's counsel wrote back, and essentially conceded that they lacked a well-founded factual basis for Motivation's Verified Claim, but that Motivation had directed them to file the Verified Claim to avoid criticism by Motivation's investors. As Motivation's counsel explained, "Motivation needed to file a protective claim . . . to be safe from a charge of neglect by investors; then we could get with you and resolve any due diligence concerns." (D.E. 123-1, at 3). In other words, Motivation directed its counsel to file first, and figure out if they had a claim later.

45. In an effort to soften the blow of Motivation's having asserted the only claim that would preclude JTR from otherwise obtaining a prompt judgment in its favor in the Admiralty Action (based on an absence of any opposition), and as a prelude to a conversation that would later occur with Kim and Sean Fisher (and which is discussed more fully in the Affidavit of Paul Sullivan), Motivation's counsel volunteered that "should Motivation prevail in its claim, JTR Enterprises would be entitled to a substantial salvage award and, if that were the result, it might be a better solution than your current position." (*Id.* at 4).

46. The next day, David Horan wrote again to Motivation's counsel. Mr. Horan began the letter as follows:

> Your October 20th letter was somewhat disappointing in a number of respects. First, I can only compare the Motivation claim to a fishing expedition. Your idea about the Fishers "speculation about whether the stones are, or are not, possibly related to the Atocha or (less likely) the Margarita" is precisely the reason that I sent my October 19th letter. Essentially, you are asking that my clients allow Motivation to challenge our extensive work on the emeralds. Simply put, you and I know that nobody should be able to file a

> <u>Verified</u> claim in order to determine if there is any chance such a
> claim exists.

(D.E. 123-1, at 5) (emphasis in original).

47.     Mr. Horan went on to explain, once again, how the emeralds did not, and could

not have, come from the *Atocha* or *Margarita*, and repeated his entreaty that Motivation should

promptly withdraw its factually and legally unsupported claim. Additionally, Mr. Horan wrote:

> In conclusion, if you have <u>anything</u> to justify the Verified Claim of
> Motivation other than the fact that some Colombian emeralds have
> been recovered from within a 5,000 square mile area of the *Atocha*
> injunctive area, we need to discuss it. If that is all you have, then
> there will be little we can agree on while the Motivation claim
> remains pending.

(*Id.* at 6) (emphasis in original).

48.     Over the next couple weeks, counsel and representatives of JTR and Motivation

engaged in settlement discussions pertaining to the circumstances under which Motivation would

agree to voluntarily dismiss its claim.     Apparently believing that these settlement

communications are admissible despite the provisions of Rule 408 of the Federal Rules of

Evidence, Motivation attached certain of these settlement communications as exhibits to its

Motion for Sanctions. (*See* D.E. 123-1, at 7-18). In the interests of providing a complete record,

and because Motivation has "opened the door" to doing so, I discuss herein other such

communications between and among the parties, and I attach certain of these communications as

Exhibits hereto.

49.     Despite Motivation's attachment of various settlement communications to

Motivation's Motion for Sanctions, Motivation's papers are conspicuously silent about what

occurred during a teleconference involving, among others, Paul Sullivan, Kim Fisher and Sean

Fisher. A summary of one of these teleconferences is set out in the Affidavit of Paul Sullivan,

which is being submitted in opposition to Motivation's Motion for Sanctions. As set forth more

fully in Mr. Sullivan's affidavit, during those conversations, Kim Fisher or Sean Fisher twice advocated that JTR simply declare that the emeralds came from the *Atocha* so that Motivation and JTR could then jointly sell the emeralds as *Atocha* treasure.  This suggestion by the Fishers is consistent with their counsel's prior statement that "should Motivation prevail in its claim, JTR Enterprises would be entitled to a substantial salvage award and, if that were the result, it might be a better solution than your current position."  (D.E. 123-1, at 4).

