the samples Jay previously had provided to the Smithsonian in sea water. Messrs. Tepper and Metz agreed that it was a good idea to ask the GIA to examine the "uncleaned" emeralds from the Smithsonian and from a new dive to be conducted by David Horan. Accordingly, CBS News / 60 MINUTES agreed to enlist the assistance of the GIA.

75. On December 21, 2011, Scott Miscovich sent an e-mail to the GIA in connection with the further analysis arranged by CBS News / 60 MINUTES. The e-mail included the following text:

> Thanks for returning my call. Really appreciate your work on this interesting project. I will have 3 sets of samples sent to you in the next week or so. They include the following:
>
> 1) Smithsonian Emeralds sent directly from Jeff Post. As we discussed, these were sent directly from the ocean to Jeff without any cleaning.
>
> 2) A second new set from the ocean directly to you without cleaning, and handled with a verifiable chain of custody.
>
> 3) A random set from the Key West vault, selected and sent with a randomized protocol and verifiable chain of custody.
>
> Please provide me with the best address and point of contact. Again, thanks for your professionalism and that of your organization in supporting this amazing endeavor.

(E-mail from Scott Miscovich to Tom Moses, dated December 12, 2011) (**Exhibit M** hereto).

76. On December 16, 2011, Paul Sullivan was copied on an e-mail to David Horan, which encouraged that there be prompt public disclosure of the results of the analyses performed by the French Lab and Swiss lab. (*See* e-mail from D. McAllister to D. Horan and others, dated December 16, 2011) (**Exhibit N** hereto). Because the e-mail had certain legal implications, Paul forwarded the e-mail to me and asked that I respond, which I did on December 18, 2011. The main points of my response were the following:

> [P]ursuant to a contractual agreement whereby Jay has agreed to work exclusively with CBS Broadcasting, CBS was informed of the probable results from the French and Swiss labs shortly after you reported those results to Paul.  Specifically, we contacted the producers of CBS News and 60 minutes to make them aware of what we were told to be the probable results, and we requested their assistance in getting to the bottom of this "mystery." Accordingly, you can be sure that it is Jay's full intent, as you say, "to disclose publicly" all the facts when we are sure we have all the facts.  Obviously, one does not work with CBS News and 60 minutes with any expectation that the results of that investigation would not be made public once the investigation is properly concluded.

> [W]e also have contacted the Smithsonian and, with CBS's help, the President of GIA.  The Smithsonian has agreed to send their samples to the GIA for further testing.  We also intend to send the GIA samples from the vault in Key West and other samples from the 'Site' when they are obtained.  The GIA has agreed to test all the samples for "enhancements" expeditiously."

> Once we have all the facts, we intend to disclose them to the Court through an appropriate filing.  Until that time, and until all the facts are in, it would be inappropriate for any of us to comment publicly.

(E-mail from B. Silverstein to D. McAllister, dated December 18, 2011) (**Exhibit N** hereto).

77.     Unfortunately, the weather conditions in December, 2011 were not conducive to visiting the Discovery Site to obtain more emeralds.  Accordingly, on January 6, 2012, JTR filed a "Status Report" with the Court, which provided disclosure about the ongoing testing that was being performed.  (D.E. 54).  Among other things, JTR reported the following:

> JTR has submitted samples of the emeralds for analysis by the Smithsonian Institute, the Gemological Institute of America (GIA) and laboratories in France and Switzerland.  JTR is currently awaiting final reports of the analyses from France, Switzerland and GIA.  The samples analyzed by the French and Swiss labs have been sent to GIA for further analysis.  JTR is also sending further samples of the emeralds to the GIA once they are recovered by the undersigned firm from the Discovery Site.  Samples previously sent to the Smithsonian Institute have been sent to GIA for analysis.  Once all of these analyses are completed, and JTR is in possession of final reports from each of the GIA and the French

and Swiss labs, JTR intends to file a copy of those final reports with this Court in connection with a further Status Report.

(D.E. 54, at 3).

78.     On January 18, 2012, the weather was conducive to visiting the Discovery Site. Accordingly, on that day, David Horan and Steve Elchlepp, Jr. traveled to the Discovery Site, salvaged twenty-one emeralds, and sent the emeralds in sea water to the GIA for analysis. (*See* e-mail from P. Sullivan to G. Stemm, dated January 18, 2012) (**Exhibit O** hereto).

79.     Also on January 18, 2012, CBS News / 60 MINUTES interviewed Gregg Stemm of Odyssey Marine Exploration, Inc. in connection with the ongoing investigation of Jay's discovery.  Mr. Stemm later informed JTR that he had been asked about the information received from the French Lab and Swiss Lab, and that Mr. Stemm had insisted that "until the final results on all the reports were in, everyone should avoid jumping to any conclusions."  (E-mail from G. Stemm to P. Sullivan, dated January 18, 2012) (**Exhibit O** hereto).

80.     On February 12, 2012, Gregg Stemm forwarded to Paul Sullivan documents Mr. Stemm had received that day from the French Lab and the Swiss Lab.  In his covering e-mail to Paul Sullivan, Mr. Stemm wrote: "These are yet to be included in a final report to us, but I wanted to get you the raw reports as soon as I received them."  (E-mail from G. Stemm to P. Sullivan and D. Horan, dated February 12, 2012) (**Exhibit P** hereto).  The next day, Paul Sullivan forwarded the raw reports to CBS News / 60 Minutes.  (E-mail from P. Sullivan to L. Tepper, dated February 13, 2012) (**Exhibit Q** hereto).

81.     Thereafter, Mr. Sullivan worked with Matco to obtain more specific information about the material the French Lab and the Swiss Lab had reported finding on the emeralds.  Mr. Sullivan also asked Matco to examine some randomly-selected emeralds with an electron microscope – as had been done by the Smithsonian – to determine if there was any trace of gold,

silver or copper.  Like the Smithsonian, Matco did, in fact, detect the presence of silver and copper using an electron microscope.  (D.E. 82, at 17-20).

82.  On April 17, 2012, Matco sent a report of its analyses to JTR.  (D.E. 82, at 16-48). The next day, JTR filed its Third Status Report with the Court.  (D.E. 82).  As stated therein, the purpose of the status report was "to apprise the Court of the status of tests and evaluations of emerald samples performed by the Smithsonian Institution and laboratories in France, Switzerland, New York City and Pittsburgh, Pennsylvania."  (D.E. 82 at 1).

83.  The Third Status Report states that the GIA detected the presence of modern material on the uncleaned emeralds from the dive of January 18, 2012 (the "January 18 Dive"). (D.E. 82 at 4).  I recently have come to understand, however, that this statement was in error.  I now understand that the GIA did no testing after January 17, 2012.  Of greater significance, further analyses of the "uncleaned" emerald samples from both the Smithsonian and the January 18 Dive, which were performed by Matco and Chemir following the filing of the Third Status Report, have confirmed that there is no epoxy resin or other modern substance on those emeralds.  Reports from Matco and Chemir setting forth these results were filed with the Court on October 1, 2012, and are discussed more fully below.

84.  In the months following the filing of the Third Status Report, Paul Sullivan continued to work with Matco and Chemir in an effort to get to the bottom of the question of whether there was any modern substance on the uncleaned emeralds from the Smithsonian or the January 18 Dive.  Although the testing by Matco and Chemir was interrupted by their being required to return the emeralds they were analyzing on account of Motivation's obtaining an Order requiring that all emeralds be brought back to Key West, before returning the emeralds Matco and Chemir analyzed fifteen (15) randomly selected samples of the uncleaned emeralds

from the Smithsonian and the January 18 Dive, and concluded that there is no modern material on any of those emeralds. As noted above, the Matco and Chemir reports were filed with the Court on October 1, 2012.

