UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**IN ADMIRALTY**

Key West Division
CASE NO.4:11-CV-10074-JLK

JTR ENTERPRISES, LLC
A Delaware Limited Liability Company

       Plaintiff,

vs.

An Unknown Quantity of Colombian Emeralds,
Amethysts and Quartz Crystals located within
3,000 yards of a point located at coordinates
24°57.79" North Latitude and 81°55.54" West
Longitude.

      *In Rem* Defendant.
_____/

## OPINION AND FINAL ORDER

THIS CAUSE comes before the Court upon the bench trial held from December 3, 2012

through December 21, 2012 in Key West and Miami, Florida.

This case is the legal finale to a three year opera with a stunning libretto: two friends

followed a treasure map to a hoard of gems on the floor of the Gulf of Mexico, then braved an

onslaught of investor disputes and accusations of fraud in order to gain title to the massive

amount of precious stones.   Plaintiff JTR Enterprises, LLC, ("Plaintiff" or "JTR"), the company

formed by the two divers after the initial retrieval, comes before the Court seeking title to the

stones, or in the alternative, a liberal salvage award.  Motivation, Inc. ("Motivation"), another

treasure salvage company in Key West, intervened as a claimant, investigating its potential claim

1

to the stones and then withdrawing the claim after determining the stones did not belong to the company.

The community of Key West, Florida is used to such stories. This case follows discoveries of treasure from the lost Spanish Galleons the Atocha and Santa Margarita, discoveries which captured the imagination of aspiring treasure seekers around the world and which are legendary in the modern salvage industry. The difference between this case and the cases of the Galleons Atocha and Santa Margarita is the striking lack of a shipwreck, or indeed any source which might tell the real story of how the stones came to be resting 65 feet deep on the surface of the ocean floor in January of 2010.

## I. Factual History

On or about January 11, 2010, friends and dive partners Jay Miscovich ("Jay") and Steve Elchlepp ("Steve") retrieved a handful of green stones from the floor of the Gulf of Mexico, some 30 miles North of Key West. As they continued to dive the site, the handful turned into a heap of stones which Steve testified now weighs between 100 and 250 pounds.

Jay and Steve were not searching the area by happenstance. As professional maritime treasure hunters, Jay and Steve were following a lead purportedly provided by a map purchased from Jay's old acquaintance Mike Cunningham, a destitute handyman from Pennsylvania.[1] For

---

[1] Jay reports paying $500 for the map and an accompanying shard of pottery, and then paying an additional $50,000 for Cunningham's renunciation of all claims to the treasure. The Court notes that Jay testified in court that he was unable to contact Cunningham and never had contact information for him. Instead, Cunningham would always call Jay, checking in on a monthly basis over the years with a blocked number that prevented Jay from seeing his phone

three days straight, Jay and Steve went out on a boat to the area of the ocean shown on the map, to search for treasure.

Steve commenced random diagnostic dives ("bounce dives") in approximately 65 feet of water without success until, on the afternoon of the third day, January 11, 2010, when Jay decided to accompany Steve on the last dive. The visibility underwater was either less than 15 feet, or 15 to 20 feet, or 20 feet (there was contradictory testimony as to this fact from Jay and Steve), and the area close to the floor of the ocean had a grey, monochromatic tone. It was during that dive that Jay, according to his testimony in court, noticed some "shiny objects" approximately fifteen feet away that he thought were pieces of broken glass "glistening on the bottom" (Testimony of Jay Miscovich, Dec. 4-5, 2012).[2] As he approached the objects, he saw "a lot of green all over the bottom." *Id.* Jay picked up a few of the objects, and then motioned Steve up to the surface to show him the objects. Electrified, the two men grabbed the four empty sandwich bags from their lunch and dove back to the ocean floor to retrieve more of the green stones. Jay describes it as feeling "like picking cherries on a cherry tree," because the stones

---

number. Jay testified that he never asked Cunningham for a phone number or address. Counsel for Motivation suggested in its closing argument that "Mike Cunningham" was merely a pseudonym for Jay Miscovich. The Court finds the story of Jay's acquisition of the purported treasure map suspicious to say the least, but at the end of the day immaterial to the resolution of title to the *res*.

