UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
"IN ADMIRALTY"

JTR ENTERPRISES, LLC,

        Plaintiff,

vs.

AN UNKNOWN QUANTITY, etc.,        CASE NO. 4:11-CV-10074-KMM

        *In Rem* Defendant,

vs.

MOTIVATION, INC.,
        Claimant.
_____/

**NON-PARTY PAUL SULLIVAN'S MOTION TO QUASH SERVICE
OF PROCESS AND RENEWED MEMORANDUM IN OPPOSITION TO
MOTIVATION'S AMENDED MOTION FOR SANCTIONS**

    Non-Party, Paul D. Sullivan, specially appears to move to quash service of process and challenge this Court's jurisdiction over him.[1] Pursuant to this Court's Order to Show Cause [D.E. 445], Mr. Sullivan also submits this Renewed Response in Opposition to the Amended Motion for Sanctions [D.E. 407] filed by Motivation, Inc. ("Motivation"), and in support states:

**INTRODUCTION**

    Beginning on January 13, 2014, this Court held a three-day evidentiary hearing on Motivation's original Motion for Sanctions against JTR Enterprises, LLC ("JTR"). On January 15, 2014, at the conclusion of that hearing, this Court determined that the above-styled admiralty action was brought and maintained in bad faith as a fraud on the Court. On February 28, 2014, Motivation filed its Amended Motion for Sanctions seeking an order to show cause directed to Non-Party, Paul D. Sullivan, among others [D.E. 407]. Without any evidentiary support, Motivation seeks sanctions against Mr. Sullivan for only one reason: because he has "deep pockets."

---

[1] While the exercise of the Court's inherent power to sanction turns on a jurisdictional issue, it is unclear if challenging the jurisdiction of the Court in this context requires a special, limited appearance. Mr. Sullivan appears specially here in an abundance of caution.

This Court lacks jurisdiction to sanction Mr. Sullivan because (1) he has not been properly served under Rule 4.1 of the Federal Rules of Civil Procedure, and (2) there is **no** evidence to support Motivation's bald assertion that Mr. Sullivan substantially participated in this litigation – let alone in any alleged bad faith conduct – or that he had a substantial interest in the litigation. This lack of evidentiary support is fatal to Motivation's attempt to expand the proceedings so that it can go after Mr. Sullivan's "deep pockets." Accordingly, Motivation's Amended Motion for Sanctions should be denied to the extent it seeks to proceed against Mr. Sullivan.

## RECENT PROCEDURAL BACKGROUND

Motivation filed its original Motion for Sanctions against JTR and its principal, Jay Miscovich, on August 27, 2013 [D.E. 123]. On February 28, 2014, it filed an Amended Motion for Sanctions ("Amended Motion"), seeking to expand the proceedings to include, among others, Non-Party, Paul Sullivan [D.E. 407]. In the Amended Motion, Motivation argues that Mr. Sullivan substantially participated in and controlled JTR's bad faith conduct. The Amended Motion – and the record in this case – is devoid of any evidence supporting Motivation's argument. Mr. Sullivan filed a Response in Opposition to the Amended Motion on March 31, 2014 [D.E. 437], and Motivation filed a Reply on April 7, 2014 [D.E. 440].

On June 19, 2014, this Court entered its Findings of Fact and Conclusions of Law relating to the original sanctions proceedings [D.E. 445]. The Court found, in relevant part, that "sanctions are warranted against JTR, for Motivation's attorneys' fees and costs, for the period of time from December 2, 2011 to April 18, 2012." *Id*. at ¶ 61. The Court concluded that JTR's sanctionable conduct was its delay in disclosing preliminary test results during that time frame showing that the emeralds at issue contained an epoxy residue. *See id*. at ¶ 62.

On June 23, 2014, Motivation filed a Motion for Reconsideration of the Findings of Fact and Conclusions of Law, arguing that the Court erred in limiting the time frame of the sanctionable conduct [D.E. 448]. The Court denied the Motion for Reconsideration on July 10, 2014 [D.E. 450].

This Court issued an Order to Show Cause to Mr. Sullivan on July 25, 2014 [D.E. 451], directing him to respond to Motivation's Amended Motion for Sanctions within 20 days of service of the Order to Show Cause. On August 6, 2014, Mr. Sullivan was served by the U.S. Marshal Service at his home in Hawaii.

2

## MOTION TO QUASH SERVICE AND MEMORANDUM IN SUPPORT

The service of the Order to Show Cause on Mr. Sullivan was improper and must be quashed. Mr. Sullivan is not a party to the above-styled litigation, and has not made a general appearance. "When it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, that party must be served with process as in any other civil action." *Fid. Nat. Fin., Inc. v. Friedman*, 76 Fed. R. Serv. 3d 276 (D. Ariz. 2010) (quoting 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2960 (1995)); *accord Comverse, Inc. v. American Telecommunications, Inc. Chile S.A.,* 2009 WL 464446, at *2 n. 4 (S.D.N.Y. Feb. 24, 2009) (citation omitted) (where it "appear[ed]" that the court lacked personal jurisdiction over non-parties because there was no evidence of proper service, the court was "[w]ithout personal jurisdiction" and could not "hold them in contempt[]").

