UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
      Plaintiff,

vs.                              CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

      *In Rem* Defendant.

**SPECIALLY APPEARING NON-PARTIES YOUNG CONAWAY STARGATT &
TAYLOR, LLP'S AND BRUCE L. SILVERSTEIN, ESQ.'S JOINT (I) MOTION
TO QUASH SERVICE OF PROCESS, AND (II) RESPONSE AND
MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION, INC.'S
<u>AMENDED MOTION FOR SANCTIONS</u>**

Non-parties, Young Conaway Stargatt & Taylor, LLP ("YCST") and Bruce L.

Silverstein, Esq. ("Silverstein"), by and through their counsel, specially appear to move to quash

service of process on them and challenge the Court's personal jurisdiction over them.  Further, as

directed by the Court's Order to Show Cause ("OSC") (D.E. 451), YCST and Silverstein hereby

jointly file their Response and Memorandum of Law in Opposition to Motivation's Amended

Motion for Sanctions Seeking Entry of Orders Directed to Paul D. Sullivan, Bruce L. Silverstein

and Young Conaway Stargatt & Taylor, LLP, Requiring Each of Them to Show Cause As to

Why They Should Not be Sanctioned for Bad Faith Litigation and Other Relief ("Sanctions

Motion") (D.E. 407).[1]  Also being filed herewith is the Affidavit of Bruce L. Silverstein, Esquire

(the "Silverstein Affidavit"),[2] attached as <u>Exhibit A</u>, which sets forth the material facts pertinent

---

[1]  The Court already has rejected Motivation's claim that Respondents' prior appearances in this
matter waived their defenses to this Court's lack of jurisdiction over them.  (D.E. 333).  As
discussed below, Respondents (i) continue to assert that the Court lacks jurisdiction over them,
and (ii) further assert that the OSC has not been served on them through valid process.  Subject
to *and without waiving* these defenses, Respondents are complying with the Court's OSC in
order to avoid any argument that they have disregarded the Court's Order.

[2]  The Silverstein Aff'd is incorporated herein by reference.  Respondents also rely on and
incorporate by reference:  (i) the Affidavit of Bruce L. Silverstein, Esq., dated Oct. 9, 2012 (with
all exhibits, D.E. 142-21 through 142-48) (the "10/9/12 Silverstein Aff'd"); (ii) the Affidavit of

to the Sanctions Motion.  In support of their motion to quash[3] and in response to the Sanctions Motion, YCST and Silverstein (together "Respondents") respectfully state as follows:[4]

## I.    INTRODUCTION

Motivation seeks sanctions against Respondents for one reason – Motivation and its attorneys view Respondents as "deep pockets" to pay Motivation's attorneys who have been working on a contingency fee for the past three years.  Relying on innuendo, speculation and fabricated and misrepresented facts, Motivation asserts that Respondents were complicit in a fraud on the Court found to have been committed by Jay Miscovich ("Jay").[5]  The actual facts belie Motivation's naked accusations and show that Respondents are professional and ethical attorneys who were the victims of any fraud committed by Jay, and not the perpetrators.[6]  Contrary to the unsupported allegations in the Sanctions Motion, (i) Respondents did not know Jay was committing a fraud on the Court (or otherwise) prior to the commencement of the evidentiary proceeding conducted by Judge Moore in January 2014 (the "Sanctions Trial"), and

---

Bruce L. Silverstein, Esquire, dated Nov. 4, 2013 (with all exhibits, D.E. 302-1, 302-2) (the "11/4/13 Silverstein Aff'd"); and (iii) the Affidavit of Bruce L. Silverstein, Esquire, dated Dec. 6, 2013 (with all exhibits, D.E. 324-1) (the "12/6/13 Silverstein Aff'd").

[3]  The legal and factual support for the motion to quash is set forth in Section IV.B *infra*.

[4]  The Respondents' Appendix containing the documents identified in this response and/or in the Silverstein Affidavit is being filed concurrently with this response.  Citations to the Appendix in this response are in the form: "(A-[tab #])".  Citations to materials from the Appendix in the Admiralty Action are in the form:  "D.E. [#]".  Except with respect to transcript excerpts and certain exhibits to filings made on the docket, cited materials from the docket are not included in the Appendix.

[5]  Contrary to its current litigation position, Motivation concedes that JTR Enterprises, LLC ("JTR") never claimed an ancient provenance for the emeralds.  *See, e.g.*, Joint Pretrial Stipulation, § V.7 (that "JTR has made no claim in this action as to the origin or original ownership of the Salvaged Material" was one of the "Uncontested Facts Which Will Require No Proof at Trial") (D.E. 163 at 5).

[6]  The same appears to be the case for JTR's counsel of record in the Admiralty Action (both David Horan and Janssen & Siracusa), Paul Sullivan, Scott Miscovich, and Jay's other outside counsel.  Respondents are unaware that any of these other persons had any prior knowledge that Jay had committed a fraud on the Court, and thus they undoubtedly were as much the victims of any fraud Jay may have committed as are Respondents.

(ii) Silverstein did not control the litigation before this Court (the "Admiralty Action").  Indeed, had Silverstein known that Jay was committing a fraud on the Court prior to the Sanctions Trial, he would have urged JTR's counsel of record in the Admiralty Action ("Record Counsel") to disclose that information to this Court – as Silverstein did on the evening following the first day of the Sanctions Trial when he first learned of Jorge Rodriguez's claim that he sold Jay emeralds that Jay claimed to have discovered in the Gulf of Mexico.[7]

Despite access to a wealth of internal communications between and among Jay, Record Counsel, various outside counsel for JTR or Jay (including, but not limited to, Silverstein), and various others, Motivation does not identify any actual facts to support its accusations.  The reason Motivation does not identify any such facts is simple – there are none.  Thus, Motivation has not met (and cannot meet) the onerous requirement of showing by "clear and convincing evidence" that Respondents should be sanctioned pursuant to the Court's "inherent authority."

Before addressing the merits of Motivation's allegations, however, the Court must first determine (i) that the Court possesses the "inherent authority" to sanction an attorney who was not a counsel of record in the case before the Court and did not violate any order entered by the Court, (ii) that the Court has jurisdiction over Respondents, and (iii) that the OSC has validly been served on Respondents.

---

[7]   At the conclusion of the Sanctions Trial, John Siracusa told Judge Moore that "I don't believe for a moment, personally that [Silverstein] would be knowingly involved in something that was fraudulent.  I think he would be the first one to bring it to your attention if he learned something like he did today, from [Mr. Rodriguez] -- which we only learned a couple days ago."  (Jan. 15, 2014 Trial Tr. (D.E. 373) at 126:8-16) (A-139).  Indeed, throughout Silverstein's 27-year career as a member in good standing of the Delaware Bar, he has always conducted himself with the utmost integrity and honesty, earning the respect of judges and his fellow attorneys.  In this regard, Silverstein has twice been appointed a Special Master to the Court of Chancery.  In connection with Silverstein's most recent appointment as a Special Master, the Court of Chancery characterized Silverstein as "a distinguished member" of the Delaware Bar, "extremely gifted," and "tough," and noted that attorneys like Silverstein serve as Special Masters "as much as a public service as anything."  *See* June 10, 2013 Conf. Tr. (Civ. Action No. 8070-CS) at 10-14. (A-127).  Respondents reserve the right to introduce expert testimony and character witnesses.

Additionally, Motivation lacks standing to seek sanctions from Respondents (or anyone else in the Admiralty Action).  Motivation is not a defendant who claims to have been wrongfully sued by JTR (much less by Respondents).  Nor is Motivation a plaintiff who claims that JTR (much less Respondents) wrongfully defended against a viable complaint brought by Motivation.  Rather, Motivation is an intermeddler in the Admiralty Action, which first asserted a legally frivolous and factually implausible claim that was dismissed by the Court (albeit without prejudice) and later asserted a fabricated claim of stolen emeralds in order to get around the patent legal defect of its initial claim of a floating barrel.  Motivation identifies no legal authority, and Respondents are unaware of any legal authority, that would support a claim for sanctions by an intervenor that asserted a failed claim.

Finally, Motivation's own bad-faith conduct precludes an award of any fees it may have incurred.  This conduct includes (but is not limited to) the following: (i) filing a legally frivolous and factually implausible verified claim in order to get access to the emeralds so that it could fulfill its self-ordained role as the "Treasure Police"; (ii) intentionally not seeking an order to show cause until weeks before the Sanctions Trial to keep Respondents from participating in the discovery process; (iii) improperly attempting to serve process of a second sanctions motion on Respondents after the Court had denied the motion (for which the Court issued an Order to Show Cause to Motivation); (iv) attempting to have the Delaware Bar institute a disciplinary proceeding against Silverstein in the hopes of gaining an improper litigation advantage; (v) improperly informing witnesses that they could avoid criminal prosecution if they cooperated with Motivation's efforts in the Admiralty Action; and (vi) offering to refrain from pursuing sanctions against various persons and entities if they would execute a false stipulation riddled with erroneous factual assertions to bolster its claims against Respondents.  In light of this conduct, Motivation has forfeited any right it claims to have to seek sanctions from Respondents.

## II.     PROCEDURAL CONTEXT OF OSC

### A.     The Sanctions Trial

Commencing on January 13, 2014, the Court held a three-day trial on Motivation's then-pending Original Sanctions Motion (D.E. 123).  In the evening following the first day of trial, Record Counsel learned from a lawyer representing Jorge Rodriguez (the owner of JR Emeralds in Jupiter, Florida), that Mr. Rodriguez would testify that Jay had purchased a large quantity of "junk emeralds" from Mr. Rodriguez if he were compelled to testify at the Sanctions Trial. (Declaration of John M. Siracusa, Esquire (D.E. 437-6) ("Siracusa Decl."), ¶ 6) (A-140).[8]  That was the first time Record Counsel learned of this, and Mr. Rodriguez's new story was contrary to prior discussions he had had with members of Record Counsel's staff. (*Id.*)   Indeed, Mr. Rodriguez previously had informed a paralegal to Record Counsel that Jay had purchased only two emerald rings from JR Emeralds.  (*Id.*; *see also* Jan. 14, 2014 Trial Tr. (D.E. 372) at 182:6-183:2) (A-138).

Later that same night, Record Counsel had a call with Silverstein in which they told him the disturbing story concerning Jay's purchase of emeralds from JR Emeralds.  The moment Silverstein learned this information, he urged that Record Counsel bring the information to the Court's attention (even though it was unlikely that Motivation would do so because it did not know the new information).  (Silverstein Aff'd, ¶¶ 7-8).  Significantly, Sullivan did not hesitate to express his agreement with Silverstein.  While some other lawyers (not at YCST) representing JTR and/or Jay expressed initial disagreement with Silverstein's view, everyone ultimately agreed that the Court needed to be informed of Mr. Rodriguez's claim.  (*Id.*, ¶ 8).  Later that night, Silverstein sent an email to Record Counsel summarizing their conversation:

I am writing to summarize what I understand from our call of a couple hours ago.

---

[8]   Respondents rely on and incorporate the Siracusa Decl. by reference.

Sometime over the past few months, Motivation claimed, for the first time, that they had identified a store at which they claim that Jay purchased a large quantity of "junk emeralds" in early 2010. Based on your own investigation of Motivation's claim, you confirmed that Jay had purchased two rings from the jewelry store, and had not purchase a large quantity of junk emeralds. You even addressed this in a filing with the Court in the past couple months.

More recently, you arranged for the jewelry store owner to testify at the Sanctions Hearing, and you put the person on your witness list.

