UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
"IN ADMIRALTY"

JTR ENTERPRISES, LLC,

        Plaintiff,

vs.                                          CASE NO. 4:11-cv-10074-JLK

AN UNKNOWN QUANTITY, etc.

        Defendant,

vs.

MOTIVATION, INC.,

        Claimant.

_____/

### MOTIVATION, INC'S REPLY TO PAUL SULLIVAN'S RENEWED MEMORANDUM IN OPPOSITION TO MOTIVATION'S AMENDED MOTION FOR SANCTIONS[1]

PRELIMINARY STATEMENT

The Court has already found that JTR Enterprises LLC ("JTR") committed a fraud on the Court by filing and prosecuting this *in rem* proceeding and then litigating the case in bad faith. The remaining issue to be decided is whether and to what extent the people actually controlling and managing JTR should be sanctioned for their roles in the fraud and bad faith litigation. So far, the people behind JTR have fallen into two camps — those who recognized the fraud and backed away (*e.g.*, David Paul Horan and John Siracusa, Florida lawyers who moved to withdraw as JTR's counsel for ethical reasons, and Scott Miscovich, Jay Miscovich's ("Jay's") brother, who reported the fraud to the FBI and withdrew from participation in the management of JTR) and, in contrast, those such as Sullivan, who followed the admonition of JTR's general

---

[1] In a single document, Sullivan joined two separate pleadings that have different responsive due dates and page limitations. This brief replies to Sullivan's opposition to Motivation's Amended Motion for Sanctions and complies with the seven-day reply time and 10-page limit. Sullivan also filed a Motion to Quash Service of Process. Motivation's opposition to that motion will be filed within 14 days of service (plus three days for CMF service) and the 20-page limit for opposition briefs.

1

counsel, Bruce Silverstein ("Silverstein" or "BS"), to "hang tough " and "see this thing to the end." [BS email, (Ex. A. JS EMAILS 69)]

Those who chose to continue aiding and abetting the fraud have steadfastly denied knowledge of the fraud even though the fraud became obvious long ago.  For example, after Sullivan knew (1) that Jay had defrauded investors and given perjured testimony in Court by claiming to have found in the Gulf of Mexico emeralds he had actually purchased in bulk from a strip mall jeweler in Jupiter Florida, (2) that Jay knew that one of his co-conspirators, Steve Elchlepp, Jr. ("Steve") threatened in writing to make one of Motivation's witnesses "fish food," (3) that soon after the threat there was an attempt to seriously injure or kill that witness, and (4) that Jay threatened in writing to "put a bullet in [the] fucking head" of one of Motivation's lawyers, Sullivan testified during the January 2014 sanctions trial that Jay was  "a good-hearted guy" [Tr. Jan. 14 p. 276, (Ex. B)] and that Jay did, in fact, find a treasure. [Tr.  Jan. 14 p. 254, (Ex. B)]

Sullivan's opposition to Motivation's motion for sanctions fits this pattern of brazen denial of the truth.  To summarize Sullivan's argument, he claims that there is "absolutely no legal or factual basis" for sanctioning Sullivan, and "**no** evidence" that Sullivan participated in the fraudulent litigation or that he had a stake in the outcome.  [Sullivan Br. pp. 2 & 4 (emphasis in original)]  In fact, however, as detailed below, Sullivan's own prior testimony and dozens of emails produced under the crime-fraud exception to the attorney client privilege demonstrate that Sullivan was an active participant in the management of this fraudulent enterprise and bad faith litigation and that he aided and abetted the fraud even though he knew or should have known of the obvious fraud.  The evidence also demonstrates that Sullivan was deeply concerned about the outcome of the litigation (as he put it, "I will do anything to help") because in addition to his membership interest in JTR he had committed considerable time to the matter and had staked his reputation on the fraudulent case by, among other things, travelling twice to Colombia to meet with government officials and the President of Colombia seeking support for JTR. [Tr. Jan. 14 pp. 208-09, (Ex. B)]

One more general comment ― in his brief, Sullivan repeatedly stresses his view that the "only reason" Motivation seeks sanctions from him is that he has "deep pockets."  [Sullivan Br. 1] To be sure, Motivation hopes that Sullivan's pockets are deep enough to pay for the damage he has caused.  As Judge Moore put it in prior proceedings in this case, "if you did prevail [on

