UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
      Plaintiff,

vs.                                      CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

      *In Rem* Defendant.

vs.

MOTIVATION, INC.,

      Claimant.
_____/

**SPECIALLY APPEARING NON-PARTY BRUCE L. SILVERSTEIN, ESQ.'S
POST-SANCTIONS TRIAL MEMORANDUM OF LAW IN OPPOSITION TO
MOTIVATION, INC.'S AMENDED MOTION FOR SANCTIONS**

As directed by the Court (D.E. 541), specially appearing non-party Bruce L. Silverstein,

Esq., by and through his counsel, hereby files his Post-Sanctions Trial Memorandum of Law in

Opposition to Motivation's Amended Motion for Sanctions ("Amended Sanctions Motion")

(D.E. 407).[1]  In opposition to the Amended Sanctions Motion, Mr. Silverstein respectfully states

as follows:

_____

[1] Mr. Silverstein expressly reserves, and incorporates herein by reference, all arguments and
defenses previously asserted in this action (Case No. 4:11-CV-10074-JLK) (the "Admiralty
Action"), including, without limitation: (i) the "inherent authority" of a district court to sanction
parties under *Chambers* does not extend to non-party outside counsel such as Mr. Silverstein (*see*
D.E. 459 at 15–22); (ii) the Court lacks personal jurisdiction over Mr. Silverstein (*see id.* at 22–
26; *see also* D.E. 478); (iii) the Order to Show Cause was not validly served on Mr. Silverstein
(*see* D.E. 478); and (iv) the lack of procedural due process given that the quasi-criminal nature of
the sanctions proceeding required that Mr. Silverstein be provided a definite statement of the
charges prior to the commencement of the proceeding, the right to discovery, and the right to a
jury trial (*see* D.E. 484 at 1–8).

## I.   <u>INTRODUCTION</u>

The Sanctions Trial held in connection the Amended Sanctions Motion established that Mr. Silverstein is an honorable man, who consistently represented his clients in a professional and appropriate manner at all pertinent times.[2]  Far from establishing by clear and convincing evidence that Mr. Silverstein engaged in sanctionable conduct, Motivation failed to prove that Mr. Silverstein's conduct was inappropriate in any way.  If anything, the evidence established Motivation's own bad faith conduct in connection with the Admiralty Action and the Amended Sanctions Motion.

Motivation chose to put only three witnesses on the stand in its case in chief – Jorge Rodriguez ("Rodriguez"), David P. Horan ("Horan"), and John Siracusa ("Siracusa").  Not one of Motivation's three witnesses testified that Mr. Silverstein engaged in any sanctionable conduct.  Instead, all three of Motivation's witnesses established that Mr. Silverstein did not know of Rodriguez's sale of emeralds to Jay Miscovich ("Jay") until Rodriguez came forward with his story after the commencement of the January 2014 sanctions hearing, and both Horan and Siracusa established that Mr. Silverstein was unaware of any material facts respecting the claimed emerald discovery that were not also known by counsel of record in the Admiralty Action.  Mr. Sullivan's testimony was to the same effect.  This testimony is consistent with the contemporaneous documentary evidence submitted at trial containing the candid comments of persons who thought their communications were privileged, further shows that Mr. Silverstein

---

[2] In addition to seeking sanctions against Mr. Silverstein, Motivation Inc. ("Motivation") originally also sought sanctions against Young Conaway Stargatt & Taylor, LLP ("YCST") and Paul Sullivan.  Upon conclusion of Motivation's case-in-chief at the trial on the Amended Sanctions Motion ("Sanctions Trial"), the Respondents each moved for an involuntary dismissal of the Amended Sanctions Motion based on a lack of evidence against them.  The Court granted YCST's and Mr. Sullivan's respective motions (*see* D.E. 528), but denied Silverstein's motion. *See* D.E. 529.

was zealously representing his clients and constantly looking for the truth, not trying to cover it up.[3]

That same evidence also shows that Motivation filed what everyone, including the Court, knew to be a meritless claim in the Admiralty Action. Motivation's purpose in seeking sanctions against Mr. Silverstein was to try and find a "deep pocket" to pay its attorneys' fees, regardless of the means by which those fees were pursued. Motivation went so far as to threaten witnesses with criminal prosecution, and tried to coerce others into signing a false Stipulation in return for release from potential sanctions themselves.

As discussed fully below, Motivation has no basis in fact or law to recover sanctions against Mr. Silverstein.

## II.     MEMORANDUM OF LAW

### A. MOTIVATION DID NOT AND CANNOT PROVE THROUGH "CLEAR AND CONVINCING" EVIDENCE THAT MR. SILVERSTEIN ENGAGED IN CONDUCT WARRANTING THE IMPOSITION OF SANCTIONS

Motivation is asking this Court to invoke its inherent powers to sanction Mr. Silverstein (a non-party) for his alleged bad faith conduct in connection with the Admiralty Action and to award attorneys' fees to Motivation. (*See* Am. Sanctions Mot. at 16-20). Courts in this circuit and others consistently require that "when imposing attorney's fees as sanctions pursuant to their inherent authority, the conduct [must] be proven by clear and convincing evidence."[4]   The

---

[3] In addition to his testimony at the Sanctions Trial, Mr. Silverstein relies on and incorporates by reference: (i) the Affidavit of Bruce L. Silverstein, Esq., dated Oct. 9, 2012 ("10/9/12 Silverstein Aff'd") (M3); (ii) Affidavit of Bruce L. Silverstein, Esquire, dated Nov. 4, 2013 (the "11/4/13 Silverstein Aff'd") (M6); (iii) the Affidavit of Bruce L. Silverstein, Esquire, dated Dec. 6, 2013 (the "12/6/13 Silverstein Aff'd") (M7); and (iv) the Affidavit of Bruce L. Silverstein, Esq., dated August 28, 2014 ("8/28/14 Silverstein Aff'd") (M8), all of which were admitted as evidence at trial.

[4] *Barash v. Kates*, 585 F. Supp. 2d 1347, 1365 (S.D. Fla. 2006) (citations omitted); *In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1293 n.6 (S.D. Fla. 2013) ("Any

Supreme Court has instructed that "clear and convincing evidence is evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, *evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.*'"  *Pape v. Local 390 of Int'l Bhd. of Teamsters*, 315 F. Supp. 2d 1297, 1308–09 (S.D. Fla. 2004) (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 286 n.11 (1990)) (emphasis added).   This heightened "clear and convincing" standard of proof is required under these circumstances for each of two separate reasons.

*First*, "inherent power sanctions . . . are fundamentally punitive," and "[o]ur judicial system has a cherished tradition of using a heightened standard of proof to guard against the erroneous imposition of criminal punishments and analogous deprivations of liberty, property, or reputation."  *Shepherd v. Am. Broad. Cos.*, 62 F.3d at 1476 (citations omitted); *accord In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d at 1293 n.6.

*Second*, when "the predicate misconduct at issue 'involves allegations of fraud or some other quasi-criminal wrongdoing by the defendant,'" the Supreme Court has explained that "'the interests at stake in those cases are deemed to be more substantial than mere loss of money'" and the heightened evidentiary standard accordingly serves to guard against "'the risk to the defendant of having his reputation tarnished erroneously.'"  *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995) (quoting *Addington v. Texas*, 441 U.S. 418, 424, (1979)).

---

fundamentally penal sanctions—dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines—require proof by clear and convincing evidence."  (citations and internal quotation marks omitted); *accord Cadle Co. v. Moore (In re Moore)*, 739 F.3d 724, 730 (5th Cir. 2014) ("[W]e uphold a lower court's decision to invoke its inherent sanctioning power only if clear and convincing evidence supports the court's finding of bad faith or willful abuse of the judicial process.").

These critically important considerations are clearly implicated by the Amended Sanctions Motion, which seeks, among other things, the imposition of attorneys' fees as sanctions against Mr. Silverstein. An award of sanctions against Mr. Silverstein would both harm him financially and severely tarnish his impeccable reputation as an attorney – a reputation Mr. Silverstein has worked very hard to build and protect for the past 27 years. (*See* 12/15/14 Tr. at 73:3–23).[5] Thus, Motivation is required to prove through clear and convincing evidence that Mr. Silverstein knowingly and deliberately helped to perpetrate a fraud on the Court. In other words, Motivation is required to provide "evidence so clear, direct and weighty and convincing" to permit this Court to "come to a clear conviction, without hesitancy," of the truth of Motivation's allegations. *See Pape*, 315 F. Supp. 2d at 1308–09 (quoting *Cruzan*, 497 U.S. at 286 n.11). Motivation has not (and cannot) even come close to meeting this heavy burden of proof. Indeed, the weight of the evidence proves that Mr. Silverstein was NOT aware of Jay Miscovich's fraud until Rodriquez came forward after the January 2014 sanctions hearing had commenced, and Mr. Silverstein promptly encouraged and agreed with counsel of record for JTR

---

[5] Indeed, throughout Mr. Silverstein's 27-year career as a member in good standing of the Delaware Bar, he has always conducted himself with the utmost integrity and honesty, earning the respect of judges and his fellow attorneys. In this regard, at the Sanctions Trial, two character witnesses testified concerning Mr. Silverstein and his professional record. Former Chancellor William B. Chandler of the Delaware Court of Chancery testified that Silverstein regularly appeared before him and that on each such occasion Chancellor Chandler found Silverstein to be "a very skilled advocate who was a zealous advocate for his client who represented him to the highest standards of the Delaware Bar." (11/20/14 Tr. at 215:14–216:6). Chancellor Chandler further testified that "I always had confidence that when Mr. Silverstein appeared in front of me, I was getting someone who was trustworthy, honest, and prepared and always a thoughtful advocate for his client." (*Id.* at 216:8–11). Lastly, Chancellor Chandler testified that he "was never ever disappointed in the conduct of Mr. Silverstein" in regards to Mr. Silverstein's professionalism. (*Id.* at 216:12–23). Similarly, Greg Varallo, Esq. testified that Mr. Silverstein consistently exhibited professionalism in the cases in which they both worked (both as adversaries and on the same side) and that Mr. Silverstein has "always been a person who has practiced with the highest ethics and responsibility." (*Id.* at 286:2–287:7).

Enterprises, LLC ("JTR") that Rodriguez needed to be called as a witness so that he could provide his testimony about selling emeralds to Jay in 2010.

### B.  MR. SILVERSTEIN NEVER KNEW OF JAY MISCOVICH'S FRAUD AND NEVER SOUGHT TO AVOID LEARNING OF THE FRAUD

Following the sanctions trial in January 2014 ("January 2014 Sanctions Hearing"), Chief Judge Moore found that *Jay Miscovich* had committed a fraud on the Court from the day the Admiralty Action was commenced through the day of Jay's death, and concluded that sanctions were warranted against Jay for *his* actions.  (*See* D.E. 445, ¶¶ 66-67, 71).[6]  Among other things, Judge Moore determined that Jay Miscovich "was clearly the mastermind behind this whole scheme" and that Jay had "managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes, that he had discovered and recovered this treasure from the seafloor in early 2010."  (*Id.*, ¶¶ 66-67).  Moreover, Judge Moore specifically found that the fraud was not proved until Jorge Rodriguez testified on the last day of the January 2014 Sanctions Hearing.  (*Id.*, ¶ 69).  And it was Siracusa, encouraged by Mr. Silverstein, who compelled Rodriguez to appear in Court and provide the testimony.  (11/19/14 Tr. at 37:23–38:3).

---

[6] Judge Moores's Findings and Conclusions are binding on Motivation, but they are not binding on Mr. Silverstein because he was not a party to the Admiralty Action or represented at the January 2014 Sanctions Hearing.  *See A.J. Taft Coal Co., Inc. v. Connors*, 829 F.2d 1577, 1578 n.3 (11th Cir. 1987) ("Previously, a mutuality of parties was necessary for the use of collateral estoppel. Later, the mutuality requirement was extinguished. Now, even one who was not a party to the previous suit may use a judgment as binding in a later action." (citations omitted)); *Hart v. Yamaha-Parts Distribs., Inc.*, 787 F.2d 1468, 1473 (11th Cir. 1986) ("A defendant who was not a party to the original action may invoke collateral estoppel against the plaintiff."); *Pierce v. Ritter, Chusid, Bivonia & Cohen*, 133 F. Supp. 2d 1344, 1347 (S.D. Fla. 2001) (citing *Hart* for the proposition that "[t]he Eleventh Circuit has endorsed [non-mutual] collateral estoppel.").

Prior to the commencement of the January 2014 Sanctions Hearing, Mr. Silverstein did not know that Jay had committed a fraud on the Court, and Motivation did not (because it cannot) present any evidence (let alone clear and convincing evidence) that Mr. Silverstein had such knowledge.  The uncontroverted evidence is that Mr. Silverstein first learned that Jay had purchased, and not discovered, the emeralds following the end of the first day of the January 2014 Sanctions Hearing, when JTR's counsel of record told Mr. Silverstein that Rodriguez would testify that Jay had purchased a large quantity of emeralds from Rodriguez if he were compelled to testify at the January 2014 Sanctions Hearing.  (12/4/14 Tr. 100:22–101:8; 103:23–104:13; 105:11–106:17).  As Mr. Silverstein testified, "[t]his was a bombshell.  This is the first time I had ever heard this…In fact, I had previously been told the contrary, that Jay Miscovich had not purchased the emeralds that were the subject of the admiralty action from Mr. Rodriguez, he had purchased two rings which were not part of the admiralty case."  (*Id.* at 106:19–25).

Moreover, several other witnesses testified at the recent Sanctions Trial that they also did not know Jay was committing a fraud until Rodriguez testified at the January 2014 Sanctions Hearing.  Mr. Sullivan testified that he believed Jay Miscovich's claimed emerald discovery was legitimate until learning of Rodriguez's testimony that he sold emeralds to Jay.  (12/10/14 Tr. at 179:8–12).  And Horan testified that Jay Miscovich convinced him, Mr. Silverstein, Mr. Sullivan, and others that "this was a legitimate find because none of us could figure out where the heck [the emeralds] came from unless [Jay] was telling the truth."  (11/19/14 Tr. at 165:17–24).  Horan further testified that "[t]he clear evidence of fraud didn't occur until [Rodriguez] turned around and finally admitted that [Jay] hadn't just bought some jewelry" but had bought pounds of emeralds from him.  (*Id.* at 166:10–14; *see also id.* at 166:16–20 ("Up until then, I

don't think anybody other than Mr. Miscovich and possibly one or two other people…knew that [Jay] had not found [the emeralds] there and that he salted the site.")).

Siracusa likewise testified that he "absolutely" believed in the case through the December 2012 trial, *see* 11/20/14 Tr. at 290:15–16, and that "we really weren't sure until Mr. Rodriguez testified that [the emerald find] was, in fact, a made-up claim…" (*Id.* at 291:8–10). Indeed, Siracusa also testified that he and others were actually going to dive the site following the January 2014 Sanctions Hearing, "but after Mr. Rodriguez's testimony, we packed up the dive gear and didn't even bother." (*Id.* at 291:16-24). Thus, as Judge Moore found, Jay Miscovich "successfully convince[d]" numerous people, including, Mr. Silverstein, Horan, Siracusa, and Mr. Sullivan, that the alleged emerald find was legitimate—none of them had knowledge of Jay Miscovich's fraud.

Mr. Silverstein also never attempted to avoid knowledge of any facts that may have revealed Jay Miscovich's fraud. There is no evidence (let alone clear and convincing evidence) that Mr. Silverstein was either willfully blind or deliberately ignorant as to whether Jay was committing a fraud. The Eleventh Circuit has instructed that "[u]nder the doctrine of willful blindness or deliberate ignorance … knowledge can be imputed to a party who knows of a ***high probability*** of [a fact in question] and ***purposely contrives to avoid learning of it***." *Gay v. Brencorp., Inc.*, 554 F. App'x 811, 816 (11th Cir. 2014) (quoting *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002)) (emphasis added).

Here, the trial record does not establish – by clear and convincing evidence or otherwise – Mr. Silverstein both (i) knew of a "high probability" that the emerald find was not genuine, ***and*** (ii) "purposely contrive[d]" to avoid learning of that fact. Indeed, as Horan testified, "there was ***always an effort to keep digging for the truth****…. I don't take any of my comments as saying

that I believe that Bruce Silverstein or his firm was involved in faking where those emeralds came from. I think that they were just as taken in as I was from the git-go." (11/19/14 Tr. at 163:22–164:2) (emphasis added). Further, as acknowledged by Motivation's counsel, Janssen and Siracusa performed appropriate "due diligence" concerning Jay Miscovich's story. (*See, e.g.,* 11/21/14 Tr. at 486:22). Mr. Silverstein was well aware of these efforts by Record Counsel and he consistently encouraged them to investigate any issues. Thus, contrary to Motivation's baseless accusations, the evidence proves that Mr. Silverstein consistently made an effort to learn the truth and that he encouraged many others, including JTR's Record Counsel and its other outside advisors, to do so as well.

In the final analysis, as discussed in detail below, the evidence proves that Mr. Silverstein did not know that Jay Miscovich was committing a fraud on the Court and that he was not willfully blind as to whether Jay was committing a fraud. Motivation's accusations to the contrary are entirely baseless—made with the benefit of hindsight and based largely on information that Motivation developed following the December 2012 trial ("December 2012 Trial") in furtherance of its efforts to get at "deep pockets," long after JTR's claim for title to the *res* had been rejected by this Court.[7] Such hindsight analysis contravenes well-settled law.[8]

---

[7] Moreover, many of the alleged "facts" that Motivation asserts should have alerted Mr. Silverstein to Jay Miscovich's fraud are irrelevant to JTR's claim for title to the *res* because they occurred following the trial of the Admiralty Action in December 2012, at which time JTR was no longer prosecuting its claim in this Court. Rather, beginning in January of 2013, the only remaining issue before this Court in the Admiralty Action was whether Motivation was entitled to sanctions.

[8] *See, e.g., Jones v. International Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (stating that, in the context of determining whether Rule 11 sanctions are appropriate, "[t]he court is expected to avoid using the wisdom of hindsight…") (quoting *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1507 (11th Cir. 1993)).

The recounting below sets forth, chronologically, what information Mr. Silverstein knew, when he knew it, and what he thought it meant.  The Court is in a fairly unique position to have access to Mr. Silverstein's and others' daily, real-time communications that were believed to be (and were) privileged when they were made[9] and, thus, bear a particular hallmark of reliability. Ordinarily, a court relies on the imperfect recollections of witnesses as to what may or may not have occurred at some past time.  Here, however, the Court has contemporaneous email communications that provide a window into exactly what was being said, when, and by whom. As will be shown, these candid communications reflect that, at all times, Mr. Silverstein believed that the evidence supporting Jay Miscovich's story outweighed the evidence undermining it. And at all times, Mr. Silverstein acted ethically and appropriately in investigating Jay's claims and in representing his clients' interests.

1.    **January–August 2011:  Mr. Silverstein's Representation in the Delaware Litigation**

From the moment that Mr. Silverstein first learned of Jay Miscovich's claimed emerald discovery, the story that was presented to Mr. Silverstein had numerous hallmarks of credibility. In January of 2011, Mark Davis ("Davis") and Mike Livingston ("Livingston") of Davis Levin Livingston ("DLL"), a respected Hawaiian law firm, approached Mr. Silverstein about defending Jay, Scott Miscovich ("Scott"), and Stephen Elchlepp, Jr. ("Steve") in a lawsuit certain investors

---

[9] On August 8, 2013, Motivation filed a motion to compel (D.E. 259) (the "Motion to Compel") asserting that the "crime-fraud" exception applied to the otherwise privileged documents withheld by Horan.  Ultimately, on December 26, 2013, following an *in camera* review of the documents Horan provided to the Court, Judge Magistrate Torres entered an order denying the Motion to Compel (D.E. 334), finding that "[u]pon complete review of the documents, we conclude that no further production of those documents is warranted because the crime-fraud exception does not apply thereto."  (D.E. 334 at 2).  Following the January 2014 Sanctions Hearing, Judge Moore entered Paperless Orders (D.E. 424 and 444) directing Horan and J&S, respectively, to produce certain documents to Motivation on the grounds that the crime-fraud exception applied to those formerly privileged documents.

had commenced in Delaware (the "Delaware Litigation") in an attempt to wrest control of an extraordinarily valuable emerald discovery from its discoverers. (*See, e.g.,* 12/4/14 Tr. at 123:20–124:7; 10/9/12 Silverstein Aff'd, ¶ 16 (M3)). The matter had been referred to Mr. Silverstein by other, trustworthy, attorneys—the same way that hundreds of other cases have been brought to Silverstein for his legal acumen and experience before the Delaware Court of Chancery. (*See id.* at 22:21–23:6; 23:25–24:7). As Mr. Silverstein testified, "this case came to [him] as there's been this amazing and valuable emerald find and people are fighting over who owns it." (*Id.* at 124:3–4).