50.     On November 21, 2011, Duncan Mathewson, a marine archeologist who was working with JTR, reported to Jay and others that his research "under cuts [Motivation's] current present position concerning the credibility of their belief that the emeralds came from [the Margarita] site," and that "[t]he case being made for connecting the emeralds with the *Atocha* is even less plausible."  (E-mail from Duncan Mathewson to Jay Miscovich and others, dated November 21, 2011, at 1:12 am) (**Exhibit K** hereto).  Mr. Mathewson's e-mail provided details underlying his conclusions, and is entirely consistent with what JTR had been telling Motivation since Motivation first entered the picture in order to protect itself from potential investor ire, and without having investigated the acts or law pertaining to its claim.

### 4.     JTR Moves to Dismiss Motivation's Claim and for a Stay of Discovery Pending Resolution of the Dismissal Motion

51.     On December 1, 2011, having failed to prevail upon Motivation to either withdraw its claim altogether, or at least agree to a process for an alternative dispute resolution, JTR moved for judgment on the pleadings and/or to dismiss Motivation's claim.

52.     Lacking any basis to respond to JTR's dismissal motion, Motivation insisted that it be permitted to inspect the emeralds held by JTR in safe deposit boxes in Key West before responding to JTR's dismissal motion.  Under settled law, however, a claimant has no right to engage in discovery in search of a cause of action.  (*See* D.E. 50, at 3-4) (citing cases).

### 5. JTR Volunteers to Allow Motivation to Inspect the Emeralds if Motivation Will Identify the Criteria for the Inspection

53.     Despite Motivation's lack of entitlement to conduct any discovery pending resolution of JTR's dismissal motion, JTR volunteered to allow Motivation to inspect the emeralds if Motivation would first identify the criteria it would use to determine whether the emeralds had come from the *Atocha*. JTR made clear, however, that it would not voluntarily permit such an inspection without Motivation first disclosing the criteria it would use for the inspection. As David Horan explained to Motivation's counsel:

> Unless there is some indication that my client can agree on as to what criteria will satisfy Motivations inquiry as to whether the verified claim would be withdrawn there is no agreement to inspect prior to the court ruling on the pending motion to dismiss/ [judgment on the pleadings].

(E-mail from D. Horan to G. Lewis, dated December 15, 2011) (**Exhibit L** hereto)

54.     Motivation refused to identify the criteria it would use for the requested inspection. Accordingly, JTR stood in its legal rights to refuse the requested inspection pending resolution of JTR's motion for judgment on the pleadings, and JTR moved for a formal stay of discovery. (D.E. 50).

### 6. The Court Schedules a Hearing to Determine Whether Motivation Should Be Permitted to Inspect the Emeralds

55.     On December 28, 2011, the Court entered an Order, establishing a hearing date of January 10, 2011 to determine whether Motivation would be permitted to inspect the emeralds prior to the resolution of JTR's pending motion for judgment on the pleadings. (D.E. 51).

### 7. JTR Makes Another Offer That Would Permit Motivation to Conduct a Prompt Inspection of the Emeralds

56.     Despite JTR's confidence that the Court would deny Motivation an opportunity to inspect the emeralds prior to the resolution of JTR's pending motion for judgment on the

pleadings – especially without first disclosing the criteria Motivation intended to use to determine whether the emeralds came from the Atocha – JTR made another offer that would permit Motivation to conduct the inspection it sought. The proposal was that (i) Motivation should stipulate that JTR is entitled to a salvage award of 75% of the Salvaged Material, (ii) JTR would withdraw its dismissal motion and provide Motivation with prompt and unfettered discovery, including a prompt inspection of the emeralds, and (iii) the parties would then litigate the question of whether the emeralds came from the *Atocha*, and, if so, how much of the remaining 25% of the treasure should be awarded to Motivation. This proposal was premised on the assertion by Motivation's counsel that "should Motivation prevail in its claim, JTR Enterprises would be entitled to a substantial salvage award and, if that were the result, it might be a better solution than your current position." (D.E. 123-1, at 4).