**L.     Material Factual Errors In Motivation's Motion for Sanctions**

85.     Motivation's Motion repeatedly refers to me as JTR's "general counsel." That is a mischaracterization. As I understand the term from my years of experience in the field of corporate law, the "general counsel" of an entity is an employee of the entity, appointed by the board of directors (or other governing body) to serve as the entity's chief in-house legal officer. *See*, *e.g.*, *In re Grievance Proceeding*, 2002 U.S. Dist. LEXIS 18417, at \*9 (D. Conn. 2002) ("the general counsel by definition is a corporation lawyer"); *China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash*, 1999 U.S. Dist. LEXIS 2674, at \*19 (S.D.N.Y. March 9, 1999) ("A corporation's general counsel is an 'officer'" ); *see also* Merriam-Webster On-Line Dictionary, at http://www.merriam-webster.com/dictionary/general%20counsel (defining "general counsel" as "a lawyer at the head of the legal department (as of a corporation or governmental subdivision)").

86.     JTR has no employees or officers who are lawyers. My firm (YCST) has been engaged by JTR, Jay Miscovich, Steve Elchlepp, Jr., and Scott Miscovich to serve as one of a number of firms that provide them with various legal services, and I am the principal attorney at my firm who provides the legal services provided to JTR by YCST. Specifically, I served as counsel of record to Jay, Steve and Scott in the Delaware Litigation, and I have provided general outside counsel services to JTR, Jay, Steve and Scott in connection with various other matters, including their dealings with David Horan, and now John Siracusa, in connection with the Admiralty Action. In that capacity, I have, among other things, helped JTR and Jay Miscovich

negotiate engagement agreements with David Horan and John Siracusa, and I have monitored the

proceedings in the Admiralty Action and provided advice and guidance.

87.      In Paragraph 9 of its Motion, Motivation claims that affidavits previously filed by

the New York Investors in the Delaware Litigation (and earlier litigation in state court in Florida,

which was dismissed, *sua sponte*, for lack of personal jurisdiction) "demonstrate that Jay

Miscovich broke two promises to deposit the coordinates of his emerald find with an escrow

agent, removed emeralds from the New York safe deposit box that the New York Investors had

determined were of a high value despite his promise not to do so, and failed to deposit other

emeralds that his brother Scott had brought to New York which Miscovich promised to do."

Motivation is wrong.  The affidavits of the New York Investors do not "establish" anything.  The

affidavits of the New York Investors were hotly contested in the Delaware Litigation, and no

Court has ever determined the veracity or accuracy of the assertions made in those affidavits.  In

fact, and as set forth in counter-affidavits and other papers filed on behalf of Jay in the Delaware

Litigation (i) Jay did not agree to deposit the coordinates of the Discovery Site with an escrow

agent, (ii) Jay did not remove the emeralds from the New York safe deposit box – even though

he had every right to do so, and (iii) Jay did, in fact, deposit other emeralds that his brother Scott

had brought to New York – even though he had no obligation to do so.[8]  Moreover, the New

York Investors ultimately dismissed their claims in the Delaware Litigation with prejudice in

consideration of a settlement that was approved by the Delaware Court of Chancery.  In

connection with the Settlement, Jay, Scott and Steve denied liability, and no contrary finding was

made by the Court.

---

[8]      Jay and Scott submitted Affidavits under seal in the Delaware Litigation.  The publicly available
copies are heavily redacted, and difficult to understand on account of those redactions.
Unredacted copies of the Affidavits can be submitted to other courts only pursuant to a Court
Order compelling their production.

88.     Paragraph 9 of Motivation's Motion further states that "These affidavits also show that while in possession of thousands of emeralds Miscovich was still trying to raise money rather than file an admiralty claim so that he could obtain title to and sell the emeralds to raise money based on their intrinsic worth and provenance." Again, Motivation is wrong. To the best of my knowledge, Jay has not tried to sell the emeralds. Rather, Jay has sought to sell ownership interests in an entity that would file an admiralty claim, and Jay sought such "investments" in order to raise funds that could be used to hire experienced counsel and other advisors who would (i) file an admiralty claim and otherwise work to secure title to the emeralds in a legally proper manner, (ii) help to protect the Discovery Site, and (iii) help to build a professional organization that would work to explore and ultimately salvage the Discovery Site and ultimately monetize the Salvaged Material after the proper legal formalities were pursued.

89.     Paragraph 9 of Motivation's Motion further states that the affidavits of the New York Investors demonstrate that "while in possession of thousands of emeralds, [Jay] was seeking contracts with Kenneth Rose to search for emeralds off Woman Key where Rose held an admiralty claim and permit to search the area." Once again, Motivation is wrong. Jay never sought a contract with Kenneth Rose "to search for emeralds off Woman Key." Rather, as explained earlier in my affidavit, Jay sought to perform exploratory and salvage work in the Woman Key area because Jay believed then, and continues to believe, that there is a Civil War era wreck in that area that is of historical significance. As such, Jay wanted to explore the Women's Key area for reasons that are wholly separate and apart from his ongoing efforts to salvage emeralds and other material from the Discovery Site in International Waters in the Gulf of Mexico.

90.     The only accurate statement in paragraph 9 of Motivation's Motion is that "The verified complaint locates Miscovich's Emerald Reef many miles from Woman Key." That statement is 100% correct. The Discovery Site is, in fact, many miles from Woman Key.

91.     In paragraph 10 of its Motion, Motivation asserts that "JTR's resistance to facilitating an inspection – one that, if Horan's claims were true, would promptly rid JTR of Motivation – was resisted because the inspection would, and did reveal, that the emeralds of value had been removed from the *res* in which Barr, Ash and Mactas and others had invested." Once again, Motivation is wrong. JTR did not resist an inspection of the emeralds out of any concern about what Motivation would find. Rather, for the reasons JTR explained to this Court in JTR's Motion to Stay Discovery, JTR resisted Motivation's effort to inspect the emeralds because (i) Motivation had no legal right to conduct such an inspection, (ii) JTR did not trust Motivation, especially after Motivation had asserted a frivolous claim of ownership of the emeralds, and (iii) JTR was simply unwilling to voluntarily permit Motivation to engage in discovery to which it was not legally entitled. This was all addressed during oral argument before this Court, and *the Court agreed with JTR's position*. (D.E. 76 at pp. 47:19 to 48:25) (Court ruling staying discovery); (D.E. 69) (Order staying discovery). Moreover, Motivation conveniently ignores the fact that JTR repeatedly offered to permit Motivation to inspect the emeralds if Motivation would provide JTR with the "criteria" that Motivation would use for the inspection in advance thereof, but Motivation refused to do so. Motivation also conveniently ignores the fact that JTR proposed to allow Dr. Eugene Lyon to determine whether the emeralds came from the *Atocha*, but Motivation rejected this proposal out of hand. In connection with this proposal, JTR specifically offered to allow Dr. Lyon to inspect the emeralds, visit the Discovery Site, and conduct whatever research Dr. Lyon deemed appropriate. As set forth in the Affidavit

of Paul Sullivan, however, Motivation was not interested in learning what Dr. Lyon determined. Instead, Motivation wanted JTR to simply agree that the emeralds came from the *Atocha* (despite the lack of any evidence to support such a view), so that Motivation could then sell the emeralds as "*Atocha* emeralds."

92. Footnote 4 of Motivation's Motion for Sanctions states that the Affidavit of Kenneth Rose [D.E. 94.11] "shows that Global Underwater Treasure Salvage, LLC, negotiated, through attorney Bruce Silverstein, a contract with Rose's Kirby Group that divided finds 50-50 between GUTS and The Kirby Group, except GUTS would not have to share any emerald finds and excluded 'Emerald Reef' from the operation of the contact but did not define its location." This is, yet again, another false and incorrect statement in Motivation's filing. The Affidavit of Kenneth Rose does not state that I negotiated an agreement between Global Underwater Treasure Salvage, LLC ("GUTS") and the Kirby Group. Mr. Rose's Affidavit clearly states that the agreement with GUTS was formed on July 28, 2010. *See* Rose Affidavit at ¶ 11. I did not yet meet, and did not even know of, Jay Miscovich until nearly six months after that date. Moreover, in July of 2010, the New York Investors, and not Jay, were funding and in *de facto* control of GUTS – as is acknowledged in paragraph 13 of Mr. Rose's affidavit. Contrary to Motivation's distortion of the record, the agreement with GUTS that is discussed in the Rose Affidavit was negotiated by the New York Investors and their counsel, and not by Jay Miscovich. Moreover, it is indisputable that I had nothing to do with the agreement between GUTS and Mr. Rose's organization.