[2] In comparing Jay's testimony to Steve's, the Court is troubled by Jay's testimony that he noticed glistening, shiny stones on the surface of the ocean floor from around fifteen feet away. On December 3, 2012, Steve testified that "we were looking for signs of gold, silver bars, coins, things like that," and he "had not noticed [the stones] because they blend in very well with the sediment, the sand. When you're training your eye to look for one thing in particular, you don't see the forest through the trees." Testimony of Steve Elchlepp, Dec. 3, 2012. The fact that such an experienced diver felt that the stones had blended in with the sand, combined with the varying reports of the visibility that day, lead the Court to, at the very least, question the reliability of Jay's account of the moment he first saw the stones.

were so concentrated in the area and easy to find. *Id.* The pair filled the four bags and then stopped for the day, heading back to Steve's home. As Jay noted in his testimony, they did not have enough air to make another dive.

Professional archeologist Dr. Robert H. Baer testified that he spent two days interviewing Jay and then prepared a draft treatment from his notes. The draft treatment tells a different story about the day of the find. Most notably, Baer's draft report has Jay diving with "two friends from Mexico" instead of with Steve. Ex. 15 at 2. In addition, the draft treatment indicates that rather than picking up a couple stones and immediately taking Steve back up to the surface, Jay picked up some stones and then continued to swim further in order to look for other indications of a shipwreck. According to Baer's draft treatment, after Jay took his friends to the surface, the three of them used a system of loose ropes wherein Jay and one diver would load a bag full of the stones and then "along with a man in the boat pulling on a rope, they would swim the bag to the surface, dump the stones in the boat, then return to the bottom," recovering "[i]n about four hours ... eighty pounds of emeralds" that first day. *Id.* at 3. This account substantially differs from Jay and Steve's testimony that they simply filled their four sandwich-sized plastic bags and then, out of air, returned home. Although counsel for JTR established on cross-examination that Baer's draft treatment contained the wrong name for Jay's brother and the incorrect year of the find, the Court finds Baer to be a credible witness.

Over the next few months, Jay and Steve went back out repeatedly to retrieve more of the stones.  Steve testified he went alone on a number of occasions and, whether jointly or alone, he retrieved stones from the site every time he dove on the site.  The recovered material was taken to Steve's Key West home, cleaned and stored in a safe.  In addition to the retrieval operations taking place in Key West, Jay and Steve also sought out potential investors for their fabulous discovery of thousands of what they believe to be lost Colombian emeralds scattered on the floor of the ocean.

According to Jay's testimony, investors contributed between $500,000 and $1,000,000.  Bruce Silverstein, Jay's lawyer, testified that either he or his law firm contributed an additional $150,000 as an equity owner of JTR.  Disputes with the investors group eventually landed in state court in Delaware.  The Court finds that this side drama is immaterial to the Court's analysis of the Plaintiff's prayer for a salvage award and/or title to the *res*.

The stones were subsequently scattered across the country, and indeed, the world.  Jay and Steve's first move was to bring stones to New York City and Washington, DC, where they showed the stones to potential investors as well as gemologists and other experts, including an official from the Smithsonian.  Jay gave stones to a jeweler in Pittsburgh, Pennsylvania, to have the stones cut and made into some pieces of jewelry.  Jay testified in trial that the jeweler produced finished pieces of jewelry that filled four gallon-sized bags comprising "a couple hundred stones".  (Testimony of Jay Miscovich, Dec. 4, 2012.)  One of the investors was given

5

some stones, one of which was made into a necklace for his wife. (Plaintiff's Second Status Report, DE #54, filed Jan. 6, 2012). Jay took bags of the stones to his ill older brother and left them for his brother to photograph.[3] Jay shipped a half bagful of stones to his younger brother in Hawaii, who showed them to potential investors before carrying them back to New York City a few months later. Once this admiralty case was filed, Plaintiff commenced to try to reassemble the stones in the jurisdiction of the United States Court in Key West.[4] Some of the stones were slowly recalled back to Key West and New York City, and some stones were sent to experts in Switzerland, France, and Columbia for evaluation.

In addition to removing stones from Key West, the pair actually planted some back into the ocean as well. Steve testified that between January and April of 2011, he filmed a promotional video at an underwater site location in approximately 35 to 40 feet of water. He placed forty stones into the water, set them on the floor of the ocean, and then proceeded to recreate the original find on film. Steve testified that they pre-counted the stones to keep track of them. According to Steve, everyone involved in the filming of the video knew it was not the actual site, and the video was never shown to anyone.