Rule 4.1(a) of the Federal Rules of Civil Procedure governs the method for service of process of an order to show cause. *Fid. Nat. Fin., Inc*, 76 Fed. R. Serv. 3d at 276 (citing Fed. R. Civ. P. 4.1(a)). The Rule expressly provides that, other than an order committing a person to civil contempt of a decree or an injunction issued to enforce federal law, an "order in a civil-contempt proceeding may be served *only* in the state where the issuing court is located or elsewhere in the United States *within 100 miles* from where the order was issued." *Id*. (emphasis added).

Motivation failed to comply with Rule 4.1. Mr. Sullivan lives more than 100 miles from the Southern District of Florida, from where service was issued. Motivation requested that service be made upon Mr. Sullivan at his home address in Kailua, Hawaii, which is more than 4,700 miles from the Key West Division of the Southern District of Florida – the issuing court. *See* Acknowledgement of Service [D.E. 453]. Rule 4.1 expressly requires that service be made only within the state of the issuing court or within 100 miles of same. Accordingly, service of process upon Mr. Sullivan was deficient as a matter of law and must be quashed.

## MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION'S AMENDED MOTION FOR SANCTIONS

While the Court lacks jurisdiction over Mr. Sullivan as a result of improper service of process, Mr. Sullivan specially appears to also challenge the Court's jurisdiction to use its inherent powers to sanction him as a non-party through this Renewed Response to the Amended

3

Motion for Sanctions, as required by the Order to Show Cause.[2]  Motivation's assertions are wholly without merit, and the Court should reject its efforts to drag Mr. Sullivan into the sanctions proceedings solely because Motivation believes he can pay its legal fees.

## I.      MOTIVATION IS SIMPLY LOOKING FOR "DEEP POCKETS"

Motivation's Amended Motion is wholly without merit.  As will be discussed at length, below, there is no evidentiary support for the imposition of sanctions against Mr. Sullivan. Motivation has resorted to advancing conclusory allegations, unsupported by the record, in a desperate attempt to expand the sanctions proceedings to include Mr. Sullivan.  The reason – as Motivation has brazenly and repeatedly admitted – is because Mr. Sullivan has money.

On February 15, 2013, Gene Lewis, Motivation's counsel, advised Motivation and its other attorneys that the "[g]oal for all of us is money judgment against deep pockets."  2/15/13 E-mail, attached as Exhibit "A."  He then went on to list potential "deep pocket" targets.  *Id*.  On April 20, 2013, Mr. Lewis sent a long e-mail detailing Motivation's strategy.  In it, he implored his team:  "Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here[.]"  4/20/13 E-mail, attached as Exhibit "B."  In the same e-mail, Mr. Lewis stated that his concern was "to accelerate the caging of deep pockets." *Id*; *see also* 4/9/13 E-mail from Gene Lewis ("All we are after is a deep pocket who can pay Kim, us, Hugh and John's folks . . . so let's get a consensus on how we can wind this down with a solvent judgment debtor(s) in our sights."), attached as Exhibit "C."

It is clear that the only reason Motivation has sought to expand these sanctions proceedings is because of its singular goal of getting money from "deep pockets" – regardless of whether those "deep pockets" actually participated in bad faith conduct.  The analysis below establishes that there is absolutely no legal or factual basis for sanctioning Mr. Sullivan.  The Court should not countenance Motivation's bad faith efforts to expand these proceedings to satisfy its "mission" to get at "deep pockets."

## II.     LEGAL STANDARD FOR SANCTIONING A NON PARTY

The Court's power to impose sanctions is derived from the inherent power "vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

---

[2] As discussed above, Mr. Sullivan specially appeared to challenge jurisdiction with his initial Response [D.E. 437] to the Amended Motion for Sanctions.  He continues that special appearance in this Renewed Response.

cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id*. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44–45. Accordingly, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994).

While a "court's inherent power to sanction includes sanctioning non-parties for bad faith conduct . . . additional safeguards may be warranted when a non-party is being sanctioned." *Feldman v. Davidson*, No. 05-61760-CIV, 2009 WL 995473, *2 (S.D. Fla. April 13, 2009) (citing *Chambers, Inc.*, 501 U.S. at 41; *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 568 (E.D. Mich. 1993)). The analysis is jurisdictional, and "[t]o be subject to the Court's inherent power to sanction, a non-party not subject to court order must (1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered." *Helmac Products Corp.*, 150 F.R.D. at 568. This two-part test "excludes an individual who has only a minor degree of involvement with the litigation and who acts outside the presence of the court." *Id*. "While such a person may interfere with litigation, the Court's interest in safeguarding the integrity of its proceedings must give way to a limitation on the Court's authority commensurate with its traditional powers." *Id*. "The key to awarding sanctions under a court's inherent powers is a finding of bad faith by the sanctioned person." *In re Creative Desperation Inc.*, 443 Fed. Appx. 399, 401 (11th Cir. 2011).