Today, you were told, for the first time, that the jewelry store owner intends to testify that he did sell Jay a large quantity of junk emeralds, and not two rings. You also now understand that the jewelry store owner recently was interviewed by someone claiming to be an FBI agent, but who you believe to be Joe Sweeney.

Based on the foregoing, you still intend to call the jewelry store owner as a witness and see what story he tells when he testifies under oath. If he testifies differently than he previously told you (i.e., Jay bought two rings and not a large quantity of emeralds), you intend to cross examine him, and also call Karina (and possibly yourselves) as witnesses to the prior story. You also intend to ask about Joe Sweeney. If, for any reason, the jewelry store owner does not appear at the hearing, you intend to inform Judge Moore (in open court) what you were told today and how it is inconsistent with what you previously were told.

I believe the your [sic] intended approach to this last-minute surprise makes perfect sense, and I wish you luck with it.

(Silverstein email to Janssen and Siracusa (1/14/14, 12:22)) (A-137).

On January 15, 2014, Record Counsel called Mr. Rodriguez to the stand and he testified that between March and September 2010 Jay made four separate $20,000 purchases of uncut emeralds from JR Emeralds located in Jupiter, Florida. (Jan. 15, 2014 Trial Tr. (D.E. 373) at 73:13-74:7; 76:10-22; 77:9-15; and 77:20-78:17) (A-139). Mr. Rodriguez also testified that he had no receipts or other records of those sales. (*Id.* at 69:14-19; 74:13-15; and 76:3-6). Based largely on Mr. Rodriguez's testimony, Judge Moore concluded that Jay had committed a fraud on the Court – a conclusion with which Record Counsel openly concurred.[9]

---

[9] Judge Moore further noted that while Motivation could "renew or file a new [sanctions] motion" against others (*see id.* at 113:13 – 114:11), it would need to "come up, fashion some sort of remedy that you think the Court has the authority to impose" and "provide some pretty specific authority" for imposing sanctions. (*Id.* at 123:11-25.). Lastly, Judge Moore warned Motivation that "the District Court should not be in a position of just entering orders that it cannot . . . properly execute" should Motivation seek sanctions against individuals "not within

**B.** **The Court Broadly Sanctions Jay and Grants a Limited Sanction Against JTR**

On June 19, 2014, Judge Moore entered the Court's *Findings of Fact and Conclusions of Law* (D.E. 445) (the "Court's Findings and Conclusions"),[10] concluding that Jay Miscovich committed a fraud on the Court from the day the Admiralty Action was commenced through the day of Jay's death, and that sanctions were warranted against Jay for his actions.  Among other things, the Court found that Jay "was clearly the mastermind behind this whole scheme . . . . [Jay] managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes, that he had discovered and recovered this treasure from the seafloor in early 2010."  (D.E. 445, ¶¶ 66-67).  By contrast, Judge Moore declined to accept Motivation's contention that JTR engaged in bad faith and vexatious litigation, and imposed only a limited and tailored sanction upon JTR.  (*Id.*, ¶¶ 61-65).

In paragraph 5 of the Court's Findings and Conclusions, Judge Moore summarized Motivation's various contentions with respect to JTR, as follows:

> Motivation contends that it is entitled to sanctions against JTR because this action was litigated "at all costs," even after a reasonable person would have known that the case was based on a fraud.  Motivation's Proposed Findings of Fact and Conclusions of Law, at 39 (D.E. 387).  Motivation further contends that the underlying litigation could have been concluded in December 2011 if JTR had revealed expert reports that indicated that the Emeralds were coated with a

---

the jurisdiction of the Court" and against whom there was "no way to enforce the sanction."  (*Id.* at 124:1-6).

[10]  The Court's Findings and Conclusions are binding on Motivation, but they are not binding on Respondents because they were not parties to the Admiralty Action or represented at the Sanctions Trial.  *See A.J. Taft Coal Co., Inc. v. Connors*, 829 F.2d 1577, 1578 n.3 (11th Cir. 1987) ("Previously, a mutuality of parties was necessary for the use of collateral estoppel. Later, the mutuality requirement was extinguished.  Now, even one who was not a party to the previous suit may use a judgment as binding in a later action." (citations omitted)); *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1473 (11th Cir. 1986) ("A defendant who was not a party to the original action may invoke collateral estoppel against the plaintiff."); *Pierce v. Ritter, Chusid, Bivonia & Cohen*, 133 F. Supp. 2d 1344, 1347 (S.D. Fla. 2001) (citing *Hart* for the proposition that "[t]he Eleventh Circuit has endorsed [non-mutual] collateral estoppel.").

modern epoxy, which would exclude the Emeralds coming from either the Atocha or the Margarita. Motivation's Proposed Findings of Fact and Conclusions of Law, at 39-40. Finally, Motivation claims that, had JTR allowed Motivation to view the Emeralds immediately, Motivation would have quickly concluded, as it did when it finally viewed the Emeralds in August 2012, that the Emeralds did not come from its ships and it would have withdrawn its claim.

Judge Moore declined to accept or adopt any of the foregoing contentions advanced by Motivation, and declined to sanction JTR for anything beyond "Motivation's attorneys' fees and costs, for the period of time from December 2, 2011 to April 18, 2012." (*Id.*, ¶ 61). As Judge Moore explained:

> While Motivation entered the case in October 2011, the Court does not find that sanctions as of this date would be appropriate against JTR. While Motivation claims that it would have quickly exited the case, had they been allowed to inspect the Emeralds, there was a lot of distrust between JTR and Motivation. . . . The Court thus finds that the sanctionable conduct began when JTR withheld information from the Court, not when Motivation made the decision to enter the case. According to the testimony presented at the hearing, JTR did not learn about the epoxy until December 2011.

(*Id.*, ¶ 62 n.16). Judge Moore further determined that April 18, 2012, was an appropriate cut-off date for sanctions against JTR, reasoning that, after JTR disclosed the epoxy information on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts. ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***" (*Id.*, ¶ 65) (emphasis added).

## C.   The Court Denies Motivation's Motion for Reconsideration

On June 23, 2014, Motivation filed a motion for reconsideration of Judge Moore's narrowly tailored sanctions decision respecting JTR, contending, among other things, that the Court's "ruling that JTR did not engage in any sanctionable conduct until it failed to disclose epoxy findings in December 2011" is internally inconsistent with its finding that the Admiralty Action is premised on a fraud masterminded by Jay. (D.E. 448 at 1-2). Motivation also argued:

> The people who animated JTR, Silverstein, his firm, and Sullivan will now likely claim that it is "law of the case" that JTR's fraud was not a sanctionable conduct, and therefore their direction of the fraud through JTR is not sanctionable conduct.

The Court should therefore, at a minimum, recast its decision not to sanction JTR for its fraud as an exercise of judicial discretion rather than a finding that JTR's fraud was not sanctionable.

Because it no longer had counsel of record in the Admiralty Action, JTR filed no response to Motivation's Motion for Reconsideration.  Even without any opposition from JTR, however, Judge Moore denied Motivation's Motion for Reconsideration, *sua sponte*, concluding that the motion was not well founded.  (D.E. 450 at 3).

**D.    By Design, Motivation Developed the "Sanctions Record" Without Respondents In An Effort to Reach "Deep Pockets"**

Because Respondents were neither parties nor Record Counsel in the Admiralty Action, they (i) did not participate in the Sanctions Trial (or the December 2012 Trial other than as witness, and Silverstein was otherwise sequestered); (ii) did not cross-examine any witnesses (at depositions or otherwise), request or subpoena documents, or otherwise participate in the defense of the discovery taken by Motivation (other than to object to subpoenas served on Respondents in the District of Delaware); and (iii) did not develop whatever record JTR's Record Counsel relied upon to defend JTR.

Significantly, the record reflects that Motivation deliberately litigated this matter in a manner that would prevent Respondents from having a fair opportunity to defend themselves.  Soon after the conclusion of the December 2012 trial concerning title to the *res* (the "December 2012 Trial"), Motivation recognized that it would need the Court to enter an order to show cause, which would need to be served through valid process, before Respondents, who were not part of the underlying case, could be subject to sanctions.[11]  Yet, Motivation delayed seeking such an order for ***more than nine months***, *see* (D.E. 315), during which time Motivation engaged in extensive discovery, conducting ten depositions and hiring a number of private investigators and

---

[11]   White emailed Morgan stating that "Silverstein did not make an appearance and neither Silverstein or the Young-Conaway firm are parties.  Should we move for an order to show cause why they should not be subject to sanctions?"  (White email to Morgan (2/13/13, 6:30)) (A-110).

putative experts – all in furtherance of its quest to reach into Respondents' perceived "deep pockets" and all without Respondents being involved in the Admiralty Action.

On November 19, 2013 – two weeks after the discovery deadline[12] and just two months before the Sanctions Trial – Motivation finally moved to amend its sanctions motion (D.E. 315), seeking, for the first time, to add YCST as a non-party against whom Motivation was seeking sanctions and to have the Court enter an order show cause why Respondents should not be sanctioned.  Judge Moore summarily rejected Motivation's motion, explaining that he had given Motivation "considerable latitude in this action to date" but would not allow Motivation to turn the proceeding "into a second litigation in its own right" by "dramatically expand[ing] the scope" of its motion to "includ[e] new arguments and new parties, different from those addressed in the underlying proceeding on the merits."  (D.E. 332).  Judge Moore further explained at the end of the Sanctions Trial that it would be "unfair to Mr. Silverstein to have to come in at such a late date."  (Jan. 15, 2014 Trial Tr. (D.E. 373) at 112:24 – 113:9) (A-139).

Notwithstanding Judge Moore's ruling, Motivation enlisted a process server to attempt to serve Respondents with "summonses," which did not have the signature of the court clerk and did not bear the Court's seal, as required under Rule 4 of the Federal Rules of Civil Procedure – but which purported to require Respondents to appear at the sanctions trial in just ten days. These "summonses," signed by Motivation's counsel, attached a copy of the amended sanctions motion (previously denied by the Court) and purported to direct Respondents to respond.

Respondents filed an emergency motion to quash Motivation's "summonses" and for a protective order, arguing that Motivation's actions were a blatant disregard of the Court's orders and an improper attempt to create jurisdiction where none existed.  (D.E. 341).  Judge Moore agreed, and quashed the "summonses," entered a protective order against Motivation's further

---

[12]   Motivation's motion to have the discovery period extended for a fourth time was denied on November 22, 2013.  (D.E. 318).

efforts to drag Respondents into the proceeding, and directed Motivation to show cause why it should not be sanctioned for its actions.  (D.E. 361).

Significantly, despite having had nearly an entire year to conduct discovery specifically for the Sanctions Trial (without Respondents' participation), and another five months of discovery it had already conducted in preparation for the December 2012 Trial (also without Respondents' participation), Motivation believed it had "ample evidence" of Jay's fraud, but still had no evidence that supported reaching into Respondents' "deep pockets" – which Motivation's lawyers (and lawyers for the New York Investors) repeatedly identified as their real goal in numerous e-mails Motivation unsuccessfully fought to withhold from JTR.[13]

- On February 9, 2013, Hugh Morgan revealed that, from Motivation's perspective, the entire point of the case was to capture a deep pocket: "**we have lost the case if we cannot reach deep pockets** . . . ."[14]  (A-109).

- On February 15, 2013, Gene Lewis, Motivation's counsel, reminded Motivation and its other attorneys that the "**[g]oal for all of us is money judgment against deep pockets**"—"**#1 Silverstein and firm**."  (A-112).