2

the sanctions motion], is there a culpable individual out there that can compensate you for your losses?" [Tr. Jan. 15 p. 125 (Judge Moore) (Ex. B)]. Putting aside the prudential rationale for focusing the motion in part on Sullivan, the reason to sanction Sullivan is not that he can pay, but that he was one of the key managers of JTR and one of the architects of JTR's fraud on this Court.[2]

## ARGUMENT

The Court may infer that Sullivan had actual knowledge of the fraud because he knew that every detail of Jay's story was contradicted by overwhelming evidence. But Motivation need not show that Sullivan had actual knowledge. A showing of willful blindness is sufficient to support sanctions imposed under the Court's inherent powers. *See e.g. Suntrust Mortgage, Inc. v. AIG United Guaranty Corp.*, 2011 U.S. Dist. LEXIS 33118 (E.D. Va. 2011) (evidentiary and sanctions rulings *affirmed* by *Suntrust Mortgage, Inc. v. United Guaranty Residential Ins. Co. of North Amer.*, 508 Fed. Appx. 243 (4th Cir. 2013). In *Suntrust*, for example, the court found that Suntrust's executives and in-house counsel "were willfully blind to the truth" of a fraud on the court after failing to "investigat[e] the provenance of [evidence]" given other inconsistencies in evidence provided by a particular Suntrust employee. *Id.* at *62. Imposing sanctions under its inherent authority, the court held that "issuing sanctions upon a finding of willful blindness is squarely in line with the sanctions standards articulated in *Chambers[v. NASCO, Inc.* 501 U.S. 32 (1991)]. *Id.* at *63.

Generally, people who join a fraudulent conspiracy are liable for all of the damage cause by the fraud, including damage caused prior to the person joining. As one court put it: "[O]ne who is a member of a conspiracy is civilly liable for all of the frauds committed by every member of the conspiracy, regardless of whether he knows about them, whether he knows who is committing them, whether he intends them to happen, whether he plans or knows about the injurious actions or knows the extent of the conspiracy, whether the frauds occur before he joins

---

[2] Sullivan's "renewed" opposition to Motivation's Amended Motion for Sanctions is a second opposition motion that should not have been filed without leave of Court. Sullivan gets one 20-page opposition, not two 20-page oppositions. In any event, given the weight and gravity of the evidence of fraud now arrayed against Sullivan, Motivation does not object to Sullivan's "renewed" response and therefore responds below. In this reply, Motivation does not repeat the substantial evidence of fraud and bad faith litigation tactics that was cited in Motivation's Amended Motion for Sanctions, but does cite the substantial new information gleaned from emails produced under this Court's crime-fraud rulings.

the conspiracy or after he quits it (unless he makes known to the other conspirators his withdrawal from the conspiracy), whether he actively participated in or benefitted by the particular acts resulting in injury, or whether his own particular contribution to or involvement in the conspiracy proximately caused anyone harm. *Aetna Casualty and Surety Co. v. Markarian*, 228 B.R. 34, 40 (1st Cir. 1998) (*citing Halberstam v. Welch*, 705 F.2d 472, 479-81 (D.C. Cir. 1983) (collecting cases); *Bridge C.A.T. Scan Associates v. Ohio-Nuclear Inc*., 608 F. Supp. 1187, 1191 (S.D.N.Y. 1985) (conspirator is liable for acts of other members of conspiracy as if they were his own, whether his role is minor or major, limited or slight); *Martineau v. Foley*, 231 Mass. 220, 223, 120 N.E. 445 (1918) (participant in conspiracy is liable irrespective of degree of his activity in wrongful act); 16 *Am. Jur. 2d, Conspiracy* §§ 50, 56 (1979) (civil conspiracy itself may be of no consequence except as bearing on determination of who is liable; each member of conspiracy is liable for acts of all, regardless of whether member's involvement was prominent or inconspicuous)).  In fashioning a sanction in this case, the Court should apply these legal principles.