Also significant was the fact that Jay, Scott, and Steve were then being advised by Paul Sullivan, a noted political organizer who had previously advised Robert Kennedy, President Carter, and President Clinton, among others. (*See* 12/4/14 Tr. at 24:8–13; 8:1–14). In December of 2010, Mr. Sullivan travelled to Colombia, at Jay's request, and met with the president of Colombia, among others, to tell him about Jay's discovery of a treasure trove of Colombian gems. (*See, e,g.,* 12/4/14 Tr. at 52:8–9). In his meetings with representatives of the Colombian government, Mr. Sullivan conveyed Jay's intent to donate 70% of the proceeds of the treasure to the people of Colombia. (12/10/14 Tr. at 113:13–23). Mr. Sullivan further informed the Colombian officials that Jay and Mr. Sullivan were willing to bring the treasure to Colombia so that it could be inspected by Colombian experts. (*Id.* at 114:2–5). After Mr. Silverstein was engaged to represent Jay, Scott and Steve in the Delaware Litigation, Mr. Sullivan informed Mr. Silverstein of Mr. Sullivan's trip to Colombia and that the response from the Colombian government was "very positive." (*Id.* at 114:18–24). Mr. Sullivan subsequently made a second trip to Colombia in March 2011 for further discussions with the Colombia presidential cabinet about Colombia taking stewardship of the emeralds. (*Id.* at 115:8–24). Upon his return, Mr.

Sullivan told Mr. Silverstein and others that he once again received "a very, very positive reaction" from the Colombian government.  (*Id.* at 115:25–116:7).

Mr. Silverstein was aware of Mr. Sullivan's trips and believed that the fact Jay asked Mr. Sullivan to approach a foreign sovereign and was willing to let it verify the emeralds lent credence to Jay's discovery.  And moreover, the fact that Jay was willing to donate such a substantial portion of his treasure appeared inconsistent with the idea that the discovery amounted to a get-rich-quick scheme.  As Mr. Silverstein testified, "it was inconceivable to me that Jay Miscovich would not only allow, but support this process if these were not emeralds that had been found in the Gulf of Mexico and were genuine Colombian emeralds."  (12/9/14 Tr. at 22:5–8; 22:21–24).

Mr. Silverstein also relied on the fact that no less an authority than the Smithsonian Institution ("Smithsonian") had given an imprimatur of genuineness.  Mr. Silverstein understood that Jeff Post, the Curator of the National Gem and Mineral Collection at the Smithsonian, wanted to curate a "major display" of the emeralds alongside the Hope Diamond, with Mr. Post remarking that Jay's discovery consisted of "the most rare type of emeralds he had ever seen" and that examining the emeralds had been "'a once in a lifetime experience for [him].'"  (Barr email to Toppe (7/13/10)) (SILVERSTEIN 008).  As one of the New York Investors wrote in an email after meeting with Dr. Post on July 13, 2010:

> Just leaving Washington and the Smithsonian. It was a home run! Jeff Post who is the curator asked for a 5 year loan of a pile of emeralds for a major display near the Hope Diamond. he wants a permanent contribution as well. He said and I quote, 'this has been a once in a lifetime experience for me'. This guy has seen everything.
>
> There was one batch of the 5-30 carat emeralds that he knew had come from the Muzo mine but said that he had never seen before and thought that they could be the most rare type of emeralds he had ever seen. We have 20,000 of those emeralds. Jeff Post said that it is quite likely that those emeralds were specific to

> Columbia and were some of the first to come out of the mine. He again said, I
> don't believe the Smithsonian has ever seen this type before.
>
> Anyway, we were all taken aback at the enthusiasm. Jeff is taking this to the head
> of the entire Smithsonian, undersecretary position.

(Barr email to Toppe (7/13/10)) (SILVERSTEIN 008).   Scott provided this email exchange

between Barr and Toppe to Mr. Silverstein in January 2011.  (12/4/14 Tr. at 164:17–19).

Mr. Silverstein was further aware that Dr. Post had reported that the Smithsonian had

discovered the presence of mineral "debris" in cracks and crevices on the surface of the emeralds

after examining them through an analytical scanning electron microscope.  In an email from Dr.

Post, which was provided to Mr. Silverstein from multiple sources, it was reported that most of

the debris are "calcite, halite, quartz, etc., minerals common in marine sediment."  It was further

reported that the Smithsonian was surprised to discover that the cracks in the emeralds' surface

also contained microscopic flecks of gold, which Dr. Post said suggested that "these emeralds

were on the seafloor associated with gold objects for some period of time."  (Post email to Barr

(9/9/10)) (SILVERSTEIN 001).   As Horan testified, the Smithsonian's evaluation added

credibility and excitement to the emerald project.  (11/19/14 Tr. at 144:21–24).

This email containing the Smithsonian's evaluation was provided to Mr. Silverstein from

multiple sources when he was first contacted in January 2011 about representing Jay, Scott, and

Steve in the Delaware Litigation.  (12/4/14 Tr. at 123:2–19; 127:10–14).  Mr. Silverstein also

was provided with copies of photographs showing the emeralds being examined by Dr. Post at

the Smithsonian.  (*Id.* at 134:5-10).  Upon receiving a copy in late January of 2011 of the email

Dr. Post had written to Mr. Barr, Mr. Silverstein called Dr. Post to confirm the content of his

email.  (*Id.* at 131:15–24; 132:13–18).  During the telephone call, Dr. Post confirmed to Mr.

Silverstein that the Smithsonian had examined the emeralds, as reflected in the photographs

provided to Mr. Silverstein, and stated that they were "one of the most exciting things he had seen as the curator of the gem collection at the Smithsonian Institute." (*Id.* at 133:3–16). Dr. Post also confirmed to Mr. Silverstein that the Smithsonian wanted a five-year loan of the emeralds for a display near the Hope Diamond. (*Id.* at 163:1–8). Dr. Post also confirmed to Mr. Silverstein that he had identified microscopic flecks of gold on the emeralds, as Dr. Post had written in his email to Mr. Barr. (*See id.* at 133:13–16).

Additionally, Mr. Silverstein knew sophisticated investors had invested in the emerald discovery long before Mr. Silverstein's involvement, and had brought the matter to court to enforce their rights with respect to the discovery and their investment. As Mr. Silverstein testified, in January 2011, he had received and reviewed a verified complaint filed by the New York Investors in state court in Monroe County, Florida. (12/4/14 Tr. at 142:1–3; New York Investors' verified complaint (SILVERSTEIN 004)). The very first paragraph of the verified complaint asserted that "Jay Miscovich is a self-proclaimed 'treasure hunter.' After many years of searching for sunken treasure without success, in early 2010, he or another 'treasure hunter' made a significant discovery. The result was the recovery of a large collection of valuable, uncut emeralds and other gemstones." (SILVERSTEIN 004; 12/4/14 Tr. at 134:19–25). Additionally, the sworn affidavits filed by the New York Investors in support the complaint affirmatively asserted that Jay had discovered a treasure. Specifically, Dean Barr, one of the New York Investors (and represented by Mr. Holloway), asserted that "***Jay Miscovich*** is a treasure hunter who, through his or others' efforts, ***came to know the location of an underwater dive site (the***

*"Dive Site") from which sunken treasure, namely emeralds and other gemstones, has been and may be recovered*."  (1/10/11 Barr Aff'd, ¶ 4)) (SILVERSTEIN 006) (emphasis added).[10]

The affidavits further asserted that the New York Investors, sophisticated financiers, had invested approximately two million dollars in Jay's discovery.   (*See* SILVERSTEIN 005; SILVERSTEIN 006; 12/4/14 Tr. at 140:14–18).   Mr. Silverstein reviewed these affidavits when he received them in January or February of 2011.   (12/4/14 Tr. at 144:20–145:3).   As Mr. Silverstein testified, these affidavits "[c]ontributed to [his] belief that Jay Miscovich had a very valuable emerald find . . . . This was part of what – my belief that Jay had a very valuable emerald find, yes." (*Id.* at 145:4–13).

Mr. Silverstein also testified that in January of 2011, he received from Davis and Livingston an unredacted version of the verified complaint the New York Investors filed in the Delaware Litigation.  (12/4/14 Tr. at 152:8–21).   According to Mr. Silverstein, this document contributed to his view of the legitimacy of the Jay's claimed discovery.  (*Id.* at 152:25–153:5; *see also* 8/28/14 Silverstein Aff'd, ¶ 12 (M8)).   Even the fact that the New York Investors felt the need to file their verified complaint under seal in the Delaware Litigation (a public version was later filed with heavy redactions)[11] indicated to Mr. Silverstein that they believed Jay had made a valuable discovery that needed protecting.  (12/4/14 Tr. at 159:20–160:13).

---

[10] *See also* 1/10/11 Ash Aff'd, ¶ 4 ("Jay Miscovich is a self-proclaimed treasure hunter.  Through his efforts (as related by him to me), *he located an underwater dive site (the "Dive Site") from which sunken treasure, specifically emeralds and other gemstones, has been recovered and additional treasure and gemstones may be recovered*.") (emphasis added) (SILVERSTEIN 005).

[11] In accordance with the practice and procedure of the Delaware Court of Chancery, the New York Investors were permitted to file their verified complaint under seal.  As required by the Court of Chancery, the New York Investors subsequently filed a redacted version of their verified complaint on February 7, 2011.  *See* New York Investors' redacted verified complaint (SILVERSTEIN 007).

Further, the New York Investors were represented by Willkie Farr & Gallagher, "a very significant New York law firm," and by Colson Hicks Eidson, a "significant firm in Florida," which further contributed to Mr. Silverstein's view of the legitimacy of Jay's claim.  (12/4/14 Tr. at 150:14–151:2).  According to Mr. Silverstein, "[t]he fact that these plaintiffs represented by these lawyers were spending a lot of money to take control of the emeralds" made him think Jay had a legitimate treasure find.  (*Id.* at 158:16–25).  As Mr. Silverstein testified, the New York Investors' selection of these expensive, high-powered law firms said a lot about their own assessment of the veracity of Jay's story and the value of the emeralds:

> Q. Why would it matter whether or not the New York investors were represented by Wilkie Farr as opposed -- in terms of your state of mind -- as opposed to a small law firm in Brooklyn?
>
> A. Well, I knew that this -- it was going to -- it had already cost them no less of tens of thousands of dollars, if not approaching a hundred thousand dollars to put together these papers with Wilkie Farr, and I had no doubt that if this case went to trial it was going to cost upwards of a million dollars or more to litigate, and people would not be spending that much money to litigate over something that was of no value, so that further informed my belief that they were litigating over something of value.

(12/4/14 Tr. at 160:19–161:5).  The New York Investors also commissioned a Florida admiralty firm to prepare a number of analyses that were "trying to identify the source of the emeralds, what ship they might have come from and [were] discussing the possible legal ramifications, if it came from a Spanish galleon."  (*Id.* at 161:6–15).  These analyses were presented to Mr. Silverstein and further informed his belief that the New York Investors were litigating over something of value.  (*Id.* at 161:2–15).

Mr. Silverstein further testified that the nature of the New York Investors' suit itself supported the legitimacy of the find:

> So the other facts that contributed to my state of mind was the fact that these New York investors had alleged that they had given -- that they had invested close to

16

$2 million and they were fighting over control of the emeralds.  They were not seeking to get their money back, they were not claiming that the find was a fraud.  They were claiming that they had invested money in this discovery and that they were the rightful persons who were in control of it, and they were spending a lot of money on a very expensive New York law firm to prosecute a case in Delaware, the goal of which was to obtain control of the emerald find.

(12/4/14 Tr. at 135:7–17).

Thus, from the very beginning of Mr. Silverstein's representation of Jay, Scott, and Steve in the Delaware Litigation everyone believed it was genuine and were vigorously fighting for control over the find.

As this representation proceeded in the Delaware Litigation, Mr. Silverstein reviewed numerous documents in the context of discovery, including candid emails between and among the New York Investors, which further confirmed the universally held belief that Jay had discovered emeralds of historical significance and extraordinary value.  Additionally, in January or February of 2011, Mr. Silverstein reviewed a report issued by the Gemological Appraisal Laboratory of America (the "GAL") from 2010, which evaluated the characteristics and value of a small fraction of Jay's emeralds.  (12/4/14 Tr. at 135:18–136:5; 136:17–20; 137:20–138:4).  According to the GAL, the estimated retail value of just twenty emeralds was approximately $120,000—which total omitted at least one specimen that the GAL reported was too rare to value.  (GAL Report (12/9/10)) (SILVERSTEIN 002).  The GAL Report also had a further comment that would later prove significant—according to the GAL, each and every stone it examined was "Untreated – No Evidence of Oil or Resin."  (SILVERSTEIN 002).  Mr. Silverstein was not satisfied with just receiving copies of the GAL report, however, and in February of 2011, he went to New York City to meet with the GAL's appraiser, Mr. Josh Lents, personally.  (12/4/14 Tr. at 136:24–137:9; *see also id.*at 138:4–9) ("Also when I went to Mr.

Lents, I brought . . . him a few selected emeralds, including ones that he previously had appraised.").

Mr. Silverstein also brought certain emeralds to Sotheby's, an auction house in New York City, where he met with the president of Sotheby's and its head gemologist. (12/4/14 Tr. at 174:13–17). After examining the emeralds, the head gemologist reported to Mr. Silverstein that one of the stones was worth between $25,000 and $40,000 just by itself. (*Id.* at 174:17–20).

Thus, from the first moment that Mr. Silverstein was approached about representing Jay, Scott, and Steve in the Delaware Litigation, it was unquestioned that Jay had discovered emeralds of extraordinary value. And based on his review of substantial evidence pertaining to the Delaware Litigation, Mr. Silverstein came to believe that Jay had, in fact, made a significant discovery. (*See* 10/9/12 Silverstein Aff'd, ¶¶ 9-14) (M3).

### 2.   August 19–21, 2011:  Investigation Into Treasure Chest Allegations by Tobia

On August 19, 2011, the Delaware Court of Chancery held a hearing to consider approval of a settlement of the Delaware Litigation. (12/4/14 Tr. at 179:24–180:2). Just prior to the hearing, Mr. Silverstein was approached by an individual introducing himself as Peter Tobia ("Tobia"), a friend of Jay's, who asked to speak with Mr. Silverstein. (*Id.* at 180:5–16). Tobia told Mr. Silverstein that Tobia "knew information that [Mr. Silverstein] should have about Jay and his discovery, and it was important that [Mr. Silverstein] understood it." (*Id.* at 180:17–19). Mr. Silverstein testified that he was "flabbergasted" by Tobia's assertion and that Tobia refused to provide details. (*Id.* at 180:17–181:22).

When Tobia surfaced, Mr. Silverstein knew that other false claims regarding Jay's discovery had already been made and debunked. (*See, e.g.*, Silverstein email to Tobia (8/20/11, 2:33)) (SILVERSTEIN 010). After The Kirby Group alleged that Jay's treasure had come from

its site, Scott relayed to Mr. Silverstein that he had "quizzed" Jay and Steve on their discovery and that "I trust Steve and believe him.  I quizzed Jay again.  Same thing.  They claim they gave David the site location to prepare a filing.") (8/28/14 Silverstein Aff'd, ¶ 22 (M8) (quoting Scott email (8/10/11, 10:56))).  Mr. Silverstein responded that, given the allegation, Jay "should be guided by Horan" on whether an admiralty filing could proceed at all.  (*Id.*, ¶ 23 (quoting Silverstein email (8/11/11, 10:44))).  Ultimately, however, Ken Rose admitted that he had been misled into believing that Jay had stolen emeralds from The Kirby Group site by persons who had an axe to grind with Jay (and who had been working for the New York Investors) and that the entire episode was a big mistake and was very embarrassing.  (*Id.*, ¶ 23; *see also* Silverstein email to Tobia (8/20/11, 2:33) (SILVERSTEIN 010)).

In any event, though Tobia refused to provide details, he appeared to be suggesting that Jay had discovered a treasure chest full of emeralds on land, rather than in the Gulf as claimed. (*See, e.g.*, Silverstein email to Tobia (8/20/11, 10:27)) (SILVERSTEIN 010).  Tobia claimed the discovery was not where Jay said—but never so much as hinted that the emeralds had been purchased or were junk.  After all, the GAL and Sotheby's had each independently appraised the emeralds as having extraordinary value, and Dr. Post at the Smithsonian believed "they could be the most rare type of emeralds he had ever seen."  (GAL Report (12/9/10) (SILVERSTEIN 002); 12/4/14 Tr. at 174:13–20; Barr email to Toppe (7/13/10) (SILVERSTEIN 008)).  Thus, as Mr. Silverstein testified, "everyone at that time believed [the emeralds] to be very substantial in value, people believed it was many millions of dollars at minimum."  (12/4/14 Tr. at 191:10–17).

Even though Tobia appeared untrustworthy and his treasure-chest story sounded farfetched, Mr. Silverstein wanted any information Tobia had to support his story, even if it undermined Jay's version of his discovery.  As Mr. Silverstein testified, "[i]f Mr. Tobia was

accurate, then Jay and Steve couldn't go forward with their proceeding because it would be fraudulent for them to do so; and if Mr. Tobia was inaccurate he was doing something untoward." (12/4/14 Tr. at 187:25–188:3). Either way, Mr. Silverstein felt that he "needed to understand who was telling the truth." (*Id.* at 188:5–6).

Accordingly, on August 20, 2011, the morning after his brief and exceedingly vague conversation with Tobia, Mr. Silverstein wrote Tobia an email urging him to come forward with the details of his treasure-chest story:

> *This is a very serious matter, and you have a responsibility to come forward if you truly believe that Jay and Steve are committing a fraud and/or other criminal misconduct. . . .*
>
> *If you truly have knowledge that Jay and Steve are misrepresenting the location of Jay's discovery that gave rise to the Delaware litigation, I encourage you to let me know the specifics and source of your information immediately. . . .*

(Silverstein email to Tobia (8/20/11, 10:27)) (emphasis added) (SILVERSTEIN 010).

Later that morning, Mr. Silverstein spoke briefly with Tobia, who was "noncommittal" and who "again would not give [Mr. Silverstein] the information that he claimed to have." (*Id.* at 188:15–19). Nevertheless, Jay directed Mr. Silverstein to make Tobia a proposal incentivizing Tobia to provide any information he had supporting his treasure-chest story. (Silverstein email to Tobia (8/20/11, 2:33) (SILVERSTEIN 010); 12/14/14 Tr. at 196:16–20).

Under this proposal, if Tobia could show that his treasure-chest story was true, he would get a much larger share of the emeralds—which Mr. Silverstein believed to be worth "many millions of dollars at minimum"—than he would if he simply went along with Jay's story. If Tobia cooperated and revealed the details of his claims, he would be entitled to a ten percent interest in the emeralds in the event that Tobia's treasure-chest story was true. (*See id.* at 191:18–22; 195:20–24; SILVERSTEIN 010 at numbered paragraph 2). On the other hand, if

Tobia merely recanted his story and acknowledged that he had made up his accusations to try to extort a larger interest in Jay's discovery, he would be entitled to just two percent—which was one percent less than what Jay had previously promised him.[12]  Mr. Silverstein believed that, since the emeralds were worth "many millions of dollars at minimum, the proposal provided "an amazing financial incentive" for Tobia to come forward if there was any basis to his treasure-chest story.

Mr. Silverstein shared all of the details of Tobia's treasure-chest story with JTR's members and other advisors, forwarding all of his email correspondence with Tobia to Horan, Davis, Livingston, Sullivan, Jay, Scott, and Steve "because it was important that they all understand what was going on." (12/4/14 Tr. at 198:5–11).  There was no disagreement with the rejection of Tobia's treasure-chest story.  As Mr. Silverstein testified, "none of these individuals or anyone else for that matter ever said to [Mr. Silverstein] that they thought Tobia was being sincere and that Jay and Steve were lying." (12/4/14 Tr. at 198:5–18).  Rather, everyone that Mr. Silverstein spoke with regarding Tobia "took the position that Tobia was not to be believed and was trying to get something." (*Id.* at 198:19–20).  So, too, Mr. Silverstein was convinced Tobia was "an extortionist" and never believed his story.  (12/4/14 Tr. at 199:2–7; *see also id.* at 177:5– 7 ("I did not believe Mr. Tobia to be an honest and sincere person, in fact I thought he was an extortionist."); Silverstein email to Horan (8/21/11, 12:33)) (M31) ("Mr. Tobia has many reasons to be untruthful.")).  Having had the opportunity to gauge Tobia's credibility firsthand, Mr.

---

[12] Long before Mr. Silverstein had ever been retained as Jay's counsel, Jay had promised Tobia, his long-time friend, a three-percent interest in his emerald discovery. (*See id.* at 179:16–20; *see also* SILVERSTEIN 005 (table attached to affidavit reflecting that Tobia entitled to 3% equity stake)).  Mr. Silverstein believed that reducing Tobia's percentage created a disincentive for him to simply agree to Jay's version of events, and as Silverstein explained at trial, Jay agreed to provide that disincentive at Silverstein's urging. (12/4/14 Tr. at 193:15–20).  Against Mr. Silverstein's advice and without his involvement, Jay ultimately settled with Tobia for the 3% interest he had originally been promised. (*See* 12/9/14 Tr. at 72:2–15).

Silverstein had come away from his brief meeting with Tobia at the Delaware courthouse convinced that Tobia "was a pretty sleazy character."  (12/4/14 Tr. at 199:7–8).