57. Motivation has submitted copies of the written communications reflecting this proposal as exhibits to Motivation's Reply in Support of its Motion to Compel. (D.E. 137-4). Citing these written communications, Motivation falsely claims that I "offered Motivation 25% of the recoveries if Motivation would drop its claim without inspecting the *res*." (D.E. 137, at 7). Motivation is wrong. I never offered Motivation any percentage of the recoveries, and I did not ask Motivation to drop its claim without inspecting the emeralds. Rather, consistent with Motivation's counsel's prior concession that JTR would be entitled to a liberal salvage award even if Motivation's claim has merit, the written communications clearly and unambiguously reflect that I proposed that Motivation stipulate to a 75% salvage award, and that:

> JTR will withdraw its pending motion for dismissal and/or judgment on the pleadings, and consent to Motivation taking full discovery – i.e., not simply an inspection of the emeralds, but any other discovery that Motivation would be entitled to take in preparation for a hearing on the merits before Judge King.

> . . .

> JTR and Motivation will continue to litigate the issue of who is entitled to all or part of the remaining 25% of the recovered material – which will be resolved by Judge King at a final hearing on the merits if it is not otherwise settled before then.

(D.E. 137-4, at 8).

58.   In support of the foregoing proposal, I offered the following explanation:

> [W]e have tried to make an offer that provides a meaningful benefit to both Motivation and JTR, and we believe JTR has come up with a sensible offer that accomplishes that objective. Unless you believe that Motivation has a meaningful chance of obtaining an award in excess of [2]5% of the recovered material – which David has advised us to be all but inconceivable – Motivation is not being asked to give up anything of value in this settlement, and Motivation stands to gain the opportunity to "discover" a basis for a stronger claim than it currently has, and at less cost inasmuch as JTR will not be opposing that discovery or otherwise engaging in motion practice based on the facial defects in Motivation's claim. By the same token, although JTR would be giving up the potential to have this matter promptly resolved on the pleadings and without discovery, by agreeing to the proposed partial settlement JTR will obtain quicker access to the portion of the recovered material that JTR ultimately will obtain without regard to how the litigation plays out.

> . . .

> The only way I could understand Kim's position to make sense were if you were counseling him to believe that Motivation might, somehow, obtain an award of greater than 25% depending on the results of the inspection. If that is the case, perhaps you, David and I should have a further discussion, as David has assured us that such a position is contrary to settled law. As we understand things, Motivation has no realistic chance of obtaining an award of in excess of 25% of the recovered material, even if it were assumed (arguendo) that Motivation were legally correct about the effect of the Order obtained in the *Atocha* litigation and factually correct about the emeralds coming from the *Atocha* – both of which are highly dubious propositions (to put it mildly).

(*Id.* at 9-10).

59.   Even after Motivation rejected JTR's offer, I wrote again, as follows:

To be crystal clear about the partial settlement proposal, JTR would agree to withdraw the dismissal motion and not argue that Motivation's pleading is facially deficient. What this means is that the case would proceed with free and open discovery of JTR's discovery, and not simply discovery of the content of the safe deposit boxes at Centennial Bank.

If, as a consequence of the discovery and ongoing exploratory work at the Discovery Site, it should be determined that the emeralds came from the *Atocha* (which is something JTR does not believe to be the case, but would not [be] upset to learn), the litigation would remain open, and we could jointly approach the Court for a determination that benefits Motivation and JTR.

By contrast, without the proposed partial settlement, JTR will stand on its pending dismissal motion, seek to preclude any discovery by Motivation (now or in the future), and Motivation may never obtain a chance to find evidence to support the "belief" asserted in the pleadings (which JTR contends to be insufficient to state a legally viable claim).

(D.E. 137-4, at 4-5).

60.  Motivation again rejected my proposal, and I made one last effort, writing:

It really is a shame we can't get our clients past the current impasse. I thought I had an idea that gave everyone a benefit, but I guess I don't understand the psychology of the Key West Treasure Community.