93. As discussed earlier in this Affidavit, I did negotiate an agreement between the Kirby Group and J&S Keys, LLC ("J&S"), which in an entity formed for the benefit of Jay and Steve in the summer of 2011. Unlike the prior agreement negotiated by the New York Investors,

the agreement I negotiated with the Kirby Group, (i) made no mention, whatsoever, of emeralds (from any site), (ii) provided for a straight 50/50 split of anything Jay's new entity might discover within the site subject to the Kirby Group's admiralty claim, and (iii) provided the Kirby Group broad observation rights.

94.     In paragraph 13 of its Motion, Motivation asserts: "It is apparent to Motivation that Miscovich, with the active assistance of Elchlepp and others, caused the filing of the instant proceedings in the belief that no party would assert a claim and that, without a claimant, no inspection by a disinterested expert would be conducted; and, that JTR would hope to obtain an adjudication of title which would lend a commercially valuable provenance to pedestrian modern-era Colombian emerald gemstones." Motivation's assertion is nonsensical. Plainly, JTR did commence the Admiralty Action with the hope JTR would obtain an adjudication of title and/or a liberal salvage award. JTR did not expect, however, that "an adjudication of title [] would lend a commercially valuable provenance to pedestrian modern-era Colombian emerald gemstones." An adjudication of title would do nothing more that establish that JTR owns whatever it is that JTR has salvaged from the Discovery Site. An adjudication of title does not change the character of what has been salvaged. The emeralds are what they are. If they are valuable, then they are valuable. If they are not valuable, then they are not valuable. An adjudication of title simple establishes to whom they legally belong.

95.     Motivation asserts in paragraph 15 that the Admiralty action "was initiated in bad faith in an effort to utilize this Court to commit a fraud on the public and, *per force*, a fraud on the Court." This could not be more false. The Admiralty Action was initiated in order that JTR might obtain an award of title and/or a liberal salvage award respecting the emeralds JTR placed within the Court's jurisdiction when it filed its claim. There was no other reason for the fling of

the Admiralty Action. If JTR had believed it could consider itself to be the lawful owner of the emeralds without pursuing the Admiralty Action, JTR would never have commenced the action.

96.     Compounding the frivolous nature of its claims, in paragraph 16 of its Motion, Motivation states: "JTR's pleadings and resistance to facilitating an inspection that would promptly rid JTR of the only claimant against the *res,* Motivation, can only be explained as a continuing perpetration of a fraud upon the court." Again, false. As previously explained, JTR's resistance to permitting Motivation to conduct an inspection of the emeralds is because litigation is an adversarial process, and a litigant is not required to provide discovery voluntarily to an adversary – especially when the litigant believes the adversary is asserting a frivolous claim. Moreover, and as spelled out, in detail, above, (i) JTR repeatedly volunteered to allow Motivation to inspect the emeralds at a very early stage in the litigation if Motivation would first provide the criteria it intended to use for the inspection, and (ii) JTR proposed that Dr. Eugene Lyon inspect the emeralds and conduct any other investigation he deemed appropriate. These are not the proposals of a party with something to hide.

97.     Paragraph 17 of Motivation's Motion states that "JTR and its general counsel, Bruce Silverstein, and others knew as early as December 2011, when they filed their Motion for Judgment on the Pleadings or to Dismiss, that the alleged 'Spanish colonial era emeralds from an ancient shipwreck', as represented to investors and depicted on 60 MINUTES, were from the modern era; that many of the emeralds were chemically treated with compounds unknown until the mid-20th Century; and, that at least some of the emeralds were identified by one of the laboratories that had evaluated them as having come from a Colombian mine that had not been opened until 1999." Again, Motivation is wrong. The fallacy of these assertions is explained throughout the body of this affidavit, and I will not waste time repeating that refutation here. It

should suffice to say that (i) I am not JTR's "general counsel," (ii) neither JTR nor Jay (nor I) represented to investors or 60 MINUTES that the emeralds are from the "Spanish colonial era" or "an ancient shipwreck" – though that still may turn out to be the case, (iii) neither JTR nor Jay (nor I) know that any of the emeralds are "from the modern era," and (iv) I do not even know where Motivation comes up with the assertion about a mine that was not open until 1999. Moreover, in December of 2011, JTR had materially incomplete information about the modern substances identified by the French Lab and the Swiss Lab, and JTR was actively working with CBS News and 60 Minutes to investigate the issue.

98.     Paragraph 20 of the Motion for Sanctions states that "Jay Miscovich caused JTR to initiate the instant litigation in bad faith and, with the support of Bruce Silverstein, maintained the litigation by means of directing JTR's local counsel to engage in dilatory litigation and obstructive behavior." Again, this is false. Not only has there been no "dilatory litigation and obstructive behavior," but I lack the power to "direct" JTR's local counsel to do anything such counsel does not believe to be appropriate. All I can do is recommend how to proceed. In the end, only the client has the power to "direct" an attorney of record to take action or refrain from taking action, and, in the end, the attorney of record has the right to withdraw from the representation if the attorney disagrees with the client's litigation strategies (so long as the attorney does so in a manner consistent with his or her professional responsibilities to the client).

99.     **Paragraph 21 of Motivation's Motion for Sanctions makes the outrageous assertion that I "was an active and knowing participant in Miscovich's fraudulent scheme and bad faith litigation" based on the content of the 2010 agreement between GUTS and Ken Rose. This paragraph is probably the best example of the reckless and defamatory nature of Motivation's Motion. It is indisputable that I did not have anything to do with**

the GUTS contract that Motivation claims to prove my complicity in a fraud.   That contract was negotiated months before I ever met, or even heard of, Jay Miscovich or the emerald discovery.

100.   **Paragraph 21 of Motivation's Motion for Sanctions also makes the reckless and false assertions that I "instructed local counsel to convey a threat to sue Motivation and its undersigned counsel in the State of Delaware for defamation and for tortious interference with an advantageous business relationship despite the litigation privilege; to later instruct local counsel to send Motivation and its undersigned counsel with the 21-day safe harbor letter threatening Rule 11 sanctions unless Motivation withdrew its claim prior to inspecting the emeralds."  These assertions are demonstrably false – and, again, show that Motivation has no compulsion from making reckless allegations for which it has no factual basis.  Although I do believe that Motivation should be sanctioned pursuant to Rule 11 and held liable for defamation and other tortious misconduct, the fact is that I discouraged JTR from sending the letter about which Motivation complains, but I was overruled by both the client and counsel of record.  Attached as Exhibit R is my e-mail of May 21, 2012, by which I sought to discourage the sending of the letter Motivation claims I "instructed" JTR's counsel of record to send.  This e-mail also proves my point that I lack the power to "direct" the Admiralty action, and can only make recommendations of what I believe to be the appropriate cause of action.**

101.   Paragraph 21 of Motivation's Motion for Sanctions also states that I "threatened The Kirby Group's Kenny Rose with litigation over a bogus claim for lending assistance to Motivation's endeavor to find the truth of this matter."  Of course, Motivation provides no evidence to support this baseless assertion.  I have not sought to dissuade Mr. Rose from

cooperating with Motivation in the Admiralty Action, much less threatened Mr. Rose with litigation if he were to do so. Indeed, since the Admiralty Action was commenced, the only communications I have had with Mr. Rose or his counsel and business partner, Mr. Wells, have been (i) early in the Admiralty Action (before Motivation asserted a claim), when I received information that an attorney named Peter Hess intended to file a claim in the Admiralty Action on behalf of Mr. Rose – which Mr. Wells denied when I spoke with him, and (ii) when I contacted Messrs. Rose and Wells (by e-mail) to see if we might revive the agreement for J&S to perform salvage activity at the Kirby Site. To repeat, I have never sought to discourage Mr. Rose from cooperating with Motivation in the Admiralty Action (or otherwise), and I certainly have never made any threat to discourage Mr. Rose from cooperating with Motivation. Motivation is just plain paranoid.