---

[3] As described during Jay's direct testimony, during the period that the stones were in the possession of his older brother, the brother sprayed the stones with a cooking oil.

[4] This was a slow process extending over approximately a year and the subject of several hearings before the Court where Claimant Motivation demanded to see and inspect the stones. JTR contended the stones would be furnished for inspection as soon as they could reasonably be brought back and deliver them into the custody of the Court.

At some point, representatives from the CBS program *Sixty Minutes* came to be in touch with Jay and Steve.  Over several months between the fall of 2011 and early 2012, the CBS crew filmed footage for the segment, both in the ocean and interviews on dry land,[5] and paid for some of the expert evaluations of the stones.  The footage of the dive trip shows Jay telling the CBS crew that the stones are worth millions of dollars, and that one particular find was worth "easily" $100,000.  Ex. 125-1.  These amounts are in stark contrast to the testimony presented at trial on December 6, 2012 by Motivation's expert, Manuel V. Marcial.  Marcial, a Key West jeweler with fifty-six years in the emerald business, testified that the overall collection of stones that he inspected (with some exceptions) was of a very poor quality that would not interest a responsible dealer.  In fact, Marcial testified that in his opinion a liberal value of the stones would be a combined total of $50,000, of which 1 or 2% would be of commercial value.  He further described demonstrating to Plaintiff's lawyer, on a court recess during trial, how one of the "emeralds" from the Plaintiff's exhibit (Ex. #121) crumbled in his hand when he applied pressure from his fingers.  He testified that such crumbling was an indication of poor quality, worthless emeralds.

Expert reports in evidence as well as testimony during trial established that at least a portion of the stones in evidence have epoxy or oil on them.  Testimony indicates that such

---

[5] Footage filmed by CBS of Jay and Steve (and others) diving at the site from what appears to be two separate cameras was submitted as evidence at the trial.  The Court has viewed the footage, but finds it poor quality evidence because it appears to have already been edited and taken out of chronological order.  The footage does suggest, however, that it is very murky and difficult to see objects and colors deep underwater, even with the use of a bright light and sunlight on the surface filtering through 65 feet of sea.

epoxy is a modern material that would not have been in existence prior to the 19th century and would have disintegrated entirely given enough time under water.

## II.    Litigation History

On September 6, 2012, JTR filed its Complaint against "An Unknown Quantity of Colombian Emeralds, Amethysts and Quartz Crystals located within 3,000 yards of a point located at coordinates 24°57.79" North Latitude and 81°55.54" West Longitude" ("the emeralds") (DE #1), along with a Motion to Appoint a Custodian (DE #3) and a Motion for Issuance of Warrant *In Rem* (DE #4). Pursuant to this Court's well-established procedure for admiralty cases, the Court moved promptly to appoint Plaintiff JTR Substitute Custodian of the *In Rem* Defendant and issue a Warrant *In Rem*. (DE #5 and 6, respectively, filed September 7, 2011). JTR published "Notice of Action *In Rem* and Arrest of Property" in The Citizen, a newspaper in Monroe County, Florida (*see* Plaintiff's Notice of Filing, DE #9, filed October 12, 2011), pursuant to Supplemental Rule C(4) for Certain Admiralty and Maritime Actions of the Federal Rules of Civil Procedure as well as Local Admiralty Rule C(4). Two claimants respond and filed timely appearances: Clawdb LLC, Azalp LLC, Darn LLC, and M Ventures LLC ("Clawdb LLC et. al.") filed a "Motion to Intervene" (DE #11, filed October 14, 2011), and Motivation Inc. filed a "Verified Statement of Right and Interest and Claim of Motivation, Inc." (DE #10, entered October 16, 2011). On October 20, 2011, the Clerk of Court entered a Clerk's Entry of Default as to the *res* as well as against all persons or entities who had not timely filed their claim.

8

The record suggests a systemic difficulty in achieving the delivery of the *res* into the jurisdiction of the Southern District of Florida. JTR's status report from September 30, 2011 (DE #7) indicated that JTR had leased safe deposit boxes in Key West where "[t]he majority of the recovered items" were currently in holding, and that the Plaintiff / Substitute Custodian was in the process of coordinating the transport of "[t]he remaining recovered items . . . [from] a bank vault in New York . . . to a bank in South Florida." Plaintiff also noted in its report that "36 representative sample emeralds have been provided to the Smithsonian National Museum of Natural History in Washington, D.C." (DE #7).