The Court's inherent power cannot be used to sanction non-parties for conduct that occurred outside of the proceedings – only bad faith conduct *in* the proceedings is sanctionable. *See In re Fema Trailer Formaldehyde Products Liab.*, 401 Fed. Appx. at 883. Accordingly, the Court should consider only that conduct that occurred within the proceedings before it.

There is no question Mr. Sullivan falls far beyond the scope of the Court's jurisdiction through its inherent power to sanction because of the complete absence of ***any*** "factual predicate" – let alone an "adequate factual predicate" – that he substantially participated in any aspect of the litigation or that he had a substantial interest in the outcome of the litigation, and certainly no evidence that he engaged in bad faith conduct.

5

Motivation's Amended Motion is rife with conclusory allegations that are unsupported by the lengthy record created in this matter. Standing alone, the conclusory manner in which Motivation makes allegations against Mr. Sullivan is insufficient for this Court to sanction a non-party such as him. *See Ware v. United States,* 154 F.R.D. 291, 293 (M.D. Fla. 1994) (refusing to grant sanctions because plaintiff had not provided "specific notice of reasons sufficient for [the Court] to consider imposing sanctions; conclusory statements are not enough"); *Beltran v. Brentwood North Healthcare Center, LLC*, 426 F.Supp. 2d 827, 832 n. 3 (N.D. Ill. 2006) (indicating that "the court would not be inclined to award such sanctions based on plaintiffs' conclusory assertions"). Nevertheless, the true defect in Motivation's allegations against Mr. Sullivan is that the record clearly demonstrates that he did not substantially participate in the litigation – and certainly not in any bad faith conduct – and did not have a substantial interest in the outcome of the litigation.

Even if Motivation's allegations of bad faith conduct on the part of Mr. Sullivan were true – and they clearly are not – it would still not be a sufficient basis for sanctioning him as a non-party. *See Feldman*, 2009 WL 995473, at *2 (holding that the court lacked sufficient evidence to enter sanctions against a non-party because his involvement and his knowledge of the fraud on the court was only gleaned from circumstantial evidence, despite the strong inference that his participation was essential to the fraud); *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir. 1994) (finding that actions of non-party were not taken in bad faith and were "insufficient to trigger sanctions against a non-party" despite his "engineering the Plan's suit and inducing the Beneficiaries to sue Howard Johnson & Co." in order to "spread his losses"). Accordingly, Motivation's Amended Motion fails, and this Court lacks jurisdiction to sanction Mr. Sullivan.

### III. SULLIVAN DID NOT SUBSTANTIALLY PARTICIPATE IN THE PROCEEDINGS

The record in this case exposes the misrepresentations and outright falsities that Motivation clings to in support of its assertion that Mr. Sullivan substantially participated in the litigation. Mr. Sullivan was a member of the JTR limited liability company. He was not, however, a managing member, and had no authority to direct its actions – including its litigation strategy. *See* JTR Operating Agreement, attached as Exhibit "D." At no time during this litigation did Mr. Sullivan cause documents to be filed, direct litigation strategy, or otherwise

6

decide the course of JTR's litigation conduct.  *See* Horan Test., Hr'g Tr. vol. II, 111:1–3; 130:4–8; Sullivan Test., Hr'g Tr. vol. II, 239:20–240:12; vol. III, 43:10–16; *see also* Declaration of David Horan ("Horan Decl.") at ¶ 5, attached as Exhibit "E"; Declaration of John M. Siracusa ("Siracusa Decl.") at ¶ 4, attached as Exhibit "F."  Before the Court is the undisputed testimony of JTR's attorneys in this case, unequivocally stating that Mr. Sullivan did not substantially participate in the litigation, let alone any bad faith conduct.  The Court's analysis ends there, and on this basis alone, Motivation's Amended Motion fails.  Mr. Sullivan will nevertheless address Motivation's specific assertions to further show their lack of merit.

In its Amended Motion, Motivation argues that Mr. Sullivan substantially participated in the litigation based on three factual assertions:

A. Sullivan and Silverstein "caused JTR to file a false status report on January 6, 2012 that made material misrepresentations concerning epoxy test results", and that they "caused JTR to continue filing motions and legal briefs in an effort to drive Motivation out of the case and conceal the epoxy evidence." Am. Mot. at 14.

B. Sullivan, Silverstein and Silverstein's firm "launched a vigorous campaign to have Motivation's claim dismissed on legal grounds, to block discovery so Motivation's expert could not examine the emeralds, and to conceal the test results showing that the emeralds were coated with modern epoxy resins." *Id*. at 12.

C. "Sullivan and Silverstein caused JTR to appeal Judge King's ruling in the Phase I Trial," and that they "let stand arguments before the 11th Circuit that were based on perjured testimony." *Id*. at 14–15.