- On February 19, 2013, Lewis wrote again that "**we don't need to be spending a lot of time on these guys except as to how to nail Scott, the firm and Bruce** and last resort Sullivan."  To which Kim Fisher responded "**We need to rely on their desire to settle and not be dragged thru a messy highly publicized trial**."  (A-113).

- On March 8, 2013, Lewis interlineated a Sweeney email with his assessment of the case:  "**ONLY WAY OUT** FOR KIM-NEIL ET AL **IS CIVIL RECOVERY AGAINST SOLVENT CREDITOR** AND THAT'S NOT JAY AND STEVE."  (A-115).

---

[13]  Motivation had claimed that communications between its attorneys and the New York Investors' counsel (Holloway) were subject to the common-interest privilege. (D.E. 301, ¶ 4) (quoting Motivation's response to JTR' second request for production of documents, dated September 17, 2013).  JTR believed there was no common interest among Motivation and the New York Investors and moved to compel the production of communications between Holloway and Motivation's counsel.  (D.E. 301).  On December 10, 2013, Judge Magistrate Torres entered the Omnibus Order on Discovery Motions, granting JTR's motion to compel.  (D.E. 325 at 8-10).

[14]  Emphasis is supplied with respect to the emails referenced.

- On March 18, 2013, Gene Lewis strategized that "getting before Judge King on the crime-fraud issue . . .is all that matters at this point" because "**[t]hat is the fastest route to Silverstein, Young Conaway** and others." (A-116).

- On April 9, 2013, Gene Lewis emailed Holloway, Morgan, White, Sweeney, Fisher: "**All we are after is deep pocket who can pay Kim, us, Hugh and John's folks**. [Jane Broadway] has the fraud nailed for Judge King vindication so **let's get consensus on how we can wind this down with a solvent judgment debtor(s) in our sights**." (A-117).

- On April 20, 2013, Gene Lewis urged Morgan, Holloway and others to remember the "mission": "**Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here . . . .**"[15] (A-121).

As Holloway (the attorney for the New York Investors) recapped in an April 17, 2013 email to Motivation's counsel, Motivation believed it could make a case against Jay early on but had no evidence Silverstein was complicit. As Holloway wrote:

> **We have ample evidence that Jay has committed fraud and perjury, but I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far.**"[16]

Motivation therefore repeatedly requested extensions of the discovery period – not to uncover proof that Jay had committed a fraud, but rather to devise some means to reach Respondents' "deep pockets" (and aid the New York Investors) on the misguided belief that the Court should somehow compensate them for their meddling in the case, regardless of the lack of merit in seeking sanctions against Respondents and Sullivan:

---

[15] *See also* Morgan email to White, Lewis, and Holloway (2/13/13) ("Our plan to take Jay and his attorney aside at the taking of his depo is still in effect. **Our targets continue to be the deep pockets**.") (A-111); Sweeney email (3/5/13) (summarizing a conference call among Motivation's circle in which Morgan urged everyone to "**Keep focused on the Big Picture here (Deep Pockets . . . )**") (A-114). On April 16, 2013, Motivation, because it believes the Court "still likes Horan," set its sights on other deep pockets: "You all know my feelings about Horan nonetheless **we have a larger issue than him at stake—winning against Silverstein and his firm**." (A-118).

[16] Holloway email to White (4/17/13, 12:10) (emphasis added) (A-120).

- On May 17, 2013, Lewis emailed Morgan, Holloway, and Fisher that "**Judge King has no notion that our problem is not an award of fees and costs but of how Kim, and us, and John's clients get paid—a solvent creditor-Silverstein's FIRM**." (A-123)

- On May 22, 2013, Morgan emailed that Motivation was close to its goals now that it had been able to locate and depose the woman who had notarized the Cunningham release:  "A goal is to obviate the necessity of a full blown trial. Now that we know that the signing is a fraud **we can be 99% assured of reimbursement providing we get to that deep pocket**." (A-124).

- On May 24, 2013, Morgan emailed that Motivation had evidence of fraud but needed more time to discover a way to make a case against a deep pocket:  "**We could go to trial with what we have** and are going to get in the immediate future **but what we don't have at this time are the deep pockets.  That is probably going to take more time**."  (A-125).

- On July 1, 2013, Lewis expressed his hope that Horan's deposition would give Motivation some evidence to go with in regard to its real "target"—YCST:  "even if he can corral Silverstein **we won't have the real deep pocket until we get his firm understanding they are the target** . . . ."[17]  (A-129).

On Holloway's advice, Motivation made a calculated decision not to depose Silverstein specifically so that the Court would not have the opportunity to hear his side of the story:  As Holloway wrote: "***If you depose BS, he'll just get out his side of the story and the testimony will be admissible at trial***."[18]  Motivation also made a deliberate decision to refrain from seeking sanctions against Horan, despite the fact that Motivation's attorneys believed Horan "knew what he was doing and thought he could pull it off."[19]  As reflected in Motivation's internal communications, the only reason Motivation held off on pursuing Horan was because Motivation

---

[17]   And, on June 4, 2013, Morgan related his discussion with Scott's attorney about letting Scott off the hook if he would give Motivation information that would lead to Silverstein's deep pocket, stating that "**we need to be assured that his information will lead to proof that would make Silverstein's actions sanctionable.  If it just leads to Jay's involvement [in my opinion] it is not worth it**." (Morgan email to Holloway, White (6/4/13, 12:01)) (A-126).

[18]   Holloway email to White (8/26/13, 3:34) (emphasis added) (A-131).  Motivation's counsel "agree[d] about not deposing Silverstein."  (White email to Holloway (8/26/13, 3:49)) (A-131).

[19]   Lewis email to Morgan, White, Fisher and Holloway (4/20/13, 11:43) (A-121).

believed it needed Horan's aid to obtain sanctions against Respondents.[20]   In contrast, Motivation's counsel stated that Silverstein did not know about the fraud, yet they cynically proceeded against Respondents in pursuit of an undeserved windfall.

## III.   FACTS

The material facts pertinent to the Sanctions Motion are summarized (i) in the Silverstein Affidavit, which is being filed concurrently with this pleading and (ii) in numerous other documents referenced in the Silverstein Affidavit, which also are being lodged with the Court in response to the OSC.  Respondents rely on and incorporate by reference the content of the Silverstein Affidavit and all documents and other matters referenced in the Silverstein Affidavit.

## IV.   MEMORANDUM OF LAW

Respondents have conducted themselves lawfully, ethically, and professionally, and have not engaged in any conduct that even remotely can be considered to warrant the imposition of sanctions pursuant to the Court's "inherent authority" (or otherwise).  Moreover, Motivation has not proved, let alone through clear and convincing evidence, that Respondents engaged in conduct that warrants the imposition of sanctions against them.  As this Court has instructed:

> The evidentiary standard governing use of a court's inherent power varies with the nature of the sanction imposed. So-called "issue-related sanctions" – those that are fundamentally remedial rather than punitive and do not preclude a trial on the merits – require proof by a preponderance of the evidence. Any "fundamentally penal" sanctions—dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines"—require proof by clear and convincing evidence.

*In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1293 n.6 (S.D. Fla. 2013).[21]

---

[20]   Lewis email to White, Morgan, Holloway, Sweeney and Kim Fisher (4/16/13, 8:34) ("Buster and all, thinking of politics here as well as legal positions.  You all know my feelings about Horan *nonetheless we have a larger issue than him at stake – winning against Silverstein and his firm.*") (A-118); *see also* Holloway email to Lewis, White, Sweeney, and Kim Fisher (7/31/13, 2:09) ("You may want to say in the C-F brief that Horan did not know about the fraud and he withdrew when he figured it out – *that will make his cooperation more likely . . . .*" (emphasis added) (A-130); Memorandum entitled "Discussion Points with Birney/Siracusa re JTR."  (11/5/13) (A-134).

Contrary to the unsupported, conclusory, and scandalous allegations in Motivation's Sanctions Motion, the actual evidence in this matter shows that Respondents are victims of any fraud Jay may have committed, and not the perpetrators of any fraud on the Court. Plainly, Motivation has not proven otherwise by clear and convincing evidence.

Before reaching the merits of Motivation's baseless allegations, however, the Court must first determine (i) that the Court possesses the "inherent authority" to sanction a party's attorney, who is not counsel of record before the Court and did not violate any order entered by the Court, (ii) that the Court has jurisdiction over Respondents, and (iii) that the OSC been served on Respondents through valid process.

## A.   The Court's Lacks the "Inherent Authority" to Sanction Respondents

Motivation has failed to identify any decision in which any federal court has held that it has the "inherent authority" (or any other authority) to sanction an outside attorney for a party, when the attorney has neither appeared as counsel of record before the court nor violated an order of the court.[22]   Absent such authority, the Court lacks subject matter jurisdiction with respect to the Sanctions Motion.

---

[21]   *See also Olem Shoe Corp. v. Wash. Shoe Co.*, 2010 U.S. Dist. LEXIS 144830, at *12 (S.D. Fla. Dec. 1, 2011) ("As the movant, the defendant has the burden of establishing by clear and convincing evidence that the plaintiff acted in bad faith."); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1365 (S.D. Fla. 2006) (applying the "clear and convincing" standard after noting that other courts have required "the conduct be proven by clear and convincing evidence" when determining whether to impose attorney's fees as sanctions pursuant to the court's inherent authority); *Cadle Co. v. Moore*, 739 F.3d 724, 730 (5th Cir. 2014) ("we uphold a lower court's decision to invoke its inherent sanctioning power only if clear and convincing evidence supports the court's finding of bad faith or willful abuse of the judicial process"); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1344 (Fed. Cir. 2013) ("Sanctionable conduct must be shown by clear and convincing evidence."); *SunTrust Mortg., Inc. v. AIG United Guaranty Corp.*, 2011 U.S. Dist. LEXIS 33118 at *41-52 (E.D. Va. Mar. 29, 2011) (declining to sanction counsel based on lack of clear and convincing evidence of "sentient" and culpable misconduct).

[22]   All legal authority upon which Motivation purports to rely is set forth on pages 16 through 19 of the Sanctions Motion. None of those decisions supports an extension of the Court's "inherent authority" to Respondents. *See Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (affirming sanctions against a **party**); *Mroz v. Glatter*, 65 F.3d 1567, 1575 (11th Cir. 1995) (sanctions

15

As best Respondents can tell, neither the United States Supreme Court nor the 11th Circuit has sustained the use of the Court's "inherent authority" to sanction any "non-party" other than counsel of record for a party.  At the district court level within the Eleventh Circuit, the most recent decision to deal with using the inherent authority to sanction a non-party (other than counsel of record for a party) is *ANZ Advanced Technologies, LLC v. Bush Hog, LLC*, 2012 U.S. Dist. LEXIS 29534 (S.D. Ala. Feb. 7, 2012), in which sanctions were imposed on the two "highest ranking officers in ANZ."  *See id.* at *29.  Unlike here, *ANZ* (and the cases identified therein) involved corporate officers with legal control over the party, and did not involve outside counsel to a party that was not counsel of record in the proceedings before the Court.