**(1)     Sullivan is subject to nonparty sanctions because he substantially participated in the management of this fraudulent litigation and he had a substantial stake in the outcome of the case.**

The "crime-fraud" emails produced by Janssen & Siracusa ("J&S") include hundreds of emails from Sullivan to various members of the "JTR team" (the JTR team included, among others, Jay Miscovich, Paul Sullivan, and Bruce Silverstein) concerning the progress of the litigation and key litigation decisions.  Indeed, Sullivan testified that he was "the investigator in chief or in charge for JTR" and that he acted as "advisor and then investigator." [Tr. Jan. 14, p. 224, (Ex. B)]  In fact, from the date of formation of JTR Sullivan served on JTR's three-member Advisory Committee. [JTR Operating Agreement §6, (Ex. C)].  The emails produced by David Horan and J&S show that JTR was governed by committee, with Sullivan and Silverstein dominating the key decision-making.  As Silverstein instructed, "nobody should reply to Motivation's counsel until the group has decided the correct response."  [BS email to JTR group, (Ex. A. JS EMAILS 11)]  On April 10, 2012, Silverstein reprimanded Horan for speaking with Motivation's counsel without keeping "the group" informed.  [BS email, (Ex. A. JS EMAILS 1)] In an email to the JTR group on April 14, 2012, Silverstein directed that "copies of all

4

correspondence with others" should be copied to "our entire group." [BS email, (Ex. A JS EMAILS 4)]   In fact, when the putative managing member, Jay, disagreed with a proposed strategy or action favored by Silverstein and Sullivan, they would persuade Jay to go along with the Sullivan/Silverstein plan.

For example, Sullivan testified that he and Silverstein favored a plan to raise additional money from the NY Investors during the period when JTR was doing everything it could to keep the epoxy findings secret.  As Silverstein wrote in an email dated February 5, 2012, "We need to remain silent about … the enhancement issue….For now, this means that it is important that there be no disclosure of these issues to (i) the Court, (ii) Motivation, or (iii) [NY Investors and their counsel]."  [BS email, Ex. D. DH EMAILS 10)].  Sullivan testified that he thought "Jay will never agree to [raise more money from the NY Investors]" but "we got Jay to agree."  [Tr. Jan. 15, 2014 p. 44, (Ex. B)]

To illustrate JTR's decision-making process, it is useful to trace the internal discussions between Sullivan, Silverstein, and Siracusa (JTR's trial counsel) concerning whether to disclose to the Court the final epoxy reports in October 2012.  In late September, 2012, Motivation was seeking disclosure of the epoxy reports.  [White email, (Ex. D. DH EMAILS 61-62].  Silverstein referred to Motivation's motion to compel production as "a frivolous piece of garbage" [BS email, (Ex. D. DH EMAILS 34)] and a "stupid motion" [BS email, (Ex. D. DH EMAILS 29)].  Rather than resolve the matter by agreement, Silverstein instructed Siracusa "not to try to persuade Motivation to refrain from filing its motion to compel" because he "want[ed] them to file it, so we can bash them over the head with our response…."  [BS email, (Ex. A. JS EMAILS 17)]  On October 1, 2012, Silverstein instructed Siracusa "not to produce anything further."  [BS email, (Ex. D. DH EMAILS 60)].  Siracusa responded that "It's one thing to stiff arm Motivation following their partial withdrawal of their claim" but explained that "we will not hold back reports that Judge King will want to see or that a [substitute] custodian should file."  [Siracusa email, (Ex. D. DH EMAILS 66-67)]  Sullivan then wrote an email to the JTR group explaining that "[a]fter reading everyone's emails I think we should not be sending any more information to the court at least until we have discussed it as a group.  I agree with Bruce, Mark and Scott [no mention of Jay] that nothing further should be sent to the Court."  [Sullivan email, (Ex. D. DH EMAILS 66)]  Siracusa filed the reports anyway, explaining in an email to Sullivan that "if we had to admit to the Judge that we had not given the court all the reports we have, then that would

5

be a credibility blow for our side …. We do not want this judge to think we are trying to cover anything up." [Siracusa email, (Ex. D. DH EMAILS 65)]  As these emails illustrate, Sullivan was involved in the decision-making process. In any event, Siracusa refused to follow Sullivan's instructions because he did not want to be implicated in an apparent cover-up.