Moreover, Jay told Mr. Silverstein he was "absolutely" in favor of offering Tobia ten percent to come forward and prove his treasure-chest story:

> And Jay told me again during this call, he said this offer of 10 percent, absolutely make it, because Jay said Tobia is lying so it really is going to translate into nothing, he won't get 10 percent because he only gets 10 percent if he's telling the truth and he's lying, that's what Jay said to me, so it was kind of calling Tobia's bluff is what was being done here.

(12/4/14 Tr. at 194:22–195:3).  The reasonable conclusion to be drawn from Jay's willingness to offer Tobia such a powerful incentive to come forward with the information he claimed to have was that Jay was confident in his story and truly had nothing to hide.  Thus, in Mr. Silverstein's mind, the episode with Tobia only further confirmed the validity of Jay's story.

Indeed, Mr. Silverstein specifically told Tobia that, even if he was uninterested in Jay's proposal, "in any event he should go to the authorities if he believes Jay was committing a fraud because that's a serious accusation, and go and make it known to whatever authorities were appropriate."  (12/4/14 Tr. at 196:20–24; Silverstein email to Tobia (8/20/11, 2:33)) (*"[I]f you truly believe your story to be true, I encourage you to bring it to the attention of the appropriate authorities, so that a proper investigation can be conducted into the location of the Treasure's discovery."*) (SILVERSTEIN 010) (emphasis added).  Tobia responded that he had "calls in to three attorneys" and that someone would contact Mr. Silverstein soon.  (Tobia email to Silverstein (8/21/11, 11:41)) (SILVERSTEIN 010).  When no one did so, Mr. Silverstein made additional unsuccessful attempts (both before and after the Admiralty Action was commenced) to contact Tobia.  (Silverstein email to Tobia (9/8/11, 5:50)) (SILVERSTEIN 010).

As Mr. Silverstein testified, he "thought Mr. Tobia's abject refusal to provide information was telling."  (12/4/14 Tr. at 199:19–20).  Thus, Tobia's accusations were far from a "red flag."

If anything, the episode with Tobia served to affirm Mr. Silverstein's belief in Jay's story. Indeed, the fact that Tobia did not come forward to challenge Jay's version of the discovery— despite a powerful incentive to do so—suggested that Jay's discovery was in fact genuine.[13] And, in the final analysis, Horan was unpersuaded by Tobia's vague assertions, and went ahead and filed the Admiralty Action – something Horan plainly would not have done if he believed there was any truth to Tobia's story.

### 3.   August 2011:  The Non-Spanish Coins

Prior to filing the Admiralty Action, Horan counseled Jay and Steve that "if it turned out that we had evidence that [the discovery] came from a Spanish gal[l]eon, we were going to end up in some very extensive and very expensive litigation against the Kingdom of Spain and the United States."  (11/19/14 Tr. at 63:1–5; Horan email to Jay, Steve, and others (8/18/11)) (M1-7) ("Spain will attack us the same way they attacked Odyssey and the United States attacked Treasure Salvors.  They will realize we have limited financial resources and will use procedure to try to break us.").  Thereafter, and still prior to the commencement of the Admiralty Action, Jay and Steve showed up at Horan's office with a number of coins, none of which were Spanish, and asked Horan, "well, would this prove that this is not a Spanish gal[l]eon or have anything to do with Spain?"  (11/19/14 Tr. at 64:25–65:4).

Horan's response was that he did not believe the coins came from the alleged discovery site (the "Discovery Site"):

---

[13] Moreover, emails from Jay to Tobia that were later forwarded to Mr. Silverstein contained "no suggestion that Jay is hiding anything or that he found the emeralds anywhere other than in International Water.  Indeed, the e-mail…which Jay sent to Mr. Tobia in June of this year, is wholly consistent with what Jay has told us all."  (Silverstein email to Horan (8/19/11, 10:34)). (SILVERSTEIN 009).  As such, Tobia's emails all appeared to be "devoted to an effort to persuade Jay to award Mr. Tobia a 5% ownership interest in the treasure."  (*Id.*).

> I told them that I understood what would motivate them to make that kind of a claim because of the fear of Spain coming into it, but that was not the way this case was going to proceed and that I wanted them to confirm to me that, in fact, they had not recovered those coins.  They did confirm that to me and then they [l]eft my office.

(11/19/14 Tr. at 70:18–23).  Although Motivation facilely counts this among its "red flags," when viewed in context, the fact that Jay and Steve were concerned with protecting their discovery from a claim by Spain suggested that the discovery was valid.  As Horan explained at the Sanctions Trial, he "understood what would motivate them to make that kind of a claim because of the fear of Spain coming into it."  (*Id.* at 70:17–20).  Thus, Horan proceeded to file JTR's verified complaint and to represent JTR in its admiralty proceeding despite the episode with the coins.  (*See, e.g.*, 12/4/14 Tr. at 224:7–12; 11/19/14 Tr. at 141:8–13).  Indeed, Horan specifically testified that, even after the coins episode, he "***had no reason in the world to speculate [the emeralds] were from anywhere other than where [Jay] said he got them.***" (11/19/14 Tr. at 141:14–20) (emphasis added).

Mr. Silverstein could not evaluate for himself Jay and Steve's credibility during the coins episode, as he was not physically present and heard about portions of it from Horan on a telephone call only after the fact.  (12/4/14 Tr. at 223:25–224:6; 12/5/14 Tr. at 8:16–9:11).  Mr. Silverstein could only rely on Horan's assessment, and as noted above, Horan's belief in Jay's story was not shaken by the episode.  (*See, e.g.*, 12/5/14 Tr. at 9:12–14).  Rather, the fact that Jay and Steve would go to such lengths to protect their discovery from a claim by Spain lent legitimacy to their story.

### 4.      September 6, 2011:  Horan Files the Admiralty Action

On September 6, 2011, Horan filed JTR's Verified Complaint (D.E. 1) in the United States District Court for the Southern District of Florida (in Admiralty), seeking an award of title

24

or a liberal salvage award respecting certain emeralds, amethysts and quartz crystals that Jay Miscovich claimed to have discovered in International waters in the Gulf of Mexico.  At Horan's suggestion (to avoid a claim by Spain) (*see* 8/28/14 Silverstein Aff'd, ¶ 30 (M8)), JTR's Verified Complaint makes **no assertions** respecting the origin, quality or value of the salvaged material; it simply alleges the location at which the salvaged material was discovered and that "some of the stones were emeralds, others were amethysts and others were quartz crystals."  (D.E. 1, ¶¶ 3, 5-6).[14]

As noted above, Horan testified that, in filing the Admiralty Action, he relied on Jay's verification and "certainly did believe" him.  (11/19/14 Tr. at 141:14–20).  Given that Horan, who had vastly more experience with treasure hunters and admiralty matters than Mr. Silverstein, was satisfied with Jay and Steve's credibility, it was entirely reasonable for Mr. Silverstein to believe as well.[15]

   **5.    September 9, 2011:  Horan's Sanity Dive**

Mr. Silverstein understood that it was Horan's practice in all of his wreck cases to dive the site himself "to get a firsthand experience and confirm for himself that it's genuine." (12/5/14 Tr. at 12:9–11; 11:17–21) ("He said that he was going to be doing a dive of the site to

---

[14] Indeed, Motivation admits that JTR never attempted to assert the actual source or value of the emeralds as reflected in the pretrial stipulated facts agreed to by the parties before the December 2012 Trial.  *See* Joint Pretrial Stipulation (D.E. 163) at Sec. V.7. ("JTR has made no claim in this action as to the origin or original ownership of the Salvaged Material") and Sec. V.8. ("JTR has made no claim in this action as to the value of the Salvaged Material.") (YCST 163).

[15] Notwithstanding Motivation's allegation in the Amended Sanctions Motion that "[t]he fraud was known to [Mr. Silverstein] by the fall of 2011," (Am. Sanctions Mot. at 6), Motivation's own candid communications reflect its internal understanding that neither Horan nor Mr. Silverstein knew of any fraud at that time.  (8/28/14 Silverstein Aff'd, ¶ 127 (M8)) (quoting Holloway email to White and Lewis that noted "**THE PERPETRATORS (NOT HORAN OR SILVERSTEIN)** KNEW THESE WERE COMMERCIAL GRADE STONES AND THEIR MISSION WAS TO USE THE COURT TO GIVE THEM PROVENANCE.") (emphasis in 8/28/14 Silverstein Aff'd).

confirm that it was a real site and that that would give him, as well as me, a lot more comfort that this was genuine and that he should be proceeding.")).  Mr. Silverstein was "thrilled to hear that" as Mr. Silverstein does not dive and had been unable to visit the Discovery Site on the ocean floor.  (12/5/14 Tr. at 12:1–2).

Accordingly, on September 9, 2011, Horan traveled to the Discovery Site with Steve to make his "sanity dive."  (11/19/14 Tr. at 141:21–23).  On this dive, Horan recovered emeralds from on the sea floor, embedded under one to three inches of silt.  (*Id.* at 141:21–143:5).  According to Horan, "the way they were buried represented to me that they had been there for an extended period of time."  (*Id.* at 143:1–5).  This sanity dive confirmed to Horan that Jay's discovery was legitimate:

> [A]t one point I was on one of the dives and I was be hand-panning the bottom to find emeralds and I found a mud patch that -- the mud patch was where a number of items had been impacted into the mud.  And there was an amethyst and some emeralds that were actually in the mud.  And it had been my experience over the years that that doesn't happen when somebody just casts something out on the bottom.  It takes a while for it to be somewhat covered by the mud.
>
> So that convinced me that they had been down there for some period of time.  That was one of the things that I looked at and said, you know, this is -- I don't know how long they have been down here, but they certainly were not put down here recently.

(11/19/14 Tr. at 57:14–58:1).

After returning to shore, Horan got Messrs. Silverstein and Sullivan on the telephone to recount his dive and share his excitement about the discovery:

> [Horan] was excited, he was extremely excited -- he said he was excited, I'm not just taking that from his words, but he said he was excited, he said it was the real deal, and that he had had concerns prior to that, but that this was a genuine site. He couldn't find a wreck but there were emeralds and he was satisfied that this was a genuine claim and that he should go forward with it . . . .

(12/5/14 Tr. at 12:25–13:6; *see also* 12/8/14 Tr. at 34:2–8) ("David Horan, as I said before, went and dove the site.  He dove the site multiple times.  And each time he would tell me he was extremely excited this was a real deal -- this was the real deal.")).  Horan's account "gave [Mr. Silverstein] a lot of comfort."  (12/5/14 Tr. at 11:17–21).  As Mr. Silverstein testified, "this was the first independent verification from somebody other than Jay or Steve regarding the genuineness of the site, and it wasn't a question now of just accepting their word; David was an independent witness that was vouching for the genuineness of the site."  (*Id.* at 13:19–23).

Although Motivation attempted at the Sanctions Trial to elicit testimony that Horan's sanity dive was a "red flag" occasioning concern about the genuineness of Jay's discovery, Horan testified that, at the time, his dives in fact served to confirm the legitimacy of the Jay's discovery:  "The problem is I have got 20/20 hindsight.  But at that point, when I saw them impacted into that mud, I believed they had been down there and there was not a real question in my mind as to whether they had been salted onto the site."  (11/19/14 Tr. at 58:11–14).  Thus, Motivation's supposed "red flag" is only a red flag with the benefit of hindsight.  Far from serving as a warning that Jay's discovery was fraudulent, Horan's sanity dive, viewed in context, was compelling evidence that the discovery was genuine.  And even if Horan later suspected that Steve may have directed him towards emeralds, that misgiving appeared insubstantial in light of the fact, established by Horan's sanity dive and others, that the location of the emeralds under one to three inches of silt meant that they were not recently deposited on the ocean floor.  Indeed, Horan admitted he was "still fooled" by Jay even after four or five subsequent dives.  (*Id.* at 142:9–20).

Moreover, shortly after Horan's sanity dive, Mr. Silverstein, Horan and Len Tepper (Chief of Investigative Projects for CBS News) traveled by boat to the Discovery Site.  (12/15/14

Tr. at 8:5–8; 8/28/14 Silverstein Aff'd, ¶ 32 (M8); 10/9/12 Silverstein Aff'd, ¶ 8 (M3)).   Len Tepper accompanied Horan and Mr. Silverstein on that trip because CBS News had been investigating the discovery – including interviewing representatives of Motivation – since February 2011.   (*See* 10/9/12 Silverstein Aff'd, ¶¶ 9, 23-26 (M3).   They were met at the Discovery Site by another boat carrying Jay, Steve, and a crew of persons from CBS News and 60 MINUTES.   (8/28/14 Silverstein Aff'd, ¶ 32) (M8).   Mr. Silverstein witnessed Horan and Steve dive into the water and subsequently resurface with a number of emeralds.   (*Id.*).   Horan appeared very excited and climbed into the boat with an emerald between his teeth, stating something along the lines of "[m]ark that one for me when we get title."  (12/15/14 Tr. at 8:11–15).

Given that Horan, an accomplished diver and one of the nation's leading attorney in the area of salvage and the law of finds, who routinely made sanity dives in his wreck cases, visited the Discovery Site for himself on several occasions and was convinced the discovery was genuine, it was entirely reasonable that Mr. Silverstein, a corporate attorney with no admiralty law experience and a non-diver who could not evaluate the site for himself, was also convinced.

**6.   September/October 2011: Twenty Pounds of Emeralds**

Soon after the commencement of the Admiralty Action, in late September or early October of 2011, Mr. Silverstein received a telephone call from Horan relating that Jay and Steve had just come to Horan's office with a Ziploc bag full of emeralds and that Horan did not believe they had come from the site.  (12/5/14 Tr. at 15:6–25).   Mr. Silverstein was not present for this meeting, *see* 11/19/14 Tr. at 74:1–7, and could not evaluate for himself Jay and Steve's credibility.   Mr. Silverstein told Horan that "[Horan] needed to do whatever investigation he needed to do to be satisfied that these emeralds came from the site, and he was the admiralty

attorney so it was his responsibility to make sure it was being done right." (12/5/14 Tr. at 20:7–13). Horan responded that he would follow through. (*Id.* at 20:14–16).

Subsequently, Horan and Jay each told Mr. Silverstein on separate telephone calls that the twenty-pound bag of emeralds had been deposited in the safe-deposit box that contained the *res*. (*Id.* at 28:18–23). Accordingly, Mr. Silverstein believed that Horan "had done his diligence and was satisfied that the emeralds had come from the site" after all. (*Id.* at 22:3–4). Since Mr. Silverstein believed that Horan "wouldn't have put them in the *res* if he didn't think it was appropriate to," *id.* at 23:23–25, the fact that Horan had included the emeralds in the *res* gave Mr. Silverstein "substantial comfort" that, despite Horan's initial misgivings, the emeralds had in fact come from the discovery site as Jay and Steve claimed. (*Id.* at 24:23–24).

Although Mr. Silverstein does not recall Horan having said so on that initial telephone call from Horan, Horan testified that Jay and Steve had explained to Horan that they had not previously revealed the recovery of this twenty-pound bag of emeralds because they had been wary of Spain's intervention and wanted to ensure they retained some emeralds in the event that Spain staked a claim to the *res*:

> And [Jay and Steve] had told me that these [emeralds] would have to be involved [in the Admiralty Action] because they -- and I asked him, why hadn't you told me about these before. And they explained that they were still worried about Spain coming in and they had held these back so that if Spain came in, they would still have something left and they wanted to include them in the material that would be adjudicated.

(11/19/14 Tr. at 73:19–25). As Mr. Sullivan testified, Horan was upset that his clients would have ever considered not including these emeralds in the *res*. (12/10/14 Tr. at 123:22–24 ("[H]e was shook up that I think his clients were even thinking of not, you know, entering this pile into the vault in Key West.")). According to Mr. Sullivan, however, the fact that Jay and Steve had come forward with these emeralds was reassuring rather than troubling:

the way I saw it, and the way Jay explained it to me was that he had gained trust in both David Horan and the court process, and that's why he, quote, let us enter the court process, if I can put it that way.

And secondly, that he wanted to, you know, put this in the vault because that was the right thing to do.  He had become convinced that was the right thing to do.

. . . So it was . . . almost a joyous occasion, you know, because they had faith in the system and because they had, indeed, found more emeralds, and so they had come clean.

But this was very, very early in the process, and I didn't see this as anything to be particularly upset about.

(12/10/14 Tr. at 123:4–19).

Nevertheless, on December 13, 2011, Messrs. Silverstein and Mr. Sullivan spoke with Jay and Steve, at Horan's request.  (12/5/14 Tr. at 25:20–26:11; *see also* Silverstein email to Horan and others (12/13/11)) (M1-16).   As Mr. Sullivan testified, the purpose of this conversation was to make clear to Jay and Steve the importance of being honest and forthcoming.  (12/10/14 Tr. at 181:14–182:10; *see also* Silverstein email to Horan and others (12/13/11)) (M1-16) ("Paul and I explained to Jay and Steve that there are serious consequences resulting from making false statements to a federal court, and that we all want to make absolutely certain that Jay and Steve understand that…").

Thus, when viewed in the context of what was known at the time—that everyone in the Delaware Litigation had believed the emeralds were genuine, that Horan's sanity dive confirmed the emeralds did not appear to have been placed in the ocean recently, that Jay and Steve were worried about Spain's intervention, and that they were wary of trusting the legal process, which had only just begun—the fact that Jay and Steve may have been tardy in coming forward with some emeralds was by no means a "red flag" that should have alerted Mr. Silverstein that Jay had never found anything at the Discovery Site and that Jay's whole discovery was a fabrication.

**7.      October, 16 2011: Motivation Files a Legally Defective and Factually Implausible Verified Claim That Was Later Dismissed by the Court**

On October 16, 2011, Motivation injected itself into the Admiralty Action by filing its Verified Statement of Right and Interest and Claim (D.E. 10) (the "Verified Statement") alleging that the emeralds Jay had discovered belonged to Motivation because they allegedly were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site.  (D.E. 10, ¶ 15).  From the start, JTR and its advisors believed that Motivation's claim was legally and factually frivolous.  As Horan testified, he "did not believe their claim to be valid with regard to it floating over in a barrel from the Atocha and Margarita wreck site."  (11/19/14 Tr. at 139:2–5).  And indeed, Horan advised Mr. Silverstein that Motivation's claim was "not factually plausible."  (*See, e.g.*, 12/4/14 Tr. at 207:24–208:15 ("[Horan] told me both orally as well as in writing, and he also sent letters to Motivation saying the same thing, that their claim was not factually plausible…"; *see also* 8/28/14 Silverstein Aff'd, ¶¶ 39-42) (M8).  And R. Duncan Mathewson, the marine archeologist retained by JTR, also advised JTR that his research showed that was Motivation's claim was implausible.  (*See id.* ¶ 38).  Further, Horan advised both Mr. Sullivan and Mr. Silverstein that by filing its claim, Motivation was just "looking for cover from dissatisfied investors" and "inviting [the investors] on a fishing expedition."   (Horan email to Sullivan and Silverstein (10/29/11, 10:49)) (SILVERSTEIN 013).

Horan's October 29, 2011 email prompted Mr. Silverstein to inquire later that same day as to whether JTR could move to dismiss Motivation's claim and get discovery stayed pending resolution of the dismissal motion.  (Silverstein email to Horan and others (10/29/11, 12:47) (SILVERSTEIN 013); *see also* 12/4/14 Tr. at 208:16–21 ("I don't know anything about admiralty court but in Delaware we could file a motion to dismiss, and we could also get a stay

of discovery until the dismissal motion was resolved, and I wanted to know if that was something that could be [done] in an admiralty court proceeding…")).  As Horan testified, Mr. Silverstein's suggestion concerning a stay of discovery was perfectly legitimate given that Motivation had filed a meritless claim.  (11/19/14 Tr. at 138:18–139:5) ("[I]t is a legitimate and ethical position to take, that you don't give discovery to someone who and does not have a real claim" and "I did not believe [Motivation's] claim to be valid…").  Indeed, Mr. Silverstein also had spoken with the John Holloway (in his capacity as counsel for the New York Investors), and Holloway likewise was "an advocate for filing a motion to dismiss and staying discovery, and he even provided [JTR] with legal research to help in that endeavor."  (*See* 12/4/14 Tr. at 208:22–209:3).

Moreover, legal research had showed that Motivation's claim was also legally implausible since the claim erroneously relied on a 1976 district court order that had been vacated in part by the Fifth Circuit.  (*Id.* at 208:4–15).[16]  Because JTR was neither a party nor a privy to the *Treasure Salvors* action, Motivation's claim to the emeralds was legally frivolous based on the Fifth Circuit's ruling.  (D.E. 40, ¶¶ 5-7; 8/28/14 Silverstein Aff'd, ¶¶ 37-38 (M8)).