I still fail to understand how an inspection of the emeralds and other material can change anything we have been discussing. As this matter progresses, Jay Miscovich is becoming increasingly aggravated with Motivation, and pushing us to take an aggressive position in the litigation – including (i) seeking sanctions if the dismissal motion is granted, and (ii) possibly commencing a class action suit against Motivation on behalf of its current and prior investors (which Jay is one). We have been pushing back very hard to keep Jay calm, but he is extremely frustrated by the fact that Motivation's claim (which he views as frivolous) is holding back JTR from moving forward with its efforts to monetize the discovery.

As I said yesterday, Jay would not be disturbed to find proof that the emeralds did, in fact, come from the *Atocha* (even though nobody at this end believes that to be the case), and would be willing to work cooperatively with Motivation to try to establish

that fact if we first had a partial settlement. Without such an agreement, however, JTR will aggressively pursue its dismissal motion, and will assert whatever objections to Motivation's discovery requests as are reasonably available to a litigant.

We would much prefer to find a quick and efficient way to resolve what may otherwise be protracted and expensive litigation (unless JTR's dismissal motion is granted, in which case the litigation will be over fairly soon).

Again, I welcome an opportunity to speak with Kim, but I understand if he is not interested in speaking with me.

(D.E. 137-4, at 1-2).

61.     Based on the foregoing e-mail communications, it is a mystery how Motivation can claim, in good faith, that I "offered Motivation 25% of the recoveries if Motivation would drop its claim without inspecting the *res*." (D.E. 137, at 7). Plainly, there was no offer of any recovery to Motivation, and there certainly was no effort to dissuade Motivation from inspecting the emeralds. To the contrary, I offered Motivation a quick and costless opportunity to inspect the emeralds and to thereafter engage in whatever other discovery they wished to pursue.

**8.     The Court Rejects Motivation's Request to Inspect the Emeralds, Stays Discovery, And Directs the Parties to Submit Briefing on The Legal Issue Raised by JTR's Dismissal Motion**

62.     On January 10, 2012, the Court held a hearing to determine whether Motivation should be permitted to inspect the emeralds, or otherwise engage in discovery, pending resolution of JTR's motion for judgment on the pleadings. (D.E. 76)

63.     In response to questioning by the Court, Motivation's counsel made the odd argument that Motivation should be permitted to inspect the emeralds in order to confirm that Motivation did ***NOT*** have a legally viable claim. As Motivation's counsel explained:

We are seeking to have discovery before we have to answer simply because if we determine these emeralds – if our experts say there is no way these could have been on the *Atocha* or the *Margarita* because they're not of the era, or they haven't been submerged

> long enough, or whatever archival reason, we want to dismiss our
> claim and move on. That's not our property. We are interested in
> what was *Atocha*'s cargo that could possibly be out there. There is
> no shipwreck associated with these emeralds, your Honor.

(D.E. 76, at 6:4-12).

64.     After Motivation's counsel admitted that Motivation lacked a factual basis to

support its verified claim that the emeralds were from the *Atocha* or *Margarita* (*see* D.E. 76, at

6:22-23), the Court stated:

> What right does anybody out there, just generally speaking in
> terms of somebody makes a discovery somewhere, and let's
> suppose that a gem collector in Pensacola that has a nice yacht, and
> he's interested, and he says, "I'll file a motion. I want to look at
> the emeralds."
>
> They don't have a right to do that unless they assert a claim. The
> man in Pensacola who is interested in this stuff, he doesn't have a
> claim. He just wants to look at the emeralds or the diamonds or
> whatever. Well, he doesn't have a right to come in and do that.
> He must first file a claim. . . .

(D.E. 76, at 6:24 to 7:8).