102. Finally, paragraph 21 of Motivation's Motion states that I "earlier threatened [Ken] Rose with exhaustive and expensive litigation when Rose sought to assert a colorable claim in the Delaware involving Miscovich and the Intervenors." Aside from the fact that my actions in the Delaware Litigation cannot possibly serve as a basis for imposing sanctions in the Admiralty action, the fact is that (i) Peter Hess filed a motion to intervene in the Delaware Litigation on behalf of Mr. Rose and based on an assertion that Jay had stolen the emeralds from the Kirby Site, (ii) I informed Mr. Hess that Jay would seek sanctions in the Delaware Litigation if Mr. Rose did not recant his frivolous assertions that Jay had stolen the emeralds from the Kirby Site, (iii) the Delaware Court of Chancery denied the intervention *sua sponte* before I even filed a response in opposition to the motion, and (iv) and Mr. Rose's counsel and business partner, Ed Wells, later admitted to me that Mr. Hess was not authorized to make a filing on Ken Rose's behalf in the Delaware proceedings, and Ken Rose admitted to me that he had been

misled into believing that Jay had stolen emeralds from the Kirby Site by persons who had an axe to grind with Jay, and that the entire episode was a big mistake and was very embarrassing. As was reported by Reuters after the Court of Chancery threw out Mr. Rose's claim:

> Just this week, Kenneth Rose, the owner of a treasure site near Woman Key, west of Key West, sought to intervene in the Miscovich case. Rose discovered an emerald he describes as the size of a chicken egg on a claim site he has held near Woman Key for decades.
>
> He at first suspected the emerald might be part of the trove the Miscovich brothers are claiming, which would suggest that their gems actually belonged to Rose. But after hiring a lawyer to intervene, Rose concluded that someone had likely placed the egg-sized emerald on his claim in a bid to stir up trouble.
>
> "Treasure hunters are only one step above drug dealers," said Rose, who carefully described himself as an "opportunist."

T. Hals, "Sunken Treasure Sparks Legal Tussle" (Aug. 19, 2011), reprinted at http://www.reuters.com/article/2011/08/19/us-sunkentreasure-idUSTRE77I4U020110819.

103. I believe that there are many other material factual errors in Motivation's Motion for Sanctions, but the specific errors discussed herein are the errors with respect to which I have personal knowledge. I would be remiss, however, if I did not note that much of Motivation's Motion for Sanctions is devoted to repeating and reaffirming Motivation's frivolous allegations that Jay's emeralds are from the *Atocha* – even though Motivation explicitly abandoned that theory in Motivation's Motion to Voluntarily Dismiss its Claim. This inconsistency makes absolutely no sense to me, and I do not understand how Motivation can continue to advance such allegations in good faith.

## M.    Motivation's Request That I Be Sanctioned And Held Liable For Attorneys' Fees

104.    Motivation's Motion for Sanctions includes a specific request that I be held liable for Motivation's attorneys' fees. I am not aware of any legal or factual basis that would support this claim.

105.    As a factual matter, Motivation identifies no conduct on my part that is remotely close to being sanctionable or providing a basis for holding me liable for an award of attorneys' fees. I believe that my conduct (all of which has been outside of the context of the legal proceedings in this case) has been professional, civil, and responsible at all times, and I expect the Court will agree.

106.    As a legal matter, my own research has failed to uncover any decision in which an award of attorneys' fees was made (or, if made, survived appellate review) against an out-of-state attorney to a party that was represented by other counsel of record in the litigation in which attorneys' fees were sought.

107.    I am not an attorney of record in the Admiralty Action, and I have not signed any pleadings or papers in that action. Nor do I have the authority to "direct" what is filed in the Admiralty Action. As out of state counsel, I can only provide the best guidance I am capable of providing, and hope that JTR and its counsel of record will agree with and follow my guidance – except in those situations where they persuade me otherwise, which has happened from time-to-time. Indeed, JTR and its counsel have not always followed my guidance (often to my chagrin). As noted, however, that is their prerogative. Although David Horan did, from time-to-time, invite me to seek admission *pro hac vice* in the Admiralty Action, I declined to do so on account of my lack of experience with admiralty matters for which Mr. Horan, and later Mr. Siracusa, were engaged by JTR to provide their experienced counsel and representation.

108. In *Leventhal v. New Valley Corp.*, 148 F.R.D. 109 (S.D.N.Y. 1993), the Court declined to impose sanctions on an attorney pursuant to Rule 11, 28 U.S.C. § 1927, or the court's inherent powers, based on the court's view that an attorney may not be held liable for sanctions unless that attorney personally appeared in the litigation and signed the papers giving rise to the sanctions. *See id.* at 111-12. *See also Bakker v. Grutman*, 942 F.2d 236, 239 (4th Cir. 1991) ("Rule 11 sanctions may not be imposed upon those attorneys who do not actually sign the papers at issue."). As the Seventh Circuit has explained:

> Andersen asserted that the lack of a signature is irrelevant – that any lawyer who played a "substantial role" in the preparation of the paper may be sanctioned, even if he did not sign it. Nothing in Rule 11 supports this position.

*Kale v. Obuchowski*, 985 F.2d 360, 363 (7th Cir. 1993).

109. The obvious reason for this rule is that counsel of record is the "gate keeper" with the ultimate responsibility to refrain from taking positions or filing papers that such counsel does not stand behind. If counsel of record is directed by a client or other counsel to take action that counsel of record believes to be improper, counsel of record can and should refuse to do so. Counsel of record cannot, however, simply "follow orders" and avoid responsibility for his or her actions. *See Long v. Quantex Resources, Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985) (holding, for sanctions purposes, that counsel of record, and not out of state counsel, is accountable for the conduct of the litigation, even if out of state counsel is primarily responsible for the preparation of the motion papers at issue), *aff'd*, 888 F.2d 1376 (2d Cir. 1989); *see also In re De Lorean Motor Co. Litigation*, 59 B.R. 329, 339 (E.D. Mich. 1986) (instructing that there is no "just following orders" defense; and that "accountability already lies with the signer, even if it means informing a superior that the proposed pleading is either factually unsound or not substantiated by the existing state of the law").

110.    Motivation claims to find support for its application for sanctions against me in *Corder v. Howard Johnson & Co.*, 53 F.3d 225 (9th Cir. 1994).  Motivation is wrong.

111.    In *Corder*, the Ninth Circuit reversed the district court's grant of attorneys' fees against Gary Baugh, who was a defendant in an action for breach of fiduciary duty in his capacity as a trustee of a pension plan.  In the action, Mr. Baugh caused the pension plan to assert a third-party complaint against Howard Johnson & Co. ("HJ"), which later obtained a summary judgment of dismissal of the claims against it.  In connection with its grant of summary judgment to HJ, the district court awarded attorneys' fees to HJ, and held Mr. Baugh jointly and severally liable for those fees with, among others, the pension plan.  *See id.* at 229.  Mr. Baugh appealed the award of attorneys' fees as against him, and the Ninth Circuit agreed that the award was inappropriate.  *See id.* at 232-33.