After Plaintiff JTR and Intervenors Clawdb LLC et al. filed multiple notices to the Court[6] disputing whether counsel had conferred prior to the filing of Interveners' Motion to Intervene (DE #11) and delineating the nature of the security interest in the *res* held by Interveners as a result of a separate settlement agreement approved by the Delaware Chancery Court ("the Delaware agreement),[7] this Court held a hearing on Intervenor's Motion to Intervene. (DE #35, filed November 23, 2011). Also at issue was the transport of the portion of stones which were still in New York City as of the end of November, despite Plaintiff's September 30th status report indicating that arrangements were being made to transport them at that time back into the Court's jurisdiction. (*See* DE #37). Plaintiff and Interveners responded by apparently settling their

_____

[6] *See*, *e.g.*, DE #17, 18, 22, 23, 24, 25

[7] *See* DE #17.

differences and filing a stipulation for an agreed order (DE #37) in lieu of a hearing, which this

Court approved December 1, 2011 (DE #38).  The Order indicated, *inter alia*, that the Interveners

would "retain a security interest in a portion of the [emeralds still in New York]" and that Plaintiff

JTR would "divide the [emeralds still in New York] into three lots," one of which would be

designated as belonging to the Intervenors pursuant to the Delaware agreement.  (DE #38 at 2).

Then, all the emeralds still located in New York would be transported by private plane to Key West

(with a brief stop in the New York studios of CBS for photographing).  (*Id.* at 3).  The Order also

stated that "a few Gemstones have been sent to France, Switzerland and/or Columbia for analysis" .

. . [and] shall all be returned after testing and held in the Key West Bank Vaults and shall not be

removed from the Bank Vaults during the pendency of this action, absent an order of this Court

allowing such removal."  (*Id.*).

    In fact, JTR's second status report, filed January 6, 2012, stated that JTR "anticipates that

the transport of the [emeralds still in New York] will occur before the end of [January]."  (DE #54,

filed January 6, 2012).  The report also noted that emeralds from the *res* had been provided to a

member of the Intervenors as well as to a jewelry store located in Pennsylvania prior to the start of

the instant action, and that JTR was in the process of transporting those stones back to Key West.

(*Id.* at 2-3).  All in all, five months into this action, the defendant *res* was apparently scattered

between Key West, New York, Pennsylvania, France, Switzerland, and Columbia, if not elsewhere.

The efforts to require Plaintiff to comply with the normal procedure of establishing

admiralty jurisdiction in a United States District Court by delivery of the *res* of found property to a

court-appointed Substituted Custodian continued through early 2012, resulting in court hearings on

June 18, 2012 and then July 30, 2012.[8]  Coupled with other issues that have arisen in the past year

of this action, the difficulty in bringing the entirety of the *res* to Southern Florida has caused a

marked deviation from this Court's prior and well-established procedures.  *See, e.g., Cobb Coin*

*Co., Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 549 F.Supp. 540 (S.D. Fla.

1982); *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 556

F.Supp. 1319 (S.D. Fla. 1983); *MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned*

*Sailing Vessel*, 631 F.Supp. 308 (S.D. Fla. 1986).

Of the two claims initially entered in response to the published notice, neither remains

today.  On the eve of trial, the Intervenors Clawdb LLC et al., who indicated multiple times over

the course of the record that their interest in the *res* is solely a security interest contingent upon

JTR perfecting title or a salvage lien pursuant to a separate settlement approved by the Delaware

Chancery Court, (*see, e.g.,* D.E. #17), voluntarily dismissed their claims with prejudice (DE #176,

filed November 29, 2012).  Claimant Motivation attempted to withdraw its claims while reserving

---

[8] In addition to managing the protracted process of returning the dispersed stones to Key West in order to bring them into the jurisdiction of the Southern District of Florida, the Court also dealt with a stream of filings concerning Claimant Motivation Inc.'s purported claim to the emeralds.  On January 10, 2012, this Court held a status conference on Motivation's claim, following up with an Order Denying Plaintiff's Motion for Judgment on the [Motivation] Pleadings and Staying Discovery.  (DE #69, filed February 7, 2012).  A second hearing followed on February 7, 2012.

claims for Rule 11 sanctions. (DE #118).[9]  The Court denied the Motion to Dismiss, retaining

jurisdiction for determination of the Motion for Sanctions prior to dismissing it as a party.[10]  (DE

#121).  Therefore, the only remaining claimant to the *res* in this action is Plaintiff JTR.[11]  The Court

conducted a bench trial from December 3, 2012 through December 21, 2012 in Key West and

Miami, Florida.