These three allegations represent the sum total of Motivation's alleged basis for this Court's exercise of jurisdiction over Mr. Sullivan, a non-party.[3]

---

[3] Motivation also alleges that "Sullivan and Silverstein caused JTR to file a settlement proposal made by Motivation as part of settlement discussions in November 2013, prior to the sanctions hearing."  This allegation is not relevant because it occurred outside the December 2, 2011 to April 18, 2012 period to which the Court found the sanctionable conduct was limited. It also occurred after the conclusion of the proceedings, when the sanctions issue was all that remained. *In re Fema Trailer Formaldehyde Products Liab.*, 401 Fed. Appx. 877, 883 (5th Cir. 2010) (quoting *In re Case*, 937 F.2d 1014, 1024 (5th Cir. 1991)) (internal quotation omitted) ("Inherent power must arise from the litigation before [the sanctioning] court, and a district court abuses its discretion for sanctioning conduct that cannot be construed as part of the proceedings before it.").  Moreover, an alleged violation of the confidentiality provisions of the agreement does not

The conduct alleged in C occurred outside the December 2, 2011 to April 18, 2012 period to which the Court found the sanctionable conduct was limited. Accordingly, the Court need not even consider that assertion. Mr. Sullivan will, however, address all three allegations to illustrate the Amended Motion's complete lack of merit.

### A. Sullivan Did Not Cause JTR to File Any Document in this Litigation, Including the January 6, 2012 Status Report

Motivation's wholly unsupported allegation that Silverstein and Sullivan "caused JTR to file a false status report on January 6, 2012 that made material misrepresentations concerning epoxy test results" fails because there is absolutely nothing in the record that even so much as implies Mr. Sullivan caused or directed the January 6, 2012 report to be filed. In fact, the record indicates quite the contrary. David Horan, JTR's admiralty counsel, testified at the sanctions hearing, and then later affirmed in his Declaration, that Mr. Sullivan did not direct or in any way cause any status report to be filed with the Court, including the January 6, 2012 report. Horan Test., Hr'g Tr. vol. II, 111:1–3; Horan Decl. at ¶ 5. *See* Siracusa Decl. at ¶ 4.

Faced with this stark record contradicting its assertions regarding the filing of the Second Status Report on January 6, 2012, in its Reply, Motivation resorted to outright fabrication concerning the Third Status Report. Without *any* citation to the voluminous record of these proceedings, Motivation baldly alleges that "Sullivan and Silverstein made multiple edits which kept Horan from filing" the Third Status Report with the Court. Reply at 7. Motivation then made the following additional misrepresentation to the Court: "Nevertheless, Sullivan had succeeded in keeping Horan from disclosing the condition of the emeralds until the very end by having him chase down the whereabouts of each of the emeralds that had been tested and making sure that not (sic) final Matco report was issued until September 17, 2012, after the emeralds had been inspected." *Id.* Again, there is no citation to the record for Motivation's strong and specific statement. Instead, as is repeatedly the case, the *only* evidence in the record on this issue directly contradicts Motivation's assertion that Mr. Sullivan had *any* involvement whatsoever in the drafting or filing of the various status reports filed with the Court. Mr. Horan himself testified at

---

represent a fraud on the Court or bad faith. Most importantly, however, Motivation cites to nothing in the record to show that Mr. Sullivan caused this document to be filed. He did not. Declaration of Joseph W. Janssen, III ("Janssen Decl.") at ¶¶ 4–5, attached as Exhibit "G."

the sanctions hearing, and then later affirmed in his Declaration, that Mr. Sullivan did not direct or in any way cause any status report to be filed with the Court. Horan Test., Hr'g Tr. vol. II, 111:1–3; Horan Decl. at ¶ 5. That Motivation simply ignored the evidence and made outright false representations to the Court is a clear indication of the Amended Motion's utter lack of merit.[4]

### B. Sullivan Did Not Attempt to Block Inspection of the Emeralds and Always Promoted Cooperation and Full Disclosure

Motivation's next claim – again, with no citation to the record – is that Mr. Sullivan, along with Mr. Silverstein and his firm, "launched a vigorous campaign" to block Motivation's request to inspect the emeralds, while trying to dismiss Motivations claim on legal grounds." Am. Mot. at 12. Once again Motivation has failed to cite to any testimony or a single document in or outside of the record that so much as hints at Mr. Sullivan's alleged participation throughout the JTR litigation, and the record indicates the exact opposite. *See* Horan Decl. at ¶ 5; Siracusa Decl. at ¶ 4; Horan Test., Hr'g Tr. vol. II, 111:1–3; 130:4–8; Sullivan Test., Hr'g Tr. vol. II, 239:20–240:12; vol. III, 43:10–16.

Motivation's suggestion that Mr. Sullivan sought to block its inspection of the emeralds is completely false, as this Court explicitly recognized in its Findings of Fact and Conclusions of Law. In limiting the time period during which sanctionable conduct occurred, the Court rejected Motivation's contention that it was not permitted to inspect the emeralds at issue in the case:

> Sullivan testified that JTR offered to let Motivation look at the Emeralds early on in the case but that they asked Motivation for a criterion that would be used to evaluate whether the stones were from the Atocha. . . . Motivation refused to provide a criterion, so the exchange fell apart. The Court thus finds that the sanctionable conduct occurred when JTR withheld information from the Court, not when Motivation made the decision to enter the case.