---

against a **party** and its **counsel of record**); *Dial HD, INC. v. Bowers*, 536 Fed. Appx. 927, 930-31 (11th Cir. 2013) (affirming award of sanctions against a **party**); *Smith v. Grand Bank & Trust of Fla.*, 193 F. App'x 833 (11th Cir. 2006) (affirming denial of sanctions against **counsel of record**); *Maale v. Kirchgessner*, 2011 U.S. Dist. LEXIS 41172 (S.D. Fla. 2011) (sanctions imposed against **party** and its **counsel of record**); *Murray v. Playmaker Servs., LLC*, 548 F. Supp.2d 1378, 1382 (S.D.Fla. 2008) (denying sanctions against **party** and granting sanctions against party's **counsel of record**); *Corder v. Howard Johnson & Co.*, 53 F.3d 225, 232 (9th Cir. 1994) (sanctions against **party's principal**); *SECO Nev. v. McMordie (In re Holloway)*, 884 F.2d 476, 477 (9th Cir. 1989) (sanctions against **court reporter**); *Moten v. Bricklayers, Masons & Plasterers Int'l Union of Am.*, 543 F.2d 224 (D.C. Cir. 1976) (awarding sanctions against **entity that tried to interpose itself as a party**, reasoning that "[t]his is not a situation in which the court is being asked to enter an award against a person which has in no way entered its name upon the court records"); *In Re Intel Corp. Microprocessor Antitrust Litig.*, 562 F. Supp. 2d 606, 611 (D. Del. 2008) (approving Special Master's recommendation of sanctions against a **non-party who was the subject of a discovery subpoena** and "engaged in vexatious litigation conduct during the adjudication of a discovery dispute"); *Savarese v. Agriss*, 883 F.2d 1194, 1209 (3d Cir. 1989) (concerning **non-parties who aided and abetted a violation of court's injunction or order**); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568 (M.D. Fla. 2009) ("non-parties" subjected to sanctions were either **counsel of record for a party in the case or counsel who violated a discovery order**); *Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036 (S.D. Fla. Sept. 3, 2008) (sanctions appropriate when, among other things, non-party's signature appeared on filings and non-party "was the **real party in interest** with respect to" certain of the claims at issue); *Helmac Prods. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563 (E. D. Mich. 1993) (court's inherent power to sanction is limited "to those individuals who were either (1) **parties**, (2) **subject to a court order**, or (3) **real parties in interest**"); *Odyssey Marine Exploration, Inc. v. The Unidentified Shipwreck Vessel*, No. 07-cv-614 (M.D. Fla. 9-25-2013) (reported at 979 F. Supp. 2d 1270) (granting sanctions against a **party** (for contempt, among other things) but denying sanctions sought against its in-house counsel).

Motivation claims to find support for sanctioning Respondents in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  Motivation is wrong.  In *Chambers*, the U.S. Supreme Court held only that the district court did not abuse its discretion in assessing attorneys' fees against the ***party*** to a proceeding for his bad-faith conduct before the court.  *See id.* at 35.  Although not part of the appeal in *Chambers*, the Court noted that the trial court also had sanctioned three attorneys of record and a trustee (who was a party in the underlying litigation).  *See id.* at 40 n.5. Significantly, the district court in *Chambers* expressly limited the sanctions to the attorneys of record notwithstanding that NASCO had also sought sanctions against "[n]umerous other attorneys in the firms of these trial attorneys [who] have filed and/or signed pleadings which appear of record."  *See NASCO, Inc. v. Calcasieu Television & Radio*, 124 F.R.D. 120, 145 (W.D. La. 1989).  Moreover, the district court specifically "determined to make no mention of charges or the names of such attorneys against whom no sanctions are imposed" because "the very fact that the attorney was charged could bring upon him the sting of disrepute."  *Id*. at 142.

Motivation's reliance on *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563 (E.D. Mich. 1993) is similarly misplaced.  (*See* Mot. at 18).  *Helmac* held that a non-party may be sanctioned if it is the "real party in interest."[23]  At issue in *Helmac* was whether the court had the inherent authority to sanction a non-party who was the principal shareholder and chief executive officer of the corporate party.  *Id.* at 564.  The court reasoned that the power to sanction extended to the officer of the corporate party because "the individual is as much

---

[23] According to the court in *Helmac*, non-parties can be sanctioned pursuant to the court's inherent authority only if they "(1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered." *Id*. at 568.  The *Helmac* court explained that its two-prong test effectively limited the scope of the court's inherent power to assess sanctions against persons who, while technically non-parties, were in fact the "real parties in interest."  *See id.*; *see also United States v. Henry*, 2013 U.S. Dist. LEXIS 133148, *110 (E.D. Va. Sept. 13, 2013) (repeating the *Helmac* qualification that "[t]his test will effectively limit the scope of the Court's inherent power to sanction to those individuals who were either (1) parties, (2) subject to a court order, or, (3) real parties in interest"); *In re VIII S. Mich. Assocs.*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (same).

involved in the litigation as any party would be, and his participation in these events is tantamount to a direct snubbing of the Court's authority by that individual." *Id*. Significantly, there are no decisions of the U.S. Supreme Court or the 11th Circuit adopting *Helmac*.[24] In any event, Respondents plainly were not the "real party in interest" in the Admiralty Action (and Motivation has not claimed otherwise). Accordingly, *Helmac* would not help Motivation even if it were assumed (*arguendo*) that *Helmac* were good law.

Judge Moore applied the *Helmac* test to conclude that Jay should be sanctioned even though he was a non-party. (D.E. 445 at 20 n.19.) Like the principal shareholder and chief executive officer in *Helmac*, Jay was the "real party in interest" because he was JTR's sole Managing Member and the holder of a controlling membership interest. In addition to Judge Moore's decision herein, there are five district court decisions within the 11th Circuit adopting *Helmac*, but none have applied it as against attorneys who were not counsel of record. In each of these cases, the non-party subject to sanction was either counsel of record for a party or "the real party in interest" (in the words of *Helmac*).[25] Even outside the 11th Circuit, courts have

_____

[24] Indeed, only one decision of any United States Court of Appeals has ever cited *Helmac*, and that decision involved the violation of an injunction, and actually reversed as to the one non-party sanctioned by the district court. *See Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009); *see also Adell Broad. Corp. v. Ehrich*, 2012 Mich. App. LEXIS 229 (Mich. Ct. App. Feb. 14, 2012) (adopting *Helmac*, and affirming the imposition of sanctions on non-party in a state-court proceeding based on a determination that the non-party was the "real party in interest" where he was "the president and director" of the offending parties and had "controlled the companies and filed the complaint on behalf of the companies").

[25] *See ANZ Advanced Techs., LLC*, 2012 U.S. Dist. LEXIS 29534, at *29 ("highest ranking officers in ANZ"); *Feldman v. Davidson*, 2009 U.S. Dist. LEXIS 36921, at *6-7 (S.D. Fla. April 13, 2009) (individual who held a "power of attorney" to act for the actual parties before the Court, and had used that power to cause various actions that were the subject of the sanctions motion); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 587-90 (M.D. Fla. 2009) (all "non-parties" subjected to sanctions were either counsel of record for a party in the case or counsel who violated a specific discovery order); *Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036, at *7-9 (S.D. Fla. Sept. 3, 2008) (non-party subject to sanctions signed the filings giving rise to sanctions – which were filed *pro se* – and did not contest the Court's authority to sanction him); *Mastercard Int'l, Inc. v. Ishak*, 2004 U.S. Dist. LEXIS 951, at *12-13 (S.D. Fla., Feb. 23, 2004) (involved sanctioning an actual party, and nobody else). In addition to the five

recognized only a handful of situations in which misconduct may expose non-parties (other than counsel of record) to sanctions under the courts' inherent power, and none apply here.[26]

Motivation also claims to find support for sanctioning Respondents in *Corder v. Howard Johnson & Co.*, 53 F.3d 225 (9th Cir. 1994) (discussing, in dicta, situations in which courts had imposed sanctions under their inherent power). *See* (Mot. at 18). Again, Motivation is mistaken. In *Corder*, the Ninth Circuit reversed a grant of attorneys' fees against Gary Baugh, who was a defendant in an action in his capacity as a trustee of a pension plan. In the action, Mr. Baugh caused the pension plan to assert a third-party complaint against Howard Johnson & Co. ("HJ"), which later obtained a summary judgment of dismissal of the claims against it. In connection with its grant of summary judgment to HJ, the district court awarded attorneys' fees to HJ, and held Mr. Baugh jointly and severally liable for those fees with, among others, the pension plan.

---

decisions from district courts in the Eleventh Circuit, various other district courts have relied upon *Helmac* to support the imposition of sanctions upon non-parties who were the real parties in interest. Significantly, not a single one of these decisions involved an attorney for a party who was not the attorney of record in the litigation. Respondents respectfully submit that the reason for this is obvious – where there is an attorney of record, he or she is the gatekeeper, and it cannot be another attorney's responsibility to police the litigation.

[26] *First*, courts have recognized the inherent power to sanction may be implicated by a non-party who has violated a court order. *See*, *e.g.*, *Marshak v. Treadwell*, 595 F.3d 478 (concerns violation of an injunction and reverses as to one non-party). *Second*, courts have assessed sanctions against a party's corporate officers, as occurred in *Helmac*. *Third*, a court's inherent power to sanction may extend to a "non-party" that filed an unsuccessful and frivolous motion to intervene in the proceedings before the court. *See Moten v. Bricklayers, Masons & Plasterers Int'l Union of Am.*, 543 F.2d 224 (D.C. Cir. 1976) (sanctioning a non-party who unsuccessfully sought to become a party); *Cozzens v. City of Lincoln Park*, 2012 U.S. Dist. LEXIS 190260 (E.D. Mich. Feb. 6, 2012) ("non-parties" were a failed intervenor and his attorneys of record in the motion to intervene). *Finally*, a court's inherent power to sanction may extend to a court reporter or other court personnel who has interfered with the court's performance of its judicial function. *See SECO Nev. v. McMordie*, 884 F.2d 476, 477 (9th Cir. 1989) (sanctioning a court reporter for "repeated and flagrant failures to meet court-imposed deadlines" that resulted in "severe prejudice to both the parties and the court"). Plainly, none of these circumstances pertain to Respondents.

*See id.* at 229.  Mr. Baugh appealed the award of attorneys' fees as against him, and the Ninth Circuit agreed that the award was inappropriate.  *See id.* at 232–33.[27]

Not only does Motivation fail to identify any decision in which the Court's "inherent authority" has been extended as far as Motivation seeks to stretch it, but several courts have specifically rejected the proposition that an attorney can be subject to sanctions under the court's inherent power without the attorney having appeared as counsel of record before the court or disobeyed an order of the court.  For example, in *Leventhal v. New Valley Corp.*, 148 F.R.D. 109 (S.D.N.Y. 1993), the Court declined to impose sanctions on an attorney pursuant to Rule 11, 28 U.S.C. § 1927, or the court's inherent powers, based on the court's expressed view that an attorney may not be held liable for sanctions unless that attorney personally appeared as counsel of record in the litigation and signed the papers giving rise to the sanctions.  *See id.* at 111–12. The obvious reason for this rule is that counsel of record is the "gate keeper" with the ultimate responsibility to refrain from taking positions or filing papers that such counsel does not stand behind. If counsel of record is directed by a client or other counsel to take action that counsel of record believes to be improper, counsel of record can and should refuse to do so.  Counsel of record cannot, however, simply "follow orders" and avoid responsibility for his or her actions.[28]

---

[27]  The Ninth Circuit also addressed an additional argument that Mr. Baugh could not be held liable for HJ's attorneys' fees because he was not a named party in the claim against HJ (even though he was a party in the underlying litigation).  Although the Ninth Circuit held in favor of Mr. Baugh, the Court noted in dictum that it has the inherent authority to sanction the types of non-parties discussed in footnote 25, *supra*.  *See id.* at 232.  The Ninth Circuit did not state that attorneys' fees may be imposed on an out-of-state lawyer who did not enter an appearance in litigation in which the party accused of bad faith was represented by counsel of record.