Though there are many examples in the JTR emails showing Sullivan's involvement in the management of this fraudulent litigation, space limitations dictate that we discuss only one more.  On October 16, 2013, Siracusa wrote an email to Jay explaining that Siracusa, Sullivan, and Silverstein "have had some rather serious discussions … as to whether any of us continue to believe your story surrounding the April, 2010 Cunningham Release …."  Siracusa explained that "if we don't believe the Mike C story, how we could possibly continue to effectively and /or ethically represent JTR through the sanctions hearing."  Siracusa advised Jay that J&S could not represent JTR "unless you were to acknowledge that your Mike C story is untrue and work towards rectifying the problems that your untruthful trial testimony has caused."  This email was copied to both Sullivan and Silverstein. [BS email, (Ex. A. JS EMAILS 60)]   In a follow up email to Jay, also copied to Sullivan and Silverstein, Siracusa explained that J&S "cannot expose our law firm and put our licenses on the line for this." [Siracusa email to JTR group, (Ex. A. JS EMAILS 59)]  The following day, J&S moved to withdraw as counsel to JTR. [D.E. 287]  On October 24, 2013, Silverstein wrote an email to Jay terminating his and his firm's representation of Jay in his personal capacity, but recommitting to representation of JTR provided Jay steps down as managing member. [BS email to Jay, (Ex. A. JS EMAILS 62)]  Jay responded that he would step down on October 29th at 5:00 p.m. [Jay Miscovich email to BS, (Ex. A. JS EMAILS 63)]  On October 29th, just prior to 5:00 p.m., Jay committed suicide. On October 27, 2013, Sullivan emailed the JTR group, stating: "I am willing to do anything to help" including testifying in defense of JTR at the sanctions hearing. [Sullivan email, Ex. A. JS EMAILS 65)]  In a similar vein, on December 9, 2013, Silverstein emailed the JTR group that they should "hang tough" and "see this thing to the end." [BS email, (Ex. A. JS EMAILS 69)]  In early January 2014 Sullivan travelled from Hawaii to Key West to act as JTR's representative and testified over a two day period after having personal knowledge of the bulk sales of emeralds by Rodriquez in a futile attempt to defend JTR.

The two examples outlined in some detail above, though only a sampling of Sullivan's activities, show that Sullivan substantially participated in managing this fraudulent litigation.

6

Sullivan also had a substantial stake in the outcome of the case. Granted, Sullivan's percentage of ownership (5%) amounts to almost nothing now that we know the emeralds were junk stones purchased at a strip mall. Early in the case, however, Sullivan no doubt thought that 5% was an enormously valuable interest. Silverstein's law firm, Young Conaway Stargatt & Taylor, committed more than $1.6 million in attorney time and expenses for their contingent 5% interest in JTR. [Operating Agreement (Ex. C) §8; BS email, (Ex. A. JS EMAILS 56)]. The fact that Sullivan acted as "investigator in chief," travelled to Colombia, and spent substantial time on phone calls and drafting and reviewing hundreds of emails shows that he thought he had a substantial stake in the outcome. As Sullivan testified, "I spent three years and a lot of time looking at this." [Tr. Jan. 14 p. 253, (Ex. B)] Moreover, Sullivan staked his personal reputation on JTR's fraudulent find by meeting with the President of Colombia concerning JTR's alleged find. [Tr. Jan. 14 p. 254 (Jay "sent me down to Colombia") (Ex. B)]. Given Sullivan's commitment of time and reputation, he had a substantial stake in avoiding an embarrassing court ruling that the entire enterprise was fraudulent.

**(2)     Sullivan participated in JTR's bad faith litigation tactics.**

Sullivan was involved in JTR's key litigation decisions that substantially increased Motivation's costs ― most notably, the decisions to block inspection of the emeralds and to keep the epoxy findings secret. [Tr. Jan. 15, p. 41(Sullivan testifies that public disclosure of epoxy is "crazy thinking"); [Tr. Jan. 14, pp. 238-40 (Sullivan describing his central role in negotiating inspection of the emeralds) (Ex. B)]

**(3)     Sullivan knowingly aided and abetted the fraud.**

Prior to the December 2012 "first finder" trial Sullivan knew the following facts: (1) After David Horan counseled Jay that if the emeralds came from a Spanish wreck, "Spain … will use procedure to break us," Jay presented Horan with non-Spanish coins that Jay claimed he found at the emerald site, but when confronted by Horan, Jay admitted he was lying about finding the coins at the emerald site [Horan email, (Ex. D. DH EMAILS 71); Horan email to Sullivan, (Ex. D. DH EMAILS 19-21)]; (2) Jay claimed falsely that he found the emerald site using a magnetometer [Id.]; (3) Horan expected JTR witnesses to give false testimony at the "first finder" trial [Id.]; (4) "rock solid" laboratory analysis provided by multiple qualified labs