Thus, from the beginning, JTR's counsel of record (Horan), advisors (Mr. Sullivan, Scott, and Dr. Mathewson), outside counsel (Mr. Silverstein, Davis and Livingston), and other interested parties (Holloway) all viewed Motivation's claim to the emeralds as patently baseless given that its claim was legally untenable under applicable Fifth Circuit precedent and its "floating barrel" theory was beyond far-fetched.  Accordingly, on December 1, 2011, Horan filed JTR's Dismissal Motion contending that Motivation's Verified Statement should be dismissed

---

[16] *See also* JTR's *Motion for Judgment on the Pleadings and Motion to Dismiss Motivation's Verifef Claim of Ownership (DE 10) and Memorandum of Law* (D.E. 40) (the "Dismissal Motion") at ¶¶ 5-7.

due to its fatally flawed legal analysis and facially implausible factual allegations.  (D.E. 40; *see also* 8/28/14 Silverstein Aff'd, ¶¶ 39-43 (M8)).[17]

Motivation's unwarranted intervention transformed the Admiralty Action from a single-party *in rem* proceeding into an adversarial proceeding.  As discussed *infra*, the adversarial nature of the proceeding heavily influenced JTR's subsequent activities, including (i) JTR's refusal to voluntarily permit Motivation to inspect the emeralds unless Motivation first identified the inspection criteria, and (ii) JTR's careful approach with respect to investigating the apparent epoxy findings and later disclosing those findings to the Court.

### 8.      December 2011: Investigating Preliminary Indications of Epoxy / Resin

Motivation's allegation that Mr. Silverstein attempted to prevent access to the emeralds in an attempted cover up is without merit.  Mr. Silverstein had been against providing Motivation any discovery, whatsoever, since the day that Motivation first asserted its meritless claim in intervention.  (*See* Silverstein email to Horan and others (10/29/11, 12:47) (SILVERSTEIN 013). By contrast, Mr. Silverstein had no objection to allowing an inspection of the emeralds by third parties who had not adopted an adversarial posture and made a baseless claim to the emeralds, as Motivation did.  (*See, e.g.*, 11/19/14 Tr. at 145:5–19).  For example, early in the Admiralty Action, Horan suggested that JTR retain the services of a professional salvage group, Odyssey Marine, to assist with the recovery and marketing of the emeralds, *see id.* at 81:6–21, and Jay readily agreed to let Odyssey Marine examine the emeralds, and neither Mr. Silverstein nor Jay voiced an objection.  (*Id.* at 144:25–145:19 (Horan testimony) (agreeing that Jay was "fine" with Odyssey looking "at the emeralds to make a determination as to value, et cetera, and whether

---

[17] Significantly, Horan and JTR's other advisors, including Mr. Silverstein, began preparing JTR's dismissal motion concerning Motivation's claim during the month before McAllister reported the Swiss and French Labs' epoxy/resin findings on December 1, 2011.  *See* 8/28/14 Silverstein Aff'd, ¶ 214 (M8).

they wanted to be involved in, certainly in the marketing, but also possibly in the recovery.")).

Mr. Silverstein similarly supported inspections of the emeralds by various other third-parties, including a gem expert engaged by the New York Investors, who examined the emeralds in February of 2012. (*See* 11/4/13 Silverstein Aff'd, ¶ 32 (M6)).

On November 9, 2011, at the request of Odyssey Marine, Horan's office sent samples of the emeralds salvaged to Ecole National Superieure de Geologie de Nancy (the "French Lab") and Laboratoire Gemtec (the "Swiss Lab") so the labs could determine the location where the emeralds had been mined and, if possible, when they had been mined. (*See, e.g.*, 11/19/14 Tr. at 82:23–83:7). This research into the emeralds' origin was arranged in furtherance of a potential business relationship, and the testing initially had no relation to the Admiralty Action. Indeed, these were not JTR's lab tests at all, but Odyssey Marine's. Odyssey Marine selected these labs, *see* 11/19/14 Tr. at 83:3–4, and Odyssey Marine hired the labs and paid for their tests, *see id.* at 148:16–19. As Horan testified, the research was "all tied in to whether we would have a relationship with Odyssey, and Odyssey was going to look at the emeralds to make a determination as to value, *et cetera*, and whether they wanted to be involved in, certainly in the marketing, but also possibly even in the recovery." (*Id.* at 145:13–17).

On December 1, 2011, Mr. Silverstein received a telephone call from Horan, informing him that Horan had received a call from an Odyssey Marine consultant, who indicated that both the French and Swiss Labs were reporting that they had detected "enhancement material" on the emerald samples. (*See, e.g.*, 12/4/14 Tr. at 212:1–8; 12/5/14 Tr. at 46:3–7). However, as discussed more fully below, JTR did not receive any reports from either the French Lab or the Swiss Lab until February 12, 2012—and even then Odyssey Marine described the reports to JTR

as "raw reports" that were not yet final.  (11/19/14 Tr. at 148:7–9; *see also* Stemm email to Sullivan (2/12/12, 3:13)) (M1-26).

Needless to say, the information being reported by the French and Swiss Labs came as a complete surprise.  (11/19/14 Tr. at 147:22–24; 12/10/14 Tr. at 127:8–10).  The Smithsonian had, after all, examined a batch of emeralds in September 2010 and did not discover any epoxy or residue on those emeralds.  (*See* SILVERSTEIN 001).  And the GAL analysis from December 2010—which analysis JTR and its advisors had actually seen, unlike the French and Swiss analyses, which JTR did not receive until February 2012—specifically reported that each and every stone it examined was "Untreated – No Evidence of Oil or Resin." (SILVERSTEIN 002).

Accordingly, JTR's various advisors (including Mr. Silverstein) developed a process for seeking to determine what could have caused the samples of emeralds sent to the French and Swiss Labs to have tested positive for oils, resins and what appeared to be epoxy when the samples previously sent to the Smithsonian and to GAL had not.  Within a couple days of receiving the first indications of modern enhancement, Mr. Silverstein called Len Tepper (the Chief Investigative Reporter for CBS News) and Andrew Metz (an Associate Producer at 60 MINUTES), reported to them what JTR preliminarily had learned about the analyses performed by the French and Swiss Labs, and asked them if CBS News or 60 MINUTES would investigate the issue.  (*See, e.g.*, 12/5/14 Tr. at 50:1–24; 29:22–30:5; 12/10/14 Tr. at 129:4–21).  Mr. Silverstein reached out to CBS News because, as noted above, it had been investigating the discovery since February 2011.  (*See* 10/9/12 Silverstein Aff'd, ¶¶ 9, 23-26 (M3)).  CBS News ultimately prepared a segment for 60 MINUTES, which was broadcast in April 2012, and which was a positive story about the discovery, and not an expose about a fraud.  (*Id.*).  Neither Mr. Silverstein nor anyone else associated with JTR had any control over the investigation by CBS or

the content of the segment that 60 MINUTES determined to air.  (*Id.*, ¶ 26; *see also* 8/28/14 Silverstein Aff'd, ¶¶ 141, 150 (M8)).

Mr. Silverstein enlisted the help of CBS knowing full well that the results of the GIA's analysis could be unfavorable to JTR and that CBS would make those results public, whatever they were.  (*See, e.g.*, 12/4/14 Tr. at 216:25–217:12; Silverstein email to McAllister (12/19/11, 3:30) (M1-18)  ("We all are interested in learning the truth of the origin of the emeralds and how they got into the Gulf of Mexico, and a process has been established – with the cooperation and knowledge of CBS News – to accomplish that objective.  Everything is being done 'above board' and will all be publicly disclosed once all of the facts are gathered and analyzed.")).

Because Jay and Steve previously had explained that they cleaned the emeralds that were ultimately sent to the French and Swiss labs using water, detergent, and paint thinner and/or mineral spirits in a basin or tub at Steve's house in Key West, Mr. Silverstein believed that this cleaning process might account for the inconsistent results and that Jay and Steve may have "polluted" the emeralds tested by the French and Swiss labs.  (*See, e.g.*, 8/28/14 Silverstein Aff'd, ¶ 57 (M8); *see also* 12/5/14 Tr. at 36:13–18) ("There was a hypothesis that something Jay and Steve had done to the emeralds after they were salvaged had caused this finding of modern substances…That it might have been something they did in the process where they were washing them with chemicals…").  By contrast, the Smithsonian emeralds, which had no oils, resins or epoxy, had not been cleaned in that manner.  (*See, e.g.*, 12/5/14 Tr. at 30:6–15; Silverstein email to Horan (12/23/11, 2:39)) (M1-19).  Accordingly, to help get to the bottom of the epoxy mystery, it was decided that JTR should have the Smithsonian send the GIA the samples Jay previously had provided to the Smithsonian in sea water in 2010.  (*See, e.g.*, 12/5/14 Tr. at 29:22–30:21; Silverstein email to McAllister, Stemm (12/19/11, 3:31)) (M1-18).

36

Additionally, within a couple days of receiving the first indications of modern enhancement on December 1, 2011, Mr. Silverstein had a telephone conversation with Horan in which he asked Horan if he would be willing to "do another dive to retrieve emeralds that he [i.e., Horan] had selected in the water . . . bring them out of the water in seawater, encapsulated in seawater, and send them to the GIA to be examined so that there would be a clear chain of custody."  (12/5/14 Tr. at 30:22–31:12; 11/19/14 Tr. at 154:10–25).  Horan agreed, saying it was "a great idea" and "he would be happy to do it."  (12/5/14 Tr. at 31:24–32:2).

On December 16, 2011, Mr. Sullivan was copied on an email from McAllister (the Odyssey Marine consultant) to Horan, in which McAllister offered his "two cents worth" and suggested public disclosure of the preliminary results of the analyses performed by the French and Swiss Labs.  (McAllister email to Horan and others (12/16/11, 11:41)) (M1-18).  At this time, however, none of JTR's members or advisors had even seen the purported analyses performed by the French and Swiss labs, and Mr. Silverstein and certain of JTR's other advisors had legitimate doubts about the French and Swiss Lab results—particularly because of the earlier reports from the Smithsonian and the GAL and Jay and Steve's clumsy efforts to clean the emeralds—and were actively trying to corroborate those results.  Additionally, JTR was bound by a contract with CBS that included a confidentiality provision and a requirement to work exclusively with CBS News.  (*See* 10/9/12 Silverstein Aff'd, ¶ 25) (M3).

Accordingly, on December 18, 2011, Mr. Silverstein, at Mr. Sullivan's request, wrote to McAllister, explaining that JTR, with CBS's help, was investigating the mysterious enhancements and would be making an appropriate filing with the Court once it had all the facts:

> [P]ursuant to a contractual agreement whereby Jay has agreed to work exclusively with CBS Broadcasting, CBS was informed of the probable results from the French and Swiss labs shortly after you reported those results to Paul. Specifically, we contacted the producers of CBS News and 60 minutes to make

them aware of what we were told to be the probable results, and we requested their assistance in getting to the bottom of this "mystery."  Accordingly, you can be sure that it is Jay's full intent, as you say, "to disclose publicly" all the facts when we are sure we have all the facts.  Obviously, one does not work with CBS News and 60 minutes with any expectation that the results of that investigation would not be made public once the investigation is properly concluded.

[W]e also have contacted the Smithsonian and, with CBS's help, the President of GIA.  The Smithsonian has agreed to send their samples to the GIA for further testing.  We also intend to send the GIA samples from the vault in Key West and other samples from the 'Site' when they are obtained.  The GIA has agreed to test all the samples for "enhancements" expeditiously."

**Once we have all the facts, we intend to disclose them to the Court through an appropriate filing.**  Until that time, and until all the facts are in, it would be inappropriate for any of us to comment publicly.

(Silverstein email to McAllister (12/18/11, 5:12)) (emphasis added) (M1-18).  Thus, when JTR received the first preliminary indications of "modern enhancement" on the emeralds, Mr. Silverstein's immediate and consistent reaction was to advocate for searching for the truth and investigating further.

Mr. Silverstein certainly had not expected that the research Odyssey Marine commissioned to investigate the emeralds' value and origins would turn up modern enhancements.  Indeed, as noted above, Mr. Silverstein was aware that the Smithsonian had not detected any such enhancements and that the GAL had specifically reported that the emeralds it examined were "Untreated" and had "No Evidence of Oil or Resin."  Thus, it seemed entirely plausible that the emeralds the French and Swiss examined had somehow been polluted by Jay and Steve's cleaning efforts.  To be sure, the potential presence of modern enhancements on the emeralds was cause for further inquiry (which was promptly pursued), but it does not suggest (let alone prove) that Mr. Silverstein was then aware that Jay was committing a fraud on the Court (which Mr. Silverstein, in fact, did not know).  And even if the emeralds did have modern enhancements on them, that still did not establish that Jay had committed a fraud.  As Holloway,

Motivation's own counsel, candidly wrote to White, Lewis, Fisher, and others, ascribing knowledge of a fraud to Mr. Silverstein (or Horan) based on the epoxy would be "pushing an inference to[o] far."  (Holloway email (4/17/13, 12:10)) (YCST 190).  The presence of modern enhancements simply did not establish that Jay had not discovered the emeralds where and when he claimed.  And indeed, throughout the entire investigation that Mr. Silverstein, Mr. Sullivan, and JTR's other advisors conducted into the "modern enhancements," Jay never resisted their attempts to get to the bottom of the mystery, which further demonstrated to Mr. Silverstein that Jay was confident in his story and truly had nothing to hide.[18]

Moreover, despite Motivation's lack of entitlement to conduct any discovery pending resolution of JTR's dismissal motion, JTR volunteered to allow Motivation to inspect the emeralds if Motivation would first identify the criteria it would use to determine whether the emeralds had come from the *Atocha*.  (*See* Horan email to Lewis (12/15/11, 4:43) (YCST 57; *see also* 8/28/14 Silverstein Aff'd, ¶¶ 44-51 (M8); 10/9/12 Silverstein Aff'd, ¶¶ 51-53 (M3)).  Motivation, however, refused to identify the criteria it would use for the requested inspection, *see id.*, ¶ 54, prompting JTR to move for a formal stay of discovery pending resolution of its motion for judgment on the pleadings.  (*See* D.E. 50).  Nonetheless, JTR made another offer that would permit Motivation to conduct the inspection it sought, and would further permit Motivation to inspect the Discovery Site and conduct any other discovery it desired – without any limitations whatsoever.  (8/28/14 Silverstein Aff'd, ¶ 49 (M8); 10/9/12 Silverstein Aff'd, ¶¶ 56-60 (M3)).  This offer, too, was refused by Motivation.  (*Id.*).  Plainly, neither JTR nor Mr.

---

[18] *See, e.g.,* 12/10/14 Tr. at 128:6–129:20 (Sullivan testimony) (testifying that, after the test results were received from McAllister, "[Mr.] Silverstein . . . suggested that we didn't have the resources to really look into anything like this ourselves . . . and suggested that . . . we ask CBS for their help . . . I believe Scott Miscovich talked to Jay and we got the go ahead on the idea.").

Silverstein was attempting to hide things from Motivation – which had no legal entitlement to inspect the emeralds at that time, in any event.

Additionally, in February 2012, when CBS News/60 MINUTES filmed a Columbian mine owner inspecting some emeralds in New York City, Mr. Silverstein invited one of the New York Investors, his counsel (Mr. Holloway), and a gem expert retained by the New York Investors to witness the filming and inspect the emeralds. (*See* 11/4/13 Silverstein Aff'd, ¶ 32 (M6)). Moreover, Mr. Silverstein asked Holloway at that time whether he would be willing to join in representing JTR in the Admiralty Action because Holloway was knowledgeable about admiralty law and had made a number of good suggestions about how to deal with Motivation. (*Id.*, ¶ 33). Again, these are not the actions of someone seeking to cover up or conceal the truth.

### 9.      January 6, 2012:  The Second Status Report

Unfortunately, the weather conditions in December 2011 had not been conducive to visiting the Discovery Site, and Horan had therefore not yet been able to recover emeralds for the GIA to test. (12/5/14 Tr. at 60:21–61:8; *see also* 8/28/14 Silverstein Aff'd, ¶ 62) (M8). Thus, on January 6, 2012, Horan filed a "Status Report" (D.E. 54) (the "Second Status Report") on behalf of JTR, which provided disclosure about the ongoing testing that was being performed. The Second Status Report (YCST 62) put everyone on notice that further testing of the emeralds was being done and that the test results would be produced and filed with the Court. (*See also* 12/5/14 Tr. at 86:3–7; 11/19/14 Tr. at 117:14–16). At the hearing on January 10, 2012, Horan "(again) represent[ed] that as soon as the GIA tests were done we would be filing the French, Swiss and GIA tests with the Court." (Horan email to Jay, Steve, Sullivan, Scott, Davis, Livingston, Silverstein (4/5/12, 10:52)) (MI-29). There were no attempts at dodging the truth— the truth would be disclosed in due course. (*See, e.g.*, 11/19/14 Tr. at 134:8–12; *see also* 12/4/14

Tr. at 218:19–23 (Silverstein testimony) ("No one ever doubted that at some point in time there was going to be full public disclosure of all the information.  The question was, when do you make that disclosure and how much information should you have in your hands before that disclosure was made.")).

And indeed, the Court and the parties were well aware that the genuineness of the emeralds was at issue.  According to Horan, the Court announced at a hearing on January 10, 2012, that it was already well aware of the possibility that the emeralds may have been scattered as "phony stuff."  (11/19/14 Tr. at 134:13–23; Horan email to Jay, Steve, Sullivan, Scott, Davis, Livingston, Silverstein (4/5/12, 10:52)) (M1-29).  And indeed, the Court specifically suggested holding up discovery until the different lab reports were completed.  (11/19/14 Tr. at 135:12–16; *see also* M1-29).  Thus, not only were the Court and the parties well aware in January 2012 that the genuineness of the emeralds was at issue but also the Court had specifically suggested that it and the parties should await the final analyses before proceeding further.

Thus, all that Mr. Silverstein did was to suggest that JTR have testing done to corroborate the preliminary results before making any affirmative representations to the Court—particularly in light of the fact that those preliminary results appeared inconsistent with earlier analyses.  For example, the GAL analysis from December 2010—which analysis JTR and its advisors had actually seen, unlike the French and Swiss analyses, which JTR did not receive until February 2012—specifically reported that each and every stone it examined was "Untreated – No Evidence of Oil or Resin."  (SILVERSTEIN 002).

In the end, in light of the uncertainty about whether the emeralds sent to the French and Swiss Labs had been contaminated, Horan agreed to await the results from the GIA testing, as well as final reports from the French and Swiss Labs, and then to file copies of all the reports,

rather than to impulsively divulge potentially misleading, secondhand information about results that could ultimately prove to be a false alarm.

Indeed, as Horan acknowledged, he ultimately bore professional responsibility for the Second Status Report.  (*See* 11/19/14 Tr. at 132:5–7).  Horan signed and filed the Second Status Report.  (YCST 62; *see also* 11/19/14 Tr. at 131:7–8).  He believed that doing so complied with his ethical obligations as counsel of record, *see, e.g.*, 11/19/14 Tr. at 136:5–7; 164:17–21, and that the Second Status Report was consistent with the high ethical standards he held himself to.  (*Id.* at 136:11–14).

In fact, Horan's ultimate decision to hold off on disclosing the presence of epoxy or resin on certain emeralds pending final results from the various labs that were being consulted was entirely proper, especially when considering that:  (i) the Court and the parties were already well aware that the genuineness of the emeralds was at issue; (ii) JTR had not seen for itself any of the preliminary reports that allegedly indicated the presence of oils, resins or what appeared to be epoxy on certain emerald samples; (iii) the presence of oils, resins or what appeared to be epoxy on the emeralds tested by the French and Swiss labs was inconsistent with the Smithsonian's testing on other samples; (iv) there was no statute, rule or Court order that required JTR to disclose the French and Swiss Labs' preliminary test results at that time; (v) JTR had promptly informed CBS News and 60 MINUTES of the preliminary results and enlisted their aid in investigating those results and in having the emeralds sent to another lab (GIA) for further testing; (vi) the French and Swiss Labs had tested only a small sampling of emeralds and the possibility that the emeralds were "polluted" when cleaned by Jay and Steve was an entirely plausible explanation for the presence of extraneous material on the emeralds sent to those labs;

and (vii) JTR was in the midst of litigation with Motivation, an adversary which JTR believed could not be trusted and which had asserted baseless claims to the Salvaged Material.[19]

And indeed, once JTR received the final reports it was awaiting, Horan promptly filed the Third Status Report, as promised.  (*See, e.g.*, 12/5/14 Tr. at 86:8–11 (Silverstein) ("Q. Did you believe in your subjective good-faith state of mind that the promise made in the second status report to provide test results was a promise that was kept to the Court?  A. Absolutely.").