65.     After hearing from counsel for both Motivation and JTR, the Court ruled that

Motivation could not inspect the emeralds or otherwise engage in any discovery of JTR unless

and until Motivation first established to the Court's satisfaction that Motivation had stated a

legally viable claim. As the Court explained:

> ***The issue is what kind of discovery goes on at this point. It
> makes a certain amount of sense, logically, that a claimant
> should at least deal with what might be a total bar, and that is the
> law of the old Fifth Circuit and the reversal of Judge Mehrtens.***
> If that case stands for the proposition that only the treasure brought
> up from the actual site that's in court, in 1969 or '70 case, can be
> the subject of a claim.
>
> ***It seems to me we ought to deal with that legal issue first.*** What I
> will do is get you all, on the motion to dismiss, brief the law. I'm
> talking about the Eleventh Circuit opinion, the case you talked
> about, Justice Stevens, as to whether or not any claim can be made

by not just your client, but anybody to something that comes from the Atocha site that wasn't brought up by the Treasure Salvors and their successor's people. That's an interesting legal issue.

*In the meantime, until we get that resolved, that would be a legal impediment, if Mr. Horan is right, that would bar any claim at all.* If you were right, then we'd go home. *We will, in the meantime, impose a limitation on any discovery*, the divers or anybody else.

I'll let you both brief the matter of the legal part of whether a claim can or cannot be asserted, and we will have a hearing, and I will rule on that. Then, in the interim, I am going to deny and reverse, if I did extend. There is a whole broad area of the law when you're dealing with the Tort Claim Act. There is a body of law in the field that talks about discovery and suggests that yeah, go ahead and let them do some discovery.

To the extent that I have permitted discovery, let me set that aside, and *we will have no discovery until we deal with this motion to dismiss, which will be done after you brief.* . . .

(D.E. 76 at pp. 47:19 to 48:25) (emphasis added).

66.     The Court later memorialized its oral ruling with an Order entered on February 7, 2012, which stated as follows: "It is further **ORDERED, ADJUDGED, and DECREED** that discovery is **STAYED** pending the Court's rulings on the issues asserted by Claimant Motivation, Inc. in its October 10, 2011 filing (D.E. #10) against the defendant *in rem* in this action." (D.E. 69).

## 9.     The Court Directs Motivation to File an Amended Claim, Discovery Proceeds, And Motivation Abandons its Claim

67.     After the Court denied Motivation's efforts to pursue discovery – including any inspection of the emeralds – the case languished, while Motivation virtually ignored the matter. In an effort to press the case forward, JTR renewed its motion for judgment on the pleadings on April 5, 2012 (D.E. 78), which resulted in the Court ordering Motivation to file a response by May 9, 2012 (D.E. 81). On June 18, 2012, the Court heard argument on JTR's renewed motion,

granted the motion without prejudice, and directed Motivation to file an amended claim (if it still wished to proceed) that asserted a basis for challenging JTR's Verified Complaint other than Motivation's barrel theory. (D.E. 92).

68.     On July 3, 2012, Motivation filed an amended claim – alleging this time that a former diver employed by Motivation's predecessor stole the emeralds from the *Atocha* wreck site sometime between April 2006 and January 2007. (D.E. 94, at ¶¶ 55-64). Although JTR could have moved to dismiss the amended claim and seek a further stay of discovery, JTR elected to defend the amended claim on the merits. (D.E. 97). Thereafter, the Court entered an Order that set a trial date and established a discovery schedule to prepare for trial. (D.E. 100).

69.     After the stay of discovery was dissolved, the Court ordered both (i) that Kim Fisher submit to a deposition on August 21, 2012, and (ii) that Motivation be permitted to inspect the Salvaged Material on or before August 29, 2012. (D.E. 116, 117). Despite JTR's right to deny Motivation an inspection of the Salvaged Material until after Kim Fisher's deposition, JTR voluntarily permitted Motivation to inspect the Salvaged Material on August 14, 2012.