112.    In dictum, the Ninth Circuit also addressed an additional argument by Mr. Baugh that he could not be held liable for HJ's attorneys' fees because he was not a named party in the claim against HJ (even though he plainly was a party in the underlying litigation).  Although the Ninth Circuit held that the award of attorneys' fees against Mr. Baugh was unwarranted, the Court expressed the following dictum:

> [E]ven in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980) (a court may assess attorney's fees against counsel who willfully abuses judicial processes). In addition, a court may impose attorney's fees to sanction a non-party whose actions or omissions cause the parties to incur additional expenses. *See SECO Nevada v. McMordie* (*In re Holloway*), 884 F.2d 476, 477 (9th Cir. 1989) (per curiam) (sanctioning a court reporter for "repeated and flagrant failures to meet court-imposed deadlines" that resulted in "severe prejudice to both the parties and the court"); *see also Moten v. Bricklayers, Masons and Plasterers International Union of America*, 543 F.2d

> 224 (D.C. Cir. 1976) (per curiam) (imposing 50% of the fees and costs upon a non-party who unsuccessfully sought to become a party, thereby incurring additional expenses for the fee petitioner).

*Id.* at 232.

113.     As is evident by the decisions cited by the Ninth Circuit (and the parenthetical explanations thereof provided by the Court), the Court's reference to "non-parties" who may be held liable for attorneys' fees was meant to be limited to persons who were active participants within the litigation before the Court – either as (i) parties to related claims (as was Mr. Baugh, who was both a defendant in the litigation and the trustee of the pension plan that asserted the claim against HJ), (ii) counsel of record (as in *Roadway Express, Inc.*), (iii) a court reporter or other court officer (as in *SECO Nevada*), or (iv) a party who had filed an unsuccessful motion to intervene (as in *Moten*). In that sense, the Ninth Circuit's dictum makes perfect sense. The Ninth Circuit did not hold, or even imply, that attorneys' fees may be imposed on an out-of-state lawyer who did not enter an appearance in the subject litigation in which the party accused of bad faith was represented by counsel of record.

114.     On page 7 of Motivation's reply in support of its Motion to Compel (D.E. 137), Motivation advances the following assertion:

> Had counsel looked for other cases citing *Corder* for the point, they might have found that "[E]ven in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

115.     This statement makes absolutely no sense, as *Roadway Express* pre-dates *Corder* by fourteen years. Moreover, the quote that Motivation attributes to the United States Supreme Court is nowhere to be found in *Roadway Express* – which involved the question of the propriety

of the imposition of attorneys' fees on a party's counsel of record in the litigation giving rise to the appeal.

116.    Presumably, Motivation meant to say that *Corder*, itself, states that "even in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices." Thereafter, *Corder* cites to *Roadway Express*, and offers the following parenthetical explanation of the United States Supreme Court's holding therein: "a court may assess attorney's fees against counsel who willfully abuses judicial processes." *See Corder*, 53 F.3d at 232.  As explained above, however, *Roadway Express* simply stands for the non-controversial proposition that sanctions may be imposed upon counsel of record in a matter.

117.    In any event, and as noted above, Motivation's Motion for Sanctions identifies no conduct on my part that is anything other than professional and appropriate.

**N.      JTR's Final Effort to Amicably Resolve the Motion for Sanctions**

118.    On October 4, 2012, I made one final effort to encourage an amicable resolution of Motivation's Motion for Sanctions and continued interference with JTR's Admiralty Action. On account of Motivation's repeated discussion and attachment of settlement communications in Motivation's various filings with the Court, I believe it is appropriate to include the latest discussions to round out the record.  Additionally, I believe they are appropriately considered by the Court pursuant to Rule 408(b) of the Federal Rules of Evidence, which permit consideration of settlement communications if they are introduced for the showing bias on the part of a witness or negating a contention of undue delay.

119.    Specifically, I made the following proposal to Motivation's counsel:

Mr. White:

I writing in an effort to bring the ongoing litigation between JTR Enterprises LLC ("JTR") and Motivation, Inc. ("Motivation") to a halt – which I believe to be in everyone's best interests.

As things now stand, Motivation has abandoned its claim to the emeralds salvaged thus far by JTR, and Motivation has sought leave to voluntarily dismiss its claim without prejudice. Additionally, Motivation currently has pending both (i) a motion for sanctions, and (ii) a motion to compel discovery. JTR is currently scheduled to file its response to the motion for sanctions next week, and you can be certain that Motivation will not like what JTR has to say in that response. Additionally, JTR intends to file a motion for sanctions, by which JTR will be seeking to recapture hundreds of thousands of dollars of attorneys' fees. As much as JTR would like [to] pursue its sanctions claim, we have managed to prevail upon JTR to see the benefit of terminating the ongoing hostilities between Motivation and JTR, so that JTR may move forward with its underlying claim for title and/or a liberal salvage award. Accordingly, we have persuaded JTR to make the following proposal:

If Motivation will withdraw its pending motions, and acknowledge in the withdrawal that Motivation has learned that it has been misled by various persons who have an axe to grind with Jay Miscovich, JTR will (i) consent to Motivation's voluntary dismissal of its claim without prejudice to any future recoveries JTR might make, (ii) promptly pursue its claim of title and/or a liberal salvage award, and (iii) refrain from asking Judge King to impose sanctions against Motivation.

Inasmuch as JTR still has much work to do to prepare its response in opposition to Motivation's pending motion for sanctions, this proposal will remain open only until the close of business tomorrow. After that, JTR will proceed full speed ahead, and we are confident that the results will not bode well for Motivation.

We are hopeful that Motivation will see the wisdom and benefit of agreeing to JTR's proposal, and that we might put this matter to rest. If you wish to speak about this proposal, please let me know, and I will arrange a conference call.

Before closing, I would be remiss if I did not comment on your repeated, defamatory and baseless accusations that I am involved in perpetrating a fraud on the Court, your clients, and others. I have been practicing law for more than twenty-five years, have an un[t]arnished reputation, and have not participated, and never will participate, in any fraudulent activity. Indeed, if I knew that JTR

was engaged in a fraud on the court, I would come forward (along with David Horan and others) and say so. In fact, however, I have no such knowledge. I strongly encourage you to refrain from making any further reckless and baseless defamatory statements in your pleadings. As I am sure you are aware, there is a limit to the qualified immunity from liability for defamation for what is stated in legal filings, and I am fairly confident that you have crossed that line.

Regards,

Bruce

(E-mail from B. Silverstein to M. White, dated Oct. 4, 2012) (**Exhibit S** hereto).

120. The next day, I received a reply that not only rejected my proposal, but branded it a threat, repeated Motivation's defamatory allegations that I am acting as a "co-conspirator" in a "fraud," and set forth a diatribe of allegations that were mainly inaccurate and otherwise supported by nothing more than massive speculation (if not paranoia). (*See* e-mail from M. White to B. Silverstein, dated Oct. 5, 2012) (**Exhibit S** hereto).

121. Following some further communications, Motivation's counsel agreed to call me on October 6 to discuss my proposal. In advance of that call, I sent Motivation's counsel a point-by-point response to the items raised in his reply e-mail, which I reproduce herein below. The assertions of Motivation's counsel are in black, and my responses are in red:

Bruce: On January 6, 2012, you emailed me and offered Motivation a settlement where Motivation would agree to a consent order that JTR would be entitled to a 75% salvage award and Motivation would be entitled to litigate the issue of whether it was entitled (as owner) to the remaining 25% of the finds and JTR would allow Motivation to conduct full discovery. Discovery or not, your offer would have prevent Motivation from contesting JTR's claim no matter what discovery showed. Under your proposal if the discovery revealed JTR's claim was a scam or a penny stock play Motivation could be considered to be a co-conspirator. Your offer was essentially the same as had been discussed and rejected multiple times since early November with Kim, Sean, Gary, Bill VanDercreek and ourselves, Paul Sullivan and Dave Horan on the calls. As you acknowledged in your January offer, Kim Fisher's consistent position throughout was that he would make no deals prior to inspection. [My offer is in writing, and is plain and unambiguous. I did not offer that JTR would agree that Motivation

was the "owner" of anything.  The offer was that (i) Motivation would stipulate that JTR was entitled to a salvage award of no less than 75%, and (ii) JTR and Motivation would then litigate the questions of (a) whether Motivation was the owner of the emeralds, and (b) if so, what percentage, if any, of the remaining 25% should be awarded to JTR as a salvage award.  If Motivation failed to prove ownership and/or later withdrew its claim based on its acceptance that Motivation had no claim to the emeralds (as JTR has been saying along), JTR would then have applied to the Court for an award of title and/or a salvage award of the remaining 25%.  Even if it were assumed (arguendo) that there were any merit to Motivation's current assertions that the Discovery is a fraud (which it is not, so far as I know), Motivation's acceptance of the offer would not have caused Motivation to be viewed as a co-conspirator]