### III.    Jurisdiction

The standard procedure for Admiralty cases in the Southern District of Florida is for

finders/salvors to file suit in admiralty and bring the subject material into custody of the Court to

establish *in rem* jurisdiction over the material.  A warrant for an arrest of the *res* issues, a

substitute custodian is appointed, and after publication of Plaintiff's claim is made, anyone

having a claim may so state and be heard at trial.  Unless a claim is entirely frivolous, no

sanctions may be brought against a conditional claimant for bringing the claim if the claim is

subsequently shown to lack merit.

---

[9] The Motion cites Motivation's own expert's determination that the *res* in question "could not have been part of the cargo of the Atocha or Santa Margarita." (DE #118).  JTR filed a Response to this Motion on August 20, 2012 (DE #120).

[10] Motivation submitted a Motion for Sanctions against JTR (DE #123, filed August 27, 2012).[10]  In furtherance of its Motion for Sanctions, Motivation filed a Motion to Compel Discovery on October 2, 2012 (DE #134).[10]  As of this Order, both of Motivation's Motions concerning sanctions (DE #123 and 134) have been fully briefed by the parties and were previously set for evidentiary hearing on December 3, 2012.  The issues raised in Motivation's Motions (DE #123 and 134) have been severed and will be considered separately.

[11] Although Motivation had already withdrawn its claim to the *res*, the Court permitted Motivation to participate in the trial for the reasons set forth in the Court's Order on Claimant Motivation Inc.'s Participation in Trial (DE #194, entered Dec. 14, 2012).

In the case at bar, it took an extraordinary amount of time for the allegedly discovered material to be submitted to the jurisdiction of the Southern District of Florida.  On the basis of this record, the Court cannot find that the material currently under the Court's arrest comprises the same material retrieved from the floor of the Gulf of Mexico, or that the material under the Court's arrest is the entire *res*.  Nor can the Court be certain that the material shown to the expert witness, examining the stones prior (and during) trial was the same material retrieved from the ocean floor and the same material contained by the *res* under the Court's arrest.

IV.    **The Law of Admiralty: Salvage vs. Finds**

    A.  **The Law of Salvage**

In 1879, Supreme Court Justice Nathan Clifford described salvage as "the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of shipwreck, derelict, or recapture." *The 'Sabine'*, 101 U.S. 384, 384 (1879).  Justice Clifford's oft-cited decision provided three necessary elements to make a claim in salvage: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success." *Id.*

The element of marine peril is not limited to ships currently afloat; courts have allowed historic shipwrecks to satisfy peril as well.  As the Fifth Circuit noted in *Treasure Salvors, Inc. v.*

*Unidentified Wrecked and Abandoned Sailing Vessel* ("*Treasure Salvors I*"), "[m]arine peril

includes more than the threat of storm, fire, or piracy to a vessel in navigation." 569 F.2d 330,

337 (5th Cir. 1978). "If [the found materials] had been resting on a reef, where they could be

seen, they would undoubtedly have been in 'peril' of being lost, and the 'marine peril' certainly

was not diminished or extinguished by the fact that [the materials] were actually lost." *Id.*

(quoting *Thompson v. One Anchor and Two Chains*, 221 F.770, 773 (W.D. Wis. 1915) (internal

quotations omitted)). *Treasure Salvors I* continues: "There is no dispute that the [wrecked ship]

was lost. Even after discovery of the vessel's location it is still in peril of being lost through the

actions of the elements." As this Court wrote in *Treasure Salvors, Inc. v. Unidentified, Wrecked*

*and Abandoned Sailing Vessel, et al.* ("*Santa Margarita decision*"), "[i]t is established in this

Circuit that a marine peril exists in an ancient, abandoned shipwreck for purposes of meeting the

requirements of a valid salvage action." 556 F.Supp. 1319, 1340 (S.D. Fla. 1983). As the

Plaintiff has the burden to prove marine peril, in such cases the Plaintiff must show that the

subject material was lost.

There is a twist to the law of salvage, however; a salvor may forfeit its rights to salvage.