Findings of Fact and Conclusions of Law, at 17 n.16 (internal citations omitted). Motivation

---

[4] Mr. Sullivan respectfully urges the Court to use caution and not take Motivation's factual assertions at face value. Many of them lack any citation to the record, and are, in fact, directly contradicted by the record. When Motivation does cite to the record, more often than not the citation does not support the assertion Motivation makes. The examples cited in this section are just a small sample of Motivation's many distortions and outright misrepresentations of the record in this case. It would be impractical to catalog them all in this Renewed Response, but a simple review of its briefing on this motion will reveal the lengths to which Motivation is willing to go to improperly get at Mr. Sullivan's "deep pockets."

9

continues to play fast and loose with the record, and this Court should continue to reject its unsupported and conclusory assertions.

Mr. Sullivan and Mr. Horan were, in fact, advocates for Motivation's inspection of the emeralds and they both diligently worked together to come to an agreement that suited the needs of both JTR and Motivation. Horan Decl. at ¶ 6; Siracusa Decl. at ¶ 5. *See* Sullivan Dep. at 120 ("I'm an advocate in our group. I'm the advocate for showing the emeralds to you guys, all right."), relevant portions attached as Exhibit "H"; *id*. at 123–4 ("So, I'm pretty touchy about this subject, because it's – I spent four or five days arguing with my guys, trying to get them to agree to show you the stuff if you could simply give us some criteria. That's your answer."); Horan Test., Hr'g Tr. vol. II, 128:10–25; Sullivan Test., Hr'g Tr. vol. II, 238:17–239:4. Thus, there is absolutely no evidence in the record to suggest that Mr. Sullivan attempted to block inspection of the emeralds and absolutely zero evidence that he "launched a vigorous campaign" to block Motivation's request to inspect the emeralds, while trying to dismiss Motivations claim on legal grounds."

### C. Sullivan Did Not Participate in Any Part of the Appeal Until After the Sanctions Hearing

Motivation's contention that "Sullivan and Silverstein caused JTR to appeal Judge King's ruling in the Phase I Trial," and that they "let stand arguments before the 11th Circuit that were based on perjured testimony" is based on conduct that occurred outside the sanctionable time period, and wholly unsupported by, and directly in conflict with, the record in this case. Moreover, it is only the appellate court, not the district court, which has authority to award sanctions for a frivolous appeal. *See Conner v. Travis County*, 209 F.3d 794–800 (5th Cir. 2000) (citing *In re Villa West Associates*, 146 F.3d 798, 808 (10th Cir. 1998) ("[T]he determination of the right to sanctions . . . for conduct during an appeal is reserved to the appellate court, although it may allow the trial court to fix the amount of the fees and costs."); *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 935 (2d Cir. 1992) ("[I]t is improper for a district court to impose sanctions for appeals taken to this Court.").

In any event, not only is there no record evidence even suggesting that Mr. Sullivan caused the appeal to be filed, but the record directly contradicts that assertion. Mr. Sullivan had nothing to do with the filing of the appeal. Janssen Decl. at ¶ 4–5. He was not even consulted by JTR or its attorneys in that regard. *Id*. In addition, JTR did not "let the argument stand before

the 11th Circuit." The appeal was withdrawn in light of the testimony on the last day of the sanctions hearing. *See* 1/16/14 E-mail from Siracusa to Sullivan, *et al*. ("In view of yesterday's testimony, does anyone object to the withdrawal of the appeal?"), attached as Exhibit "I."

Accordingly, not only would it be improper for this Court to sanction Mr. Sullivan for actions alleged to have occurred before the Eleventh Circuit Court of Appeals, but the record fails to support, and once again contradicts, Motivation's allegation that Mr. Sullivan caused JTR to file an appeal in the Eleventh Circuit Court of Appeals, or that he in any way caused JTR to continue to prosecute same.

## IV. SULLIVAN DID NOT HAVE KNOWLEDGE OF THE FRAUD

Because there is no evidence of Mr. Sullivan's substantial participation in bad faith conduct in this litigation, the Amended Motion fails even if its allegations were true that Mr. Sullivan had knowledge of the fraud perpetrated by JTR. Those allegations, however, are false. But because the allegations of substantial participation – which, again, are false and unsupported – are only meaningful if Mr. Sullivan actually had knowledge of the fraud, we address them here in order to show that they are absurd.

Motivation alleges that "the fraud was known" to Mr. Sullivan by the fall of 2011 because he allegedly knew that (1) "Miscovich fraudulently claimed that he'd found 54 non-Spanish coins at the wreck site"; (2) the "test results showed that the emeralds were coated with modern epoxy resins"; and (3) "Miscovich lied under oath at (sic) December 2012 trial."[5] Am. Mot. at 6.