[28]  *Long v. Quantex Res., Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985) (holding, for sanctions purposes, that counsel of record, and not out-of-state counsel, is accountable for the conduct of the litigation, even if out-of-state counsel is primarily responsible for the preparation of the motion papers at issue), *aff'd*, 888 F.2d 1376 (2d Cir. 1989); *see also In re De Lorean Motor Co. Litig.*, 59 B.R. 329, 339 (E.D. Mich. 1986) (instructing that there is no "just following orders" defense and that "accountability already lies with the signer, even if it means informing a superior that the proposed pleading is either factually unsound or not substantiated by the existing state of the law").

In *In re VIII South Michigan Associates*, 175 B.R. 976 (Bankr. N.D. Ill. 1994), the court similarly held that it lacked the inherent authority under *Chambers* to sanction a non-party who "helped to develop theories which the [parties] relied on in the litigation" and who "may well have suggested the shots" made by the attorneys of record. *Id.* at 984. Additionally, the court noted that the non-party's conduct would be "worthy of sanctions" if the court possessed the authority to grant such relief. *Id.* at 987 n.7. Nonetheless, the court concluded that *Chambers* could not be extended to the non-party at issue, explaining:

> The decision in *Chambers*, if read broadly, might be used to support a holding that a court has the inherent authority to sanction any person or entity that is responsible for an abuse of the legal system. However, the court declines to read *Chambers* so broadly and instead concludes that *Chambers* should be limited to parties and their counsel. First, the only sanctions before the Supreme Court in *Chambers* were the sanctions imposed on *Chambers* himself in his capacity as a party. Second, throughout the opinion, the majority of the Court suggested that the inherent power should be limited to imposing sanctions on parties and their counsel. (*Id.* at 983).

Motivation's argument incorrectly assumes that a court's inherent authority is implicated whenever a non-party has engaged in questionable conduct (which has not occurred here, in any event). While the court's authority to sanction may be inherent, it is not unbounded. Rather, the court's inherent authority is limited to that necessary to control the proceedings before it and to ensure compliance with its orders. As the 5th Circuit explained in the decision affirmed by the *Chambers* Court, "[t]o the extent that inherent power is seen as a product of necessity, it contains its own limits. It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).[29] Moreover, the Supreme Court has cautioned that the

---

[29] *See also Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991) (explaining that a federal court's inherent authority "is based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in connection

inherent powers of the federal courts "must be exercised with restraint and discretion" both "[b]ecause of their very potency" and "[b]ecause they are "shielded from direct democratic controls." *Chambers*, 501 U.S. at 45; *Roadway Express, Inc.*, 447 U.S. 752, 764 (1980). Thus, "[t]he threshold for the use of the inherent power sanction is high," and "[s]uch powers may be exercised only if essential to preserve the authority of the court." *Natural Gas Pipeline Co. of Am. v. Energy Gathering*, 86 F.3d 464, 467 (5th Cir. 1996). The conduct of non-party attorneys who have not appeared as counsel of record before the Court nor disobeyed an order entered by the Court simply does not implicate the Court's inherent authority.

In the end, Motivation has failed to identify any decision in which any federal court has held that it has the "inherent authority" (or any other authority) to sanction an outside attorney for a party, when the attorney has neither appeared as counsel of record before the court nor violated an order of the court, and Motivation's desperate effort to reach into Respondents' "deep pockets" requires an extension of *Chambers* and its progeny beyond their breaking point.

**B.      The Court Lacks Personal Jurisdiction Over Respondents**

Due process and basic civil procedure mandate that a court cannot sanction or issue an order to show cause against a person or entity over which the court lacks jurisdiction, including a person or entity that has not been served with valid process – even when the court is asked to invoke its inherent powers. *Chambers*, 501 U.S. at 50. Consistent with the limited nature of the inherent power of a court to sanction non-parties (as discussed in greater detail above), Congress has recognized that federal courts do not have the power to issue orders to show cause, or even contempt orders, outside the territorial jurisdiction of each federal district court. *See, e.g.*, *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 906-07 (5th Cir. 1995) (vacating sanctions order

---

with those proceedings" by seeing that the court's orders are obeyed) (citing *Chambers*, 501 U.S. at 43). *Accord Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) ("it is unclear whether the inherent power to sanction discovery abuses extends to abuses committed by non-parties"), *cert. denied*, 510 U.S. 1073 (1994).

because district court lacked personal jurisdiction over non-party, who was in-house counsel for a party, but who had never entered an appearance in the action). Thus, before issuing sanctions or an order to show cause against Respondents, there must be a basis for the exercise of the Court's jurisdiction and valid service upon them.

This Court has already held that it does not have jurisdiction over Respondents because their prior appearances in this matter have been for limited purposes, rather than general appearances, and because they have not been served with valid process in this matter. *See* Paperless Order, December 26, 2013 (D.E. 333). The Court also has recognized that it would be "unfair" to drag Respondents into this matter after the entirety of the pre-trial proceedings had already been completed.[30] As Judge Moore noted, it would be "unfair to Mr. Silverstein to have to come in at such a late date." (Jan. 15, 2014 Trial Tr. (D.E. 373) at 112:24 – 113:9) (A-139).

This continues to be true, as Respondents have never been properly served with valid process under the Federal Rules of Civil Procedure. "[W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, he must be served with process as in any other civil action." *McGuire*, 48 F.3d at 907 (citing 11A Wright & Miller, *Federal Practice & Procedure* § 2960 at 589); *accord Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 44446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (where there was no evidence of proper service, the court was "[w]ithout personal

---

[30]   Respondents consistently have asserted they have not submitted themselves to the Court's jurisdiction. Indeed, this issue was the subject of Respondents' response ("Response") (D.E. 284) in opposition to Motivation's motions (D.E. 279 & 277) for a ruling that Respondents had submitted themselves to the Court's jurisdiction and for a note to that effect in the admission of John Dorsey *pro hac vice*. The Response is incorporated herein by reference. On September 25, 2013, Judge Moore entered a paperless order (D.E. 282) approving the motion for admission *pro hac vice* of John Dorsey—without Motivation's requested note that Respondents had submitted themselves to the Court's jurisdiction. Moreover, on December 26, 2013, Judge Moore entered a further paperless order (D.E. 333) denying Motivation's motion and specifically rejecting the argument that Respondents had waived their jurisdictional arguments. *See also* (D.E. 445, at 3 n.3) ("**This Court found that Silverstein had not submitted himself to its jurisdiction** . . . ." (emphasis added)).

jurisdiction" and could not "hold them in contempt[ ]").  "'Service of process is the mechanism by which the court [actually] acquires' the power to enforce a judgment against the defendant's person or property.  In other words, service of process is the means by which a court asserts its jurisdiction over the person." *SEC v. Ross*, 504 F.3d 1130, 1137-38 (9th Cir. 2007) (internal citations omitted).  "Without a proper basis for jurisdiction, or in the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *Id.* at 1138-39.

Moreover, the law is settled that actual notice of the Order to Show Cause "does not satisfy the requirement of proper service." *McGuire*, 48 F.3d at 907.  Rather, for service of process of the Order to Show Cause to be validly made upon Respondents, it must be served in accordance with – and is subject to the territorial limitations of – Rule 4.1 of the Federal Rules of Civil Procedure.  *See Fid. Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851, at *18-19 (D. Ariz. Mar. 12, 2010) ("Because the process here is an [Order to Show Cause] and not a summons, the court must look to Rule 4.1(a).").

In addition to specifying *who* must make service, Rule 4.1(a) limits *where* service may be made.  In the absence of a specific federal statute allowing for broader service of the relevant type of process, service is expressly limited to "the state where the district court is located" – which is the state of Florida in this instance.  In this case, no federal statute operates to broaden this reach.  Thus, the service of the Order to Show Cause on Respondents in Delaware is invalid under Rule 4.1(a) and does not permit this Court to exercise jurisdiction over Respondents. *Accord* Hon. William W. Schwarzer et al., Federal Civil Procedure Before Trial §13:247 (2007) (noting, in discussion of orders to show cause for violations of preliminary injunctions, that "[t]he party sought to be held in contempt is entitled to notice of the [Order to Show Cause].  The

order must be served in the state in which the district court is located or within 100 miles from the courthouse in which it was issued.").

Consequently, federal district courts lack jurisdiction outside their territorial limits – even where a party has actual notice of an order to show cause. *See Fidelity*, 2010 U.S. Dist. LEXIS 35851, at *33 (holding "this court lacks personal jurisdiction over the Trust because it was not properly served with the [Order to Show Cause] in accordance with Fed. R. Civ. P. 4.1" in spite of actual notice). As any judgment rendered in the absence of personal jurisdiction is void and must be set aside, *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (per curiam), this Court should avoid the nullity of issuing a judgment on the Sanctions Motion in the first instance.[31] Indeed, Judge Moore has in fact already specifically warned Motivation's counsel that the Court would not enter an unenforceable order. (*See* D.E. 373 at 123:23 – 124:7) ("THE COURT: So you're going to have to provide some pretty specific authority for—or to impose what sanctions, and on whom. If they are—if they, you know, you might want to impose sanctions on people, certain people, but if they're not within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court should not be in a position of just entering orders that it cannot execute on, properly execute it. MR. TUTHILL: Sir, I understand that.") (A-139). Motivation never complied with Judge Moore's directive and has instead bullied ahead with its baseless motion.

Respondents have never consented to this Court's jurisdiction or waived the lack of valid process. Thus, while Respondents have not engaged in any sanctionable conduct, the authority

---

[31] Judgment rendered in the absence of personal jurisdiction is void regardless of whether there is any process or procedure by which the Court could effectively acquire personal jurisdiction over Respondents. *McGuire*, 48 F.3d at 908, n.14 (vacating district court's order sanctioning defendant's in-house counsel based on lack of jurisdiction due to lack of service of process regardless of whether the district court had any procedural means by which to acquire jurisdiction over the non-party).

of the Court to consider that issue simply does not exist.  The Court should, therefore, decline to rule on the Sanctions Motion for lack of jurisdiction and invalid service of process.

**C.**     **Motivation Has Failed to Establish a Clear and Convincing Case for Sanctions**

In any event, there is simply no factual basis upon which to find that Respondents engaged in sanctionable conduct – under the governing "clear and convincing" standard or otherwise.  Motivation makes numerous assertions in an attempt to find support for imposing sanctions against Respondents.  Like Motivation's original Verified Claim in the Admiralty Action, none of Motivation's assertions in its Sanctions Motion are supported by the actual facts or applicable law.  Each of the assertions is examined (and refuted), seriatim, in the Silverstein Affidavit, which is incorporated herein by reference, and a few of the "big picture" issues are addressed below, as well.

**1.**     **Respondents Did Not Knowingly Participate in a Fraud on the Court**

The central theme of the Sanctions Motion is Motivation's claim that Respondents knowingly participated in a fraud on the Court that Judge Moore found to have been committed by Jay.  This could not be further from the truth.  If Jay committed a fraud on the Court, Respondents are victims of that fraud – not perpetrators.  Indeed, Respondents may have been duped into spending more (in the value of wasted legal services, among other things) than any other victim of any fraud Jay may have committed.

The facts (as opposed to Motivation's baseless and reckless assertions) show that Respondents did not know that Jay had committed a fraud on the Court (or anybody else) at any time prior to the commencement of the Sanctions Trial on January 13, 2014.  The facts further show that Silverstein (and Sullivan) promptly urged JTR's Record Counsel to voluntarily disclose the key evidence of Jay's alleged fraud within moments of first learning of that evidence.

Moreover, and as detailed in the Silverstein Affidavit (and in Silverstein's prior affidavits, his trial testimony, Sullivan's affidavits and trial testimony, and in numerous contemporaneous documents), there was substantial evidence supporting the veracity of the emerald find beyond Jay and Steve's insistence—and Respondents were wholly unaware of Rodriguez's claim until after the commencement of the Sanctions Trial.