7

showed that the emeralds were coated with modern epoxy resins [McAllister email, (Ex. D. DH EMAILS 7-8)]; (5) Horan withdrew, in part, because of Silverstein's efforts to cover-up and keep secret the epoxy findings [Horan email, (Ex. D. DH EMAILS 19-21)]; (6) based on observations made while diving the emerald site, Horan suspected that the emeralds and a cannon ball had been planted at the site [Id.]; (7) Jay and Steve had withheld emeralds from the Court's custody in violation of the Court's Substitute Custodian Order, explaining that they were holding back emeralds "until the case looked like it would be won" [Id.]; (8) Horan found that some of the emeralds had been "oiled" and may not have come from the emerald site [Id.]; (9) Jay and Steve's "explanations as the [the emeralds'] origin have varied" [Id.]; (10) a recognized emerald expert, Daniel McAllister, concluded that the total value of all the emeralds "may not sell for enough to repay all the investors" [Id.]; (11) in December 2011 Horan expressed his concern that "Jay has been untruthful" [BS email, (Ex. D. DH EMAILS 1)]; (12) by March 1, 2012, Horan determined that he needed to withdraw because JTR was persisting "in a course of action that I reasonably believe is fraudulent, repugnant, or imprudent," that there were "'credibility problems' with our client" and Horan explained that "[n]o privilege attaches to communications between an attorney and a client with respect to transactions constituting a false claim or perpetration of a fraud" [Horan email March 1, 2012 & Silverstein response copied to Sullivan, (Ex. D. DH EMAILS 14-15)]; (13) in July, 2012, Steve emailed the JTR group stating that he wanted one of Motivation's witnesses to be "fish food" [Elchlepp email, (Ex. A. JS EMAILS 15)]; (14) in a November 2, 2012, email to Sullivan and Silverstein, Steve threatened to harm two witnesses [Elchlepp email, (Ex. A. JS EMAILS 45)]; (15) soon after Steve's threats, attempts were made to kill or injure both of the threatened witnesses [*see* BS email (referring to the "spring loaded shotgun incident") (Ex. A. JS EMAILS 50)]; and (16) Silverstein recommended to Sullivan and the entire JTR group that Horan, JTR's Florida counsel, "needs to be threatened" for trying to withdraw as counsel for ethical reasons [BS email, (Ex. A. JS EMAILS 16)]. These facts, taken together, show that Jay and Steve had lied or given "varying accounts" to their own lawyer (concerning coins, the magnetometer, and the origin of emeralds), had threatened witnesses who were in fact attacked, had violated the Substitute Custodian Order (by holding back emeralds) and that an experienced treasure salvage expert (Horan) suspected that the emeralds were planted.

At the "first finder" trial, Motivation learned for the first time the name of the alleged "diver" (Michael Cunningham) who supposedly sold the treasure map to Jay and then signed a release of salvage rights in consideration of a cash payment of $50,000. Armed with this information, Motivation quickly uncovered proof of the fraud and provided that proof to JTR, Sullivan, and Silverstein. Most of this evidence is outlined in Motivation's motion for sanctions, but emails produced by Horan and J&S under the crime-fraud exception to the attorney-client privilege add even more evidence of fraud known to Sullivan and others. Therefore, in addition to the evidence known to Sullivan that was outlined in Motivation's Amended Motion for Sanctions ▬ that Michael Cunningham was in prison in 2010, that Jay's request for reimbursement of "salvage expenses" included mostly chicken sandwiches and no actual salvage expenses, that two witnesses gave sworn statements that they each accompanied Jay (on two separate occasions) to buy emeralds in Jupiter, Florida, etc., etc., etc. ▬ Sullivan was aware of the following additional evidence of fraud: (1) Jay had prepared another "Cunningham Release" in February 2010 also notarized by Stacey Wolf in which Jay conveyed to "Cunningham" 60% of the find in consideration of a release [*See* JTR email thread, (Ex. A. JS EMAILS 60)]; (2) there was a "serious discussion" between Siracusa, Silverstein, and Sullivan in October 2013 in which all apparently agreed that Jay could not be believed and that Jay committed perjury during the trial; [Siracusa email, (Ex. A. JS EMAILS 60)]; (3) in January 2013 Jay threatened in writing to "put a bullet in the fucking head" of one of Motivation's lawyers [Jay Miscovich email, (Ex. A. JS EMAILS 47)]; (4) Siracusa and Steve dove the emerald site on September 9, 2012 and found 72 emeralds, but when Siracusa dove the site *without* Steve on December 8 & 9, 2012, August 30, 2013, and September 28, 2013, Siracusa did not find *any* emeralds at the site [JTR response to Interrogatory No. 6 served Nov. 1, 2013, (Ex. E)]; Jorge Rodriquez, owner of JR Emeralds in Jupiter Florida, sold Jay 80 pounds of emeralds in bulk in the spring of 2010 [Silverstein email to Siracusa, (Ex. A. JS EMAILS 70-71)].