10. **January–April 2012:  Attempting to Get to the Bottom of Preliminary Indications of Epoxy / Resin**

a. **January 2012:  Gathering Information**

On January 18, 2012, in furtherance of JTR's attempts to get to the bottom of the oil/resin/epoxy mystery, Horan once again dove the Discovery Site (the "January 18 Dive"), salvaged twenty emeralds, and sent the emeralds in sea water to the GIA for analysis.  (Sullivan email to Stemm (1/18/12, 10:41) (SILVERSTEIN 025); 11/19/14 Tr. at 154:10–25; 12/5/14 Tr. at 35:11–23).  Prior to the January 18 Dive, Horan informed Mr. Silverstein that Steve was questioning the need for another dive, and asked Mr. Silverstein to help secure Steve's cooperation.  Accordingly, Mr. Silverstein wrote to Steve as follows:

> David told me today that you were questioning the need for another dive/recovery to send to the GIA. ***I know you are extremely frustrated, but the dive is important to help ascertain whether the emeralds were mined in the past century or many hundreds of years ago.***  This needs to be determined before (i) the admiralty process is completed, (ii) there can be any monetization of the emeralds, and (iii) CBS will be willing to telecast the 60 MINUTES segment. ***It does not matter what the further testing shows (although it certainly would be***

---

[19] Motivation was fully aware that emeralds had been sent to the French and Swiss Labs.  In a December 16 email, Lewis wrote that "Kim and Manuel would like to review the Report on the 15 or so emeralds examined by the French or Swiss laboratory you and [Mr. Sullivan] discussed with us last month."  (Lewis email to Horan (12/16/11, 7:49)) (YCST 58).  In response, Horan's recommendation to Mr. Sullivan, Scott, and Mr. Silverstein was that "[w]e should tell them that there is no report yet from the French and Swiss labs."  (Horan email to Silverstein, Scott, and Sullivan (12/16/11, 10:14)) (YCST 58).

> *better if the emeralds are free of any modern substances). We just need to know*
> *the answer – one way or another.*

(Silverstein email to Steve (1/9/12) (emphases added) (SILVERSTEIN 016); *see also* 12/5/14 Tr.

at 61:9–62:7).

Also on January 18, 2012, CBS News / 60 Minutes interviewed Gregg Stemm ("Stemm")

of Odyssey Marine in connection with the ongoing investigation of Jay's discovery. Stemm later

informed JTR that he had been asked about the information received from the French and Swiss

Labs, and that he had insisted that "until the final results on all the reports were in, everyone

should avoid jumping to any conclusions." (Stemm email to Sullivan (1/18/12, 10:21))

(SILVERSTEIN 025).

### b.     February-March 2012:  Collecting Analyses

On February 12, 2012, Stemm forwarded to Mr. Sullivan documents that Stemm had

received that day from the French and Swiss Labs. (Stemm email to Sullivan (2/12/12, 8:13))

(M1-26). In his covering email to Mr. Sullivan, Stemm wrote: "These are yet to be included in a

final report to us, but I wanted to get you the raw reports as soon as I received them." (*Id.*) The

next day, Mr. Sullivan forwarded the "raw reports" to CBS News / 60 Minutes. (10/9/12

Silverstein Aff'd, ¶ 80) (M3).

Thereafter, Mr. Sullivan worked with another lab, Matco Services, Inc. ("Matco"), based

in Pittsburgh, PA, to obtain more specific information about the material the French Lab and the

Swiss Lab had reported finding on the emeralds. (*See, e.g.,* 12/5/14 Tr. 73:20–74:10; 8/28/14

Silverstein Aff'd, ¶ 68) (M8). As Mr. Silverstein testified, the fact that Mr. Sullivan had

coordinated testing by Matco "was one of many things that gave [Mr. Silverstein] great comfort

that appropriate diligence was being performed to determine what, if anything, was on the

emerald and what exactly it was, if there was anything." (12/5/14 Tr. at 75:12–19). Mr. Sullivan

also asked Matco to examine some randomly-selected emeralds with an electron microscope—as had been done by the Smithsonian—to determine if there was any trace of gold, silver or copper. (8/28/14 Silverstein Aff'd, ¶ 68) (M8).  Like the Smithsonian, Matco both (i) detected no epoxy on the emeralds it examined, and (ii) detected the presence of silver and copper using an electron microscope.  (D.E. 82, at 17-20; 8/28/14 Silverstein Aff'd, ¶ 68 (M8)).

Soon after receiving the "raw reports" from the French and Swiss labs, and before the Matco results had been received, Horan began preparing a third status report for JTR to file with the Court.  (Horan email to Silverstein, Sullivan, Elchlepp, Scott and Jay (2/28/12, 5:56)) (M1-27).  While Mr. Silverstein debated the timing of filing the third status report with Siracusa and Horan, he expressly deferred that decision to Record Counsel.  ((Silverstein email to Horan, Siracusa (3/26/12, 3:29)) (*"Inasmuch as I am not an attorney of record in the admiralty proceeding, however, I leave it to the two of you [i.e., Horan and Siracusa] (and your partners and associates) to advise JTR on this subject."*) (emphasis added) (M2-9).

On April 2, 2012, JTR received indications that the 60 Minutes episode may have been scheduled to run sometime in the next two to six weeks – which meant that the precise location of the Discovery Site would soon be publicly known.  (Silverstein email to Kincannon (4/2/12, 3:18)) (SILVERSTEIN 017).  Horan advised that JTR should file the third status report once they received the Matco results, regardless of when and if the CBS broadcast was to air:  "As to when we file the 3rd status report it looks like we will have the MATCO results in the next week and then we can insert the results into the draft and file it."  (Horan email to Silverstein, Kincannon (4/2/12, 3:54)) (SILVERSTEIN 017).

### 11.      April 18, 2012:  The Third Status Report

On April 17, 2012, Matco sent a report of its analyses to JTR.  The next day, Horan filed the Third Status Report (D.E. 82) (M13).  As stated in the Third Status Report, the purpose of the

report was "to apprise the Court of the status of tests and evaluations of emerald samples performed by the Smithsonian Institution and laboratories in France, Switzerland, New York City and Pittsburgh, Pennsylvania." (*Id.* at 1).[20]  Further analyses of the "uncleaned" emerald samples from both the Smithsonian and the January 18 Dive, which were performed by Matco and Chemir Analytical Services ("Chemir") following the filing of the Third Status Report, confirmed that there was no epoxy resin or other modern substance on those emeralds.  (*See* Sullivan email to Siracusa, Silverstein and others (9/24/12, 8:10) ("Basically the report shows that ALL of the samples that were taken out of the water and sent directly to the labs without being "cleaned" had NO surface coating of any kind.") (YCST 137); *see also* Siracusa email to Sullivan, Silverstein and others (10/1/12, 8:48)) ("The final Matco and Chemir reports do show that at least 10 uncleaned stones did not have any epoxy on them.") (M1-33).[21]

In addition to apprising the Court of the status of tests of emerald samples, the Third Status Report disclosed that the emeralds could be associated with a "modern" shipwreck.  In that regard, the Third Status Report states:

> JTR does not yet know how or when the emeralds, amethysts and quartz crystals were deposited into the Gulf of Mexico.  JTR has, however, located wreckage of a number of modern (Twentieth Century) shipwreck sites within the approximately six hundred (640) acres described in the above caption.  ***Because of the information provided by all of the laboratories, it now appears that the source of the emeralds, amethysts and quartz crystals could be one of these "modern" shipwrecks.***

---

[20] Although, the Third Status Report states that the GIA detected the presence of modern material on the "uncleaned" emeralds from the January 18 Dive (*id.* at 4), that statement was made in error since GIA did no testing after January 17, 2012 and, therefore, it could not have performed any tests on the emeralds recovered from the Discovery Site by Horan and Steve during the January 18 Dive.  (*See* Sullivan email to Siracusa (10/1/12, 7:43)) (explaining that "GIA never tested the Jan dive set because they never received them until after their testing was finished.") (M1-33).

[21] Reports from Matco and Chemir setting forth these results were filed with the Court on October 1, 2012.  *See* D.E. 131.

> ***To date, JTR has not found any wreckage from any vessel in close***
> ***proximity to the Emerald Site that pre-dates the twentieth century.***

(D.E. 82 at 3) (M13) (emphasis added).  Thus, by no later than April 18, 2012, JTR had alerted

the Court, Motivation, and the public, that JTR was not claiming, or otherwise seeking to

establish, an ancient provenance for the *res*.  Based on the foregoing disclosure, Judge Moore

held that Motivation could not obtain sanctions from JTR for any expenses incurred beyond

April 18, 2012.  (*See* D.E. 445, ¶¶ 64-65).[22]

### 12.    September 2012:  Siracusa Recovers Emeralds

On September 9, 2012, in furtherance of JTR's continuing efforts to get to the bottom of

the epoxy mystery, Siracusa dove the Discovery Site with Steve and recovered seventy-two

emeralds and several amethysts.  (*See, e.g.*, 11/20/14 Tr. at 236:10–237:10).  As with Horan's

sanity dive, the fact that another trustworthy person was able to verify the existence of gems at

the site was further evidence supporting the genuineness of the find.

### 13.    October 5–6, 2012:  Mr. Silverstein Engages in an Open Dialogue With Motivation's Counsel

On October 5, 2012, Motivation's counsel, Marlow White, sent Silverstein an email

accusing Mr. Silverstein of acting in bad faith.  (White email to Silverstein (10/5/12, 4:11))

(SILVERSTEIN 022); 12/8/14 Tr. at 6:24–7:20).  Mr. Silverstein "took [White's] accusation

very seriously" and responded to White's email the next day with an item-by-item response to

the points White raised.  (*Id.* at 7:13–23; Silverstein email to White (10/6/12, 12:53)

(SILVERSTEIN 022); *see also* 10/9/12 Silverstein Aff'd, ¶¶ 120-123 (M3)).

---

[22] In the unlikely event that the Court were to hold Mr. Silverstein accountable for JTR's conduct – even though counsel of record is not being held accountable – Judge Moore's ruling places a limit in such sanctions that is binding on Motivation as the law of the case.  Plainly, Mr. Silverstein's liability for JTR's conduct cannot extend beyond the liability of JTR, itself.  Indeed, Motivation acknowledged as much in its failed motion for reconsideration of Judge Moore's post-hearing rulings.

And when White made allegations concerning matters that Mr. Silverstein was unfamiliar with, Mr. Silverstein asked White to provide further information so that Mr. Silverstein could substantiate the allegation. (*See,* Silverstein email to White (10/6/12, 12:53) (SILVERSTEIN 022) ("[p]erhaps, you can provide me with evidence that I can review and consider its implications," and "[i]f you have contrary evidence, as opposed to speculation, I look forward to learning what it is."); *see also* 10/9/12 Silverstein Aff'd, ¶¶ 120-123 (M3)). White, however, never provided any information he may have had in response to Mr. Silverstein's requests. (12/8/14 Tr. at 8:1–11).

### 14.    November 20, 2012:  The Luckenbach Theory "Made Sense"

Notwithstanding the Third Status Report's statement that the emeralds appeared to have come from a "modern shipwreck" (D.E. 82 at 4-5), Mr. Silverstein, in light of "all the information [he] had from the past year and a half from the Smithsonian" among other sources, continued to hold out hope, "perhaps foolishly" in hindsight, that the emeralds would ultimately prove to be colonial-era emeralds that had been contaminated with modern enhancements after being removed from the sea floor. (12/8/14 Tr. at 12:17–22; *id.* at 15:5–9).

The theory that colonial-era emeralds had been contaminated with modern enhancement was not definitively laid to rest until November 20, 2012, when Siracusa reported that an expert performing an appraisal had concluded that certain of the emeralds were "manufactured"—that is, that emerald fragments had been crushed together to form one larger emerald. (*See, e.g.*, 12/8/14 Tr. at 11:14–12:3; Siracusa email to Jay, Steve, and others (11/20/12, 7:30) (SILVERSTEIN 023)). Because this manufacturing technique had only been used since the 1800s, the emeralds could not be colonial-era. (*See, e.g.,* 12/8/14 Tr. at 12:8–12). As Mr. Silverstein explained, this new information in November 2012, "kind of changed [his] view of everything" and left him "dumbfounded." (*Id.* at 12:13–25; Silverstein email to Sullivan,

Siracusa, Jay, and others (11/20/12) (11:42) (SILVERSTEIN 023) ("I am…dumbfounded by the new information about the specimens being assembled and manufactured.")).  Even still, the fact that the emeralds were not colonial-era was not evidence that the emeralds had not been found on the sea floor as Jay claimed.  (*See, e.g.,* 12/8/14 Tr. at 13:1–23; 11/20/14 Tr. at 290:15–16 (Siracusa testimony) ("Q. And you believed in the case, didn't you?  A. Absolutely, through the [December 2012] trial, I did believe in the case.")).

Indeed, the fact the emeralds almost certainly had a modern origin lent further credence to the theory, championed by Mr. Sullivan, that the emeralds had come from the *SS Edward Luckenbach*, a cargo ship that had served in the U.S. Navy and sank in 1942.  (11/19/14 Tr. at 106:17–23; 12/10/14 Tr. at 160:11–15).[23]  One "fascinating" aspect of this theory, according to Horan, was that the *Luckenbach*, at the time it sank, had been transporting "valuable wartime materials," apparently including material for use in the Manhattan Project—and beryllium, which is used to make plutonium bombs, "just happens to be the substrate for the emeralds." (11/19/14 Tr. at 107:12–108:5).  In contrast to the *Atocha* forty miles away, the wreck of the *Luckenbach* was located within less than 100 yards of the location where Jay claimed to have found the emeralds.  (11/19/14 Tr. at 143:9–12).

Accordingly, Mr. Sullivan spent "quite a bit of time" in the National Archives, researching the *Luckenbach* as a source for the emeralds and gathered more than 700 documents concerning what was on the *Luckenbach*.  (12/10/14 Tr. at 160:25–161:2).  According to Mr. Sullivan's extensive research, the materials on board the *Luckenbach* at the time it sank consisted

---

[23] At or around this same time in November 2012, JTR and its advisors were also considering other theories espoused by Horan concerning the origins of the emeralds.  Specifically, Horan had raised the issue of whether it was possible the emeralds came from a shrimp boat or smugglers.  *See, e.g.,* Sullivan email to Jay, Steve, Silverstein and others (11/20/12, 10:42) (SILVERSTEIN 023); 12/8/14 Tr. at 14:2–21.

of the exact same elements that the Smithsonian had found embedded on the surface of certain

emeralds back in September 2010.  As Mr. Sullivan explained:

> It turns out that the Luckenbach carried 17 -- and I know for a fact, I have
> the documents for this, was carrying 1769 tons of a material called antimony, and
> it also turns out that they only salvaged 254 tons of antimony, leaving about 1500
> tons of antimony on the bottom of the ocean for 70 years.
>
> Now, remember that the importance of this, to me and to Bruce, was that
> in 2010 the Smithsonian had found micron bits of gold, silver and copper on
> samples sent to them. And now I find that there's 1500 tons of antimony on the
> bottom of the ocean where Jay says he found the gems. And antimony – I found
> this out and it's a fact, it's a scientific fact -- antimony comes from the smelting of
> gold, silver and copper.

(12/10/14 Tr. at 160:25–161:21).

This was consistent with the Smithsonian's Jeff Post's finding of microscopic "grains" of

gold, silver, and copper, which he believed was evidence that the emeralds had laid in the ocean

sediment with these other elements for long enough that the gold, silver, and copper eroded and

became embedded on the emeralds.  (Post email to Barr (9/9/10)) (SILVERSTEIN 001).  Thus,

the Luckenbach theory not only accounted for how modern emeralds came to be buried on the

ocean floor under three inches of silt, it also explained the mystery of how gold, silver, and

copper came to be embedded in the microscopic cracks on the surface of the emeralds.

As Mr. Sullivan testified, it appeared unimaginable that this confluence could be a

coincidence:

> this was compelling evidence to me and to others, including Bruce, I believe, that
> either this is one of the world's greatest coincidences and inexplicable, or for a
> significant length of time gems selected randomly from the pile contained must
> have been in the water for a significant length of time because those gems
> contained micron bits of gold, silver and copper.

(12/10/14 Tr. at 161:15–21).  Indeed, Horan agreed, testifying that the Luckenbach theory "went

very far" in explaining why the emeralds appeared to have modern origins but also appeared to

have laid on the ocean's floor long enough to become buried under the silt and to have gold,

silver, and copper become embedded.  (11/19/14 Tr. at 106:23–107:11).  As Horan put it, the Luckenbach theory just "made sense."  (*Id.* at 107:17–19).  Mr. Silverstein likewise found this to be a plausible hypothesis.  (12/8/14 Tr. at 13:24–14:5).

### 15. November 2012:  The Cunningham Release

Although Motivation sought to make an issue of the Cunningham Release at the December 2012 Trial, JTR had made no allegation about the Cunningham Release in the Admiralty Action (nor had Jay in the Delaware Litigation),[24] and the general consensus among JTR's advisors was that the Cunningham Release was of minimal significance because the debris map relating to the agreement "didn't really get [Jay and Steve] to the emeralds" and was essentially "worthless."  (11/20/14 Tr. at 241:13–21).  As Siracusa testified, Jay and Steve allegedly recovered the emeralds "at a site more than a mile and half or two miles" from the debris map coordinates that Jay had been given by Cunningham, which was "nowhere near where [Jay and Steve] found the emeralds.  (*Id.* at 241:5–16).  As Mr. Silverstein testified, the "Mike Cunningham issue" had nothing to do "with the genuineness of the discovery.  So each time somebody raised an issue about the Mike Cunningham issue, which had been an ongoing issue for many months, it didn't cause me to change my understanding of the genuineness of the discovery.  They were two separate issues."  (12/10/14 Tr. at 35:1–13).

---

[24] The Cunningham Release had no relevance whatsoever to the Delaware Litigation, and no papers filed in the Delaware Litigation made any mention of the release, Mike Cunningham, or the alleged $50,000 payment.  (12/9/14 Tr. at 97:21–23; 8/28/14 Silverstein Aff'd, ¶ 181) (M8). Even if Mr. Silverstein had had some reason to know about, or investigate, the Cunningham Release during the Delaware Litigation, it would have been futile and arguably unethical for Mr. Silverstein (or any other attorney representing Jay, Scott or Steve) to interview Taback or other Proskauer Rose attorneys, since Proskauer and Taback were aligned with the New York Investors suing Mr. Silverstein's clients. 12/9/14 Tr. at 96:23–97:23; *see also* 8/28/14 Silverstein Aff'd, ¶¶ 180-183 (M8).

Nonetheless, various efforts were made (both before and following the December 2012

Trial) to determine the veracity of Jay's story as part of the general due diligence regarding the

find.  Among other things:  (1) Mr. Sullivan "personally verified and checked out that the notary

that signed the Cunningham agreement . . . was a real notary"  (11/20/14 Tr. at 239:14–19); (2)

Siracusa "was satisfied that she was a real notary"  (*Id.* at 239:20); (3) Mr. Silverstein "was

aware of efforts being made by Paul Sullivan to find Mike Cunningham"  (12/9/14 Tr. at 103:2–

3); (4) Siracusa "personally tried to find Mike Cunningham before the trial" and found a Mike

Cunningham from Jay's home town that appeared to be the right age  (11/20/14 Tr. at 239:20–

240:8; (5) Siracusa interviewed Jay for "many hours" and "asked him a lot of questions" about

the map and the payment to Cunningham (*id.* at 243:6–12); (6) Mr. Silverstein "physically

received a copy of the agreement between Jay Miscovich and Mike Cunningham in November of

2011" and provided a redacted copy to CBS News (12/9/14 Tr. at 94:12–14); and (7) Horan

"spoke with Jay about the Cunningham Release no later than late 201[1]" and it was Mr.

Silverstein's understanding that "Horan either (i) was . . . satisfied with the veracity of Jay's

accounting of the history of the Cunningham Release, or (ii) determined that the Cunningham

Release was immaterial to the Admiralty Action – or both."[25]  (8/28/14 Silverstein Aff'd, ¶ 183)

(M8).  Indeed, as Motivation's counsel acknowledged in his opening statements at the Sanctions

Trial, Janssen and Siracusa were "doing due diligence."  (11/19/14 Tr. at 10:17–25).  It is

uncontroverted that Mr. Silverstein was well aware of and, in fact, expressly encouraged the due

---

[25] Significantly, Horan, the counsel of record with the duty to this Court to investigate, was satisfied with the veracity of the Cunningham Release because he continued to serve as JTR's Record Counsel for nearly a year after the Cunningham Release came to light in the Fall of 2011. It is thus untenable for Motivation to argue that Horan was blameless in continuing to represent JTR before the Court for nearly a year after the Cunningham Release came to light, while at same time arguing that the mere fact that Mr. Silverstein knew of the Cunningham Release meant he had acted in bad faith and committed a fraud on the Court.

diligence being performed by Janssen and Siracusa.  (*See, e.g.,* Silverstein email to Janssen, Siracusa, and others (11/23/12, 7:33) (M2-53) ("Thanks for continuing to press this…. Please keep us all informed and let us know if you hit a roadblock.")).

Janssen and Siracusa also requested that Jay provide evidence supporting his assertion that he had paid $50,000 to Mike Cunningham in exchange for the "Cunningham Release." (12/15/14 Tr. at 34:11–17; *see also* emails exchanged between Jay and Janssen (11/23/12)) (M2-53).  Specifically, on November 23, 2012, Janssen and Jay exchanged a series of emails about statements from the bank that Jay stated he had withdrawn the funds used to pay Cunningham. (M2-53).  Janssen stated "[w]e need the checks, but we really need the identification of the withdrawals that add up to $50k.  A contorted explanation is not going to fly with the Court, and I don't want to get into the issue that you wanted to avoid IRS detection.  Please go through the statement and highlight which withdrawals/checks you made to reach the $50k paid to Cunningham."  (Janssen email to Jay (11/23/12, 6:15)) (M2-53).