70.     On August 17, 2012, Motivation filed a motion to voluntarily withdraw from these proceedings – thereby acknowledging, once and for all, that Motivation has no legally cognizable interest in any of the emeralds salvaged through that date. (D.E. 118). Motivation also sought leave to file a Motion for Sanctions within 60 days of the voluntary dismissal of its claim. (D.E. 118, at 4-5). While accepting Motivation's concession that it had no claim against any of the Salvaged Material (which is what JTR has been saying for the past year), the Court declined to enter an Order that would allow Motivation to voluntarily dismiss its claim until such time as Motivation either presented or abandoned a motion for sanctions pursuant to Rule 11. Specifically, on August 21, 2012, the Court entered an Order, which states, as follows:

> Motivation seeks dismissal without prejudice of its Amended
> Verified Claim (DE #94), but asks the Court to retain jurisdiction
> for sixty (60) days to entertain a possible Rule 11 motion for
> sanctions.  In consideration of the foregoing, the Court finds that
> the Motion to Dismiss should be denied without prejudice to
> reconsider after the issue of sanctions has been resolved.

(D.E. 121)

## K.     The "Enhancement" Issue

71.     On or about November 9, 2011, David Horan's office sent samples of emeralds salvaged from the Discovery Site to Ecole National Superieure de Geologie de Nancy (the "French Lab") and Laboratoire Gemtec (the "Swiss Lab") for the purpose of seeking to determine, with as much specificity as possible, the location where the emeralds had been mined and, if possible, when they had been mined.

72.     On December 1, 2011, JTR learned that both the French Lab and the Swiss Lab were reporting that they had detected "enhancement material" on the emerald samples. Specifically, JTR learned that the French Lab was reporting that it had detected oil and/or one of two types of resin on seven of the ten emerald samples, and the Swiss Lab was reporting that it had detected epoxy resins on the samples it had analyzed.  As of that date, JTR had not yet received written reports from the French Lab or the Swiss Lab.  Rather, all that JTR received at that date was an e-mail from an associate of David Horan's in Colombia, which set forth excerpts from e-mails he had received from the two labs.  As discussed more fully below, JTR did not receive documents from either the French Lab or the Swiss Lab until February 12, 2012 – and even then the recipient of the reports, who provided those documents to JTR, described the documents as "raw reports" that were not yet final.

73.     The information being reported by the French Lab and the Swiss Lab came as a complete surprise to me.  I thereafter spent a good deal of time speaking with David Horan, Paul

Sullivan, Jay Miscovich, Scott Miscovich and Steve Elchlepp, Jr. in an effort to understand the possible explanations for the new information. Among other things, I determined that there were at least two explanations in which Jay's account of the discovery and the information coming out of the French Lab and the Swiss Lab were consistent with one another. Those explanations were that (i) Jay and Steve had discovered emeralds of modern origin at the Discovery Site, or (ii) Jay and Steve had, somehow, "polluted" the emeralds through the process they used to clean them of salt from the sea. I believed then, and continue to believe, that the first explanation is most probably the correct explanation. Moreover, substantial further testing by Matco and Chemir tends to support my belief.

74.     In order to help get to the bottom of this new mystery, it was decided that David Horan should visit the Discovery Site with Jay and/or Steve, retrieve some emeralds in sea water, and send them to the GIA for testing. It also was decided that Scott Miscovich (who had a good relationship with Jeff Post) should contact the Smithsonian and request that they to send the GIA the emerald samples that were provided to the Smithsonian in sea water back in August of 2010. Additionally, I recommended that we promptly bring the new information to the attention of CBS News and 60 MINUTES, and enlist their aid in investigating the issue. Accordingly, I called Len Tepper and Andrew Metz (an Associate Producer at 60 MINUTES), reported to them what JTR had learned about the analyses performed by the French Lab and the Swiss Lab, and asked them if CBS News or 60 MINUTES would investigate the issue. During my call with Messrs. Tepper and Metz, we discussed the plan to have David Horan visit the Discovery Site and retrieve further emeralds that could be sent directly to the GIA without being cleaned in any manner, so that the GIA could evaluate the emeralds to test them for the presence of epoxy resin or other modern substances. We also discussed the possibility of having Jeff Post send the GIA