By January 2012, Motivation's own investigations had raised a number of red flags:

- Miscovich claimed to have recovered some 65,000 plus emeralds sitting in plain view on the bottom some 30-40 miles out in the Gulf of Mexico in January 2010. [This is incorrect.  Jay claims to have recovered 65,000 plus emeralds over a period of 12 to 18 months, commencing in January, 2010, during which time Jay and Steve claim to have made numerous trips to the Discovery Site, which is within the coordinates identified in JTR's Verified Claim] Dr. Baer, a consultant to GUTS reported Jay said he recovered these emeralds with the assistance of two Mexican divers. [So far as I know, Dr. Baer is mistaken.  I have never heard this "story" from anyone else – not ever.  I know of no "Mexicans" who have anything to do with Jay and his discovery, and I have never seen any evidence to support Dr. Baer's alleged account of the facts. Additionally, as discussed below, Jay was not in control of GUTS prior to August 19, 2011]  We have reason to believe the "Mexicans" were Elschlepp and Kent Van Raalte.  [So far as I know, the first time Kent ever visited the Discovery Site was in late 2011, when he accompanied Jay, Steve, and various persons from 60 MINUTES.  I, too, was on that trip.  I spoke to Kent, who appeared ecstatic by what he saw, and he told me he had never been there before.  I have heard this from others, as well.] Plus, they did all of this in 20-30 dives.  That is preposterous according to every diver Kim Fisher knows and every diver known to Kenny Rose.  First, that is not the way nature handles things out in the Gulf (or Atlantic); second, just do the math.  That is an average of over 2,200 to 3,200 emeralds per dive.  [I have been told that there were at least 20 or 30 trips to the site, during which each trip at least two people each made two two-hour dives.[9]  Although I have

---

[9]     I was mistaken.  I understand that there were between 60 and 80 trips to the Discovery Site between January, 2010 and the time Jay and Steve had collected 65,000 emeralds – not just 20 to

no diving experience, it is perfectly conceivable to me that thousands of these stones could be collected in a single trip to the Discovery Site, in which between eight and twelve hours were spent salvaging the emeralds – i.e., two hours per diver, times two trips, times two or three divers, none of which was Kent. Indeed, I was at the site with 60 MINUTES when three divers went into the water for less than an hour and came up with what seemed to be more than a hundred emeralds – even though they had to devote substantial time to showing a photographer what they were doing, and fending off a shark] The Fishers have been recovering Muzo emeralds on the Atocha for some 27 years, using modern equipment and air-lifts and recoveries are less than 3,000 stones for the entire period and none were found laying on the sea floor unless forced up by air-lifts. [This fact proves nothing. The Fishers have been salvaging the remains of the *Atocha*, which I understand did not even list emeralds on its manifest. From what I know, Jay's discovery is not the *Atocha*. For all we know, Jay's discovery is from a ship that was carrying hundreds of thousands of emeralds. The fact that it has taken many years to find 3,000 emeralds at the *Atocha* site is entirely immaterial to the question of how long it would take to find 65,000 emeralds at a different site involving a different ship. It is logical folly to contend otherwise. Suppose for example, I were to scour the junk yards in Key West, and it took me 10 years to find a Rolls Royce engine. Would that mean that a friend of mine who scours the junk yards of London would be lying if he told me that he found 10 Rolls Royce engines in one day at the first junk yard he visited? This is precisely the type of argument you are making. The Fisher's experience at the *Atocha* wreck site is anecdotal and has no bearing on another salver's experience at an entirely different site. Similarly, the fact that Odyssey found hundreds of pounds of gold is not lacking in credibility simply because the Fishers found mainly silver.] By Jay's own admission, they recovered these stones and colonial era pottery using just scuba gear. [To my knowledge, Jay does not claim to have recovered colonial era pottery at the Discovery Site. Jay claims that someone else found colonial era pottery at the site, and brought it to Jay's attention before Jay ever visited the site. Jay said as much during the 60 MINUTES segment] The hundreds and perhaps thousands of very small emeralds shown to Marcial on August 14 were by Jay's admission in front of John Siracusa, Dave Horan and Eric Williams (and Sean and Gene and Manuel) recovered using a kitchen or baker's type sieve! [That is

---

30 trips. I also understand that there were two or three dives each trip (per diver), and that most of the dives lasted approximately one hour each. I corrected my mistake when I spoke with Mr. White the following afternoon.

consistent with what I have been told. If you have evidence that this is untrue and/or cannot be true, I would be interested to learn about it]

- We also learned after filing Motivation's claim that Jay had approached some of the IR guys at the Fisher's in 2009 with a scheme to assist him in raising funds to develop a huge (300 pounds or more) cache of Colombian emeralds he and Elschlepp had located off the coast of Equador. [I have no personal knowledge about this. I have heard a story about an ORRV expedition, in which Scott Heimdal was working with the Ecuador government, and which ended with Mr. Heimdal being arrested and/or chased away by the military. I also am not sure you have the right year, but you might. I have no reason to believe that this has anything to do with Jay's claimed discovery in January, 2010] This was later posted on ORRV blogs. During this period Jay and Elschlepp dove with Kenny Rose in his permitted area off Woman Key. [So what? I understand that there a number of potentially interesting wrecks within the "Kirby Site," including a civil war era wreck that is of interest to Jay and Steve] Miscovich attempted a similar push with Scott Hemidal and Peter Tobias for investors in 2010 this time touting the emeralds as coming from the Atocha. [I have no knowledge of any claim by Jay that the emeralds came from the *Atocha*. I do know that Jay has denied this claim since the first day that Motivation asserted it. The only "evidence" I have ever seen of this assertion is the affidavit you procured from Scott Wilding, which I personally know, for a fact, to contain inaccurate information – which I will explain in my Affidavit if Motivation does not withdraw its Motion for Sanctions. We also have information about Mr. Wilding that is, to say the least, less than flattering]

- Emerald Reef and GUTS brought Scott Heimdal, Tobia, Jay and other ORRV players into the picture in early 2010. Jay received 25,000,000 shares in April 2010 per SEC reports. [I investigated this issue during the pendency of the Delaware Litigation. As I understand matters, the shares in question were never issued to Jay. Rather, the reports state that the[s]e shares are being held by ORRV in trust for Jay, and I understand that Jay has disputed these reports and has disclaimed any ownership of these shares.]

- The prime red flag, though, was that in early 2010, Eschlepp and Peter Tobias approached Brent Bisbane, the then new owner of the 1715 wrecks off Vero Beach, and proposed they subcontract on one of admiralty court approved wrecksites where they anticipated finding a substantial find of Colombian emeralds. [I know nothing about this. Perhaps, you can provide me with evidence that I can

review and consider its implications]  At about the same time in 2010 GUTS entered into an agreement with Kenny Rose for an area off Woman Key that would exclude any emerald finds or the non-defined "Emerald Reef" from the normal owner-subcontractor split in the industry of 50-50. [The "GUTS" Agreement with Ken Rose was negotiated by the "New York Investors" and their lawyers.  Jay was not in control of GUTS at the time the Agreement was negotiated and formed.  By the time Jay was put in control of GUTS, Ken Rose already had purported to terminate the Agreement.  I have my suspicions about that Agreement, but I have seen no evidence that Jay was behind the Agreement.]  Subsequently you negotiated a deal with Rose for Jay and Steve (J&S Keys, LLC) which did not include the tell-tale exclusion of emeralds clause. [You are 100% correct.  I can, and will, explain this Agreement in my Affidavit.  Your suspicions about the Agreement are entirely unfounded.  Moreover, as you correctly note, there is no exclusion for emeralds.  Indeed, there is no mention of any emeralds in the agreement I negotiated.  The Agreement provided for (i) a straight-up 50/50 split of anything found at the Kirby Site, and (ii) Ken Rose had broad observation rights.  As I understand matters Jay had no expectation of finding any emeralds at the Kirby Site, and was interested in exploring a civil war era wreck known to be within that area.]