Judge Paul Niemeyer of the Fourth Circuit Court of Appeals addresses such a situation in *R.M.S.*

*Titanic, Inc. v. Haver* ("*Titanic I*"):

While the law of salvage provides substantial protection to salvors to encourage their

saving of life and property at sea, it also imposes duties of good faith, honesty, and

14

diligence in protecting the property in salvors' care.  Thus, salvors have to exercise a trust

over the property for the benefit of the owner and subject to any orders of a court.  In this

vein, salvors are not entitled to remove property from the wreck for their own use or to

use the property for their own use.  When a violation of this trust occurs, the salvage

claim is forfeited.  Indeed, it has been held that even when salvors have mistakenly

misunderstood their rights and have taken property for their own use, they forfeited their

right to a salvage award.  171 F.3d 943, 963-64 (4th Cir. 1999) (internal citations

omitted).

Judge Niemeyer further elaborated on this forfeiture in his 2006 follow-up opinion, *R.M.S.*

*Titanic, Inc. v. The Wrecked and Abandoned Vessel* ("*Titanic III*"): "…[A] salvor acts on behalf

of a true owner, *even when that owner has not been identified….* [W]hen the salvor violates that

trust, it may forfeit its salvage rights, including the right to exclusive possession and a salvage

award." 435 F.3d 521, 532 (4th Cir. 2006) (emphasis added).

### B.  The Law of Finds

In order to grant title, as opposed to a salvage award, the Court must apply the law of

finds.  "Unlike the law of salvage, the law of finds imposes no trust on the finder, who acquires

the property for his own benefit." *Odyssey Marine Exploration, Inc. v. Unidentified, Wrecked,*

*and Abandoned Sailing Vessel*, 727 F.Supp.2d 1341, 1344 (M.D. Fla. 2010).  Judge Abraham

Sofaer's decision in *Hener v. U.S.* provides a frequently cited contextualization for the application of the law of finds in admiralty cases:

> The law of finds is disfavored in admiralty because of its aims, its assumptions, and its rules. The primary concern of the law of finds is title. The law of finds defines the circumstances under which a party may be said to have acquired title to ownerless property. Its application necessarily assumes that the property involved either was never owned or was abandoned.... To justify an award of title (albeit of one that is defeasible), the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it. ....Salvage Law assumes that the property being salved is owned by another, and thus it has not been abandoned. 525 F.Supp. 350, 356 (S.D.N.Y. 1981).

In simpler terms, the elements of a finds claim in admiralty are "(1) intent to reduce property to possession, (2) actual or constructive possession of the property, and (3) that the property is either unowned or abandoned." *Titanic III*, 435 F.3d at 532 n.3.

Judge Sidney Aronovitz explained the possession aspect of the law of finds in his 1986 decision, *MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*: "[T]he finder of abandoned property must continuously possess or be in the process of reducing to possession the property which he has found. With regard to the requirement of continuous possession, the law of finds is unforgiving." 631 F.Supp. 308, 311 (S.D. Fla. 1986).

The third element is particularly tricky. "Unowned" implies natural materials "such as flora and fauna" that have never been owned. 727 F.Supp.2d at 1344. It seems to this Court that "unowned" further implies an object that is indigenous to the place where it was found, which logically has not yet been picked up by a person and transported as a possession. For that property which *was* owned at some point but has since been lost, a finder must show abandonment by the original owner.

The cases that have relied on the law of finds rather than salvage to determine claims in admiralty tend to turn on whether the finder can show abandonment. In basic terms, there have been two types of factual scenarios: cases in which original owners affirmatively (and publicly) abandoned their property (in which abandonment is fairly straight forward), and the cases in which no owner comes forward and abandonment must be inferred. *See Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 974 F.2d 450, 461 (4th Cir. 1992). In situations where no owner comes forward, "[s]uch circumstances may give rise to an inference of abandonment..." *Id.* Quoting a 1981 District Court opinion from Texas, (*Hatteras, Inc. v. THE U.S.S. HATTERAS*, 1984 A.MN.C. 1094, 1097 n.5 (S.D. Tex. 1981)), *Columbus-America Discovery Group* states, "[w]hile mere nonuse of property and lapse of time without more do not establish abandonment, they may, under circumstances where the owner has otherwise failed to act or assert any claim to property, support an inference of intent to abandon." 974 F.2d at 461 (internal quotations omitted).