Before addressing the substance – or lack thereof – of Motivation's allegations that "the fraud was known," it is important to note that nearly all these allegations relate to "Silverstein" or "Silverstein and his firm" or "Silverstein and his team of more than 10 lawyers." Am. Mot. at 6–12. Occasionally, Motivation groups "Silverstein and Sullivan" together. Almost nothing in the Amended Motion deals with Mr. Sullivan's actual knowledge. Indeed, a review of the Amended Motion makes it apparent that Mr. Sullivan's name was simply inserted into an existing draft so that Motivation could complete its mission of getting at his "deep pockets."

---

[5] It is difficult to understand how Miscovich's allegedly false testimony in the December 2012 trial could have put Mr. Sullivan on notice of the fraud in the fall of 2011, more than a year before the testimony was given.

### A. The 54 Coins?

With respect to Motivation's bases for alleging that the "fraud was known," its first point is curious. It asserts that Miscovich made a false claim that he found non-Spanish coins, and this somehow should have indicated to Mr. Sullivan that the treasure was a fraud. But there is nothing to indicate that Mr. Sullivan was aware that this statement was false or that he was even aware the claim was made. And Motivation does not even explain how such knowledge would have revealed the fraud.

### B. The Epoxy Residue Did Not Indicate the Find Was a Fraud

Motivation's second assertion is that Mr. Sullivan knew by the fall of 2011 that the find was a fraud because tests revealed epoxy residue on the emeralds. This goes to Motivation's assertion that the January 6, 2012 Status Report was fraudulent, because it alleges that Mr. Sullivan was aware of those alleged test results when the report was filed. Am. Mot. at 14. In fact, neither Mr. Sullivan nor the others involved came to believe the emeralds contained modern epoxy residue until they began to get results back from the testing facilities. They did not receive the actual test results back from the labs until February 2012. And, even then, this knowledge was far from conclusive. More importantly, the presence of modern epoxy itself did not indicate the find was a fraud. Correspondence between Motivation's attorneys shows that Motivation itself understood this fact. *See* 9/5/13 E-mail from John Holloway to Marlow White and Gene Lewis ("JTR never represented to the Court that the emeralds were ancient shipwreck emeralds after it had the epoxy studies. If the emeralds were found at sea, the admiralty filing was appropriate whether or not they were associated with a wreck."), attached as Exhibit "J."

On October 16, 2011, Motivation filed its intervening claim with the Court. *See* Motivation's Verified Complaint [D.E. 10]. Shortly after Motivation filed this claim, Mr. Horan sent a small sample of the emeralds for testing. Horan Test., Hr'g Tr. vol. II, 122:24–25. His contact was an emerald expert, Daniel McAllister. In December of 2011, Mr. McAllister informed Mr. Horan that very preliminary results showed the presence of an unidentified "enhancement" material on the sample emeralds. Horan Test., Hr'g Tr. vol. II, 131:12–22; Sullivan Test., Hr'g Tr. vol. II, 229:13–25. Because CBS was already producing the SIXTY MINUTES episode, *The Trouble with Treasure*, Mr. Silverstein suggested, and Mr. Sullivan agreed, to ask CBS to use its superior resources to test a larger sample of the emeralds and get to the bottom of the enhancement issue. Sullivan Test., Hr'g Tr. vol. II, 271:7–11 ("We went to

12

CBS and asked them to keep [the potential enhancement material discovery] confidential and to go and get a lab and they could investigate it and ***whatever they found they were perfectly able to put on television. There was absolutely no restriction in what they found.***") (emphasis added).[6]

On January 6, 2012, JTR filed a status report indicating that the emeralds had been sent to labs for inspection and that JTR would file said reports with the Court upon receiving them from the labs. *See* January 6, 2012 Status Report [D.E. 54]. It did not mention the presence of a modern epoxy with the gems, because *no* reports had come back concluding that to be the case. *See id*. It was only in February of 2012 – *after* the January 6, 2012 report was filed – that Mr. Sullivan received the "raw" results of the tests, which indicated the presence of a modern epoxy. *See* 2/12/12 E-mail from Greg Stemm, attached as Exhibit "K."[7] As mentioned above, however, this certainly did not indicate that the treasure find was a fraud. Motivation's assertion that Mr. Sullivan knew the treasure find was a fraud at the time of the January 6, 2012 status report simply does not make sense. Mr. Sullivan made every effort to determine the legitimacy of this find and reveal it publically when results were confirmed.

### C. It Was Not Until Long After the Trial That Sullivan Began To Suspect That Miscovich Was Not Truthful

Motivation's final assertion is that Mr. Sullivan was aware of the fraud by the fall of 2011 because he allegedly knew that Miscovich lied under oath during the December 2012 trial. Putting aside the obvious chronological impossibility of this assertion, it is unclear specifically what Motivation is referring to, but it does appear to rely on the issue of the Cunningham Release. Motivation's argument regarding the Cunningham Release is, essentially, that the Release was so poorly drafted and unprofessional that it was obvious the New York law firm of

---

[6] On Sunday, April 22, 2012, with Mr. Sullivan's blessing, CBS did, in fact, broadcast the epoxy findings to ***sixty million Americans***. Sullivan Test., Hr'g Tr. vol. II, 271:7–11. Notably, the CBS SIXTY MINUTES episode, *The Trouble with Treasure*, aired less than four months *after* JTR allegedly attempted to mislead the Court with the January 6, 2012 Status Report, and four days after the April 18, 2012 Status Report [D.E. 82], which fully informed the Court of the findings in the lab reports from every lab that tested the emeralds.