**2.      Silverstein Did Not Exercise Control Over the Litigation**

Motivation is incorrect that Silverstein exercised control over the litigation.  To the contrary, Silverstein did not have the ability to cause any filings to be made in the Admiralty Action that did not have the support of Record Counsel.  While Silverstein often offered his views to Record Counsel, others bore both the authority and responsibility of determining the course of the Admiralty Action.[32]  Significantly, Motivation has not moved for sanctions against any of JTR's Record Counsel – even though it is those attorneys who had the legal (and ethical) responsibility for all filings they made on JTR's behalf in the Admiralty Action.

Examples of Silverstein's acknowledgements that Record Counsel had ultimate responsibility for the Admiralty Action follow:

- On August 11, 2011, Silverstein emailed that, in light of certain reports of a plot orchestrated by or on behalf of The Kirby Group, "I am reluctant to endorse taking legal action (such as filing an Admiralty claim) based on the assumption it is true. **In the end, however, I believe that Jay should be guided by Horan on this issue."** (Silverstein email (8/11/11, 10:44)) (A-9).

- On October 5, 2011, in response to Silverstein's indicating he did not object to Horan's proposed course of action, Horan wrote:  "Bruce—we do not communicate well- **I was not asking for your permission**."  To which Silverstein responded, "**I wasn't meaning to give you permission – which is not mine to give or withhold**.  I actually was just trying to communicate my assent to your suggestion." (Silverstein email to Horan, Sullivan, Scott, Jay, Steve (10/5/11, 6:33)) (A-21).

---

[32] *See, e.g.*, Horan Oct. 2, 2013 Dep. Tr. at 153:24 – 154:13.  (A-133).

- On October 18, 2011, Horan filed the Mathewson Report without advance notice to Silverstein, who did not even see the report or know of its content before it was filed.[33]

- On October 27, 2011, Silverstein emailed Horan affirming Horan's role as "admiralty counsel" to JTR and stating that when Silverstein and Davis spoke to the New York Investors' counsel, **"we were very careful to make clear to him that you are [JTR's] admiralty attorney, and that any admiralty-related issues need to be run by you."** Silverstein also informed Horan that he and Davis had told the New York Investors' counsel that any ideas relating to the *Atocha* needed to be raised with Horan because Silverstein and Davis "did not have any expertise in that area." (Silverstein email to Horan, Sullivan, and Davis (10/27/11, 5:00)) (A-27).

- Additionally, on October 27, 2011, Silverstein emailed his thoughts on Horan's proposed stipulation with the New York Investors:  "Here are my proposed edits (in track change format).  **Obviously, I defer to David on the ultimate language** . . . ." (Silverstein email to Horan, Jay, Steve, Scott, Sullivan, Livingston, Davis (10/27/11, 4:55)) (A-26).

- On October 28, 2011, Silverstein emailed Holloway a revised version of the proposed stipulation, copying Horan on the email.  Silverstein stated that the revised stipulation "has been vetted and approved by David Horan, (Silverstein email to Holloway (10/28/11, 6:01)) (A-28), and, later, that "David will need to be involved in any discussions respecting the edits," (Silverstein email to Holloway (11/1/11, 11:41)) (A-28).  When Silverstein forwarded the email chain to Jay and others, Jay questioned why certain expenses were necessary, Silverstein responded that "**[a]s we discussed earlier today, you should discuss these issues with David.**"  (Silverstein email to Jay, Steve, Scott, Sullivan, Livingston, Davis, and Horan (11/1/11, 10:40)) (A-29).

- On November 10, 2011, Silverstein responded to Jay's email about transporting the emeralds from New York to Key West, encouraging Jay to consult with Horan, as Jay's attorney of record in the Admiralty Action:  "Jay:  **You need to raise your concerns with David**.  I have been encouraging the two of you to discuss this for the past two weeks, but you both seem to be ignoring my encouragement.  **David is your lawyer in the admiralty action.  You are paying him well.  Make him answer your questions**."  (Silverstein email to Jay, Scott, Sullivan, Davis, Livingston, Steve (11/10/11, 6:48)) (A-31).

- On December 6, 2011, Silverstein emailed stating that Steve should consult with Horan regarding certain filings required in the Admiralty Action:  "**David should be handling this. . . .  [T]hese are all questions David should be helping to answer.  They are a core part of the admiralty proceeding process.**"  (Silverstein email (12/6/11, 11:06)) (A-38).

---

[33] Horan email to Scott, Jay, Steve, Sullivan, and Silverstein (10/19/11, 2:42) ("These documents **were filed** in the Federal Court **yesterday**." (emphasis added)) (A-145).

- On March 24, 2012, Silverstein relayed his discussions with counsel to the NY Investors about transporting the emeralds to Key West but referred Jay and others to JTR's attorneys of record in the Admiralty Action regarding the approach required there: "**I leave those issues to David Horan and John Siracusa to resolve (as it is a matter arising under the Order entered in the admiralty proceeding).**" (Silverstein email to Jay, Scott, Sullivan, Steve, Livingston, Davis, Kincannon, and Horan (3/24/12, 1:53)) (A-52).

- On March 26, 2012, Silverstein emailed Horan, Siracusa, and others to express his views on the timing of the filing of the Third Status Report: "**Inasmuch as I am not an attorney of record in the admiralty proceeding, however, I leave it to the two of you (and your partners and associates) to advise JTR on this subject.**" (Silverstein email to Horan, Siracusa, Davis, Livingston, and others (3/26/12, 3:29)) (A-53).

- On April 13, 2012, Silverstein emailed Jay, Scott, Steve, Sullivan, Steve, Davis, Livingston, and others to express his views on a proposed settlement with the New York Investors: "**In the end, however, neither of these decisions is mine to make, and both decisions are up to Jay, Scott and Steve—with Jay having the final word.**" (Silverstein email to Jay, Horan, Siracusa, and others (4/13/12, 4:18)) (A-57).

- On April 23, 2012, Silverstein responded to Steve regarding the possibility that Dean Barr would keep the boat that Jay and Steve had anticipated using to work the discovery site: "I hope you all have another way to work and protect the site. Otherwise, as I understand the admiralty law, Jay will be in danger of losing his status as salver in possession. **You should discuss this with David and John.**" (Silverstein email to Steve, Horan, Janssen, Siracusa, and others (4/23/12, 7:45)) (A-58).

- On October 1, 2012, Silverstein emailed Janssen regarding discovery strategy and Motivation's request for documents: "**In the end, you are Jay's counsel of record, and I can only weigh in with my views. The ultimate decision, of course, if for you and Jay to make.**" (Silverstein email to Janssen (10/1/12, 1:39)) (A-79).

- On October 1, 2012, Silverstein emailed Siracusa regarding the filing of lab reports: "For what is worth, I believe that my proposed strategy is entirely professional and consistent with existing decisional law. **In the end, however, this is for you and Jay to decide.**" (Silverstein email to Janssen and Siracusa (10/1/12, 3:22)) (A-80). "**If we cannot agree on an issue or a strategy after talking it over, I always will defer to you as the counsel of record.**" I ask only for the courtesy of having a conversation to try to reach a compromise before action is taken." (Silverstein email to Janssen, Siracusa, Horan, and others (10/1/12, 7:36)) (A-83).

- On October 2, 2012, Silverstein emailed Siracusa regarding the filing of lab reports: "It would, however, be helpful if we could have more conferences among the entire team to determine strategy. **In the end, JTR will be guided by your decisions, as you are counsel of record.** I expect, however, that the other members on this team may, from time-to-time have insights and experience that will be of assistance to you

29

in making your decisions." (Silverstein email to Siracusa, Davis, Livingston, and others (10/2/12, 10:05)) (A-86).

- On October 13, 2012, Silverstein emailed Siracusa regarding JTR's response to the Original Sanctions Motion: "I did not know that you were taking the approach to the sanctions motion that you did take until two or three days before the response was due – which was the first time I saw a draft. . . .  When I received the draft, I was concerned that it was the wrong approach, but I knew how hard you had worked on the response, and I cannot tell you how much I appreciate your efforts on Jay's behalf. . . . **And, as I said earlier today, you may well be right that this is the best approach, and I may well be mistaken."**  (Silverstein email to Siracusa (10/13/12, 8:14)) (A-91).

- On November 6, 2012, Silverstein emailed Holloway and White regarding a draft of a proposed order resolving New York Investors' claim in the Admiralty Action. **"I have now had a chance to review the language at issue, and I have no objection to the proposed change—subject, of course, to any view John or Joseph might have."**  In the last email in this exchange, Silverstein further states:  **"Subject to formal sign-off by John Siracusa or Joe Janssen, this looks good to me."** (Silverstein email to Holloway, Janssen, Siracusa, and others (11/6/12, 4:03)) (A-94).

Further, Record Counsel sometimes overruled Silverstein's recommendations and made filings or decisions with little or no input from Silverstein.  For example, on August 8, 2012, Silverstein emailed Siracusa regarding deposition strategy:

> Lastly, there is a lot going on about which I have been unaware, and filings are being made that I have not seen.  Perhaps, that is ok, as you all seem to have this under control.  If, however, you want my continued input, I need to know what is going on in real time, with an opportunity to comment.

(Silverstein email to Siracusa, Horan, Davis, Livingston, and others (8/8/12, 9:09)) (A-71).[34]

In contrast to the many contemporaneous email exchanges showing that Silverstein did not control the Admiralty Action, the only putative support Motivation offers in support of its

---

[34]   Siracusa also filed JTR's Notice of Filing (D.E. 131) against the recommendation of Silverstein and without even sharing a draft of the filing with Silverstein before it was filed. (Silverstein email to Janssen (10/1/12, 4:59)) ("I believe this is a mistake.  But – I understand that it is Jay's decision to make.  May I, at least, see the entire filing you propose to make before it is filed, so that I might suggest edits.") (A-82); *see also* (Silverstein email to Siracusa, stating "I thought that JTR was going to proceed on the basis that nothing further would be submitted unless it was required by an applicable rule or order, and that we all would discuss whether voluntarily doing something that was not required was a wise strategy.") (10/2/2012, 10:05) (A-86).

assertion on page 14 of the Sanctions Motion that Silverstein "caused JTR to file a false status report" is the docket entry for the status report.  Of course, the fact that a document was filed does not prove that Silverstein had any control over its filing.  In any event, the Second Status Report was a collaborative effort among numerous persons, and Record Counsel agreed to file the Second Status Report because he concluded it was an appropriate filing to make.

As Horan accurately testified at the Sanctions Trial:

> *Ultimately, it is up to lead counsel.  It's up to lead counsel in the litigation to make decisions . . . .  The ultimate final decisions rested with me*.

(Horan Oct. 2, 2013 Dep. Tr. at 153:24 – 154:13) (A-133).  It is illogical and disingenuous for Motivation to argue that the Court should sanction Silverstein, but not Horan, for the contents of a filing Horan made – especially when Judge Moore concluded that Horan did nothing wrong. (D.E. 373 at 131:24 – 132:6) (A-139).

### 3.    Silverstein Was Not JTR's General Counsel

Motivation is incorrect that Silverstein was JTR's "General Counsel."  (Mot. at 4-5).  The General Counsel of an entity is an officer of the entity, appointed by the board of directors (or other governing body) to serve as the entity's chief in-house legal officer,[35] and Silverstein is not, and never has been, an employee or officer or General Counsel of JTR.  *See* (12/6/13 Silverstein Aff'd, ¶¶ 2-8, 30 and 10/9/12 Silverstein Aff'd, ¶¶ 85-86).