Knowing all the facts outlined above (and the facts outlined in Motivation's Amended Motion for Sanctions), Sullivan took the stand at the Sanctions Trial in January 2014 and testified that Jay found a treasure. [Tr. Jan. 14 p. 254, (Ex. B)]. Because he knew that three witnesses confirmed that Jay bought emeralds in bulk in Jupiter, Florida, Sullivan testified that it was a "possibility" that Jay bought "stuff to add to the treasure." [Id.] He also testified that "another possibility" was that the emeralds came from a sunken shrimp boat [Id. at 255] ▬ an

9

account this Court described as "a bizarre story" [D.E. 445 p. 12 n.13 (Findings of Fact and Conclusions of Law)] — even though on October 16, 2012, Siracusa advised the JTR group, including Sullivan, that "I have … dove the site extensively and have yet to find any shrimp boat wreckage." [Siracusa email, (Ex. A. JS EMAILS 59)]  In other words, Sullivan gave false (even bizarre) testimony in an effort to defend JTR in the face of truly overwhelming evidence that the entire enterprise was fraudulent.  Indeed, the evidence of fraud known to Sullivan before he testified was so extensive and irrefutable that in closing argument JTR's counsel finally conceded the fraud in open Court [Tr. Jan. 15 pp. 130-40, (Ex. B)]  and later advised the Court that JTR's fraud was "outrageous, inexcusable and indefensible."  [D.E. 385-1 p. 39 (JTR's Proposed Findings of Fact and Conclusions of Law)]

## CONCLUSION

As this case progressed, evidence of fraud accumulated at a steady pace, disproving every element of Jay's story, piece by piece.  The treasure map, Cunningham release, the "find" occurring in early January 2010 — all fraudulent.  Three witnesses testified that Jay purchased emeralds in Jupiter Florida.  All of this evidence was known to Sullivan before he testified in defense of JTR.  The only way for Sullivan to miss the fact that he was actively involved in a fraudulent conspiracy was for him to be willfully blind to the obvious.

Fraud on the court is a serious matter under any circumstances.  In *in rem* admiralty proceedings involving historic treasure salvage, however, a federal court may be required to evaluate the veracity of an alleged treasure find without the benefit of an adversary proceeding.  If no adverse claim is filed, the integrity of the judicial process stands exposed.  It is, therefore, important that the people behind JTR's fraud and bad faith litigation be held accountable and sanctioned severely enough to deter future attempts to fraudulently manipulate the judicial process.  Therefore, applying standards of civil liability that apply in fraud cases, the Court should order Sullivan to pay to Motivation all attorney fees and costs incurred (including fees due on a contingent basis) by Motivation in this case, including, but not limited to, costs and fees for pursuing the sanctions awards and all costs of filing and prosecuting Motivation's claim.

Given that there appears to be material factual disputes at issue, Motivation asks the Court to schedule an evidentiary hearing and pretrial conference.

Respectfully submitted,

/s/ A. Eugene Lewis
A. EUGENE LEWIS
Florida Bar Member 94810
MARLOW V. WHITE
Florida Bar Member 275417
LEWIS & WHITE, P.L.C.
P.O. Box 1050
Tallahassee, Florida 32302
Vox: (850) 425-5000
Fax:  (850) 425-5004
Email: lawlaw@polaris.net
ATTORNEYS FOR MOTIVATION, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of September, 2014, I filed the above motion with the Clerk of the Court and, by virtue of the Clerk of the Court's CM/ECF system, a copy will be electronically provided to all counsel of record in this cause.

/s/ A. Eugene Lewis
Florida Bar Member 94810