Later that same day, Mr. Silverstein wrote to Janssen, Siracusa, Jay, and others:

Thanks for continuing to press this.  I have never explored this issue to the point of having any proof.

Please keep us all informed and let us know if you hit a roadblock . . . . Assuming (arguendo), however, that Jay did make this up, or kept some portion of the funds (which I have no reason to believe to be the case), what difference does it make insofar as the validity of the pleadings in the Admiralty Action are concerned – so long as Jay does not so testify at the trial . . .  ***All of this is a long way of saying that Jay absolutely needs to be 100% truthful in whatever testimony he gives at the coming trial.***  If Jay truly paid Mike $50k, he will need to say so.  If that did not occur, Jay needs to be prepared to explain why he repeatedly has said otherwise in the past.  ***Either way, however, Jay needs to provide truthful testimony.  I always tell my clients that they must always tell the truth.  Once they do that, the rest is up to the judge.  All in all, however, the truth tends to win out.***

(Silverstein email to Janssen, Siracusa, and others (11/23/12, 7:33)) (emphases added) (M2-53).[26]   At the Sanctions Trial, Mr. Silverstein explained what prompted him to advise Janssen and Siracusa that "Jay needs to provide truthful testimony:"

> … I was saying what I thought that Jay needed to be 100 percent truthful in whatever testimony he was going to give.   It didn't matter whether he had documents to show what he was saying had occurred.   ***If it occurred, he needs to testify the way it occurred.   If it didn't occur, he obviously should not, cannot testify to something that didn't occur.   One way or the other, he needed to provide truthful testimony.   That is what I tell every client I have at every step of the way.   You need to be truthful with the Court.***

(12/15/14 Tr. at 35:2–21) (emphasis added).

On November 23, 2012, Mr. Silverstein again emailed Janssen, Siracusa, Jay and others, stating "[o]ne last thought on this subject.   If you do not elicit testimony about a map or payment for a map, then any questions on cross are outside the scope of direct and impermissible." (Silverstein email to Janssen, Siracusa (11/23/12, at 8:32)) (M2-54).   Contrary to the nefarious conclusions Motivation is asking this Court to draw, Mr. Silverstein was not attempting to hide falsehoods from the Court.   Indeed, Mr. Silverstein noted earlier that same day:

> Plainly, Jay has told everyone he knows the story about the treasure map and payment – including me multiple times.   Indeed, Jay was "warned" before making this statement on camera with CBS that he should not do so unless it was true, and Jay insisted on telling his story the way he told it.   ***Although I have no first-hand***

---

[26] Not only did Mr. Silverstein encourage Janssen and Siracusa to press the issue with Jay, he also encouraged Holloway to share any proof of fraud with him.   Specifically, upon learning that Holloway was investigating the Cunningham Release, Mr. Silverstein wrote, "You obviously have the right to conduct any legitimate investigation you wish.   And, if you were to uncover proof of a fraud, I would hope that you would share it with me.   As I have told you, I am as interested as you are in learning the truth.   So far, I am unaware of any proof of a fraud.   If I were to learn of information that proves that there was a fraud, I would come forward with that information."   (Silverstein email to Holloway (1/14/13, 2:12)) (M2-28).   Holloway never did share any of the information he was gathering – because, by then, he was working with Motivation in a bad faith effort to reach into Mr. Silverstein's "deep pockets" and to help Holloway's other clients (the New York Investors) develop a multi-million RICO claim against Mr. Silverstein, YCST and Mr. Sullivan – which Holloway believed would be benefitted by his helping Motivation obtain sanctions.

> ***knowledge on the subject, I tend to believe Jay has been truthful – especially since Jay would need to be very stupid or crazy to stick with this story after being given every opportunity to avoid doing so, and I do not believe Jay is stupid or crazy***…

(Silverstein email to Janssen, Siracusa, and others (11/23/12, 7:33)) (emphasis added) (M2-53).

Thus, Mr. Silverstein believed Jay was telling the truth about the Cunningham Release, but "understood that Mr. Janssen and Mr. Siracusa were concerned that they didn't have enough proof to present [the map story and the payment] in court."   (12/9/14 Tr. at 163:2–6).   Mr. Silverstein's email to Janssen and Siracusa regarding Jay's testimony (*see* Silverstein email to Janssen, Siracusa (11/23/12, 8:32)) (M2-54) was intended only to provide his "thought as to how they could avoid dealing with an issue that they were not comfortable dealing with."   (*Id.* at 162:13–163:1).

In the final analysis, while there were inconsistencies concerning the $50,000 payment to Cunningham, these seemed inconsequential when considering both the vast evidence supporting the genuineness of Jay's find and the apparent irrelevance of the debris map and the Cunningham Release to the emerald find.   Even when Janssen and Siracusa subsequently discussed withdrawing as counsel, they repeatedly emphasized to Mr. Silverstein that "they continued to believe that there was, in fact, emeralds in the Gulf of Mexico that had gotten there, not from Jay but from some other way, that had been submerged for many years . . . ."   (12/8/14 Tr. at 24:15–20).   As Siracusa wrote to Jay, "we all agree that we just don't know whether you and Steve actually found the stones at the site. ***There is certainly sufficient evidence that you did and the stones were submerged for some time.***") (Siracusa email to Jay (10/16/13, 4:35) (emphasis added) (M2-32).   Mr. Silverstein also developed some concerns about the Cunningham Release,

but, again, it had nothing to do "with the genuineness of the discovery.  They were two separate issues."  (12/10/14 Tr. at 35:1–13).[27]

### 16. December 2012:  Trial Concerning Title to the *Res*

The Admiralty trial began on December 3, 2012.  The trial lasted five days in total and was concluded on December 21, 2012.  Mr. Silverstein was among the witnesses who testified at trial.  Other than the time Mr. Silverstein testified as a fact witness at that trial, he was required to be sequestered from the courtroom because he was neither a party to the Admiralty Action nor counsel of record to any party.

On January 25, 2013, the Court declined to provide a salvage award to JTR, finding that "[h]aving forfeited their rights to salvage and failing to prove the elements of the law of salvage or finds, [JTR] has failed to convince the Court that a salvage award or the awarding of title to the *res* is appropriate."  (D.E. 199 at 22).  In its Opinion and Final Order, the Court stated:

> When all is said and done, there are two options:  Jay and Steve legitimately found lost stones on the floor of the Gulf, or Jay and Steve placed stones acquired elsewhere on the ocean floor in order to 'find' them and thereby establish an ancient provenance and greatly enhance the value of the stones and the reputation of the men as treasure salvors.  There is just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them.

(*Id.*).

Previously, on December 28, 2012, after learning from Janssen and Siracusa that they had concerns that Jay and/or Steve may have made untrue statements during the course of their testimony at the December 2012 Trial, Mr. Silverstein had urged Janssen and Siracusa that, if Jay or Steve had in fact made untrue statements in their testimony, "***you have an obligation to***

---

[27] As discussed further below, it was not until Motivation's extensive post-trial discovery efforts following the December 2012 Trial that information putting the Cunningham Release into serious doubt was exposed.  Discovering that information took Motivation several months of focused investigation, aided by judicial process, private investigators, putative experts, and assistance from the New York Investors to develop the supposed evidence that Motivation claims establishes Jay lied about the Cunningham Release.

***correct the record if you know to a reasonable certainty that Jay or Steve purposefully made***

***an untrue statement about a material fact when testifying***."  (8/28/14 Silverstein Aff'd, ¶ 165)

(M8) (quoting Silverstein email (12/28/12, 1:27) (emphasis in 8/28/14 Silverstein Aff'd))).  For

his part, Mr. Silverstein did not know what Jay (or any other witness) had testified, because Mr.

Silverstein had been sequestered during the trial, and a transcript of the trial had not yet been

prepared.[28]

At that time, however, neither Mr. Silverstein, nor JTR's Record Counsel, nor even

Motivation's own counsel knew whether Jay had in fact planted the stones.  To the contrary,

Holloway—then counsel for the New York Investors—had confided in Mr. Silverstein that his

clients had charged him with determining whether Jay and Steve had committed a fraud.

(12/6/13 Silverstein Aff'd, ¶ 49 (M7)).  In that regard, Holloway also told Mr. Silverstein two

things during and immediately following the December 2012 Trial—namely that (i) Holloway

was unconvinced as he watched the trial unfold, and at the end of the trial, that Jay or Steve had

committed any fraud, and (ii) Motivation had no business being involved in the case.  (*Id.*).

### 17.   January–December 2013:  Motivation's Extensive Discovery in Pursuit of "Deep Pockets" Following the December 2012 Trial

After the Court declined to award JTR title to the *res*, Motivation embarked on a nearly

year-long discovery expedition in furtherance of its original sanctions motion.  Motivation would

have this Court ignore the fact that its current argument is based largely on information that

neither Mr. Silverstein nor JTR's Record Counsel (nor Mr. Sullivan, Davis or Livingston) knew

while JTR's claim was pending before the Court, and which came to light only after extensive

discovery efforts by Motivation, specifically targeted to get at Mr. Silverstein's and others'

---

[28] Mr. Silverstein did not learn of the details of Jay's trial testimony until he received a trial
transcript sometime following the conclusion of the trial.  (8/28/14 Silverstein Aff'd, ¶ 165 (M8).

perceived deep pockets.  As Holloway candidly represented to the Court during his argument on Respondents' motions for involuntary dismissal, Tobia's testimony during his **October 30, 2013** deposition was "the ***first inkling***" that Jay had in fact purchased the emeralds he claimed to have discovered.  (11/21/14 Tr. at 455:8–9) (emphasis added))

    a.      **January 25–July 8, 2013:  Motivation Seeks Two Extensions of its Discovery Period to Try to Reach "Deep Pockets"**

Although Motivation believed it had ample evidence of Jay Miscovich's fraud in early 2013, Motivation had no evidence that Mr. Silverstein was complicit in or knew of Jay's fraud – which was what was desperately needed by Motivation (and the New York Investors) to achieve their actual goal of reaching into Mr. Silverstein's perceived "deep pockets."  As Holloway wrote to Motivation's counsel on April 17, 2013: "We have ample evidence that Jay has committed fraud and perjury, but **I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud** . . . . "  (Holloway email to White (4/17/13, 12:10) (emphasis added) (YCST 190); *see also* 8/28/14 Silverstein Aff'd, ¶ 127 (M8)) (quoting Holloway email to White and Lewis noting that neither Horan nor Mr. Silverstein were aware of any fraud.)  Similarly, on April 20, 2013, Lewis wrote to Holloway and others: "**Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket!**  Without that Buster and I are out of here . . . .").  (Lewis email to Holloway (4/20/13) (emphasis added) (YCST 191).

Accordingly, at a hearing on April 22, 2013, two days after Lewis candidly reiterated Motivation's "mission," Motivation moved to extend discovery for a second time[29] at a

---

[29] On January 25, 2013, the Court originally set the sanctions trial to commence on March 18, 2013 (D.E. 200).  On February 8, 2013, Motivation moved to continue the trial date, arguing that it had managed to locate Michael Cunningham and Stacy Wolf and needed more time to develop the recently-acquired information (D.E. 203).  According to Motivation, it would "continue to diligently prepare for trial as early as April 22, 2013, should the court grant [its] motion."  (*Id.* at

hearing—while still concealing its true objectives from the Court. (*See, e.g.*, 12/16/14 Tr. at 45:6–8 (Lewis testimony referring to YCST 191, "[i]t is a document that I authored at the time I was General Counsel of Motivation two days before the hearing before Judge King on the 22[nd] [of April 2013].").  The Court granted Motivation's request, *see* D.E. 230, extending discovery, again, to July 8, 2013.  Having been granted a further extension of the discovery deadline, Motivation continued its quest to develop some means to reach into Mr. Silverstein's and others' perceived "deep pockets."

### b.    July 22, 2013:  Motivation Seeks to Reopen Discovery

On July 22, 2013—two weeks after the discovery period had ended—Motivation filed a motion requesting that the Court reopen discovery.  (D.E. 253).  On August 19, 2013, Judge Moore rescheduled the sanctions trial to January 13, 2014, and reopened discovery until November 4, 2013. (D.E. 267).   Motivation attempted to make full use of this year-long discovery period.  On several occasions Motivation engaged private investigators to track down leads.  It even retained putative experts in hand-writing analysis and forensic ink dating.  (*See, e.g.*, D.E. 255).   Motivation issued numerous subpoenas and requests for production and numerous subpoenas and filed numerous motions to compel.  (*See* D.E. 222, 224, 228, 259). Further, Motivation conducted all ten of its allotted depositions, nearly all of which were taken more than five months after the December 2012 Trial.[30]

---

2).  On February 15, 2013, the Court granted Motivation the relief it requested and continued the sanctions trial until July 29, 2013 and set the discovery deadline for May 31, 2013 (D.E. 208).

[30] Specifically, Motivation conducted the following depositions: (1) Stacy Wolf (notary for the Cunningham Release) on February 28, 2013; (2) Cary Borza (Eagle's Club Manager) on May 2, 2013; (3) Alan Roth (Stacy Wolf's former employer) on May 2, 2013; (4) Ivan Taback (New York lawyer from Proskauer Rose) on May 15, 2013; (5) Michael C. Cunningham (Jay's former employee) on June 7, 2013; (6) Steve Elchlepp on June 20, 2013; (7) Marcella Patino (Steve's girlfriend) on July 3, 2013; (8) David Horan on October 2, 2013; (9) Anthony Santelli (investor in Emerald Reef) on October 7, 2013; and (10) Peter Tobia (JTR member), on October 30, 2013.

During this time that Motivation was conducting discovery following the December 2012 Trial, Siracusa had "stopped consulting regularly" with Mr. Silverstein, *see* 11/20/14 Tr. 274:5–8, and Mr. Silverstein had become less involved in the matter given that the Court had rejected JTR's claim for title.  (12/10/14 Tr. at 44:4–12).   Moreover, Mr. Silverstein was not present for any of these depositions and thus could not probe the deponents or assess their credibility for himself.  (*See, e.g.*, 12/10/14 Tr. at 38:12–18; *id.* at 39:22–25; *see also* 8/28/14 Silverstein Aff'd, ¶ 170 (M8)).   Mr. Silverstein never even saw the full copies of the transcripts of these depositions.  (*See, e.g.,* 12/10/14 Tr. at 39:14–18 ("You know, I don't think I've ever seen these documents that you put before me, 37 and 38.  I think I have seen redacted -- partial versions of these that were filed with the court at some point in time, but I don't think I've ever seen these entire transcripts."); *see also id.* at 41:7–11).  Indeed, not even Janssen and Siracusa had a copy of these transcripts.  (*See id.* at 40:12–15).   Thus, Mr. Silverstein only ever received "partial transcripts . . . many, many months after the depositions occurred" when Motivation filed its self-serving deposition excerpts on docket.  (12/10/14 Tr. at 75:14–22).

Even then, Mr. Silverstein did not review these self-serving excerpts carefully.  (*See id.* at 40:19–20; 8/28/14 Silverstein Aff'd, ¶170 (M8)).   Moreover, as Mr. Silverstein testified, even after Motivation filed deposition excerpts on the docket, he accorded "very little value" to them because he believed that they did not provide a fair representation of the deponents' testimony and had been coerced from the deponents:

> I don't know what Mr. Tobia testified to throughout the course of this -- at least 158-page deposition because I was only given a very few pages of it, and it wasn't valuable to me to read portions of testimony because I didn't know what else he said.  So I didn't know what he testified to.
>
> If I read this, I knew what he said in particular answers to questions; but I don't know what follow-up, if any, he had, I don't know what other answers he gave that clarified that.  So this was of very little value to me.

(12/10/14 Tr. at 76:7–15).  As Mr. Silverstein explained, he "couldn't even make heads or tails of [the excerpts] for the most part" given their incompleteness, and he thus "gave them no credibility."  (*Id.* at 81:17–18).   Further, Mr. Silverstein understood that, prior to these depositions, Motivation had been "threatening people with criminal prosecution if they didn't cooperate" and "promising people financial benefit and reward if they did."  (*Id.* at 81:9–13).  Thus, when he received the deposition excerpts—long after JTR's case was done and many months after the depositions themselves, which he had not attended—Mr. Silverstein, to the extent the excerpts were even comprehensible, gave them little to no time and attention.

Even assuming (*arguendo*), that Tobia's October 30, 2013 deposition testimony was not influenced by Motivation's threats of criminal prosecution, his testimony concerning Jay's purchase of emeralds in no way establishes that Mr. Silverstein had any prior knowledge that the discovery was a fraud.  To the contrary, as Holloway later candidly represented to the Court during his argument on Respondents' motions for involuntary dismissal, Tobia's deposition testimony (which was taken nearly 11 months after the December 2012 trial) was "the ***first inkling***" that Jay had purchased the emeralds he claimed to have discovered.  (11/21/14 Tr. at 455:8–9) (emphasis added).

### c.   October 23, 2013:  Motivation Seeks a Fourth Extension of Discovery Period

On October 23, 2013, twelve days before its thrice-extended discovery period was set to expire, Motivation filed a motion seeking (1) to further extend the discovery period to December

30, 2013, and (2) to take another ten depositions beyond the ten depositions provided for under the Federal Rules of Civil Procedure.  (D.E. 292).[31]

Even after running out of "authorized depositions," on November 7, 2013, just nine days after Jay's apparent suicide, Motivation obtained a statement from Lisa Martarano, Jay's long-time assistant and bookkeeper, recounting allegedly suspicious behavior by Jay, which she had not provided to JTR's Record Counsel.[32]   Mr. Silverstein discussed the statement with Janssen and Siracusa, who told Mr. Silverstein that Motivation "had been threatening Ms. Martorano with criminal prosecution if she didn't cooperate with [Motivation], and that they didn't know even what her full statement was because they only had excerpts."  (12/10/14 Tr. at 93:8–15). Because Mr. Silverstein was told that Martorano gave the statement only after "being threatened by [Motivation] and offered rewards for her cooperation," he did not give the statement any credence.  (*Id.* at 92:10–13).

All told, for approximately eleven months following the December 2012 Trial, Motivation was able to conduct discovery in furtherance of its quest to reach into Mr. Silverstein's perceived "deep pockets"; whereas Mr. Silverstein, as a non-party to this matter, had no ability to conduct discovery, contest any of Motivation's "evidence," or examine any witness deposed by Motivation.

---

[31] On November 21, 2013, Magistrate Judge Torres denied (D.E. 317) Motivation's request for additional depositions.  And on November 22, 2013, Judge Moore denied Motivation's request to extend discovery for a fourth time.  (D.E. 318).

[32] Motivation cited the self-serving parts of the statement in its Omnibus Reply to Responses of JTR Enterprises, LLC, Young Conaway Stargatt & Taylor, Bruce Silverstein, John Siracusa, and David Horan's to Motivation's Motion to Compel (D.E. 310), but refused to produce the entire statement to JTR's Record Counsel until JTR filed a motion to compel (D.E. 312).

**18.**     <u>January 13–15, 2014: January 2014 Sanctions Hearing Before Judge Moore</u>

On January 13-15, 2014, the Court held a three-day trial on Motivation's then pending Original Sanctions Motion. At the January 2014 Sanctions Hearing, the Court heard from seventeen witnesses, including Mr. Sullivan, Karina Maska, and Jorge Rodriguez. In the evening following the first day of trial on January 13, 2014, attorneys at J&S were informed by Rodriguez's lawyer that if Rodriguez was compelled to testify at the hearing, he would testify that Jay had purchased emeralds from him. (11/20/14 Tr. at 263:2–18). That was the first time that J&S learned of this and Rodriguez's new story was contrary to prior discussions he had with members of J&S staff. (*Id.* at 262:15–20). Indeed, Rodriguez previously had informed Ms. Maska (a paralegal at J&S) that Jay had only purchased two emerald rings from JR Emeralds. (*Id.*). In fact, Siracusa testified that he had "personally spoke to [Rodriguez's] lawyer prior to the sanctions hearing and…was assured that Jay Miscovich had only purchased two emerald rings from his shop." (*Id.* at 262:21–25).

Later that same night, the J&S attorneys had a call with Mr. Silverstein about the disturbing story concerning Jay's purchase of emeralds from JR Emeralds. (12/4/14 Tr. at 100:22–101:8; 102:4–19; 103:23–104:9). The moment Mr. Silverstein learned of this information, he urged that Janssen and Siracusa bring the information to the Court's attention (even though it was unlikely that Motivation would do so because it did not know the new information). (*Id.* at 107:18–108:2; 109:2–16). Later that night, Mr. Silverstein sent an email to J&S summarizing their conversation:

> Joe John & Christy:
>
> I am writing to summarize what I understand from our call of a couple hours ago.
>
> Sometime over the past few months, Motivation claimed, for the first time, that they had identified a store at which they claim that Jay purchased a large quantity of "junk emeralds" in early 2010. Based on your own investigation of

Motivation's claim, you confirmed that Jay had purchased two rings from the jewelry store, and had not purchase a large quantity of junk emeralds. You even addressed this in a filing with the Court in the past couple months.