- All of this activity we now know was happening after the alleged 2009 Equador finds as well as the alleged January 2010 Emerald Reef recoveries.

The April 22, 2012, 60 Minute documentary did nothing to dispel the above concerns and indeed increased inflow of information to Motivation disputing Jay's claims.

Newspapers had reported that court documents showed the emeralds had a value of nearly a half a billion dollars. [You should not believe everything you read in the press.  This was a sensational report that was not supported by the pleadings in the Admiralty Action.]  These estimates, at least in the Key West Citizen, no doubt, came from Miscovich.  [I do not believe that the reporter got this value from JTR, Jay, or anyone authorized to speak for JTR.  If you have contrary evidence, as opposed to speculation, I look forward to learning what it is.]  Since Miscovich had already worked a stock deal with ORRV by then and brought ORRV principals into Emerald Reef LLC and GUTS, ORRV appears to have tried to capitalize on its own 5.17% interest in JTR above the Emerald Reef shares owned by insiders.   [As discussed above, your information about Jay's relationship with ORRV is inaccurate.  After JTR filed its admiralty claim, Scott Heimdal (a principal of ORRV) threatened to file a claim against the emeralds.  Personally, I thought the claim had no merit, and was unconcerned about JTR needing to litigate against Mr. Heimdal.  Other advisors to JTR had a

different view, and a settlement was reached with Mr. Heimdal (and not ORRV), which has been misdescribed in internet postings, and about which I have complained.]

Manuel Marcial's inspection revealed that, except for one or two stones, the entire balance of the emeralds (which Miscovich represented as being the totality of the finds) was of non commercial quality and had a value of much less than the $100,000,000 Jay touted on 60 Minutes and a far cry from the $500,000,000. [You should watch the 60 MINUTES segment again and/or review the transcript attached to Motivation's Motion for Sanctions. Jay never volunteered any belief respecting the value of the emeralds. 60 MINUTES does claim that Jay believed the emeralds were worth hundreds of millions of dollars, but you will not see or hear Jay saying so in the segment (or in the transcript). Don't you think 60 MINUTES would have shown Jay saying this if he had done so? In any event, Jay does believe the emeralds are worth hundreds of millions of dollars. Jay may be right if it turns out that the emeralds are from a colonial era wreck – which Jay also continues to believe. Alternatively, Jay's belief may turn out to be woefully misplaced. Whatever the emeralds turn out to be worth, Jay is entitled to his beliefs. Indeed, Jay has a constitutional right to believe whatever he wants to believe. Significantly, nowhere in any of the Admiralty filings has Jay expressed any belief respecting the value or origin of the emeralds. That has all been made up by the press, the rumor-mill, and others] Miscovich has, according to his own accounts, had possession of the gemstones for almost 2 years prior to filing and had plenty of opportunity to obtain a valuation of the bulk of his "finds." [Jay had possession of certain emeralds for 1 year and 8 months prior to the admiralty filing. For much of that time, however, a great number of the emeralds were "locked up" in a safe deposit box to which Jay had no access – which was the subject of the Delaware litigation. With respect to the emeralds that were accessible to Jay, there were various valuations obtained before the Admiralty action was commenced. If those valuations are to be believed, they would support the view that the entirety of the discovery may be worth hundreds of millions of dollars. Mr. Marcial is entitled to his opinion, but it is different from the opinions expressed by other folks. And – they were all viewing the same emeralds. There has been no "swit[c]heroo."] Some 3 dozen gemstones were shown to the Investors and the Smithsonian Institute and they presumably had real value. [To the best of my knowledge, this is very true. To the best [o]f my knowledge, these very same emeralds were made available for Mr. Marcial's inspection. I also have seen these same emeralds inspected by other "experts."] We still wonder where they and the emeralds in the December 9, 2010, appraisal at Doc 131-8 are located and so should you. [It is my understanding – which can be corroborated by John Siracusa – is that all of these emeralds were included among the emeralds that were made available to Mr. Marcial for his inspection. Indeed, it is my understanding that every single emerald in JTR's custody was made available for Mr. Marcial's inspection. I know you find this hard to believe, but it is true to the best of my knowledge, and I am prepared to so testify. I also witnessed a number of these emeralds being inspected by a Colombian mine owner who was brought in by 60 MINUTES. I have consulted with other

"experts" as well.  I have heard all sorts of differing valuations of the very same emeralds – which makes me scratch my head and wonder whether these so-called experts really know what they are doing.  Again, I would be pleased to talk to you about this.]

It is clear to us that "Doctor Jay" Miscovich has lied about his professional employment and has told conflicting and improbable tales about buying a map, finding the emeralds at the coordinates stated and getting a top NYC admiralty lawyer's advice.  [I think you are going to be very surprised!  The truth will set you free – but it may well come at a substantial cost.]

It is clear to us (and outside counsel with whom we consulted) that had Kim agreed to the January 6 offer, Kim and Motivation (and the Lewis & White law firm) would be co-conspirators in a fraud scheme if our suspicions are correct – and we have no evidence to the contrary.  [This is discussed above.  Also, I note that I repeated[ly] asked to speak to Kim in January, and he refused my invitations]

While you are ethically required to represent your client, the Advisory Committee Notes to Rule 11 amendments in 1983, called to our attention by John Siracusa, admonishes that, although "the rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories... [t]he court...should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."  Of course, this does not apply to you directly because you are not counsel of record but you are the strategist and call the shots.  [I did not "call the shots."  I simply provided legal advice, which was often followed, and was sometimes disregarded.  Also, I am glad to see that you now acknowledge that Rule 11 does not apply to me.]  The point is, though, that by January 2012, you knew or should have known that the French lab was angry at being asked to analyze a bunch of enhanced, modern era gemstones unlikely to be from any shipwreck; likewise, the Swiss lab.  [I do understand that the two labs were upset.  I also believe that there is a logical explanation for their findings, which I would be pleased to discuss with you if you really want to talk about it, and have not closed your minds to the possibility that you have made a huge mistake in the positions you have taken in this litigation]  We are sure that you had other indicators by then.  [I disagree, but I suppose reasonable minds might differ on what constitutes an "indicator."  Personally, I have been vigilant to investigate every allegation that has been leveled against Jay, and I have tried to remain skeptical of his claims.  I have yet to find any evidence that persuades me that Jay is engaged in a fraud.  If I were persuaded of that fact, I would withdraw as counsel, and I would get in line with your client in making claims against JTR and Jay]  You should have launched a thorough inquiry after having so many negative reports.   [We did launch a thorough investigation – which commenced within days of receiving the very first indications from the French and Swiss Labs that they had found modern materials on the emeralds.  The investigation involved CBS News, the GIA, Matco, and Chemir.  Additionally, we caused JTR to obtain new samples – under the supervision of counsel of

record in the admiralty proceeding.  Thus far, all indications are that the reports from the French and Swiss Labs can be explained, and it remains possible that the emeralds are from a colonial era wreck and/or a WWII wreck.  Again, I am happy to explain, and will be doing so in my Affidavit.  Again, I believe you are making a huge mistake and jumping to unwarranted conclusions that are contrary to the actual evidence – much of which you know nothing about, and other of which you have simply ignored or misunderstood.]