This Court appreciates, as was previously noted by the Fifth Circuit in *Treasure Salvors I*, that the "[d]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." 569 F.2d at 337. However, as pointed out in *Columbus-America Discovery Group*, the *Treasure Salvors I* decision specifically noted "that it had been stipulated by all parties involved that the original owners had abandoned the wrecks, and the district court also made mention of the fact that, 'The modern day government of Spain has expressed no interest in filing a claim in this litigation as a successor-owner.'" 974 F.2d at 462 (quoting *Treasure Salvors I*, 569 F.2d at 337). The *Columbus-America Discovery Group* court closes its discussion of the law of abandonment with a clear statement of what must be shown to prove abandonment: "abandonment must be proved by clear and convincing evidence, though, such as an owner's express declaration abandoning title. Should the property encompass an ancient and longlost shipwreck, a court may infer an abandonment." 974 F.2d at 464-65. *See also Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 671 (5th Cir. 2000).

## V.   Analysis of the Facts from Trial

### A.   Without a shipwreck, an essential element of proof is missing under the law of salvage.

The law of salvage calls for a marine peril. This element may be satisfied by an "ancient, abandoned shipwreck." *Santa Margarita decision*, 556 F.Supp. at 1340. When there is a shipwreck involved, Plaintiff can provide documentation of the ship, its cargo, dates, etc. which

allows the Court to make certain logical assumptions as to the owner of the material (e.g. the King of Spain). Then the Court can require the owner to provide a salvage award.

In the instant case, however, there is no shipwreck, and no proof that the stones were ever lost in the first place. The only evidence is that Jay and Steve retrieved the material from the ocean floor on and after January 11, 2010. But the genuineness of the act of retrieving the material does not prove that the material was previously lost. The material may never have been lost, if Motivation's claims are correct that Plaintiff owned the material, dropped it into the ocean, and then retrieved it. To give an appearance of discovery of Spanish Treasure, without a shipwreck, without an owner, and indeed without a showing of a marine peril, the Court cannot find the law of salvage applies in this case.

### B.  Plaintiff has forfeited salvage rights

In addition to the lack of a marine peril, the Plaintiff has forfeited its rights to salvage. In providing the stones to the jeweler in Pittsburgh so that he might cut the stones and make pieces of finished jewelry from them, Jay removed property from the *res* for his own use. Indeed, Jay testified in trial that the jeweler produced finished pieces of jewelry that filled four gallon-sized bags (comprising "a couple hundred stones"). Testimony of Jay Miscovich, Dec. 4, 2012. Jay also testified that he was under the impression that he was allowed to cut the stones. As Judge Niemeyer instructed in *Titanic I*, such forfeiture applies even when the salvor was mistaken about his rights regarding the *res*. Testimony of Jay Miscovich, Dec. 4, 2012. In addition, an

investor was given three stones, one of which was made into a necklace for his wife. Therefore, even if the Court were to apply the law of salvage, Plaintiff has forfeited any right to a salvage claim due to exploitation of the *res* for personal use.

### C. The Court Must Apply the Law of Finds

In light of the above analysis as well as the Plaintiff's original prayer for the award of title to the *res*, the Court now addresses the case through the lens of the law of finds.[12] The first difficulty arises with regard to the requirement of continuous possession. As relayed above, the retrieved *res* was separated and sent, piecemeal, across the world. While Jay and Steve have testified that the entire *res* has been returned, Steve also admitted during cross examination that he does not know for sure that there was no break in the chain of custody. The Court agrees; even assuming that any stones sent to laboratories or other scientific experts were treated professionally and completely returned, there were too many other individuals carrying the stones from one place to another out of the presence of Jay and Steve (e.g. the investor who received three stones and gave at least one to his wife, Jay's older brother who kept them overnight for photographs and sprayed them with cooking spray, Jay's younger brother who shuttled them around Hawaii, and Jay's younger brother's wife who carried some stones to a bank in Hawaii, to name a few) to rule out interference with, or replacement of, the stones. It is also impossible for the Court to be certain that all of the stones eventually arrived back to Key

---

[12] Although counsel for the Plaintiff requested injunctive relief in his closing argument on December 21, 2012, the Court cannot grant an injunction under the law of finds.

West for that same reason. This issue casts a not-insignificant shadow of doubt over the possession elements of a claim under the law of finds.