[7] At the hearing, Mr. Sullivan testified that he received the first report just after Christmas. Sullivan Test., Hr'g Tr. vol. III, 42:1–24. Mr. Sullivan, however, was mistaken. As the Stemm e-mail makes clear, the first lab report did not arrive until February of 2012.

Proskauer Rose could not have drafted it, as alleged by Miscovich. *See* Am. Mot. at 8–9. This pure speculation, however, is certainly not evidence that Mr. Sullivan was aware Miscovich had lied under oath. Although following the trial, Mr. Sullivan had growing concerns about Miscovich's truthfulness, those concerns were not confirmed until well after the trial on the evening of the first day of the sanctions hearing, more than a year after Miscovich took the stand in December 2012. *See* Siracusa Decl. at ¶ 6. That was when Mr. Sullivan first learned that Jorge Rodriguez, the owner of JR Emeralds, who had previously represented that Miscovich purchased only two rings, was going to recant and now testify that Miscovich purchased a bunch of emeralds. *Id.*

Despite this, Mr. Sullivan and JTR's attorneys never sought to prevent the truth from getting out. Indeed, upon learning that Mr. Rodriguez might not appear to testify, Mr. Sullivan and JTR's attorneys unanimously agreed that Mr. Rodriguez *must* testify, and were prepared to enforce the subpoena if it became necessary. *Id.* at ¶ 7. After briefly considering the possibility that Mr. Rodriguez could be lying, Mr. Sullivan's and JTR's attorneys' position remained the same – Mr. Rodriguez *must* testify. *Id*. Christy Janssen immediately called Mr. Rodriguez's attorney and informed him of their intent to enforce the subpoena issued by the Court if Mr. Rodriguez did not voluntarily testify. *Id*.; *see also* Siracusa Test., Hr'g Tr. vol. II, 149:15–153:21 (discussion between the Court and JTR's attorneys informing the Court of their conversation with Mr. Rodriguez and his attorney the night prior).

### D. The Record Establishes That Sullivan Was Not Aware of the Fraud

Finally, contrary to Motivation's suggestion throughout its Amended Motion that it should have been obvious that Miscovich's story was a fraud, Mr. Sullivan had little reason to question the validity of the emeralds until after the conclusion of the December 2012 trial. Beginning at the time – or slightly before – Mr. Sullivan took an ownership interest in JTR, he knew that:

> [T]he Smithsonian had looked at [the emeralds] . . . [he] saw the Smithsonian letter. [He] knew that [the New York investors] had gone to Sotheby's. [He] knew that the New York investors thought [the emeralds] were worth hundreds and hundreds of millions of dollars as expressed in the Cayman Island document where they're making hundreds of millions of dollars every year, right in the document.

Sullivan Test., Hr'g Tr. vol. II, 198:14–20; *see also* 9/9/10 E-mail from *Smithsonian Institution's*

*Gem and Mineral Collection Curator*, Jeffery Post, Ph.D, to Dean Barr, *et al*., attached as Exhibit "L." Mr. Sullivan had emeralds appraised, and those appraisals indicated that the gems' value was substantial. *Id*. at 202:21–205:8. By the time of the CBS broadcast, the emeralds had been blessed by a New York law firm, a New York hedge fund, the Smithsonian, Sotheby's, and an independent appraiser, yet, according to Motivation, "from at least the time Sullivan and Silverstein saw the Cunningham Release in December 2011, the scam was *transparently* fraudulent." Am. Mot. at 19 (emphasis in original). This assertion is not supportable.

After Mr. Sullivan received the appraisal results, he agreed to Miscovich's request that he go to Colombia to negotiate with the government. Miscovich also authorized him to place the emeralds in the custody of the Colombian government. Mr. Sullivan found this to be further evidence of the find's authenticity because it would have been "bizarre" and lacking in common sense to think that Miscovich would ask him to negotiate with the Colombian government and even place the emeralds in its custody, if Miscovich knew the emeralds were fake. *Id*. at 210:15–19. Even Mr. Horan, an experienced diver and attorney in admiralty, with particular experience in treasure discoveries, testified that there was nothing he suspected was incorrect or false at the time he filed the Verified Complaint. Horan Test., Hr'g Tr. vol. II, 114:11–13.

Accordingly, Motivation's allegation that Mr. Sullivan knew by the fall of 2011 that Miscovich's story was a fraud, is entirely unsupported, and yet again, contradicted by the record.