Additionally, Motivation successfully asserted to this Court that Silverstein had no right to remain in the courtroom on JTR's behalf during the December 2012 Trial.  (*See* D.E. 302-10 and 302-11) (A-101).  Having successfully asserted to this Court that Silverstein was nothing

---

[35] *See*, *e.g*., *China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash*, 1999 U.S. Dist. LEXIS 2674, at *19 (S.D.N.Y. March 9, 1999) ("A corporation's general counsel is an 'officer'"); *In re Grievance Proceeding*, 2002 U.S. Dist. LEXIS 18417, at *9 (D. Conn. 2002) ("the general counsel by definition is a corporation lawyer"); *see also* Merriam-Webster On-Line Dictionary, at http://www.merriam-webster.com/dictionary/general%20counsel (defining "general counsel" as "a lawyer at the head of the legal department (as of a corporation or governmental subdivision)").

more than a fact witness subject to sequestration, Motivation should now be judicially estopped from arguing that Silverstein was JTR's General Counsel.[36]  Having convinced the Court that Silverstein should not be allowed in the courtroom, Motivation cannot now argue that Silverstein is responsible for what transpired therein.

Mischaracterizing Silverstein as JTR's "General Counsel" is nothing more than another litigation tactic designed to extract money from Respondents' "deep pockets."  In candid conversations, Motivation's own attorneys recognized that their story was fiction:

> **The thing about Silverstein that is a little touchy is how to couch his ratty conduct—as the de facto managing member of JTR or as its general counsel or both.  I think keeping him in the role of an attorney increases the potential for his law firm to come in and settle to protect its reputation.**

(White email to Hugh Morgan (2/8/13)) (emphasis added) (A-109).  Thus, Motivation cannot in good faith argue that Silverstein was JTR's "General Counsel."

### 4.    Silverstein Did Not Make Any Sanctionable or Illegal Threats

Contrary to Motivation's reckless and defamatory claims, Silverstein did not (and did not attempt to) "interfere with the administration of justice" in the Admiralty Action or threaten any witness with litigation for the purpose of discouraging them from testifying in support of Motivation.  (Mot. at 15).  As set forth in more detail in the Silverstein Affidavit, Silverstein did not speak with Ash, Barr, Horan, Baer, Marcial, Rose, or Sweeney about the substance of their actual or intended testimony in the Admiralty Action or about whether they would or should testify.  As described in the Silverstein Affidavit, Silverstein did at times indicate to other attorneys that he believed certain conduct was or would be actionable, but these comments,

---

[36]  *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (noting that the purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" (citations omitted)); *Burnes v. Pemco Aeroplex*, 291 F.3d 1282, 1286 (11th Cir. 2002) (finding that privity and individual prejudice by the opponent of the party against whom the doctrine is applied is not necessary to invoke judicial estoppel because the doctrine is intended to protect the judicial system, not the individual litigants).

which were made only to other attorneys, were entirely appropriate and in no way constituted witness intimidation.[37]  Similarly, this Court has itself already dismissed Motivation's suggestion that there was anything improper Silverstein's common-sense advice to Baer and Marcial during sequestration at the December 2012 Trial.  *See* Dec. 6, 2012 Trial Tr. (D.E. 221) at 50:14-16 ("All right.  That explains that.  It didn't impede any of the witnesses.  They came and said whatever they wanted to say.  Let's move on.") (A-103).

In sum, all of Silverstein's communications with Ash, Barr, Horan, Baer, Marcial, Rose or Sweeney – directly or through their respective counsel – have been entirely within the bounds of the law and applicable ethical rules, and contrary to Motivation's unfounded claims, none of these communications was taken for the purpose of intimidating or harassing anyone, to interfere with the administration of justice, or for any other improper or inappropriate purpose.

### 5. In Light of the Court's Rulings Before the Sanctions Trial, and Motivation's Apparent Intent to Disregard Those Orders, Silverstein Did Not Attend the Trial

Silverstein did not attend the Sanctions Trial.  Contrary to Motivation's suggestion, however, the rationale for doing so was not a desire to avoid scrutiny but rather the Court's prior rulings and Motivation's own improper attempt to expand the scope of the Sanctions Trial.

Specifically, in the weeks before the Sanctions Trial:  (1) Judge Moore held that this Court does not have jurisdiction over Silverstein and YCST because their appearances in this

---

[37]  *See, e.g.*, *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266 (S.D.N.Y. 2001) (recognizing that "threats of litigation do not form the basis of a witness tampering allegation" and concluding that "the litigation which Defendants supposedly threatened to bring" did not support a witness-tampering claim when the litigation would have been brought "on behalf of the very clients whose interests the defendant firms [were] committed to represent"); *see also Blackmon v. Iverson*, Civil Action No. 01-CV-6429, 2002 U.S. Dist. LEXIS 18352, at *10–*14 (E.D. Pa. Sept. 26, 2002) ("a threat to sue does not constitute a threat for purposes of" witness tampering and declining to disqualify attorney for telling witness the attorney would be filing suit against him); *Phila. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, Civil Action No. 91-0449, 1992 U.S. Dist. LEXIS 12745, at *19 (E.D. Pa. Aug. 25, 1992) ("In a litigious society such as ours, it is thin-skinned to think that a threatened counter suit . . . is witness intimidation rather than a mere puffing . . . .").

matter have been for limited purposes, rather than general appearances, and because they have not been served with process in this matter;[38] (2) Judge Moore denied Motivation's attempt to obtain sanctions against Silverstein and YCST, reasoning, among other things, that the motion (D.E. 315) was untimely and permitting Motivation to add new "parties" to the case, including Silverstein and YCST, would "dramatically expand the scope of the motion by including new arguments and new parties, different from those addressed in the underlying proceeding on the merits[]" and would improperly "allow this proceeding to develop into a second litigation in its own right";[39] and (3) Judge Moore quashed Motivation's improper summonses, entered a protective order in favor of Silverstein and YCST "to prevent the further filing of similar summons by Motivation,"[40] and further ordered Motivation to show cause why it should not be sanctioned by the Court for its actions.

Further, despite Judge Moore's clear and unequivocal denial of Motivation's last-minute motion to amend (D.E. 315) the original sanctions motion filed in 2011, *see* Paperless Order, December 26, 2013 (D.E. 332), Respondents' review of Motivation's response (D.E. 347) ("Motivation's Response") and Proposed Findings of Facts and Conclusions of Law (D.E. 344)

---

[38]   *See* Paperless Order, December 26, 2013 (D.E. 333).

[39]   *See* Paperless Order, Dated December 26, 2013 (D.E. 332) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

[40]   *See* Paperless Order, January 10, 2014 (D.E. 361).  As noted in prior filings, and as sustained by this Court, Respondents have made a limited entry of appearance in this matter without generally submitting themselves to the Court's personal jurisdiction, and specifically have reserved all rights to object to any claim that the Court has personal jurisdiction over them for purposes of the Admiralty Action.  Notably, Motivation never attempted to serve Respondents with any papers filed in the Admiralty Action and Motivation's counsel sent only courtesy copies by email to Respondents prior to the filing of the motion for the *pro hac* admission of John T. Dorsey for the limited purpose of contesting Motivation's Motion for Reconsideration (D.E. 269).  Moreover, Motivation's counsel did not even begin providing either Silverstein or YCST with courtesy copies of some of Motivation's filings until sometime after the December 2012 Trial, and even then, Motivation never attempted to consult with Respondents respecting any of Motivation's filings – as would be required under Local Rule 7.1(a)(3) if Respondents were parties to this action – until Motivation filed its Sanctions Motion (D.E. 407) following the sanctions trial in January 2014.

showed that Motivation intended to present a "case" at the Sanctions Trial that went far beyond even the case alleged in the prior amended sanctions motion.  Indeed, Motivation expressed its clear intention to present "evidence" based on the amended sanctions motion that had already been denied by this Court.  (Motivation's Response at 4).

Motivation's expressed intention to present a case based on a denied motion was remarkable and concerning to Respondents, as Motivation's filings made clear that Motivation simply ignores orders of the Court and the facts when it is convenient for it to do so. Accordingly, in light of the Court's rulings immediately prior to the sanctions trial, Motivation's expressed intent to skirt the Court's rulings, and the fact Silverstein was not JTR's counsel of record and would otherwise have no role at trial, Silverstein had good reason not to attend the sanctions trial.

*     *     *

For the foregoing reasons, Respondents did not engage in any sanctionable conduct and Motivation's arguments to the contrary are unsupportable and contradicted by the facts and applicable law.

**D.**     **<u>Motivation Lacks Standing to Seek Sanctions Against Respondents</u>**

Additionally, Motivation lacks standing to seek sanctions from Respondents.  Motivation is not a defendant who claims to have been wrongfully sued by JTR (much less by Respondents). Nor is Motivation a plaintiff who claims that JTR (much less Respondents) wrongfully defended against a viable complaint brought by Motivation.  Rather, Motivation is an intermeddler in the Admiralty Action, which first asserted a legally baseless and factually frivolous claim that was dismissed by the Court (albeit without prejudice) and later asserted a fabricated claim of stolen emeralds in order to get around the patent legal defect of its initial claim of a floating barrel from the Seventeenth Century.  Moreover, Judge Moore ordered that Motivation's claims that it was

35

acting as a "virtual *qui tam* relator," *see, e.g.*, D.E. 292, ¶ 1, should be stricken from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." (D.E. 360). Thus, Motivation simply lacks standing to seek sanctions against Respondents (or Sullivan for that matter), and Motivation identifies no legal authority, and Respondents are unaware of any legal authority, that supports Motivation's standing to pursue sanctions here.

**E.**     **Motivation Approaches the Court With Unclean Hands**

Without regard to the merit (or lack thereof) of Motivation's claim for sanctions, the Court should refuse to award sanctions in favor of Motivation because it has unclean hands in this matter. Indeed, courts consistently "have refused to invoke their inherent authority to impose sanctions where the party requesting sanctions has unclean hands."[41]

Here, there is ample evidence that Motivation has unclean hands. First and foremost, Motivation voluntarily injected itself into the Admiralty Action by filing its *verified* claim alleging that the emeralds Jay had discovered were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site. (D.E. 10, ¶ 15).

---

[41]  *Thomas v. Schwab*, 2012 U.S. Dist. LEXIS 177080, *4 (E.D. Mich. Dec. 14, 2012) ("Both parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other." (citing *S. Shore Ranches, LLC v. Lakelands Co., LLC*, 2010 U.S. Dist. LEXIS 71047, *16 (E.D. Cal. Jun. 18, 2010))); *Black v. Schwartz*, 2012 U.S. Dist. LEXIS 132524, *12-13 (E.D.N.Y. Sept. 17, 2012) (declining to award defendants sanctions for several reasons, including "blatant mischaracterizations" made by defendants and the Court's inability to ascertain how much defendants spent on defending the discontinued portion of the case versus the amount spent of defending the malpractice claim against them (citing *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999), for the proposition that "[a]lthough . . . we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision")); *see also Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992) (reversing district court's granting of Rule 11 motion for sanctions and noting that "[s]ome of [defendant's] defenses are more ingenious than ingenuous and compel us to caution that [parties] who live in glass pleadings ought not to throw Rule 11 stones."); *see also Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (the principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior).