More recently, you arranged for the jewelry store owner to testify at the Sanctions Hearing, and you put the person on your witness list.

Today, you were told, for the first time, that the jewelry store owner intends to testify that he did sell Jay a large quantity of junk emeralds, and not two rings. You also now understand that the jewelry store owner recently was interviewed by someone claiming to be an FBI agent, but who you believe to be Joe Sweeney.

Based on the foregoing, you still intend to call the jewelry store owner as a witness and see what story he tells when he testifies under oath. If he testifies differently than he previously told you (i.e., Jay bought two rings and not a large quantity of emeralds), you intend to cross examine him, and also call Karina (and possibly yourselves) as witnesses to the prior story. You also intend to ask about Joe Sweeney. If, for any reason, the jewelry store owner does not appear at the hearing, you intend to inform Judge Moore (in open court) what you were told today and how it is inconsistent with what you previously were told.

I believe the your [sic] intended approach to this last-minute surprise makes perfect sense, and I wish you luck with it.

(Silverstein email to Janssen, Siracusa, and Lazarchick (1/14/14) (SILVERSTEIN 003); 12/4/14

Tr. at 109:17–20)).

On January 15, 2014, Siracusa called Rodriguez to the stand and he testified that between March and September 2010 Jay made four separate $20,000 purchases of uncut emeralds from JR Emeralds located in Jupiter, Florida. Rodriguez also testified that he had no receipts or other records of those sales. Based in part upon Rodriguez's testimony, Judge Moore concluded that Jay had committed a fraud on the Court – a conclusion with which Siracusa openly concurred.

Thus, from the end of the December 2012 Trial, Motivation had nearly an entire year to conduct discovery for the January 2014 Sanctions Hearing—in addition to the five months of discovery it had already conducted in preparation for the December 2012 Trial. As discussed in detail in the Response (D.E. 459) at 5-6, however, even after all of Motivation's discovery, ultimately it was JTR (and not Motivation) that presented the Court with the testimony upon

which the Court concluded that Jay had committed a fraud on the Court.  As Judge Moore wrote,

it was only *after* Jorge Rodriguez testified on the last day of the January 2014 Trial that "the

Court knew that the allegations contained in the Complaint were not true."  (D.E. 445, ¶ 69).

19.   **June 19, 2014:  Sanctions Against Jay and Limited Sanctions Against JTR**
      **Pertaining Only to Short Period Between December 2011 and April 2012**

On June 19, 2014, Judge Moore entered the Court's *Findings of Fact and Conclusions of*

*Law*, concluding that Jay Miscovich committed a fraud on the Court from the day the Admiralty

Action was commenced through the day of Jay's death, and that sanctions were warranted

against Jay for his actions.  (D.E. 445).  Among other things, the Court found that Jay "was

clearly the mastermind behind this whole scheme . . . [Jay] managed to successfully convince his

investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the

general public, and many others, including investigative reporters from CBS' <u>60 Minutes</u>, that he

had discovered and recovered this treasure from the seafloor in early 2010."  (*Id.*, ¶¶ 66-67).

### The 16 Week Window

By contrast, Judge Moore rejected Motivation's assertions that JTR engaged in bad faith

and vexatious litigation, and declined to sanction JTR for anything other than failing to disclose

the findings of the French and Swiss Labs between December 2, 2011 and April 18, 2012.  (*Id.*,

¶¶ 61-65).  Specifically, Judge Moore summarized Motivation's contentions with respect to JTR:

> Motivation contends that it is entitled to sanctions against JTR because this action
> was litigated "at all costs," even after a reasonable person would have known that
> the case was based on a fraud.  Motivation's Proposed Findings of Fact and
> Conclusions of Law, at 39 (D.E. 387).  Motivation further contends that the
> underlying litigation could have been concluded in December 2011 if JTR had
> revealed expert reports that indicated that the Emeralds were coated with a
> modern epoxy, which would exclude the Emeralds coming from either the Atocha
> or the Margarita. Motivation's Proposed Findings of Fact and Conclusions of
> Law, at 39-40.  Finally, Motivation claims that, had JTR allowed Motivation to
> view the Emeralds immediately, Motivation would have quickly concluded, as it
> did when it finally viewed the Emeralds in August 2012, that the Emeralds did not
> come from its ships and it would have withdrawn its claim.

(*Id.*, ¶ 5).  Judge Moore rejected each of the foregoing contentions, and declined to sanction JTR

for anything beyond "Motivation's attorneys' fees and costs, for the period of time from

December 2, 2011 to April 18, 2012."  (*Id.,* ¶ 61).  As Judge Moore explained:

> While Motivation entered the case in October 2011, the Court does not find that
> sanctions as of this date would be appropriate against JTR.  While Motivation
> claims that it would have quickly exited the case, had they been allowed to
> inspect the Emeralds, there was a lot of distrust between JTR and Motivation . . .
> The Court thus finds that the sanctionable conduct began when JTR withheld
> information from the Court, not when Motivation made the decision to enter the
> case.  According to the testimony presented at the hearing, JTR did not learn
> about the epoxy until December 2011.

(*Id.*, ¶ 62 n.16).  Judge Moore determined that April 18, 2012 was an appropriate cut-off date for

sanctions against JTR, reasoning that, after JTR disclosed the epoxy information on April 18,

2012, "JTR, the Court, and Motivation were working from the same set of facts.  ***Thus, when***

***Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to***

***stay in the case.***"  (*Id.*, ¶ 64) (emphasis added).

On June 23, 2014, Motivation filed a motion for reconsideration of Judge Moore's

narrowly tailored sanctions decision respecting JTR, contending, among other things, that the

Court's "ruling that JTR did not engage in any sanctionable conduct until it failed to disclose

poxy findings in December 2011" is internally inconsistent with its finding that the Admiralty

Action is premised on a fraud masterminded by Jay.  (D.E. 448 at 1-2).  Motivation also argued:

> The people who animated JTR, Silverstein, his firm, and Sullivan will now likely
> claim that it is "law of the case" that JTR's fraud was not a sanctionable conduct,
> and therefore their direction of the fraud through JTR is not sanctionable conduct.
> The Court should therefore, at a minimum, recast its decision not to sanction JTR
> for its fraud as an exercise of judicial discretion rather than a finding that JTR's
> fraud was not sanctionable.

(*Id.* at 2). Because it no longer had counsel of record in the Admiralty Action, JTR filed no

response to Motivation's Motion for Reconsideration.  Even without any opposition from JTR,

however, Judge Moore denied Motivation's Motion for Reconsideration, *sua sponte*, concluding that the motion was not well founded.  (D.E. 450 at 3).[33]

*      *      *

Based on the foregoing, the facts do not establish—let alone establish by clear and convincing evidence—that Mr. Silverstein ever knew of Jay Miscovich's fraud or that Mr. Silverstein ever acted to avoid gaining knowledge of facts that may have revealed the fraud. Indeed, despite the fact that Motivation has had unfettered access to years' worth of contemporaneous communications between and among JTR's advisors—which were privileged when made and thus bear a particular hallmark of reliability—Motivation does not, and cannot, provide any testimony or identify a single document demonstrating that Mr. Silverstein knew of Jay's fraud or acted to avoid gaining knowledge of the fraud.

Instead, Motivation, with the clarity of hindsight, cherry-picks isolated incidents, rolls them up together, and claims they were "red flags" that, taken together, should have caused Mr. Silverstein to deduce what Jay's "investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes" did not.  Most of these "red flags," however, either occurred outside Mr. Silverstein's presence, such that he could not assess their credibility for himself, or came to light long after JTR's claim to the *res* had failed, such that Mr. Silverstein gave them little time or

---

[33] In any event, even if it were assumed (*arguendo*) that there were some basis for sanctioning Mr. Silverstein for JTR's conduct in the Admiralty Action, any sanctions actually imposed on him would need to be limited to the same four month time period for which JTR has been sanctioned.  (D.E. 445).  Moreover, Motivation does not, and cannot, point to any harm it suffered between December 2, 2011, and April 18, 2012.  As Judge Moore explained, after JTR disclosed the results of its investigations on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts.  ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***"  (D.E. 445, ¶ 65) (emphasis added).

attention.  Hindsight analysis such as this contradicts well-settled law.  Contrary to Motivation's position, these supposed "red flags" cannot be taken out of the context of when they occurred, what else was occurring at the time, and what else Mr. Silverstein knew, or thought he knew, when those events were occurring.

Indeed, from the first moment that Silverstein was approached about representing Jay and his associates, the story that was presented to Silverstein had numerous hallmarks of credibility—from reputable attorneys and esteemed law firms, from sophisticated investors, from the Smithsonian itself.  And throughout the Admiralty Action, numerous facts corroborating Jay's story came to light—including, for example, the fact that experienced, independent third parties dove the site and verified its genuineness.  To be sure, issues arose throughout the course of the Admiralty Action that were cause for further inquiry, as happens in every case.  When they did, Mr. Silverstein's immediate and consistent reaction, as shown by the testimony elicited during the Sanctions Trial and numerous contemporaneous documents, was to advocate for searching for the truth and investigating further.  And whenever questions arose, Jay welcomed and encouraged Mr. Silverstein's attempts to get to the bottom of the issue.  All of these facts, and others supporting Jay's story, are wholly disregarded by Motivation in its self-described "mission" to get at Mr. Silverstein's deep pockets.

Moreover, it is indisputable (and Motivation has not alleged, let alone proven, otherwise) that all of the allegedly suspicious information that Motivation identifies in an attempt to suggest that Mr. Silverstein should have concluded Jay was perpetrating a fraud was known in equal measure by JTR's Record Counsel and other outside advisors—all of whom "continued to aid" JTR despite knowing that same information.  It is therefore untenable for Motivation to argue

that Mr. Silverstein should have concluded what JTR's Record Counsel and other outside advisors, equally well informed, did not.

In the final analysis, the evidence proves that Mr. Silverstein never knew, and never acted to avoid knowing, of Jay Miscovich's fraud.  The evidence further proves that Mr. Silverstein was a dedicated attorney that zealously and ethically represented his clients' interests at all times throughout his involvement in this matter.  Accordingly, the Amended Sanctions Motion must be denied.

### C.  MR. SILVERSTEIN DID NOT ENGAGE IN SANCTIONABLE CONDUCT

In any event, in addition to the facts that Mr. Silverstein never knew, and never acted to avoid knowing, of Jay Miscovich's fraud, there is simply no factual basis upon which to find that Mr. Silverstein engaged in sanctionable conduct – under the governing "clear and convincing" standard or otherwise.

#### 1.        Mr. Silverstein Did Not Exercise Control Over the Litigation

Contrary to Motivation's unsupported and conclusory allegations, the uncontroverted (and incontrovertible) truth is that Mr. Silverstein did not control the litigation and he did not have the ability to cause any filings to be made in the Admiralty Action that did not have the support of Record Counsel.  (*See, e.g.,* 10/9/12 Silverstein Aff'd, ¶ 29) (M3).[34]  Horan was Record Counsel from the time JTR commenced the Admiralty Action in September 2011 until he withdrew in October 2012.  As Horan testified, the "ultimate final decisions" rested with him, *see* 10/9/12 Silverstein Aff'd, ¶ 8) (M3), and Horan ultimately bore professional responsibility for filings he made on behalf of JTR, including the status reports.  (*See, e.g.,* 11/19/14 Tr. at

---

[34] Motivation, however, did not move sanctions against Horan and was willing to stipulate that J&S "were innocent of the fraudulent and bad faith litigation," *see* M2-37, ¶ 12, even though it is Record Counsel who had the legal (and ethical) responsibility for all filings they made on JTR's behalf in the Admiralty Action.

132:5–7).  Similarly, Siracusa testified that he "made the ultimate decisions as counsel of record" regardless of whether Mr. Silverstein agreed with that decision.  (11/20/14 Tr. at 290:11–14).  Siracusa further testified that he "did what I wanted to do" at points in the case in which he and Mr. Silverstein disagreed on how to proceed.  (*Id.* at 273:16–20).

While Mr. Silverstein often offered his views to Record Counsel, and participated in open and honest debate regarding the litigation, others bore both the authority and responsibility of determining the course of the Admiralty Action.  Both Record Counsel and Mr. Silverstein were clearly aware of this fact.  Examples of Mr. Silverstein's acknowledgements that Record Counsel had ultimate responsibility for the Admiralty Action follow:

- On August 11, 2011, Mr. Silverstein emailed that, in light of certain reports of a plot orchestrated by or on behalf of The Kirby Group, "I am reluctant to endorse taking legal action (such as filing an Admiralty claim) based on the assumption it is true.  **In the end, however, I believe that Jay should be guided by Horan on this issue."** (Silverstein email (8/11/11, 10:44)) (emphasis added) (M28).

- Additionally, on October 27, 2011, Mr. Silverstein emailed his thoughts on Horan's proposed stipulation with the New York Investors:  "Here are my proposed edits (in track change format).  **Obviously, I defer to David on the ultimate language** . . . ." (Silverstein email to Horan, Jay, Steve, Scott, Sullivan, Livingston, Davis (10/27/11, 4:55)) (emphasis added) (SILVERSTEIN 012).

- On November 10, 2011, Mr. Silverstein responded to Jay's email about transporting the emeralds from New York to Key West, encouraging Jay to consult with Horan, as Jay's attorney of record in the Admiralty Action:  "Jay:  **You need to raise your concerns with David**.  I have been encouraging the two of you to discuss this for the past two weeks, but you both seem to be ignoring my encouragement.  **David is your lawyer in the admiralty action.  You are paying him well.  Make him answer your questions**."  (Silverstein email to Jay, Scott, Sullivan, Davis, Livingston, Steve (11/10/11, 6:48)) (emphasis added) (SILVERSTEIN 014).

- On March 26, 2012, Mr. Silverstein emailed Horan, Siracusa, and others to express his views on the timing of the filing of the Third Status Report:  **"Inasmuch as I am not an attorney of record in the admiralty proceeding, however, I leave it to the two of you (and your partners and associates) to advise JTR on this subject."** (Silverstein email to Horan, Siracusa, Davis, Livingston, and others (3/26/12, 3:29)) (emphasis added) (YCST 093).

- On October 1, 2012, Mr. Silverstein emailed Janssen regarding discovery strategy and Motivation's request for documents: **"In the end, ok, you are Jay's counsel of record, and I can only weigh in with my views. The ultimate decision, of course, if for you and Jay to make."** (Silverstein email to Janssen (10/1/12, 1:39)) (emphasis added) (M1-33).

Further, Record Counsel sometimes rejected Mr. Silverstein's recommendations[35] and made filings or decisions with little or no input from Mr. Silverstein. For example, on August 8, 2012, Mr. Silverstein emailed Siracusa regarding deposition strategy:

> Lastly, there is a lot going on about which I have been unaware, and filings are being made that I have not seen. Perhaps, that is ok, as you all seem to have this under control. If, however, you want my continued input, I need to know what is going on in real time, with an opportunity to comment.

(Silverstein email to Siracusa, Horan, Davis, Livingston, and others (8/8/12, 9:09)) (YCST 127).

In contrast to the testimony of Record Counsel, and the many contemporaneous email exchanges showing that Mr. Silverstein did not control the Admiralty Action, the only putative support Motivation offers in support of its assertion on page 14 of the Amended Sanctions Motion that Mr. Silverstein "caused JTR to file a false status report" is the docket entry for the status report. Of course, the fact that a document was filed does not prove that Mr. Silverstein had any control over its filing. In any event, the Second Status Report was a collaborative effort among numerous persons, and Horan filed the Second Status Report because he concluded it was an appropriate filing to make.

As Horan confirmed at trial: "[T]he second status report complied with [Horan's] ethical obligations as counsel of record . . . the third status report complied with the ethical obligations as counsel of record . . . [and] as of April 2012, the reporting to the [C]ourt with respect to this matter was consistent with the high ethical standards" Horan holds himself to. (11/19/14 Tr. at 136:5–14). It is illogical and disingenuous for Motivation to argue that the Court should sanction

---

[35] *See, e.g.,* 8/28/14 Silverstein Aff'd, ¶¶ 90, 99-102, 104-105 (M8).

Mr. Silverstein, but not Horan, for the contents of a filing Horan made – especially when Motivation itself contends that Horan did nothing wrong[36] and Judge Moore concluded that Horan did nothing wrong.  (1/15/14 Tr. at 131:24–132:6) (M45).

In the final analysis, Mr. Silverstein's involvement throughout the course of the litigation was limited to participation in open and honest debate with JTR, its Record Counsel, its other outside advisors, and others, who were all working from the same facts.  When individuals raised concerns about Jay's credibility or the conclusions that could or should be drawn from the facts on hand, Mr. Silverstein did not hide from these concerns, but rather tested them, had valid points in rebuttal, and encouraged further investigation by others.[37]  Accordingly, Mr. Silverstein should not be subject to sanctions, especially when, as here, Motivation concedes that Record Counsel did nothing wrong – even though it is those attorneys who had the legal (and ethical) responsibility for all filings they made on JTR's behalf in the Admiralty Action.

### 2.   Mr. Silverstein Did Not Make Any Sanctionable or Illegal Threats

Contrary to Motivation's reckless claims, Mr. Silverstein did not (and did not attempt to) "interfere with the administration of justice" in the Admiralty Action or threaten any witness with litigation for the purpose of discouraging them from testifying in support of Motivation. (Am. Sanctions Mot. at 15).

---

[36] *See, e.g.,* Lewis email to Janssen and Siracusa (12/2/13) (M2-37, ¶ 12) ("Motivation agrees to abandon any claims it may have for sanctions or other causes of action arising from, or connected with, the instant litigation, against . . . David Horan . . . who Motivation believes to be innocent of the fraudulent and bad faith litigation . . . .").

[37] *See, e.g.,* Silverstein email to Horan (cc'ing Davis, Livingston, Sullivan, Scott, Jay, and Steve) (12/08/11) (M1-15); Email exchanges between Horan and Silverstein (cc'ing Davis, Livingston, Sullivan, Scott, Jay and Steve) (12/23/11, 12/27/11-12/28/11) (M1-19; M1-20; M1-21); Email exchanges among Silverstein, Horan, Sullivan, Jay, Scott, and Steve (cc'ing Livingston, Davis, Siracusa, and Janssen) (03/24/12-03/26/12) (M2-09); Email exchanges among Silverstein, Sullivan, Jay, Scott, Steve, Livingston, Davis, Siracusa, Janssen (11/20/12) (SILVERSTEIN 023).

With respect to alleged threats made by Mr. Silverstein to Horan, Motivation attempts to make great weight of an email Mr. Silverstein sent on August 22, 2012 to Janssen, Siracusa, Mr. Sullivan and others on after learning that Horan was thinking about withdrawing as counsel to JTR.  (Silverstein email to J&S, Sullivan and others (8/22/12, 6:06)) (M2-24).  When this email is taken in context, and after considering the testimony of witnesses on the subject, it is clear that Motivation is grasping at straws.  As Silverstein testified, a misunderstanding occurred between Horan and Mr. Silverstein during a meeting in Horan's office, which misunderstanding was immediately resolved and Horan and Mr. Silverstein then had a "cordial lunch."  (*See* 12/9/14 Tr. 147:20–149:14).

With respect to any alleged threats made by Mr. Silverstein to other witnesses, Motivation did not produce any witnesses to testify at the Sanctions Trial on the subject and the Court should ignore this red herring altogether.  Regardless, as set forth in more detail in the 8/28/14 Silverstein Affidavit (M8), Mr. Silverstein did not speak with Ash, Barr, Rose, Baer, Marcial, or Sweeney about the substance of their actual or intended testimony in the Admiralty Action or about whether they would or should testify.  (*See id.*, ¶¶ 231-40 (M 8); *see also* 11/4/13 Silverstein Aff'd, ¶ 52 (M6)).  Indeed, Mr. Silverstein's only discussion of Ash, Barr, and Rose's involvement was through their counsel.  (*See id.* at ¶¶ 232-33, 237).   While Mr. Silverstein indicated to other ***attorneys*** that he believed certain conduct was or would be actionable, these comments, which were made only to other attorneys, were entirely appropriate and in no way constituted witness tampering or intimidation.[38]   After learning that Baer and

---

[38] *See, e.g.*, *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266 (S.D.N.Y. 2001)(recognizing that "threats of litigation do not form the basis of a witness tampering allegation" and concluding that "the litigation which Defendants supposedly threatened to bring" did not support a witness-tampering claim when the litigation would have been brought "on behalf of the very clients whose interests the defendant firms [were] committed to represent");

Marcial were not represented by counsel, Mr. Silverstein simply told each man that he "should consult with an attorney who represents his interests before he testifies."  (8/28/14 Silverstein Aff'd, ¶¶ 235-36 (M8); *see also* 11/4/13 Silverstein Aff'd, ¶¶ 52-53) (M6) (The Court concluded that Motivation's claim was a non-issue and directed Motivation's counsel to "move on.").  Perhaps most striking is Motivation's allegation that Mr. Silverstein threatened Joseph Sweeney, who physically threatened Mr. Silverstein and sent Mr. Silverstein numerous inappropriate emails.  (8/28/14 Silverstein Aff'd, ¶ 238).  In contrast, Mr. Silverstein never spoke with Sweeney or anyone else regarding whether Sweeney would or should testify in the Admiralty Action.  (*Id.*).[39]

In sum, all of Mr. Silverstein's communications with Ash, Barr, Horan, Baer, Marcial, Rose or Sweeney – directly or through their respective counsel – have been entirely within the bounds of the law and applicable ethical rules, and contrary to Motivation's unfounded claims, none of these communications was taken for the purpose of intimidating or harassing anyone, to interfere with the administration of justice, or for any other improper or inappropriate purpose.