Yet you threatened a class action suit against Motivation on behalf of its current and prior investors (Jay is one) if Motivation did not drop its claim prior to the January 10, 2012, hearing.  [I truthfully told you that Jay was threatening to bring such an action, and that I was doing my best to dissuade him from doing so.  The exact quote is as follows: "As this matter progresses, Jay Miscovich is becoming increasingly aggravated with Motivation, and pushing us to take an aggressive position in the litigation – including (i) seeking sanctions if the dismissal motion is granted, and (ii) possibly commencing a class action suit against Motivation on behalf of its current and prior investors (which Jay is one).  We have been pushing back very hard to keep Jay calm, but he is extremely frustrated by the fact that Motivation's claim (which he views as frivolous) is holding back JTR from moving forward with its efforts to monetize the discovery."]  According to John Siracusa or Joe Janssen you spent a lot of money gathering documentation relative to Motivation's business.  [If John or Joe told you this, they are mistaken.  I have not spent any money gathering any documentation relative to Motivation or its business.]  Through John and Joe you threatened us with Rule 11 sanctions in July.  [This is an example of where my advice was not followed.  I was against making such a threat, and preferred to make another effort to extend an olive branch to see if a settlement might be reached.  My "strategy" was over-ruled, and the Rule 11 letter was sent.  It did not come from me, and was sent over my objection.  I have contemporaneous documentation to prove this.  Motivation's allegations to the contrary are insulting]  You have threatened Kenny Rose for cooperating us and, in the Delaware case, threatened Rose that you would break him financially if he tried to maintain his claim in those proceedings and have threatened others as well.  [I have never threatened Mr. Rose with anything and I certainly never threatened to "break [Mr. Rose] financially."  When Peter Hess filed a motion to intervene in the Delaware Litigation on behalf of Mr. Rose, I did inform Mr. Rose's counsel that Jay would seek sanctions in Delaware if Mr. Rose did not recant his frivolous assertions that Jay had stolen the emeralds from the Kirby Site.  Mr. Rose's counsel and business partner, Ed Wells, later admitted to [me] that Mr. Hess was not authorized to make a filing on Ken Rose's behalf in the Delaware proceedings, and Ken Rose admitted to me that he had been misled into believing that Jay had stolen emeralds from the Kirby Site by persons who had an axe to grind with Jay, and that the entire episode was a big mistake and was very embarrassing.  I have not threatened Mr. Rose or otherwise made any effort, whatsoever, to refrain from cooperating with Motivation in the Admiralty proceedings.  Indeed, since the Delaware Litigation was concluded, the only communications of any sort I have had with Mr. Rose [or] Mr. Wells have been (i) early in the process when we

received information that Mr. Hess intended to file a claim on behalf of Mr. Rose – which Mr. Wells, denied, and (ii) when I contacted them to see if we might revive the agreement for Jay to perform salvage activity in the Kirby Site]

Now you are again threatening us if we don't withdraw our motion to compel. [I am making no threat of any sort] If JTR has nothing to hide, why is it that the production we seek is driving you to make another Rule 11 threat? The fact that you are making such threats over Motivation's request for a relatively few documents, should be an alert to yourself that you must have too much invested in this deal because your judgment is getting poor. [In 25 years of practice, I have always advised my clients to resist discovery that they are not required to produce. No good ever comes from producing discovery that is not required by applicable law – even when one has nothing to hide. Providing discovery is a costly and one-sided affair. The other side always seeks to distort whatever discovery they obtain. Motivation has no right to discovery at this time, and its pending motions to compel and for sanctions are, themselves, sanctionable in my view.]

You may not view yourself as a knowing co-conspirator to perpetuate a fraud on the court; but, through your persistence in closing your eyes to the glaring truth that the financially desperate Miscovich cooked-up a scheme to defraud the gullible public who buy penny stocks by, first, and then when that did not succeed, hit upon an admiralty action as a way to increase the value of his pedestrian emeralds by defrauding a federal court. [I certainly do not view myself as a co-conspirator in any fraud, and I find Motivation's (and now you[r] accusations to the contrary defamatory]

You could show us a least some indication of your sincerity about not being a part of a scheme to defraud the public and to defile Judge King's court, if you would conduct a reasonable investigation about Dr. Jay's assertions and his conduct, .e.g. have you seen evidence of a $50,000 payment to a diver (other than Steve Elschlepp or Kent Van Raalte) [I have seen such evidence, and well prior to the filing of the admiralty action] and evidence that Miscovich engaged a top NYC admiralty lawyer [I have seen such evidence, and well prior to the filing of the admiralty action]. Have you investigated the basis for the rumor that the "finds" were worth nearly a half-billion dollars. [I have seen evidence that Jay's discovery may be worth hundreds of millions of dollars, and possibly as much as a half billion dollars or more, and well prior to the filing of the admiralty action. Nonetheless, no such allegation was made in the Admiralty action. Nor, to my knowledge, has any such assertion been made to the press by JTR, Jay or any other person authorized to speak on JTR's behalf] Have you insisted that, since JTR has nothing to hide, JTR should willingly comply with Motivation's request for production before being ordered. [Absolutely not. An adversary is entitled only to such discovery as the law permits. Motivation is not entitled to any discovery at this point in time, and I will not insist that JTR provide such discovery voluntarily – although I would consider recommending that JTR share such information with Motivation if Motivation were acting responsibly and not

pursuing sanctions and otherwise seeking to interfere with JTR's admiralty claim.]

We decline your offer and threat. Please govern yourself accordingly. [Again, I have made no threat, and I look forward to discussing this with you tomorrow]

(E-mail from B. Silverstein to M. White, dated Oct. 6, 2012) (**Exhibit T** hereto).

122.     I spoke with Mr. White for approximately forty-five minutes on the afternoon of October 6. Mr. White told me that he viewed Motivation as having the right and responsibility to continue to pursue this action, despite the fact that Motivation has abandoned its claim to the emeralds, because Motivation has an obligation to "police" the treasure hunting community. I couldn't disagree more. My understanding of the civil justice system is that Motivation has no right to serve as a private attorney general. If Motivation truly believes that JTR is truly involved in a fraud, Motivation should bring it to the attention of the appropriate authorities. Motivation lacks standing to remain in this case to serve as the treasure police.

123.     On October 7, Mr. White informed me that Motivation was unwilling to withdraw its pending motions and continued opposition to JTR's obtaining an award of title, but that JTR's filings in response to Motivation's Motion for Sanctions might provide a basis for revisiting the decision. (E-mail from M. White to B. Silverstein, dated Oct. 7, 2012) (**Exhibit T** hereto)

## O.     **Concluding Remarks**

124.     In more than twenty-five years of practicing as an attorney, I have seen a lot of excellent lawyers and I have seen some very poor lawyering. Throughout the course of my representation of Jay, Scott and Steve, however, I have witnessed the most frivolous, defamatory and vexatious filings I have ever seen – and the worst of them have been made by Motivation in the Admiralty Action. I have heard that the "trouble with treasure" is that it brings all sort of vermin out from under the woodwork – such as the trio of felons (Edwards, Wilding and Krajewski) who are aiding Motivation in its efforts. I would not, however, have believed that

licensed attorneys, such as those representing Motivation in the Admiralty action, could file such frivolous drivel. The reckless and defamatory allegation that I am complicit in perpetrating a fraud on the court is just one example of the baseless allegations made in these proceedings.

**FURTHER AFFIANT SAYETH NOT**.

Bruce L. Silverstein

STATE OF DELAWARE )
                       )    SS.
NEW CASTLE COUNTY )

This 9th day of October, 2012, personally appeared before me, a Notary Public for the State and County aforesaid, Bruce L. Silverstein, who, by me being first duly sworn, deposed and said that the facts set forth in the foregoing affidavit are true and correct to the best of his knowledge and belief.

Kay M. Shuey
Notary Public

My commission expires on February 16, 2013

**KAY M. SHUEY**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
**My commission expires Feb. 16, 2013**