The third element calls for the *res* to either have never been previously owned, or to have been lost and abandoned by its owner. Never previously owned implies local flora or fauna that is indigenous to the area of retrieval. The testimony indicates that the *res* is comprised of stones which are *not* indigenous to the bed of the Gulf of Mexico. Therefore, the Court moves to the other option: whether the *res* has been lost and abandoned by its original owner. In other words, the Court must address the elephant in the room: how did these stones come to be sitting on the ocean floor in January of 2011?

The court in *Columbus-America Discovery Group* is quite firm on the requirement for clear and convincing evidence of abandonment, but carves out an exception for cases in which there is "an ancient and longlost shipwreck" and no owner files a claim. 974 F.2d at 464-65. In such cases, the court may infer abandonment. This record is devoid of any evidence of any shipwreck, 16th Century Spanish Galleon, or any proof of abandonment by a prior owner. The *res* has appeared seemingly out of thin air, without proof of the source of origin, of transportation or prior ownership. Plaintiff has failed in this essential element of proof. Duncan Matthewson in Ex. #125-1 and 2 (DVDs) suggests that the emeralds were possibly contained on the deck of a Spanish Galleon in a barrel of gems, that got washed overboard in a storm, but this is no more

21

than mere speculation by the witness obviously intended to influence the CBS crew that 16th Century Spanish Treasure was involved.

When all is said and done, there are two options: Jay and Steve legitimately found lost stones on the floor of the Gulf, or Jay and Steve placed stones acquired elsewhere on the ocean floor in order to "find" them and thereby establish an ancient provenance and greatly enhance the value of the stones and the reputation of the men as treasure salvors.  There is just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them.  The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds.  Each story represents one possible interpretation of entirely circumstantial evidence, and neither persuades the Court.  Even if the Court could determine that Jay and Steve did indeed find the stones on the first day, the Court has no credible evidence upon which to base a finding that the material was lost or abandoned by some other original "finder" or owner.

## VI.    Conclusion

Having forfeited their rights to salvage and failing to prove the elements of the law of salvage or finds, Plaintiff has failed to convince the Court that a salvage award or the awarding of title to the *res* is appropriate.  The Court therefore awards no salvage award to JTR, nor any award of title to the material to JTR.  Pursuant to Supplemental Rule E(5)(d) of the Federal Rules of Civil Procedure, the Court has the discretion to set the terms and conditions of the release of

the arrested property in this case.  Under the facts of this very unusual case, where the law

precludes award of title of the *res* to Plaintiff JTR, and there remains in the case no other

claimant as to the *res*, the question of proper disposition of the material gem stones remains.  The

Court concludes that the *res* should be simply returned to the parties who physically brought it to

the jurisdiction of the Court, delivered it to the U.S. Marshal and who obtained appointment of

substitute custodian, JTR Enterprises, LLC; namely, Jay Miscovich and Steve Elchlepp.  The

Court makes no finding as to the type, source, value, provenance, or origin of the stones

comprising the *res*.

       Therefore, the following is **ORDERED, ADJUDGED and DECREED**:

    A.  The Substitute Custodian, appointed by this Court's Order of September 7, 2011

       **(DE #5)** shall furnish to the Court a list of all costs incurred, as a function of its

       position as Substitute Custodian, as a result of this litigation (including, but not

       limited to, the costs of maintaining the *rem* in bank vaults in Key West, Florida).

    B.  The Substitute Custodian is hereby **discharged** of all other duties as of the date of

       this Order, and shall transfer the *res* over to the custody of the United States

       Marshal Service.

    C.  The *rem* shall remain in the custody of the Court via the United States Marshal

       Service until the Warrant for Arrest of *In Rem* Defendant has expired.

D. Jay Miscovich and Steve Elchlepp shall refund all costs incurred by the Court and by the Substitute Custodian as a result of this litigation.

E. The Warrant for Arrest of *In Rem* Defendant, issued September 7, 2011 **(DE #6)** shall not expire until ten (10) days have passed, or until such time as all expenses incurred by the Court and by the Substitute Custodian as a result of this litigation have been refunded by Jay Miscovich and Steve Elchlepp, whichever is longer.

F. Once the Warrant for Arrest of *In Rem* Defendant has expired, the *rem* **shall be returned** to the sole custody of Jay Miscovich and Steve Elchlepp.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami-Dade, Florida, this 25th day of January, 2013.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

Copies furnished to:
All Counsel of Record