## V.   SULLIVAN DID NOT HAVE A SUBSTANTIAL INTEREST IN THE OUTCOME OF THE LITIGATION

As discussed in Section II, above, the Court can only exercise its jurisdiction through its inherent power to sanction a non-party if that non-party substantially participated in the bad faith conduct and had a substantial interest in the outcome of the litigation. The lack of any evidence of the former is dispositive. The latter requirement, however, is also not satisfied, and this provides an independent ground for denying the Amended Motion.

JTR was formed on August 11, 2011. Initially, Mr. Sullivan took only a five percent ownership interest in JTR, which he and his wife committed to a charitable trust. *See* Sullivan Test., Hr'g Tr. vol. III, 21:7–25:7; *see also* JTR Operating Agreement, Ex. "D." As Mr. Sullivan testified, he valued the JTR units donated to charity at zero because the purpose of the charitable trust was not to take a tax write-off, but to make a substantial contribution to charity if the emeralds "turned out to be worth a lot of money later on[.]" *Id*. at 22:18–24. From the

beginning, Mr. Sullivan's goal has always been to "get the truth out."  Sullivan Test., Hr'g Tr. vol. II, 264:9.  *See also* Horan Decl. at ¶ 7; Horan Test., Hr'g Tr. vol. II, 133:11–15 (Paul Sullivan . . . and I spent so many hours on the phone trying to figure out what is going on here and how do we . . . figure out how this all occurred and how these things got there."); Horan Test. Hr'g Tr. vol. II, 142:13–16 (Mr. Sullivan . . . was deadset on trying to determine exactly what [the enhancement material] was.  If it was Aricept or Opticon, then it was a very, very modern type of enhancement product.").

Mr. Sullivan later invested $100,000 in exchange for an additional one percent ownership interest in JTR, making his total interest in JTR to that point, six percent (six units).  *See* Sullivan Test., Hr'g Tr. vol. II, 197:4–25.  As soon as questions arose as to the origin of the emeralds, he personally invested $2,000.00 to conduct research at the National Archives, *id*. at 265:2–6, and he spent an additional $21,000.00 to continue investigating the enhancement material on the emeralds.  *Id*. at 233:6–20.

In its Reply, Motivation points to certain actions taken by Mr. Sullivan to support its argument that he had a substantial interest in the litigation.  Reply at 2.  Most of those "actions" are just that: actions.  They do not evidence a substantial interest in the litigation.  Indeed, Motivation's long list of bullet points contains only two potentially relevant points to this discussion:  that Mr. Sullivan owned five percent of JTR stock, and that he spent his own money "in support of the litigation."  Neither shows a substantial interest.

As discussed above, Mr. Sullivan donated his five percent interest in JTR to charity.  It is unclear why Motivation continues to assert Mr. Sullivan's mostly-divested interest in JTR in support of the substantial interest argument.  Motivation knows full well that Mr. Sullivan has only a one percent interest in JTR, which interest is held jointly with Mr. Silverstein.

Motivation's assertion that Mr. Sullivan's alleged substantial interest in the litigation is established by his payment to an independent third party to investigate the epoxy findings on the emeralds makes no sense.  Mr. Sullivan spent that money to uncover the truth.  It does not show that he had a substantial interest in the litigation.  Instead, it shows that he had no knowledge of the fraud.  If he did, he would not have gone to such lengths and spent his own money to uncover the truth regarding the initial epoxy findings.

In sum, Mr. Sullivan held six units in JTR.  Five were immediately donated to a charitable trust, for which he receives no benefit – tax or otherwise.  The last unit is held by an

entity created with Bruce Silverstein. Accordingly, his financial interest is extremely limited. Moreover, as described above, Mr. Sullivan spent tens of thousands of dollars of his own funds to investigate the validity of the find and get to the bottom of the epoxy issue. Far from having a substantial interest in JTR's fraud on the Court, Mr. Sullivan's efforts ultimately helped expose the fraud. His lack of a "substantial interest" requires denial of the Amended Motion.

## CONCLUSION

This Court lacks jurisdiction over Mr. Sullivan because the service purportedly effected on him was improper and in violation of the Federal Rules of Civil Procedure. The Court also lacks jurisdiction through its inherent power to sanction because Mr. Sullivan did not have a substantial interest in JTR's bad faith litigation and unquestionably did not substantially participate in bad faith conduct in the proceedings. Accordingly, Mr. Sullivan respectfully requests that this Court deny Motivations' Amended Motion for Sanctions with respect to him.

Dated this 26th day of August, 2014.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

PODHURST ORSECK P.A.
*Attorneys for Paul D. Sullivan*
City National Bank Building, #800
25 West Flagler Street
Miami, FL 33130
Tel: 305-358-2800   Fax: 305-358-2382

By: /s/John Gravante, III
   JOHN GRAVANTE, III
   Florida Bar No. 617113
   E-Mail: jgravante@podhurst.com

   ROBERT C. JOSEFSBERG
   Florida Bar No. 040856
   E-Mail: rjosefsberg@podhurst.com