Motivation made those allegations despite that its claim to the emeralds was (i) legally untenable based on the Fifth Circuit's ruling in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 335-336 (5th Cir. 1978), and (ii) factually implausible given that the Discovery Site is forty (40) miles from the *Atocha* wreck-site and thirty (30) miles from the outer-most bound of the debris trail from the *Atocha*.  By Motivation's own counsel's words, the stated purpose of filing the verified claim was that "Motivation needed to file a protective claim . . . to be safe from a charge of neglect by investors; then we could get with you and resolve any due diligence concerns."[42]  Simply put, Motivation concocted the "floating barrel" theory, not to make an honest claim to the emeralds, but to inject itself into this matter to serve as the self-appointed "Treasure Police."[43]

Other examples of Motivation's bad-faith tactics throughout the course of its involvement in this matter include the following:

- Suggesting to Sullivan that the parties should skip the inspection of the emeralds and "just say that JTR's emeralds were from the *Atocha*" and market them together as *Atocha* emeralds.  (Sullivan Aff'd (D.E. 302-6), ¶ 7) (A-88).[44]

- After repeatedly refusing requests for criteria for inspecting the emeralds, Motivation filed the Original Sanctions Motion, which was primarily based on JTR's alleged "resistance to facilitating an inspection" and engaging "in dilatory litigation and obstructive behavior," (Original Sanctions Motion (D.E. 123), ¶¶ 10, 20).  In its motion, Motivation conveniently failed to mention JTR's efforts to reach a compromise on the inspection issue and the fact that the Court had entered an order staying discovery (D.E. 69).

---

[42]   White letter to Horan (10/20/11) (A-24).

[43]   Silverstein Aff'd, ¶¶ 40, 211.  Respondents do not mean to suggest that Motivation is precluded from taking appropriate actions if Motivation believes that someone is engaged in fraudulent "treasure hunting" activities.  Plainly, Motivation has the same right as any other citizen to report its beliefs to the appropriate investigative or prosecutorial authorities, and to request appropriate assistance.  Motivation does not, however, have the right to act as a self-appointed Private Attorney General (or, as Motivation's counsel calls it, the "Treasure Police"), much less to assert legally frivolous and factually fanciful Verified pleadings for the fraudulent purpose of obtaining discovery through the civil justice system.

[44]   Respondents rely on and incorporate the Sullivan Aff'd by reference.

- Despite having what it believed to be sufficient evidence to establish that Jay committed a fraud on the Court, Motivation embarked on an extensive discovery expedition aimed at reaching "deep pockets" that could pay its attorneys.

- Asserting in numerous pleadings, including the Sanctions Motion, that Silverstein "called the shots" and controlled the litigation, notwithstanding the facts that Record Counsel filed all papers on behalf of JTR and Horan unequivocally testified that "[t]he ultimate final decisions rested with me." (Horan Oct. 2, 2013 Dep. Tr. at 154:9 – 155:7) (A-133).

- Improperly informing witnesses they could avoid criminal prosecution if they cooperated with Motivation's efforts in the Admiralty Action (*See, e.g.*, Sweeney email to Holloway, Lewis, Morgan, and others (6/3/13)) (A-146).[45] Indeed, Siracusa was present "by telephone or in person, when MOTIVATION's attorney, Hugh Morgan represented to witnesses, Steve Elchlepp and Stacey Wolf, just before he took their depositions, that MOTIVATION was working with federal law enforcement authorities and that this was their 'last chance' to 'come clean' and suggested he could somehow help them avoid prosecution if they told the truth."[46]

- Alleging in the Sanctions Motion that the fraud was known to Silverstein by the fall of 2011 (Mot. at 6) when Motivation's own internal communications reflect Motivation's understanding that neither Horan nor Silverstein knew of any fraud at that time.  (Holloway email to White and Lewis (9/6/13)) (A-132).

- Despite knowing in February 2013 that Motivation would need to file a motion for an order to show cause to seek sanctions against Respondents, Motivation did not file such a motion until November 19, 2013 (D.E. 315), which was after the discovery deadline, thus unfairly prejudicing Respondents as they were precluded from taking discovery of Motivation (or any other party or non-party).

- Contacting witnesses under false pretenses during its discovery efforts.  (*See, e.g.,* Sweeney email to Lewis, White, Morgan, and Holloway (4/16/13, 9:30) (stating that the manager of the Eagles Club had called Sweeney and "believes I am an

---

[45]  Sweeney wrote: "Have a seat – this is a good one. . . .  I told Steve that as a fellow Sailor, I felt obliged to call and let him know that he was fast becoming the main patsy in the emerald case – and I could prove it to him with tape and transcripts that the FBI just gave us.  I could feel his butt pucker over the phone.  I asked him if he had ever been to a Federal prison. . . .  **I told him to relax, think about what prison life will be like (no girls, no kids, no beer), and he had to [sic] chance to get out in front of this.  I told him that we could probably help him with the FBI if he just asked.**"  (emphasis added) (A-146).

[46]  *See* JTR's Motion to Strike Motivation's References Contained in its Filings to Itself as Having Been "Appointed" a "Virtual *Qui Tam* Relator" and Supporting Memorandum of Law (D.E.  306) ("Motion to Strike") at 1-2, fn 1; *see also* Steve Elchlepp June 20, 2013 Dep. Tr. at 4-5 (Motivation's counsel represented to Steve on the record that Motivation would not seek sanctions against him if he cooperated and "we'll tell [the FBI] that you are cooperating.") (A-128).

investigator for the District Court (don't ask)") (A-119); (Sweeney email to Holloway, Lewis, Morgan (6/3/13) (stating that he called Steve's place of employment and "told his boss that I was an old friend of Steve's from the Navy visiting KW and to pass my number along if he has a chance") (A-146).[47]

- Harassing Silverstein by sending him emails with vindictive commentary that are indicative of the dealings Respondents have had with Motivation and its representatives. (*See* Sweeney email to Silverstein (6/10/14) (A-141); Sweeney email to Silverstein (6/11/14) (A-142); Sweeney email to Silverstein (6/12/14, 10:12) (A-143); and Sweeney email to Silverstein (6/12/14, 3:23) (A-144).

- Attempting to have the Delaware Bar institute a disciplinary proceeding against Silverstein in the hopes of gaining an improper litigation advantage.

Perhaps the most telling example of Motivation's bad-faith litigation tactics is its underhanded efforts just prior to the Sanctions Trial to force persons such as Janssen, Siracusa, Horan, Sullivan, and others to sign the "settlement proposal" containing statements of "fact" designed to aid Motivation's efforts to sanction Respondents in exchange for Motivation's agreement to refrain from pursuing sanctions against them.  (D.E. 384).[48]  In essence, Motivation was telling JTR, Janssen, Siracusa, Davis, Livingston, Sullivan, Scott, Horan, and Kincannon that Motivation believed they are innocent of any wrongdoing and that Motivation was willing to sign the Proposal so stating, but that Motivation would seek sanctions against those persons if they refused to sign an agreement that pointed the finger at Jay, Steve, and Silverstein.  Either (1) Motivation believed the facts to which it was willing to stipulate (in which case Motivation had no non-frivolous bases for seeking sanctions against JTR, Sullivan, J&S, and others), or (2) Motivation was willing to sign a false stipulation for the purpose of bolstering its sanctions

---

[47] As Siracusa represented to the Court:  "On November 5, 2012, the undersigned also received a call from Jay Miscovich's former secretary, in which she stated that she had been recently contacted by Joe Sweeney (MOTIVATION's in-house paralegal) and that Mr. Sweeney had informed her that **he was working with federal law enforcement, that "she was on the top of the list", and that she needed to give her sworn statement to him.**"  (D.E. 306 at 2, n.1) (emphasis added).

[48] *See also* (Lewis email to Janssen and Siracusa (12/2/13, 3:19) (forwarding draft proposal) (A-135); (Lewis email to Janssen and Siracusa (12/3/13, 9:27) (noting that "we will treat each [] signatory that is unable or unwilling to execute the document as fair game in the trial.") (A-135).

motion against Jay, Steve, and Silverstein.  That sort of unethical behavior is emblematic of Motivation's actions throughout the course of the Admiralty Action.

Based on the foregoing, Motivation does not deserve any award in this matter, regardless of the Court's findings concerning the conduct of Respondents.[49]

**CONCLUSION**

The factual record before the Court demonstrates that Respondents have not engaged in any sanctionable conduct.  Motivation's attempt to paint Respondents as having participated in a fraud on this Court fails to establish by any standard, let alone the clear and convincing standard required, the facts necessary to sanction a non-party.  Relying on conclusory allegations and innuendo, Motivation attempts to reach what it calls "deep pockets" regardless of the adverse effects its baseless allegations will have on Respondents.  Thus, even if the Court had personal jurisdiction over Respondents, and the Federal Rules of Civil Procedure provided for a way to validly serve process on Respondents, the Court should deny Motivation's request for sanctions against Respondents.  Based on the jurisdictional defects of the Sanctions Motion, as well as established limitations on inherent authority to sanction non-parties under the circumstances alleged here, the Court should decline to further consider Motivation's baseless allegations. Respondents, therefore, respectfully request that the Court enter an order denying Motivation's Sanctions Motion.

---

[49]  In any event, even if it were assumed (*arguendo*) that there were some basis for Sanctioning Respondents for JTR's conduct in the Admiralty Action, any sanctions actually imposed on Respondents would need to be limited to the same four month time period for which JTR has been sanctioned.  (D.E. 445).  Moreover, Motivation does not, and cannot, point to any harm it suffered between December 2, 2011, and April 18, 2012.  As Judge Moore explained, after JTR disclosed the results of its investigations on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts.  ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***"  (D.E. 445, ¶ 65) (emphasis added).

Respectfully submitted,


Kendall B. Coffey, FBN 259681
David J. Zack, FBN 641685
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida  33133
Tel.  305-858-2900
Fax.  305-858-5261

By:  **/s/ David J. Zack**
      David J. Zack
      kcoffey@burlington.com
      dzack@coffeyburlington.com
      vmontejo@coffeyburlington.com
      service@coffeyburlington.com
      *Counsel for Young Conaway*
        *Stargatt & Taylor, LLP and*
      *Bruce L. Silverstein, Esq.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing generated by CM/ECF, on August 28, 2014, on all counsel or parties of record on the Service List below.

By:     /s/David J. Zack

<u>**SERVICE LIST**</u>

*JTR Enterpises, LLC vs. An Unknown Quantity, etc., vs. Motivation, Inc.*
*Case No. 4:11-cv-10074-JLK*

JTR Enterprises, LLC
c/o 608 Whitehead Street
Key West, FL  33040
*Pro Se*

Hugh J. Morgan
Law Office of Hugh J. Morgan
317 Whitehead Street
P.O. Box 1117
Key West, FL  33041
Tel. (305) 296-5676
hugh@hjmorganlaw.com
*Counsel for Motivation, Inc.*

John Edward Tuthill
The Law Office of John E. Tuthill
3300 49th Street North
St. Petersburg, FL  33710
*Counsel for Motivation, Inc.*

Arthur Eugene Lewis, Jr.
Lewis & White, P.L.C.
222 W. Georgia Street
P.O. Drawer 1050
Tallahassee, FL  32301-1050
Tel.  (850) 425-5000
Fax  (850) 425-5004
lawlaw@polaris.net
*Counsel for Motivation, Inc.*

Marlow V. White, Jr.
Lewis & White
222 W. Georgia Street
Tallahassee, FL  32301-1139
*Counsel for Motivation, Inc.*

John Gravante, III
Podhurst Orseck, P.A.
25 West Flagler Street
Suite 800
Miami, FL  33130
Tel. (305) 358-2800
Fax (305) 358-2382
jgravante@podhurst.com
*Counsel for Material Witness*
*Paul D. Sullivan*