### 3.  Mr. Silverstein Was Not JTR's General Counsel

Motivation is incorrect that Mr. Silverstein was JTR's "General Counsel."  (Am. Sanctions Mot. at 4-5).  The General Counsel of an entity is an officer of the entity, appointed by the board of directors (or other governing body) to serve as the entity's chief in-house legal

---

*see also Blackmon v. Iverson*, Civil Action No. 01-CV-6429, 2002 U.S. Dist. LEXIS 18352, at *10–*14 (E.D. Pa. Sept. 26, 2002) ("a threat to sue does not constitute a threat for purposes of" witness tampering and declining to disqualify attorney for telling witness the attorney would be filing suit against him); *Phila. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, Civil Action No. 91-0449, 1992 U.S. Dist. LEXIS 12745, at *19 (E.D. Pa. Aug. 25, 1992) ("In a litigious society such as ours, it is thin-skinned to think that a threatened counter suit . . . is witness intimidation rather than a mere puffing . . . .").

[39] Tellingly, Mr. Sweeney was in the courtroom during most of the Sanctions Trial and yet Motivation did not bother to call him to the stand.

officer,[40] and Mr. Silverstein is not, and never has been, an employee or officer or General Counsel of JTR.  (8/28/14 Silverstein Aff'd, ¶¶ 116-119 (M8); 12/8/14 Tr. at 90:3–6 ("[Y]ou've continuously said that I was doing all these things in my capacity as general outside counsel.  I was doing all these things as an attorney who was working to represent JTR.).

Additionally, during the December 2012 Trial, Motivation invoked the rule of sequestration and Mr. Silverstein, being a fact witness on JTR's behalf, was appropriately sequestered and was not permitted to remain in the courtroom.  If, in fact, Mr. Silverstein had been JTR's General Counsel (which he was not), Mr. Silverstein would have been permitted to be in the courtroom during the December 2012 Trial to assist Record Counsel.  Having successfully asserted to this Court that Mr. Silverstein was nothing more than a fact witness subject to sequestration, Motivation should now be judicially estopped from arguing that Mr. Silverstein was JTR's General Counsel.[41]  In the final analysis, mischaracterizing Mr. Silverstein as JTR's "General Counsel" is nothing more than another litigation tactic by Motivation.

---

[40]  *See*, *e.g.*, *China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash*, 96 Civ. 9553 (PKL), 1999 U.S. Dist. LEXIS 2674, at *19 (S.D.N.Y. March 9, 1999) ("A corporation's general counsel is an 'officer'"); *In re Grievance Proceeding*, No. 3:01GP6 (SRU), 2002 U.S. Dist. LEXIS 18417, at *9 (D. Conn. 2002) ("the general counsel by definition is a corporation lawyer"); *see also* http://www.merriam-webster.com/dictionary/general%20counsel  (Merriam-Webster  On-Line Dictionary defining "general counsel" as "a lawyer at the head of the legal department (as of a corporation or governmental subdivision)").

[41]  *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (noting that the purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" (citations omitted)); *Burnes v. Pemco Aeroplex*, 291 F.3d 1282, 1286 (11th Cir. 2002) (finding that privity and individual prejudice by the opponent of the party against whom the doctrine is applied is not necessary to invoke judicial estoppel because the doctrine is intended to protect the judicial system, not the individual litigants).

**D. SANCTIONS AGAINST MR. SILVERSTEIN ARE NOT WARRANTED UNDER**
   ***HELMAC* BECAUSE HE WAS NOT THE "REAL PARTY IN INTEREST" IN**
   **THE ADMIRALTY ACTION**

Sanctions against Mr. Silverstein are not warranted under *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563 (E.D. Mich. 1993).[42]  *Helmac* held that a non-party may be sanctioned if he is the "real party in interest" in the litigation.[43]  At issue in *Helmac* was whether the court had the inherent authority to sanction a non-party who was the principal shareholder and chief executive officer of the corporate party.  *Id.* at 564.  The court reasoned that the power to sanction extended to the officer of the corporate party because "the individual is as much involved in the litigation as any party would be, and his participation in these events is tantamount to a direct snubbing of the Court's authority by that individual."  *Id.*

By contrast, Mr. Silverstein plainly was not the "real party in interest" in the Admiralty Action.  *First*, Mr. Silverstein did not substantially participate in the proceedings before the Court.  As *Helmac* court explained, its test "excludes an individual who has only a minor degree of involvement with the litigation and **who acts outside the presence of the court.**"  *Helmac*,

---

[42] Significantly, there are no decisions of the U.S. Supreme Court, the Eleventh Circuit, or any other United States Court of Appeals, adopting *Helmac*.  For the reasons set forth in YCST and Silverstein's response in opposition to the Amended Sanctions Motion, Silverstein respectfully submits that *Helmac* was wrongly decided to the extent that it suggests that the Court's "inherent authority" to grant sanctions extends to a non-party that is not counsel of record, a non-person that sought unsuccessfully to intervene in an action, a court reporter, a baliff, or other another court employee.  *See* D.E. 459 at 17–19.

[43] The *Helmac* court explained that its two-pronged substantial-interest and substantial participation test was meant to limit the scope of the court's inherent power to those persons who, while technically non-parties, were in fact the "real parties in interest" behind a party to the proceedings before the court.  *Helmac*, 150 F.R.D at 548; *accord United States v. Henry*, 2013 U.S. Dist. LEXIS 133148, *110 (E.D. Va. Sept. 13, 2013) ("This test is designed to effectively limit the scope of the Court's inherent power to sanction to those individuals who were either (1) parties, (2) subject to a court order, or, (3) real parties in interest." (citation and internal quotation marks omitted)); *In re VIII S. Mich. Assocs.*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (same).

150 F.R.D. at 568 (emphasis added).  For example, in *Desiderio v. Parikh (In re Parikh)*, the court held that inherent-power sanctions were not warranted against a non-party—even though she had participated in fraudulent conveyances—when the non-party's participation in the actual proceedings before the court was limited to testifying in person and via affidavits.  508 B.R. 572, 601–02 (E.D.N.Y. 2014) ("Meena testified, in person and via affidavit, and was the subject of subpoenas.  This alone is insufficient to establish sufficient participation.  Her participation in the fraudulent conveyances outside of these proceedings does not implicate participation within the Court proceedings.  In fact, even if this Court had jurisdiction to sanction Meena, it would not do so because it can point to no conduct by Meena within these proceedings that would subject her to sanctions.").

Here, Mr. Silverstein's participation in the proceedings before the court was limited to testifying at the December 2012 Trial and submitting affidavits.  As in *Desiderio*, such testimony does not amount to substantial participation in the proceedings before the Court.  Mr. Silverstein was not Record Counsel responsible for prosecuting the Admiralty Action—as Horan and Siracusa both testified, they were responsible for the filings and statements made in court.  (*See, e.g.,* 11/20/14 Tr. at 296:10–12; 290:11–14; 11/19/14 Tr. at 132:5–7; 131:7–8).  And while Mr. Silverstein was never shy about speaking up in the open and honest debates among JTR's advisors, JTR's Record Counsel could always—and often did—ignore his input.  (*See, e.g.,* 11/20/14 Tr. at 273:16-20); (Silverstein email to Siracusa, Horan, Davis, Livingston, and others (8/8/12, 9:09)) (YCST 127); Silverstein email to White (10/6/12, 12:53) (SILVERSTEIN 022 ) ("I did not 'call the shots.'  I simply provided legal advice, which was often followed, and sometimes disregarded . . . .  This is an example of where my advice was not followed. . . . My 'strategy' was over-ruled . . . .").  Thus, Mr. Silverstein did not substantially participate in the

proceedings before the Court, and he could not, and did not, exercise control over the proceedings from outside the Court.

*Second*, Mr. Silverstein did not have a substantial interest in the outcome of the Admiralty Action.   Mr. Silverstein had only an indirect interest in 1.5 percent of JTR's membership units, which he held through an entity named P&B Finance LLC, which was 50% owned by Mr. Sullivan.   (12/9/14 Tr. at 37:12–38:7; 8/28/14 Silverstein Aff'd, ¶ 121 (M8)). This is not the "substantial" interest contemplated of a "real party in interest" under *Helmac*. Indeed, the non-party sanctioned in *Helmac* was the corporation's **principal shareholder and chief executive officer**.  Here, by contrast, Mr. Silverstein is not JTR's principal shareholder but rather the indirect holder of a minimal one-half of one percent interest in JTR, and he is not JTR's chief executive but rather an outside attorney retained by the company.  It thus defies reason to argue, as Motivation does, that Mr. Silverstein's indirect, one-half-of-one-percent interest somehow makes him the "real party in interest" in the Admiralty Action.  Indeed, the Court has already concluded, correctly, that YCST, which held a 5% interest in the value of the emeralds from its work in the Delaware Litigation, and Mr. Sullivan—who also held a 5 percent interest (which he later transferred to a charitable trust)—were not the real parties in interest in the Admiralty Action on account of these insubstantial interests.  (*See* D.E. 528 at 4).  By contrast, Judge Moore concluded that Jay was properly subject to sanctions even though he was a non-party because Jay, as the principal holder of JTR's membership interests and its sole Managing Member, was the "real party in interest" behind JTR, like the principal shareholder and chief executive officer in *Helmac*.  (D.E. 445 at 20 n.19.)

In sum, Mr. Silverstein was not the real party in interest in the Admiralty Action.  Quite the contrary, his participation in the proceedings before the Court and his indirect one-half

percent interest in JTR were both insubstantial according to the *Helmac* standard, and sanctions against Mr. Silverstein, a non-party, are not warranted here.

### E. MOTIVATION LACKS STANDING TO SEEK SANCTIONS AGAINST MR. SILVERSTEIN

Additionally, Motivation lacks standing to seek sanctions from Mr. Silverstein. Motivation is not a defendant who claims to have been wrongfully sued by JTR (much less by Silverstein). Nor is Motivation a plaintiff who claims that JTR (much less Mr. Silverstein) wrongfully defended against a viable complaint brought by Motivation. Rather, Motivation is an intermeddler in the Admiralty Action, which first asserted a legally baseless and factually frivolous claim that was dismissed by the Court (albeit without prejudice) and later asserted a fabricated claim of stolen emeralds in order to get around the patent legal defect of its initial claim of a floating barrel from the Seventeenth Century. Moreover, Judge Moore ordered that Motivation's claims that it was acting as a "virtual *qui tam* relator," *see, e.g.*, D.E. 292, ¶ 1, should be stricken from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." (D.E. 360). Thus, Motivation simply lacks standing to seek sanctions against Mr. Silverstein, and Motivation identifies no legal authority, and Mr. Silverstein is unaware of any legal authority that supports Motivation's standing to pursue sanctions here.

### F. MOTIVATION APPROACHES THE COURT WITH UNCLEAN HANDS

Without regard to the merit (or lack thereof) of Motivation's claim for sanctions, the Court should refuse to award sanctions in favor of Motivation because it has unclean hands in

this matter.[44]   Indeed, courts consistently "have refused to invoke their inherent authority to impose sanctions where the party requesting sanctions has unclean hands."[45]

Here, there is ample evidence that Motivation has unclean hands.  First and foremost, Motivation voluntarily injected itself into the Admiralty Action by filing its **verified** claim alleging that the emeralds Jay had discovered were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site.  (D.E. 10, ¶ 15).  Motivation made those allegations despite that its claim to the emeralds was (i) legally untenable based on the Fifth Circuit's ruling in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 335-336 (5th Cir. 1978), and (ii) factually implausible given that the Discovery Site is forty (40) miles from the *Atocha* wreck-site and thirty (30) miles from the outer-most bound of the debris trail from the *Atocha*.   Simply put, Motivation

---

[44] Motivation has advanced no legal argument (valid or otherwise) in support of Motivation's naked assertion (*see* D.E. 480 at 19) that its own bad acts do not prevent Motivation from receiving a sanctions award.

[45] *Thomas v. Schwab*, No. 09-CV-13632, 2012 U.S. Dist. LEXIS 177080, *4 (E.D. Mich. Dec. 14, 2012) ("Both parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other." (citing *S. Shore Ranches, LLC v. Lakelands Co., LLC*, No. 09-CV-105, 2010 U.S. Dist. LEXIS 70147, *16 (E.D. Cal. Jun. 18, 2010))); *Black v. Schwartz*, No. 09-CV-2271(JS)(GRB), 2012 U.S. Dist. LEXIS 132524, *12-13 (E.D.N.Y. Sept. 17, 2012) (declining to award defendants sanctions for several reasons, including "blatant mischaracterizations" made by defendants and the Court's inability to ascertain how much defendants spent on defending the discontinued portion of the case versus the amount spent of defending the malpractice claim against them (citing *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999), for the proposition that "[a]lthough . . . we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision")); *see also Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992) (reversing district court's granting of Rule 11 motion for sanctions and noting that "[s]ome of [defendant's] defenses are more ingenious than ingenuous and compel us to caution that [parties] who live in glass pleadings ought not to throw Rule 11 stones."); *see also Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (the principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior).

concocted the "floating barrel" theory, not to make an honest claim to the emeralds, but to inject

itself into this matter to serve as the self-appointed "Treasure Police."[46]

Other examples of Motivation's bad-faith tactics throughout the course of its involvement

in this matter include the following:

- Alleging in the Amended Sanctions Motion that the fraud was known to Silverstein by the fall of 2011 (Am. Sanctions Mot. at 6) when Motivation's own internal communications reflect Motivation's understanding that neither Horan nor Silverstein knew of any fraud at that time.  (Holloway email to White and Lewis (4/17/13)) ("We have ample evidence that Jay has committed fraud and perjury, but I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far.") (YCST 190); *see also* 8/28/14 Silverstein Aff'd, ¶ 127 (M8).

- Suggesting to Mr. Sullivan that the parties should skip the inspection of the emeralds and say that JTR's emeralds were from the *Atocha* and market them together as *Atocha* emeralds.  (10/9/12 Silverstein Aff'd, ¶ 49 (M3); 8/28/14 Silverstein Aff'd, ¶ 45 (M8)).

- Suggesting to Mr. Silverstein that ethics charges would be filed against him if Mr. Silverstein did not persuade Jay to back down to Motivation while at the same time Motivation's counsel acknowledged that Motivation never believed the emeralds were from the *Atocha* or *Santa Margarita*, and that Motivation had intervened in the Admiralty Action to fulfill its self-proclaimed role as "police [of] the treasure community."  (12/6/13 Silverstein Aff'd, ¶ 47) (M7).

- Despite having what it believed to be sufficient evidence to establish that Jay committed a fraud on the Court (*see* Holloway email to White and Lewis (4/17/13)) (YCST 190), Motivation embarked on an extensive discovery expedition aimed at

---

[46] *See* 11/4/13 Silverstein Aff'd, ¶ 73 (M6); 8/28/14 Silverstein Aff'd, ¶¶ 40, 211 (M8).  Mr. Silverstein does not mean to suggest that Motivation is precluded from taking appropriate actions if Motivation believes that someone is engaged in fraudulent "treasure hunting" activities. Plainly, Motivation has the same right as any other citizen to report its beliefs to the appropriate investigative or prosecutorial authorities, and to request appropriate assistance.  Motivation does not, however, have the right to act as a self-appointed Private Attorney General (or, as Motivation's counsel calls it, the "Treasure Police"), much less to assert legally frivolous and factually fanciful verified pleadings for the purpose of obtaining discovery through the civil justice system.

reaching "deep pockets" that could pay its attorneys.  (Lewis email to Holloway, Morgan and others (4/20/13)) ("Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here . . . .") (YCST 191).

- Improperly suggesting witnesses could face indictments if they did not cooperate with Motivation's efforts in the Admiralty Action.  (Lewis email to Siracusa (11/4/13)) (YCST 275).[47]

- Improperly informing witnesses they might avoid both civil and criminal liability if they cooperated with Motivation's efforts in the Admiralty Action.  (Sweeney email to Steve (12/3/13)) (M2-39).

Perhaps the most telling example of Motivation's bad-faith litigation tactics is its underhanded efforts just prior to the January 2014 Sanctions Hearing to force persons such as Janssen, Siracusa, Horan, Mr. Sullivan, Davis, Livingston, and others to sign a false Stipulation containing statements of "fact" designed to aid Motivation's efforts to sanction Mr. Silverstein and YCST in exchange for Motivation's agreement to refrain from pursuing sanctions against them.  (Lewis email to Janssen and Siracusa (12/2/13)) (M2-37).  In essence, Motivation was telling JTR, Janssen, Siracusa, Davis, Livingston, Mr. Sullivan, Scott, Horan, and Kincannon that Motivation believed they are innocent of any wrongdoing and that Motivation was willing to sign the stipulation so stating, but that Motivation would seek sanctions against those persons if they refused to sign an agreement that pointed the finger at Mr. Silverstein.  Either (1) Motivation believed the facts to which it was willing to stipulate (in which case Motivation had

---

[47] *See also* Siracusa testimony, 11/20/14 Tr. at 297:16–298:4 ("[S]uggestions were made from Motivation's team that there was an FBI investigation ongoing in the case and that indictments would be looming or forthcoming and that I needed to either settle the case or withdraw or I might be indicted along with the rest of the group which I found very interesting because I have worked with the Federal Bureau of Investigation before and they typically do exactly what they want and don't tell anybody, especially in civil cases, you know, what the status of their investigations are or what they are planning to do, et cetera.  So to the extent that that was a threat, that occurred."); *id.* at 300:5–13 (testifying that Lewis "suggested that he was concerned for myself, for the welfare of my law partner Joe and his wife Christie, that if we didn't settle, we would be in serious trouble.").

no non-frivolous bases for seeking sanctions against JTR, Mr. Sullivan, J&S, and others), or (2) Motivation was willing to sign a false stipulation for the purpose of bolstering its sanctions motion against Mr. Silverstein.  That sort of unethical behavior is emblematic of Motivation's actions throughout the course of the Admiralty Action.

Based on the foregoing, Motivation does not deserve any award in this matter, regardless of the Court's findings concerning the conduct of Mr. Silverstein.

### III.  <u>CONCLUSION</u>

The factual record before the Court demonstrates that Mr. Silverstein has not engaged in any sanctionable conduct.  Motivation's attempt to paint Mr. Silverstein as having participated in a fraud on this Court fails to establish by any standard, let alone the clear and convincing standard required, the facts necessary to sanction a non-party.  Relying on conclusory allegations and innuendo, Motivation attempts to reach what it perceives to be Mr. Silverstein's "deep pockets" regardless of the adverse effects its baseless allegations will have on Mr. Silverstein (and his family).  Mr. Silverstein, therefore, respectfully requests that the Court enter an order denying Motivation's Amended Sanctions Motion.

Respectfully submitted,

Kendall B. Coffey, FBN 259681
David J. Zack, FBN 641685
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida  33133
Tel.  305-858-2900
Fax.  305-858-5261

By:  **/s/ David J. Zack**
David J. Zack
kcoffey@burlington.com
dzack@coffeyburlington.com
vmontejo@coffeyburlington.com
service@coffeyburlington.com
*Counsel for Bruce L. Silverstein, Esq.*

83

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by Notice of

Electronic Filing generated by CM/ECF, on January 21, 2015, on all counsel or parties of record

on the Service List below.

By:     /s/David J. Zack

## SERVICE LIST

### *JTR Enterprises, LLC vs. An Unknown Quantity, etc., vs. Motivation, Inc.*
### *Case No. 4:11-cv-10074-JLK*

JTR Enterprises, LLC
c/o 608 Whitehead Street
Key West, FL  33040
*Pro Se*

John Edward Tuthill
The Law Office of John E. Tuthill
3300 49th Street North
St. Petersburg, FL  33710
*Counsel for Motivation, Inc.*

John E. Holloway
Troutman Sanders, LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
757-687-7724
Email: john.holloway@troutmansanders.com
*Counsel for Motivation, Inc.*

Arthur Eugene Lewis, Jr.
Lewis & White, P.L.C.
222 W. Georgia Street
P.O. Drawer 1050
Tallahassee, FL  32301-1050
Tel.  (850) 425-5000
Fax  (850) 425-5004
lawlaw@polaris.net
*Counsel for Motivation, Inc.*

Marlow V. White, Jr.
Lewis & White
222 W. Georgia Street
Tallahassee, FL  32301-1139
*Counsel for Motivation, Inc.*

John Gravante, III
Podhurst Orseck, P.A.
25 West Flagler Street
Suite 800
Miami, FL  33130
Tel. (305) 358-2800
Fax (305) 358-2382
jgravante@podhurst.com
*Counsel for Material Witness*
*Paul D. Sullivan*