**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**KEY WEST DIVISION**

### CASE NO. 11-CV-10074-KING

JTR ENTERPRISES, LLC,

      Plaintiffs,

vs.

AN UNKNOWN QUANTITY, etc.,

      *In Rem* Defendant,

vs.

MOTIVATION, INC.,

      Claimant.

_____/

## OPINION AND ORDER DENYING SANCTIONS

One of the greatest transgressions that can be committed against a federal court is to knowingly perpetrate a fraud and to commandeer and manipulate the legal processes to do so. This case involves just such a fraud. What this Court described as the "legal finale to a three-year opera with a stunning libretto" more than two years ago has come back for an even more stunning—encore.

Motivation, Inc. seeks to invoke this Court's inherent power to sanction bad-faith litigation conduct one of the alleged perpetrators or enablers of the fraud, Plaintiff JTR's outside general counsel, attorney Bruce L. Silverstein.[1]

---

[1]     Motivation also sought sanctions against two other respondents: Mr. Silverstein's Delaware law firm, Young Conaway Stargatt & Taylor, LLP, and JTR investor and advisory board member Paul Sullivan. After Claimant Motivation rested its case-in-chief, the Court granted Mr. Sullivan and YCST's Motions for Involuntary Dismissal, finding that Motivation had failed to present sufficient evidence <u>at that time</u> on (i) Sullivan's substantial involvement in the underlying litigation, or (ii) either Sullivan's or YCST's substantial interest in the outcome of the litigation. DE #528. Mr. Silverstein is the only remaining respondent.

## I. Background

This case involves a criminal conspiracy against the United States District Court for the Southern District of Florida, which began with the filing of a completely fabricated admiralty case falsely alleging a fictitious discovery of lost treasure from an 18th century Spanish galleon.

The corrupt intent of the criminally inspired conspiracy of faking a discovery of lost Spanish treasure of thousands of junk emeralds previously planted on the bottom of the ocean to be later "discovered" as newly discovered *res*, subject to the admiralty jurisdiction of the United States District Court, was to obtain a judicial decree awarding the conspirators not only title to the previously planted emeralds, but also an injunctive order preserving to the criminals the exclusive right to continue searching the fake, imaginary site of the "discovery," thus preserving the opportunity to continue to "salt" the site with junk treasure for sale to innocent victims (purchasers and investors) who had been misled into believing the discovery was true and genuine based on the Court's admiralty decree.

Although the future victims of the conspirators would have been the purchasers of the fake gems and the investors who were expected to invest in the continued salvage operations of the fake discovery, the immediate victim was the United States District Court and the American system of justice. The entry of a final decree as sought by Plaintiff would have lended credence to the conspirators' outrageously false claims of a new discovery.

The corrupt criminal conspiracy of the false discovery of an eighteenth century Spanish treasure galleon and the filing of a totally false, fictitious admiralty case quickly gained a number of supporters willing to believe the incredible lies of the originators of the fraud, Jay Miscovich and Steve Elschlepp (the divers who reported the discovery of the previously planted junk emeralds). Among these supporters who enthusiastically commenced to promote the fraud were family members and their business associates, private investors, large corporate law firms, local

and national media sources, including the CBS program "60 Minutes," the Smithsonian Institute, and elected officials of the Colombian government.

The involvement of all of these individuals and corporate entities produced, in some instances, astounding results. The record indicates that a more than three million dollar investment was made in furtherance of the criminal enterprise. The record further indicates that various law firms have invested legal services (some paid, some unpaid) of several million dollars in attorneys' fees and costs of litigation. The case has additionally spawned hundreds of hours of judicial labor in the three trials that have thus far been conducted.[2]

The numerous parties and entities are listed in the foregoing paragraphs. Some are innocent, some are not. Some can be proven as knowing members of a criminal conspiracy to deceive and defraud the United States Court of the Southern District of Florida, and some are not so provable by the high requirements of the governing standard of proof for sanctionable conduct. This is the issue of this part (the third trial) of what appears to be a never-ending series of trials and evidentiary hearings flowing out from the original admiralty case.[3]  Who knew? What did they know? When did they know? Did they participate with the knowledge and intent to commit a criminal fraud on the court and innocent victims or were they dupes and unknowing aids to the original criminal conspirators who were fully aware of the fraud on the court?

---

[2]     The original admiralty case of December 2011 spanned four days at the U.S. Courthouse, Key West, Florida (the "Admiralty Action"), and the first sanctions trial on the original complaint for sanctions before Judge Moore consumed three days at the U.S. Courthouse, Key West, Florida. The amended sanctions trial before Judge King spanned 13 days at the U.S. Courthouse, in both Key West and Miami, Florida.

[3]     Paul D. Sullivan, sued by Motivation, Inc. for sanctions, on January 13, 2015 (D.E. #555), has filed a Motion for Sanctions against Motivation. Alleged defrauded investors are pursuing an independent separate case against Defendants Bruce L. Silverstein, Young Conaway Stargatt & Taylor, LLP, Paul Sullivan and P&B Finance, LLC (in this fourth trial) for triable RICO damages of $13.5M (*Azalp LLC v. Bruce L. Silverstein, et al.*, No. 14-cv-10079-JEM). The parties have stated in pleadings herein that the U.S. Attorney's Office is monitoring this sanctions trial for possible criminal indictment. These matters are currently pending in this district.

As a secondary issue in determining proof of sanctionable conduct, are the persons who cannot be proven to have had direct knowledge of participating in the planting of emeralds in the ocean subject to sanctions for deliberately closing their eyes to the fraud being committed in deliberate indifference to the harm their activities were causing?  Is the proof in this record substantial enough to prove by clear and convincing evidence that such individuals (if any) are to be sanctioned?  Is it a legal offense for such an individual to defend on a basis that "I never knew that the conspirators purchased fake emeralds and planted them on the bottom of the ocean since they never told me that"?  Should they, if the evidence is clear and convincing that Jay and Steve were *obviously* lying about making a discovery of lost treasure, have withdrawn from the conspiracy at the time it became known to them or made the facts of the fraud known to the court?

This, the Amended Motion for Sanctions by Claimant Motivation, Inc., raises a plethora of legal issues not at issue in this Court's order of January 25, 2013, or Judge Moore's Order of June 19, 2014:  Legal issues pertaining to sanctions of persons and entities not parties to the original admiralty action; the legal standard for burden of proof, i.e., clear and convincing evidence; the elements of deliberate ignorance; the inherent authority of a court to impose sanctions; and the Court's jurisdiction to sanction parties who have not personally been served or appeared in litigation pending before the Court prior to sanctions being sought against that person or entity.

A combination of this Court's January 25, 2013, Opinion and Final Order (DE #199) (the "Admiralty Order") and the Honorable United States District Judge K. Michael Moore's June 19, 2014, Findings of Fact and Conclusions of Law (DE #445) ("Judge Moore's Sanctions Order") adequately details the procedural and factual background of this tale, and the relevant portions of each will be reproduced verbatim herein. As Judge Moore succinctly put it, "[t]he factual narrative in this matter has two versions: the tall tale and the truth." Judge Moore's Sanctions Order, DE #445 at 2.

4

## A. The Tall Tale – The Admiralty Trial

This story—as far as the Court knew on January 25, 2013, when it entered its Admiralty Order—begins with the alleged discovery by two treasure hunters of a cache of jewels on the bottom of the Gulf of Mexico off of Key West, Florida:

> On or about January 11, 2010, friends and dive partners Jay Miscovich ("Jay") and Steve Elchlepp ("Steve") retrieved a handful of green stones from the floor of the Gulf of Mexico, some 30 miles North of Key West. As they continued to dive the site, the handful turned into a heap of stones which Steve testified now weighs between 100 and 250 pounds.
>
> Jay and Steve were not searching the area by happenstance. As professional maritime treasure hunters, Jay and Steve were following a lead purportedly provided by a map purchased from Jay's old acquaintance Mike Cunningham, a destitute handyman from Pennsylvania.[1] For three days straight, Jay and Steve went out on a boat to the area of the ocean shown on the map, to search for treasure.
>
>> FN 1. Jay reports paying $500 for the map and an accompanying shard of pottery, and then paying an additional $50,000 for Cunningham's renunciation of all claims to the treasure. The Court notes that Jay testified in court that he was unable to contact Cunningham and never had contact information for him. Instead, Cunningham would always call Jay, checking in on a monthly basis over the years with a blocked number that prevented Jay from seeing his phone number. Jay testified that he never asked Cunningham for a phone number or address. Counsel for Motivation suggested in its closing argument that "Mike Cunningham" was merely a pseudonym for Jay Miscovich. The Court finds the story of Jay's acquisition of the purported treasure map suspicious to say the least, but at the end of the day immaterial to the resolution of title to the res.
>
> Steve commenced random diagnostic dives ("bounce dives") in approximately 65 feet of water without success until, on the afternoon of the third day, January 11, 2010, when Jay decided to accompany Steve on the last dive. The visibility underwater was either less than 15 feet, or 15 to 20 feet, or 20 feet (there was contradictory testimony as to this fact from Jay and Steve), and the area close to the floor of the ocean had a grey, monochromatic tone. It was during that dive that Jay, according to his testimony in court, noticed some "shiny objects" approximately fifteen feet away that he thought were pieces of broken glass "glistening on the bottom."[2] As he approached the objects, he saw "a lot of green all over the bottom." Jay picked up a few of the objects, and then motioned Steve up to the surface to show him the objects. Electrified, the two men grabbed the four empty sandwich bags from their lunch and dove back to the ocean floor to retrieve more of the green stones. Jay describes it as feeling "like picking cherries

on a cherry tree," because the stones were so concentrated in the area and easy to find. The pair filled the four bags and then stopped for the day, heading back to Steve's home. As Jay noted in his testimony, they did not have enough air to make another dive.

> FN 2. In comparing Jay's testimony to Steve's, the Court is troubled by Jay's testimony that he noticed glistening, shiny stones on the surface of the ocean floor from around fifteen feet away. On December 3, 2012, Steve testified that "we were looking for signs of gold, silver bars, coins, things like that," and he "had not noticed [the stones] because they blend in very well with the sediment, the sand. When you're training your eye to look for one thing in particular, you don't see the forest through the trees." Testimony of Steve Elchlepp, Dec. 3, 2012. The fact that such an experienced diver felt that the stones had blended in with the sand, combined with the varying reports of the visibility that day, lead the Court to, at the very least, question the reliability of Jay's account of the moment he first saw the stones.

*   *   *

> Over the next few months, Jay and Steve went back out repeatedly to retrieve more of the stones. Steve testified he went alone on a number of occasions and, whether jointly or alone, he retrieved stones from the site every time he dove on the site. The recovered material was taken to Steve's Key West home, cleaned and stored in a safe. In addition to the retrieval operations taking place in Key West, Jay and Steve also sought out potential investors for their fabulous discovery of thousands of what they believe to be lost Colombian emeralds scattered on the floor of the ocean.

Admiralty Order, DE #199 at 2–5.

This Court noted in its Admiralty Order that testimony presented at trial by Dr. Robert H. Baer, a professional archaeologist hired to draft a treatment of the find for possible public relations uses, told a very different story of the discovery:

> Most notably, Baer's draft report has Jay diving with "two friends from Mexico" instead of with Steve. In addition, the draft treatment indicates that rather than picking up a couple stones and immediately taking Steve back up to the surface, Jay picked up some stones and then continued to swim further in order to look for other indications of a shipwreck. According to Baer's draft treatment, after Jay took his friends to the surface, the three of them used a system of loose ropes wherein Jay and one diver would load a bag full of the stones and then "along with a man in the boat pulling on a rope, they would swim the bag to the surface, dump the stones in the boat, then return to the bottom," recovering "[i]n about four hours … eighty pounds of emeralds" that first day. This account substantially

differs from Jay and Steve's testimony that they simply filled their four sandwich-sized plastic bags and then, out of air, returned home.

*Id.* at 4 (internal citations omitted). Nevertheless, the tale continues:

The stones were subsequently scattered across the country, and indeed, the world. Jay and Steve's first move was to bring stones to New York City and Washington, DC, where they showed the stones to potential investors as well as gemologists and other experts, including an official from the Smithsonian. Jay gave stones to a jeweler in Pittsburgh, Pennsylvania, to have the stones cut and made into some pieces of jewelry. Jay testified in trial that the jeweler produced finished pieces of jewelry that filled four gallon-sized bags comprising "a couple hundred stones." One of the investors was given some stones, one of which was made into a necklace for his wife. Jay took bags of the stones to his ill older brother and left them for his brother to photograph. Jay shipped a half bagful of stones to his younger brother in Hawaii, who showed them to potential investors before carrying them back to New York City a few months later. Once this admiralty case was filed, Plaintiff commenced to try to reassemble the stones in the jurisdiction of the United States Court in Key West. Some of the stones were slowly recalled back to Key West and New York City, and some stones were sent to experts in Switzerland, France, and Columbia for evaluation.

In addition to removing stones from Key West, the pair actually planted some back into the ocean as well. Steve testified that between January and April of 2011, he filmed a promotional video at an underwater site location in approximately 35 to 40 feet of water. He placed forty stones into the water, set them on the floor of the ocean, and then proceeded to recreate the original find on film. Steve testified that they pre-counted the stones to keep track of them. According to Steve, everyone involved in the filming of the video knew it was not the actual site, and the video was never shown to anyone.

At some point, representatives from the CBS program *Sixty Minutes* came to be in touch with Jay and Steve. Over several months between the fall of 2011 and early 2012, the CBS crew filmed footage for the segment, both in the ocean and interviews on dry land, and paid for some of the expert evaluations of the stones. The footage of the dive trip shows Jay telling the CBS crew that the stones are worth millions of dollars, and that one particular find was worth "easily" $100,000. These amounts are in stark contrast to the testimony presented at trial on December 6, 2012 by Motivation's expert, Manuel V. Marcial. Marcial, a Key West jeweler with fifty-six years in the emerald business, testified that the overall collection of stones that he inspected (with some exceptions) was of a very poor quality that would not interest a responsible dealer. In fact, Marcial testified that in his opinion a liberal value of the stones would be a combined total of $50,000, of which 1 or 2% would be of commercial value. He further described demonstrating to Plaintiff's lawyer, on a court recess during trial, how one of the "emeralds" from the Plaintiff's exhibit crumbled in his hand when he applied pressure from his fingers. He testified that such crumbling was an indication of poor quality, worthless emeralds.

Expert reports in evidence as well as testimony during trial established that at least a portion of the stones in evidence have epoxy or oil on them. Testimony indicates that such epoxy is a modern material that would not have been in existence prior to the 19th century and would have disintegrated entirely given enough time under water.

\*    \*    \*

On September 6, 2012, [Plaintiff] JTR [Enterprises, LLC] filed its Complaint against "An Unknown Quantity of Colombian Emeralds, Amethysts and Quartz Crystals located within 3,000 yards of a point located at coordinates 24°57.79" North Latitude and 81°55.54" West Longitude." . . . JTR published "Notice of Action *In Rem* and Arrest of Property" in The Citizen, a newspaper in Monroe County, Florida, pursuant to Supplemental Rule C(4) for Certain Admiralty and Maritime Actions of the Federal Rules of Civil Procedure as well as Local Admiralty Rule C(4). Two claimants respond and filed timely appearances: Clawdb LLC, Azalp LLC, Darn LLC, and M Ventures LLC filed a "Motion to Intervene," and [Claimant] Motivation Inc. filed a "Verified Statement of Right and Interest and Claim of Motivation, Inc."

*Id.* at 5–8 (internal citations and footnotes omitted).

The standard procedure for Admiralty cases in the Southern District of Florida is for finders/salvors to file suit in admiralty and bring the subject material into custody of the Court to establish *in rem* jurisdiction over the material. A warrant for an arrest of the *res* issues, a substitute custodian is appointed, and after publication of Plaintiff's claim is made, anyone having a claim may so state and be heard at trial.

*Id.* at 12.

Motivation, Inc., by its filing of October 16, 2011 (DE #10), was the only Claimant.  It immediately commenced discovery and demanded inspection of the emeralds to determine whether they could have come from one of the 17th Century shipwrecks to which they have title, the *Nuestra Senora De Atocha* (the "*Atocha*") or the *Santa Margarita*. DE #47. According to Motivation's original theory, the emeralds could have floated forty miles in a barrel from the site of the *Atocha* to the site of the alleged new "discovery" by Plaintiff.  DE #10. JTR disputed this theory, and moved to dismiss. DE #40, filed December 1, 2011. Because of this dispute, the Court denied Defendant Motivation's requests for inspection and granted a stay of discovery

until the Court could determine the legal sufficiency of Motivation's claim. DE #55; DE #69. After test results revealing the presence of modern epoxy on some of the emeralds were finally revealed to the Court DE #82, filed April 18, 2012, and after Motivation amended its claim to change its theory from floating barrels to intentional theft from the *Atocha* site (DE #94, filed July 3, 2012), the Court ordered JTR to produce the emeralds for inspection by Motivation's expert (DE #117, entered August 7, 2012). After inspection, Motivation's expert concluded that the emeralds did not come from the *Atocha* or *Santa Margaria*. Motivation withdrew its claim to the *res* on August 17, 2012.

What then occurred is best described in this Court's Admiralty Order as "systemic difficulty in achieving the delivery of the *res* into the jurisdiction of the Southern District of Florida," which saw the *res* "five months into this action [if not later] . . . apparently scattered between Key West, New York, Pennsylvania, France, Switzerland, and Columbia, if not elsewhere." *Id*. at 9–10. This "caused a marked deviation from this Court's prior and well-established procedures" so much so that, as Judge King found in the substantively entered Admiralty Order of January 25, 2013 (DE #199), the Court could not "find that the material . . . under the Court's arrest is the entire *res*." *Id*. at 13. Furthermore, the Court could not be "certain that the material shown to the expert witness . . . was the same material retrieved from the ocean floor and . . . contained [in] the *res* . . . ." *Id*.

This Court's Opinion and Final Order, entered at the conclusion of the trial held December 3 through December 21, 2012, denied any relief to Plaintiff JTR Enterprises, Inc. on all claims, holding:

> The law of salvage calls for a marine peril. This element may be satisfied by an "ancient, abandoned shipwreck." *Santa Margarita decision*, 556 F.Supp. at 1340. When there is a shipwreck involved, Plaintiff can provide documentation of the ship, its cargo, dates, etc. which allows the Court to make certain logical assumptions as to the owner of the material (e.g. the King of Spain). Then the Court can require the owner to provide a salvage award.

In the instant case, however, there is no shipwreck, and no proof that the stones were ever lost in the first place. The only evidence is that Jay and Steve retrieved the material from the ocean floor on and after January 11, 2010. But the genuineness of the act of retrieving the material does not prove that the material was previously lost. The material may never have been lost, if Motivation's claims are correct that Plaintiff owned the material, dropped it into the ocean, and then retrieved it. To give an appearance of discovery of Spanish Treasure, without a shipwreck, without an owner, and indeed without a showing of a marine peril, the Court cannot find the law of salvage applies in this case.

*Id.* at 18–19.

Further, in light of Jay's delivery of the *res* to a jeweler in Pittsburgh to have certain of the stones cut, finished pieces of which filled four gallon-size bags, this Court found that "even if the Court were to apply the law of salvage, Plaintiff has forfeited any right to a salvage claim due to exploitation of the *res* for personal use." *Id.* at 20.

As for JTR's claim for title under the law of finds, this Court first laid out the elements required to sustain such a claim: "(1) intent to reduce property to possession, (2) actual or constructive possession of the property, and (3) that the property is either unowned or abandoned." *Id.* at 16 (internal citation omitted). In its analysis of this claim, this Court found that JTR failed to prove entitlement to title as follows:

The first difficulty arises with regard to the requirement of continuous possession. As relayed above, the retrieved *res* was separated and sent, piecemeal, across the world. While Jay and Steve have testified that the entire *res* has been returned, Steve also admitted during cross examination that he does not know for sure that there was no break in the chain of custody. The Court agrees; even assuming that any stones sent to laboratories or other scientific experts were treated professionally and completely returned, there were too many other individuals carrying the stones from one place to another out of the presence of Jay and Steve (e.g. the investor who received three stones and gave at least one to his wife, Jay's older brother who kept them overnight for photographs and sprayed them with cooking spray, Jay's younger brother who shuttled them around Hawaii, and Jay's younger brother's wife who carried some stones to a bank in Hawaii, to name a few) to rule out interference with, or replacement of, the stones. It is also impossible for the Court to be certain that all of the stones eventually arrived back to Key West for that same reason. This issue casts a not-insignificant shadow of doubt over the possession elements of a claim under the law of finds.

The third element calls for the *res* to either have never been previously owned, or to have been lost and abandoned by its owner. Never previously owned implies

10

local flora or fauna that is indigenous to the area of retrieval. The testimony indicates that the *res* is comprised of stones which are *not* indigenous to the bed of the Gulf of Mexico. Therefore, the Court moves to the other option: whether the *res* has been lost and abandoned by its original owner. In other words, the Court must address the elephant in the room: how did these stones come to be sitting on the ocean floor in January of 2010?

The court in *Columbus-America Discovery Group* is quite firm on the requirement for clear and convincing evidence of abandonment, but carves out an exception for cases in which there is "an ancient and longlost shipwreck" and no owner files a claim. 974 F.2d at 464–65. In such cases, the court may infer abandonment. This record is devoid of any evidence of any shipwreck, 16th Century Spanish Galleon, or any proof of abandonment by a prior owner. The *res* has appeared seemingly out of thin air, without proof of the source of origin, of transportation or prior ownership. Plaintiff has failed in this essential element of proof. Duncan Matthewson in Ex. #125-1 and 2 (DVDs) suggests that the emeralds were possibly contained on the deck of a Spanish Galleon in a barrel of gems, that got washed overboard in a storm, but this is no more than mere speculation by the witness obviously intended to influence the CBS crew that 16th Century Spanish Treasure was involved.

*Id.* at 20–21.

The failure of JTR to prove its claims, the incredible nature of Jay and Steve's story (and indeed much of their testimony), and rumors of fraud revealed in court filings (*see e.g.*, Joint Pretrial Stipulation, DE #163, filed November 23, 2012) and in testimony adduced at trial led this Court to make an observation that would later prove particularly prescient:

When all is said and done, there are two options: Jay and Steve legitimately found lost stones on the floor of the Gulf, or Jay and Steve placed stones acquired elsewhere on the ocean floor in order to "find" them and thereby establish an ancient provenance and greatly enhance the value of the stones and the reputation of the men as treasure salvors. There is just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them. The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds. Each story represents one possible interpretation of entirely circumstantial evidence, and neither persuades the Court.

*Id.* at 22.

Accordingly, this Court declined to issue either an award in salvage or title to the *res* under the law of finds. Rather, this Court simply returned the *res* to the parties who physically

brought it into court (JTR, Jay, and Steve), and expressly made "no finding as to the type, source, value, provenance, or origin of the stones comprising the *res*." *Id.* at 23.

The rumors of fraud, the delay in getting the stones into the jurisdiction of the Court, and the refusals to allow Motivation an inspection of the emeralds early on in the case, thereby prolonging its involvement and multiplying its legal costs, all resulted in Motivation's original Motion for Sanctions (DE #123, filed August 27, 2012). This Court severed the sanctions motion from the Admiralty Trial. DE #172.  Judge K. Michael Moore held an evidentiary hearing on the sanctions issue from January 13–15, 2014. It is here that the tall tale ends, and the discovery of truth begins.

**B. The Truth – Judge Moore's Sanctions Trial/Evidentiary Hearing[4]**

After nearly a year of discovery into the issue of sanctions, Judge Moore's three-day trial on the subject culminated with a stunning on-the-stand revelation from a subpoenaed witness and a finding by Judge Moore that the whole case had indeed been designed from the beginning to commit a fraud upon the Court:

> The truth is that in 2010 Miscovich purchased a total of eighty pounds of raw emeralds from JR Emeralds, a jewelry store in Jupiter, Florida. According to the testimony of Jorge Rodriguez ("Rodriguez"), the owner of JR Emeralds, Miscovich purchased the Emeralds over four visits in March, May, August, and September [of 2010]. Each trip Miscovich purchased approximately 20 pounds of emeralds for approximately twenty thousand dollars for a total of approximately eighty thousand dollars. By purchasing the Emeralds and then "finding them" at the bottom of the ocean, Miscovich engaged in fraud to vastly increase their value as purported "sunken treasure."

Judge Moore's Sanctions Order, DE #445 at 2. (internal citations omitted).

Further, after having put Rodriguez on the stand for the purpose of revealing his role in Jay's acquisition of the emeralds and thereby exposing this fraud:

---

[4]       Judge Moore was assigned the first sanctions hearing/trial by Chief Judge Moreno during Judge King's absence the first week of July 2012.  The case was reassigned to Judge King after Judge Moore's trial of January 13-15, 2014 to rule on all proceedings of the Amended (Second) Motion for Sanctions filed by Motivation.

In the closing arguments of the sanctions hearing, Janssen & Siracusa, JTR's counsel, admitted JTR's wrongdoing. They admitted that "the scheme to defraud was to represent emeralds of a certain quality as having a higher quality based on their origin from an antique shipwreck." JTR's counsel admitted that the "artifice to defraud" was to use the District Court to grant "the imprimatur or the blessing or the *Good Housekeeping* seal of approval to say that . . . these are antique emeralds."

*Id.* at 14. (internal citations omitted).

Accordingly, Judge Moore found "by clear and convincing evidence, that a fraud has been committed upon this Court,"[5] *id.* at 16, and that "Miscovich was clearly the mastermind behind this whole scheme." *Id.* at 18. Judge Moore imposed sanctions against Jay in the amount of Motivation's fees incurred from October 16, 2011, the date Motivation entered the case, through October 29, 2013, the date Jay Miscovich committed suicide. *Id.* at 20.

In addition to exercising the Court's inherent power and assessing sanctions against Jay's estate for his act of committing a fraud upon the Court—about which Judge Moore found that "there is no starker example of bad faith," *id.* at 19—Judge Moore assessed sanctions against Plaintiff JTR for not disclosing to the Court or to Motivation the presence of epoxy on the emeralds. *Id.* at 17. At Judge Moore's sanctions trial it was revealed that in early December of 2011, JTR and its admiralty counsel at the time, David Horan, learned the results of testing being conducted on the emeralds by French and Swiss labs. *Id.* at 9–10. These tests showed that some of the emeralds had epoxy on them, and because epoxy did not exist until the 19th century, the emeralds could not have come from Motivation's 17th century Spanish galleons the *Atocha* or *Santa Margarita. Id.*

---

[5]     Citing *Barash v. Kates*, 585 F. Supp. 2d 1347, 1364 (S.D. Fla. 2006), for the proposition that "[T]he Court has found no Eleventh Circuit opinion discussing the standard that the court should apply when deciding whether to impose sanctions pursuant to the Court's inherent authority for fraud upon the Court.  However, other courts have required that when imposing attorney's fees as sanctions pursuant to their inherent authority, the conduct be proven by clear and convincing evidence."

As Plaintiff JTR's admiralty counsel, Horan believed he had a duty to the Court to disclose the test results, considering his previous representations to the Court on the possible origin of the emeralds contained in a report Horan filed on October 18, 2011. *Id.* at 11. This report, authored by archaeologist R. Duncan Mathewson, III and titled "Underwater Archaeological Investigations of the Emerald Site off the Florida Keys Research Design Executive Summary," opined that the emeralds "clearly represent[ed] a cargo loss at sea" and that an approximate date range for the site could be from 1570–1700, though "more research is required before a more definite date can be determined." DE #19 at 9. Horan testified before Judge Moore that he had "heated discussions" with Silverstein over disclosure of the lab results. DE #445 at 11–12.

JTR did not disclose the results to the Court, however. Instead, JTR reported the French and Swiss lab results to CBS and the *60 Minutes* team, *id.* at 11, and arranged for more testing of the stones by another lab with CBS's assistance. *Id.* JTR filed a "Second Status Report" on January 6, 2012, that only revealed that testing was ongoing and results would be shared with the Court "once all of these analyses are completed . . . and JTR is in possession of final reports from each of the GIA, the French and Swiss labs." DE #54 at 3. JTR did not reveal the results of these tests to the Court or to Motivation for a period of four and a half months from when it first learned of the probable results in early December of 2011, until April 18, 2012, when it filed its "Third Status Report." DE #82. Judge Moore held that once JTR first learned this information, "which indicated that the Emeralds were not from the *Atocha* or the *Margarita*," JTR "had an obligation at that point to disclose this information to the Court." DE #445 at 17. Judge Moore found this obligation to exist "[r]egardless of whether this report necessarily meant that the Emeralds *could not* be from the *Atocha* or the *Margarita*." *Id.* Judge Moore went on to specifically find with regard to this obligation that

> At this point, JTR was on notice that these Emeralds likely did not come from the *Atocha* or the *Margarita* (or any ship that did not sink in the past century, for that matter) and they should have similarly put the Court and Motivation on notice of that information. The fact that JTR told *60 Minutes* in no way diminishes its obligation to this Court. In fact, it demonstrates that JTR knew that something was going on and that these reports would have a substantial impact on the adjudication of the *res*. JTR was obligated at that point to make the Court aware of the information.

*Id.* at n.16.

The Court imposed this sanction because JTR had withheld the epoxy results from the Court and Motivation, and awarded Motivation its attorneys' fees incurred from December 2, 2011, through April 18, 2012. The Court imposed this sanction because Plaintiff had withheld the epoxy results from the Court and Motivation. *Id.* at 18. It was not imposed for Jay's lies about the alleged "discovery."

During Judge Moore's Sanctions Trial, and after the fraud on the court had been revealed, the Court granted Motivation leave to file an Amended Motion for Sanctions to be directed at any other parties Motivation thought responsible for committing this fraud. Judge Moore further found that the crime-fraud exception to the attorney-client communications privilege applied and compelled the production of previously privileged email and other communications between and among JTR, its members, and its counsel. *See* DE #424; DE #444. This resulted in the production of hundreds of emails and discovery of other substantial evidence not previously disclosed to the Court or Motivation. The evidence that has come to light since those orders is the focus of this Opinion. A large part of the following findings of fact were either deliberately withheld in the trial on the salvage case held before Judge King in January 2013 or constitute complete perjury by the original conspirators Jay Miscovich and Steve Elchlepp.

## II. Findings of Fact

### a. Prologue – The Genesis of a Fraud

Jay Miscovich invested in Motivation, Inc. in approximately 2009.  It was probably what he observed during that experience as a treasure salvage investor that inspired him to devise this fraudulent conspiracy to use the federal Admiralty Court to pervert justice. Though no one but Jay could have known what he meant when he testified under oath at the Admiralty Trial, his words foreshadowed his fraud:

> I started realizing that [with] most of these treasure hunting companies, the real treasure was making money by taking it from their investors, and they weren't really looking for treasure. [So] I decided to do it on my own and decided I could do it better.

Jay Miscovich 12/4/12 Admiralty Trial Testimony, Ex. M41 at 10.

Of course we now know that this is precisely what Jay did. As Judge Moore found, Jay "managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' *60 Minutes*, that he had discovered and recovered this treasure from the seafloor [and] allowed millions of dollars to be invested into this fraud before the Complaint in the instant case was even filed." DE #445 at 19.

### b. Bruce Silverstein's Initial Involvement with Jay Miscovich

Bruce Silverstein has practiced law at the Delaware law firm of Young Conaway Stargatt & Taylor LLP ("YCST") for his entire career, approximately 28 years.  His practice focuses on corporation law, which he describes as "including alternative entities . . . limited partnerships . . . large mergers and acquisitions . . ." and similar issues. Transcript of Amended Motion for Sanctions Hearing, December 4, 2014 ("Hearing Tr. 6"), at 112–13.[6]  In late January of 2011,

---

[6]     Hereinafter, the Court will cite to Day 1 of the second (Judge King) sanctions hearing, which took place on 11/19/14, as "Hearing Tr. 1." This portion of the transcript is DE #543. The Court will cite to Day 2 of the sanctions hearing, which took place on 11/20/14, as "Hearing Tr.

Silverstein received a phone call from Hawaii attorneys Mark Davis and Mike Livingston of the law firm Davis Levin Livingston ("DLL") about the possibility of representing Jay, Steve, and Scott Miscovich (Jay's brother) in defense of a lawsuit filed against them in the Delaware Court of Chancery (the "Delaware Litigation"). *Id.* at 116. The Delaware Litigation, filed on January 19, 2011, was brought by investors in Jay's emerald find (the "New York Investors"), and was described by Silverstein as dealing "with a question of corporate governance and who was in charge of an entity, an alternative entity." *Id.* at 117. According to Silverstein, the Delaware Litigation boiled down to "there's been this amazing and valuable emerald find and people are fighting over who owns it." *Id.* at 124.

Silverstein testified that, in addition to the phone call from Davis and Livingston about YCST's possible retention in the Delaware Litigation, on the same day he also received a phone call and an email from New Orleans attorney Lou Fishman about YCST's possible retention in the same matter. *Id.* at 117. According to Silverstein, attached to the email from Mr. Fishman was an email from Jeffrey Post, Ph.D. ("Dr. Post"), the Curator of the National Gem and Mineral Collection at the Smithsonian Institute, to the New York Investors dated September 9, 2010, in which Dr. Post describes results of analytical scanning electron microscope testing on the emeralds. *Id.* at 123. Dr. Post's email, which Silverstein testified to having read the day he was first approached to represent Jay, Steve, and Scott in the Delaware Litigation, states that flecks of gold, silver, and copper were found in cracks in the emeralds, the presence of which elements

---

2," which can be found at DE #544. Day 3, on 11/21/14, will be cited as "Hearing Tr. 2," which can be found at DE #544. Day 3, on 11/21/14, will be cited as "Hearing Tr. 3," and can be found at DE #545. Day 4, on 11/24/14 will be cited as "Hearing Tr. 4," and can be found at DE #567. Day 5, on 11/25/14 will be cited as "Hearing Tr. 5," and can be found at DE #554. Day 6, on 12/4/14 will be cited as "Hearing Tr. 6," and can be found at DE #546. Day 7, on 12/5/14 will be cited as "Hearing Tr. 7," and can be found at DE #547. Day 8, on 12/8/14 will be cited as "Hearing Tr. 8," and can be found at DE #548. Day 9, on 12/9/14 will be cited as "Hearing Tr. 9," and can be found at DE #549. Day 10, on 12/10/14 will be cited as "Hearing Tr. 10," and can be found at DE #550. Day 11, on 12/15/14 will be cited as "Hearing Tr. 11," and can be found at DE #552. Day 12, on 12/16/14 will be cited as "Hearing Tr. 12," and can be found at DE #551. And Day 13, on 2/2/15 will be cited as "Hearing Tr. 13."

"seems consistent with the idea that these emeralds were on the seafloor associated with gold objects for some period of time." Silverstein Ex. 1. Silverstein and YCST accepted the representation and were engaged by Jay, Steve, and Scott for their defense in the Delaware Litigation. Hearing Tr. 6 at 117–18.

In addition to Davis and Livingston of DLL, Jay, Steve, and Scott were also being advised by Paul Sullivan, Scott's neighbor and friend in Hawaii and a self-styled political organizer who worked on the campaigns of Presidents Carter and Clinton. *Id*. at 8. Sullivan became involved with Jay and Steve through Jay's brother Scott sometime in early 2010. *Id*. at 9. Sullivan testified that, in addition to acting as an advisor to Jay, Steve, and Scott, in December of 2010 he had traveled to Colombia at Jay's request and met with the president of Colombia to convey Jay's offer of 70% of the emeralds in exchange for the government of Colombia's physically running the salvage operation. Hearing Tr. 10 at 113–14. Sullivan further testified that he made a second trip to Colombia in March of 2011 for further discussions with the Colombian presidential cabinet on this issue. *Id*. at 115. Silverstein testified that he was aware of Sullivan's trips to Colombia, made both before and shortly after he was retained in the Delaware Litigation, and that he found it "inconceivable . . . that Jay Miscovich would not only allow, but support this process if these were not emeralds that had been found in the Gulf of Mexico and were genuine Colombian emeralds." Hearing Tr. 9 at 22.

Shortly after being retained in the Delaware Litigation, in late January of 2011 and into February of 2011, Silverstein began to review many documents related to that case. The Verified Complaint in the Delaware Litigation, which the New York investors filed against Jay, Steve, and Scott on January 19, 2011, was filed by lawyers at the New York law firm Willkie Farr & Gallagher ("Wilkie Farr"). Silverstein Ex. 7. Further, the New York Investors had filed on January 11, 2011, another Verified Complaint against Jay and Steve in the Circuit Court for the

16th Judicial Circuit in and for Monroe County, Florida, in which case the New York Investors were represented by both the Florida law firm Colson Hicks Eidson as well as by Willkie Farr. Silverstein Ex. 4. Filed along with this complaint were affidavits by two of the New York Investors, Mr. Dean Barr and Mr. Neil Ash. Silverstein Ex. 5; Silverstein Ex. 6. In these affidavits, these New York Investors stated that Jay had made a discovery of "sunken treasure, namely emeralds and other gemstones." *Id.* These affidavits, dated January 10, 2011, further stated that these New York Investors had invested approximately two million dollars in Jay's discovery. *Id.*  Silverstein received and reviewed a copy of this complaint and these affidavits shortly after he was retained in the Delaware Litigation. Hearing Tr. 6 at 142. Silverstein testified that "the fact that [the New York Investors] were represented by these lawyers and were spending a lot of money to take control of the emeralds" contributed to his own belief in the legitimacy of Jay's find. *Id.* at 158. Further, Silverstein testified that he believed the New York Investors' investments and selection of these expensive, respected, and high-powered law firms said a lot about their own assessment of the veracity of Jay's story and the value of the emeralds. *Id.* at 135, 160.

Also among those documents that Silverstein reviewed around the time he was first retained in late January of 2011 was another email, dated July 13, 2010, sent by Barr to Bob Toppe (another of the New York Investors), reporting the results of a meeting that Barr and Jay had had that day with Dr. Post of the Smithsonian. Hearing Tr. 6 at 164. In the email, Barr told Toppe that Dr. Post was very excited by the emeralds he had inspected, exclaiming them to be "the most rare type of emeralds he had ever seen," that examining them had been a "once in a lifetime experience," and that he was interested in curating a "major display" of the emeralds alongside the Hope Diamond. Silverstein Ex. 8. Silverstein testified that after reviewing this email in late January 2011, he called Dr. Post to confirm its content. Hearing Tr. 6 at 131–132. During this phone call, Dr. Post confirmed what Silverstein had read in the July 13, 2010, and

the September 9, 2010, emails; specifically, that Dr. Post had examined some of the emeralds, that "they were one of the most exciting things he had seen as the curator of the gem collection of the Smithsonian Institute," that the Smithsonian did want a five-year loan of some of the emeralds for display near the Hope Diamond, and that Dr. Post had identified microscopic flecks of gold in the emeralds. *Id.* at 133, 163.

In addition to the information he obtained from Dr. Post, shortly after Silverstein was retained in the Delaware Litigation, in late January or early February of 2011, Silverstein received and reviewed information on the appraised value of certain of the stones. *Id.* at 135. Among these appraisals was a report (dated December 9, 2010) by Josh Lents of the Gemological Appraisal Laboratory of America (the "GAL"). Silverstein Ex. 2. According to the GAL, which in preparing its appraisal had only evaluated the characteristics and value of a small fraction of Jay's emeralds, the estimated retail value of just twenty stones was approximately $120,000. *Id.* This total did not include one specimen, about which the GAL had concluded "Due to rarity and exceptionally preserved condition, value cannot be accurately stated." *Id.* Finally, in an observation that would later prove significant, the GAL described each stone it examined as "Untreated – No evidence of oil or resin." *Id.* In late January or early February of 2011, Silverstein went to New York City and personally met with Lents, the GAL appraiser who prepared the report. Hearing Tr. 6 at 136. Silverstein brought to the meeting "a few selected emeralds, including ones that [Lents] previously had appraised."[7] *Id.* at 138. Finally, Silverstein testified that he personally brought certain emeralds to Sotheby's in New York City, where he met with the president of Sotheby's and its head gemologist. *Id.* at 174. According to Silverstein, the head gemologist examined one emerald in particular under a jeweler's loupe and estimated its value to be between $25,000 and $40,000. *Id.*

---

[7]    The record does not reveal what was discussed at this meeting.

With all of this information in hand, in July of 2011, Silverstein created an entity called P&B Finance LLC through which he and Sullivan invested in and obtained a 1.5% equity interest in the emeralds. Hearing Tr. 9 at 37. Silverstein testified that he invested $80,000 of his own money. *Id.* Silverstein further testified that as part of the retainer agreement for the Delaware Litigation, his law firm, YCST, as well as the Hawaii law firm who referred that case to him, DLL, each obtained a 5% equity interest in the emeralds. *Id.* at 16.

### c. Dave Horan Retained by JTR

Silverstein testified that early on in his representation of Jay, Steve, and Scott in the Delaware Litigation he advised his clients that they should seek the advice of an admiralty lawyer to determine whether an admiralty filing would be appropriate and advisable. Hearing Tr. 6 at 115. In early March of 2011, Silverstein, Jay, Steve, Scott, Sullivan, Davis, and Livingston, interviewed Key West admiralty attorney David Horan by videoconference. *Id.* Mr. Horan has extensive experience in the area of salvage. Hearing Tr. 1 at 142. By March 15, 2011, Jay entered into a retainer agreement with Mr. Horan for representation "with respect to, among other things, admiralty and customs issues." M25. This agreement listed Silverstein as Jay's "general outside counsel." *Id.* at ¶1. Paragraph 4 of this agreement, titled "Authorization and Decision Making," required Horan to "seek specific authorization from Client and Client's general outside counsel" before undertaking any of a litany of tasks necessary to the maintenance of the instant action. *Id.* at ¶4. Horan testified that in practice, as his representation of Jay progressed, "[Mr. Silverstein] was the primary attorney representing JTR." Hearing Tr. 1 at 45.

Horan testified that prior to hearing from or being retained by Jay, Steve, Silverstein, Sullivan, or "any of the JTR people"—or prior to early March of 2011—he received a call from Len Tepper, the producer of *60 Minutes*. Hearing Tr. 1 at 42. During this call Mr. Tepper told Horan that he was considering producing a segment for the show on Jay's find, and asked whether Horan would be an "expert source" for the segment. *Id.* After meeting with the JTR

people, but before being retained in early March 2011, Mr. Horan, an "accomplished diver," went on what he has called a "sanity check" dive with Steve at the site of the find. Hearing Tr. 1 at 142; DE #372 at 100–10. Horan testified that during this sanity check dive he found a number of emeralds and amethysts, with several of the stones being "impacted" in the mud under several inches of silt, which indicated to him that they had been down there for some time. Hearing Tr. 1 at 57, 141—42. Horan testified that he then became interested in this case, saying "when you pull up a handful of emeralds, you get interested." DE #372 at 109—10. Horan was retained as admiralty counsel after this dive. *Id.* at 110.

Before JTR filed this case on September 6, 2011, the Delaware Litigation settled. 8/28/14 Bruce Silverstein Affidavit, Motivation Ex. M-8 at ¶18. According to Silverstein's affidavit, a settlement agreement was executed and preliminarily approved in the Delaware Litigation on March 29, 2011, and was set for a final approval hearing on August 19, 2011.

### d.  Peter Tobia Warns Silverstein That Jay is Not Truthful

On August 19, 2011, the Delaware Court of Chancery held a hearing to consider final approval of the settlement in the Delaware Litigation. Hearing Tr. 6 at 179. Just prior to this hearing, Silverstein was approached by Peter Tobia, a friend of Jay's, who asked to speak with Silverstein. *Id.* at 180. Tobia told Silverstein that he "knew information that [Silverstein] should have about Jay and his discovery, and it was important that [Silverstein] understood it." *Id.* Silverstein testified that during that meeting Tobia refused to provide details about this "information" until he "had his deal." *Id.* According to Silverstein, after Tobia refused to elaborate further, either on the "deal" he required or the information that he had, Silverstein told Tobia that he had a hearing to attend and didn't have time to deal with him. *Id.* at 181–82. Silverstein thought Tobia was an "untrustworthy character," and at that point Silverstein returned to the Delaware settlement hearing for approval that same day. *Id.*

That night, at 10:34 p.m. on August 19, 2011, after the settlement hearing had concluded, Silverstein forwarded to Horan, with copies to Jay, Steve, Sullivan, Scott, Davis, and Livingston, a copy of an email Jay had sent to Tobia on June 28, 2011. Silverstein Ex. 9. In the forwarded email, Jay informed Tobia that a 3% interest in the find was all he was going to get, and mentions Tobia's "misconception that [the treasure] was found in a treasure chest on land somewhere," adding "we wish it was [found in a treasure chest on land somewhere because] a beach/land find in Florida is 'finders keepers' no litigation of any kind . . . [but] because it is in international waters we have a huge mess." *Id.* at 2. In Silverstein's cover email to Horan and the rest of the JTR people, he explained that a series of emails from Tobia that he had reviewed demonstrated an "effort to persuade Jay to award Mr. Tobia a 5% ownership interest in [t]he treasure." *Id.* at 1. Silverstein went on to tell the group that "[he] reviewed all of the e-mails, and there is no suggestion that Jay is hiding anything or that he found the emeralds anywhere other than in International Water;" that "Jay and Steve both understand the drastic consequences that would flow from their supporting a false admiralty filing (including the possibility of jail), and that it will be very easy to determine whether the treasure truly comes from the site they have identified. Nonetheless, they both support making the admiralty filing, so that they can proceed to obtain title to the treasure." *Id.*

The next morning, at 10:27 a.m. on August 20, 2011, Silverstein sent an email to Tobia. Silverstein Ex. 10 at 4. Silverstein referenced their brief encounter at the courthouse the day before, and told Tobia that

> [t]his is a very serious matter, and you have a responsibility to come forward if you truly believe that Jay and Steve are committing a fraud and/or other criminal misconduct. On the other hand, if you do not have a legitimate basis for your claims, I encourage you to formally retract them now, before any harm befalls my clients as a result of your assertions. One way or another, you must stop threatening to reveal what you claim to be the truth in the absence of Jay's agreement to honor what you claim to be your arrangement for an ownership interest in the discovery.

> If you truly have knowledge that Jay and Steve are misrepresenting the location of Jay's discovery that gave rise to the Delaware litigation, I encourage you to let me know the specifics and source of your information immediately, and without any strings attached to your doing so.

*Id.*

Silverstein concluded this email with a request that, should Tobia wish to discuss this issue further, he reply to this email and Silverstein will call him. *Id.* Within the next forty minutes, Silverstein and Tobia spoke, prompting Silverstein to send a second email at 11:07 a.m. thanking Tobia for the call and asking Tobia to speak with him again at some point that day between noon and three. *Id.* at 3.

Later that afternoon, at 2:33 p.m., Silverstein sent a third, and lengthy, email to Tobia, revealing that they were able to speak again as he had requested. *Id.* at 2. Silverstein's email first states that

> I understand from our call earlier today that you continue to contend that the Treasure Jay discovered was not discovered in international waters off the coast of Florida, as Jay insists to be the case. Moreover, I further understand that you believe the Treasure to have been discovered "on land in Florida—or something like that." I also understand that you conten[d] that a Treasure Chest may have been involved. I spoke with Jay and Steve, and they both deny your assertions and insist that the Treasure was discovered in International waters off the coast of Florida.

*Id.* Silverstein continued:

> Based on the foregoing, Jay has authorized me to make you the following offer:
>
> 1.  You will provide your complete and unrestricted cooperation in helping Jay and his advisors understand all details and supporting evidence for your story, which contradicts Jay's assertions.
>
> 2.  If, as you contend, the Treasure was discovered at a location different than Jay already has identified to us, Jay (and others) will allocate to you a 10% interest in any treasure and/or any value that might be realized as a result of its discovery.
>
> 3.  If, as Jay contends, the Treasure was, in fact, discovered in International Waters off the coast of Florida, you will relinquish any claim you believe to have in the Treasure and/or any value that might be realized as a result of its discovery.

24

Jay also has asked me to communicate the following alternative to you:

> Despite what Jay views to be fraudulent and defamatory accusations respecting Jay and the location of his discovery, Jay recognizes that you were (until recently) a good friend, who provided meaningful moral support in the past. Accordingly, if you truthfully do not believe the information you have been hinting at for the past few months (and which you discussed with me this morning), and you are willing to acknowledge that you have no knowledge that contradicts Jay's assertion that he discovered the Treasure in International Waters off the coast of Florida, then Jay is willing to forgive your past transgressions and allocate a 2% ownership interest in the Treasure that Jay says he discovered in International Waters off the coast of Florida.

*Id.* So as not to be misconstrued, Silverstein added:

> To be perfectly clear, Jay's alternative proposal is not intended to be an inducement to cause you to change your story if you truly believe your story to be true. Indeed, if you truly believe your story to be true, I encourage you to bring it to the attention of the appropriate authorities, so that a proper investigation can be conducted into the location of the Treasure's discovery. If your story turns out to be true, I expect that you will be rewarded for bringing it to the attention of the appropriate authorities. And, if your story turns out to be a fabrication that was created to place pressure on Jay to allocate some ownership interest to you (or provide you with some other value), I am sure you can guess what potential consequences will follow. One way or another, however, your reporting your story to appropriate authorities will help get to the truth—which you claim to be your only objective.

> Finally, although you told me that you are not represented by an attorney in connection with this matter, you did tell me that you had, at some point, spoken with [attorney Peter] Hess—who also was [at] the settlement hearing yesterday on behalf of The Kirby Group (which initially claimed that Jay's Treasure came from The Kirby Group site, but has now retracted that claim). Accordingly, I am copying Mr. Hess on this e-mail. If Mr. Hess believes your story or has other information (beyond his now debunked story about The Kirby Group), I encourage him to come forward with his information, and not to make any further threats to interfere with Jay's endeavor.

*Id.* at 2–3.

Horan was copied on this email as well. *Id.* Tobia responded by email the next day, August 21, 2011, stating that 1) he had calls in to three attorneys but hadn't heard back from any of them, it being a weekend; 2) Mr. Hess was going to seek permission from the Kirby Group to also represent Tobia; and 3) someone would contact Silverstein soon. *Id.*

On September 8, 2011, Silverstein emailed Tobia a fourth and final time stating: "Your e-mail below (which is our last communication) states that you have calls in to three attorneys and someone would contact me soon. That was nearly three weeks ago, and nobody has contacted me. Have you retained an attorney with whom I should be speaking? If not, how do you wish to proceed?" *Id.* at 1. That same day Silverstein forwarded this entire email chain, comprising all of the emails between Silverstein and Tobia in Silverstein Ex. 10, to Jay, Steve, Sullivan, Scott, Davis, Livingston, and Horan. *Id.*

Silverstein testified that he did not hear anything further from Tobia after this last email, and none of the members of JTR to whom Silverstein had forwarded the email chain placed any stock in Tobia's assertions. Hearing Tr. 6 at 198. "To the contrary," Silverstein testified, "everyone that I spoke with took the position that Tobia was not to be believed and was trying to get something, people couldn't quite understand what or why, including David Horan, who went forward with the admiralty filing despite this chain of communications." *Id.* Silverstein testified that as of September 8, 2011, he thought Tobia to be "an extortionist" and the fact that Tobia never provided any information and his "abject refusal" to do so was telling. *Id.* at 199.

Prior to January 19, 2011, the date on which the Delaware Litigation was filed and Silverstein was retained, and as discussed previously, two of the New York Investors, Dean Barr and Neil Ash, executed affidavits—each dated January 10, 2011—in a case filed by the New York Investors against Jay and Steve in the State Circuit Court in Monroe County, Florida. Silverstein Ex. 5; Silverstein Ex. 6. In addition to stating that millions had been invested by the time those affidavits were filed, the affidavits had attached as an exhibit a schedule dated August 6, 2010, of equity ownership shares in "any emeralds (or treasure whatever) recovered to current date and moving forward." Silverstein Ex. 5 at 10; Silverstein Ex. 6 at 8. Tobia is listed as having a 3% equity ownership interest in each of these schedules. *Id.*

Silverstein testified that in conveying Jay's offer to Tobia on August 20, 2011, he did not participate in any sort of cover up. Hearing Tr. 6 at 196. He testified that

> To the contrary, I thought that what was going on here was that we were trying to incentivize Mr. Tobia to come forward with his information so that we could have an accurate understanding of what happened, and we were encouraging him both by providing a financial incentive for him to come forward with his information if he was telling the truth; and on top of that, I told him that if he didn't want to do a deal at all, in any event he should go to the authorities.

*Id.*

Tobia did not accept Jay's offer, nor did he recant his claim that Jay did not find the emeralds where he said he did.

Two days after Silverstein talked to Tobia, on August 21, 2011, he received additional details of Tobia's story. Horan forwarded to Silverstein an email dated August 19, 2011, that Horan had received from Peter Hess, a lawyer in Wilmington, Delaware. Motivation Ex. M-31. In Hess' August 19 email to Horan, he said that that Tobia "is on the periphery, but he's known Jay Miscovich for a long time and says that he first became aware of the emeralds in January, 2010." Hess reported that he had received a call from Tobia on January 23, 2010, during which Tobia "asked a hypothetical as to the legal consequences for treasure discovered 'in international waters.'" *Id.* at 2. Further, Hess claimed that Tobia reported being present when "the gemstones were first shown to Steve—whose eyes bugged out." *Id.* Hess claimed that he had "no reason to believe that Peter Tobia would tell me anything except the truth. Perhaps not the whole truth, but trustworthy as far as it goes." *Id.* Silverstein testified that he read this email and it gave him concerns, not about any part of Jay's story, but about Hess: "That gave me no suspicious [sic]whatsoever about the veracity of Jay and Steve's claim. But it gave me concerns about Mr. Hess, because he was revealing attorney-client information in this e-mail." Hearing Tr. 9 at 77. Silverstein further testified that "he spoke to Mr. Horan about Mr. Hess, and he told me that Mr.

Hess at one time worked for Mr. Horan and had stolen a number of his files and that he was not a person to be trusted." *Id.*

In October of 2011, after this admiralty case was filed, JTR agreed to settle with Tobia, granting him a 3.25% equity interest.[8] Hearing Tr. 9 at 72. Silverstein testified that he was against the decision to enter into any agreement with Tobia, but that he was on vacation with his family when this settlement was reached. *Id.*

### e. Non-Spanish Coins – Jay and Steve Lie to Horan

Prior to the filing of the Admiralty Action, Jay was advised by the New York Investors and others that because the emeralds had been found in international waters he should take his discovery to a foreign country to obtain title rather than the Courts of the United States. At the Admiralty Trial, Jay testified that he was "advised, for the first year and a half, from at least 20 admiralty attorneys, not to file in [the U.S.] and to take the action to another country . . . Gibraltar, the Dominican Republic, the Cayman Islands." Jay Miscovich 12/4/12 Admiralty Trial Testimony, Motivation Ex. M-41 at 25.

On August 18, 2011, Horan sent an email to Jay, Steve, Scott, Sullivan, Davis, and Livingston, not copying Silverstein, and attached a draft of the Admiralty Complaint, which he said he was "ready to file." Motivation Ex. M1-7. Horan further "strongly recommended" that JTR "meet with a professional salvage organization who have the personnel, experience and equipment to do it right." *Id.* Citing similarities between Jay's find and that of another case Horan was familiar with (e.g., very little shipwreck material and lots of valuable items lying exposed on the sea floor), Horan described the salvage company in that case—Odyssey—as having done "it correctly from the start." *Id.* Horan went on to warn everyone copied on the email that "Spain will, I'm sure, intervene in our case and claim that we are hiding the identity of

---

[8]    The record is unclear as to how or why Tobia's interest was increased from his initial 3% interest.

the shipwreck, that we have irreparably destroyed the integrity of the wrecksite, and Spain will flood us with litigation . . . the same way they attacked Odyssey." *Id.*

On the evening of August 19, 2011, with the settlement of the Delaware Litigation having been approved earlier that day, Silverstein wrote an email to Horan, copying Jay, Steve, Sullivan, Scott, Davis, and Livingston, telling Horan that both Jay and Steve are in favor of a U.S. Admiralty filing. Silverstein Ex. 9. Mr. Silverstein continued "[a]s I understand things, the only thing that currently stands in the way of a filing this Monday [, August 22, 2011,] is the possibility that Odyssey will persuade Jay that Gibraltar (or another country) is a better option. Personally, I remain in favor of filing in the U.S., and I am hoping that Jay will give [Horan] the green light tomorrow or Sunday to file on Monday." *Id.*

However, by August 21, 2011, just two days after the settlement was approved and three days after Horan's warning, in light of "the risks attendant to" an Admiralty filing, the plan had apparently changed. On that afternoon, Silverstein sent an email to Jay, Steve, and Scott, copying Sullivan, Davis and Livingston, in which he reaffirmed his preference for filing in the U.S. and threatened to withdraw from his representation should a U.S. filing not be made. Silverstein Ex. 11. Silverstein's email to Jay, Scott and Steve states as follows:

> As you all know, as of last Sunday evening, the plan of action following the settlement hearing in Delaware (which has now occurred) was (i) to make an appropriate customs filing no later than tomorrow morning [Monday, August 22, 2011], and (ii) to make an Admiralty Court filing a few hours after the customs filing was made.
>
> Although I would have preferred to see the customs filing made many months ago, David Horan was hired to have responsibility for that issue, and he did not see a need to follow through until now. I did prefer to see the Admiralty filing await the settlement hearing in Delaware, but I also agreed that the filing should be earlier than that if David Horan believed that it was necessary to make the filing sooner in order to protect Jay's interest in the Discovery.
>
> As of Yesterday, I understand that you are considering new "advice" from Odyssey that a customs filing is not necessary if the Discovery is within a certain distance to the Florida coast. I am not a customs attorney, and I do not know [or] have any personal knowledge as to where the Discovery is located. Accordingly, I

have no opinion respecting the validity of the advice you are getting from Odyssey, and I have no opinion respecting your decision to follow or disregard that advice. I do believe, however, that it is important that you speak with David Horan or some other attorney who can provide you with advice on the customs issue. I also believe that it is better to make a customs filing you may not be required to make, as opposed to failing to make a customs filing you may be required to make.

As of yesterday, I also understand that you no longer intend to make an Admiralty Court filing tomorrow [Monday, August 22, 2011]. I believe this is a big mistake for all of the reasons I explained to you yesterday, which I will not repeat in this e-mail. It should suffice to say that an Admiralty Court filing is the only way to guarantee that you are doing the "right thing" (assuming the Treasure was discovered how, where and when Jay and Steve say it was discovered) without regard to the risks attendant to such a filing. Any other course of action is fraught with legal, financial, and practical risk.

I continue to encourage you to steer the course that was set prior to the settlement hearing in Delaware, and proceed with a customs filing and Admiralty Court filing tomorrow. As I told you yesterday, if you pursue a different course, I will wish you the best, and I will be available to provide moral support and guidance, but I cannot continue [to] guarantee that I will be willing to devote further time and expense to this matter (beyond the clean up work needed to help comply with the settlement agreement—which is not technically required by our engagement arrangement, but which I will do, nonetheless).

*Id.* at 1–2.

After receiving both Horan's warning about the potential for Spain to make a claim, and this email from Silverstein, but prior to the commencement of the Admiralty Action, Jay and Steve showed up at Horan's office with a number of coins, none of which were Spanish, and asked Horan, "well, would this prove that this is not a Spanish Galleon or have anything to do with Spain?" Testimony of David Horan, Hearing Tr. 1 at 64–65. Horan testified that upon looking at these coins, which he recalls as being Dutch, English and French, he

said something affirmative [to Jay and Steve] like, 'I do not believe in any way that these came from the area where you are finding emeralds. I do not believe they have ever been in the water. And I certainly understand the concern you might have with regard to trying to prove its not Spanish, but this is not the way to do it and take those coins out of my office and don't ever let me see them again. . . . I told them that I understood what would motivate them to make that kind of a claim because of the fear of Spain coming into it, but that was not the way this case was going to proceed and that I wanted them to confirm to me that, in fact,

they had not recovered these coins. They did confirm that to me and then they left my office.

*Id.* at 70–71.

Silverstein was not present at this meeting, but Horan testified that he then called Silverstein and Sullivan to report this incident. *Id.* According to Silverstein, "Jay's story about the non-Spanish coins did give me reason to be skeptical about Jay's veracity. Against the then-existing evidence supporting the veracity of Jay's accounting of his discovery of the emeralds (including Horan's later "Sanity Dive"), however, Jay's indiscretion regarding the coins did not cause me to believe that the discovery was a fraud." Motivation Ex. M8 at ¶ 157.

Despite this incident with the coins, on September 6, 2011, Horan instituted the Admiralty Action by filing the Verified Complaint for Maritime Salvage (DE #1) on behalf of JTR, and verified by Jay Miscovich. Horan testified that he relied on Jay's verification in filing this case and that he "certainly did believe him." Hearing Tr. 1 at 141.

Horan had dived the site "multiple times" and told Silverstein after each that "he was extremely excited this . . . was a real deal." Hearing Tr. 8 at 34. On September 9, 2011, three days after this case was filed, Horan made another dive, with Steve, and again recovered emeralds. Hearing Tr. 1 at 141. Shortly after this dive, Silverstein, Horan and *60 Minutes* producer Len Tepper traveled by boat to the discovery site. Hearing Tr. 11 at 8. They were met there by another boat carrying Jay, Steve, and a crew of persons from CBS News and *60 Minutes*. Silverstein did not dive, but testified that he witnessed Horan and Steve dive into the water and resurface with a number of emeralds.  During that trip, Silverstein also witnessed Horan climb onto the boat with an emerald between his teeth and exclaim, "mark that one for me when we get title." *Id.*

### f. Sudden Production of a 20 lb. Bag of Emeralds That Jay and Steve Had "Held Back" From Disclosing to the Court.

Silverstein testified that in late September or early October of 2011, soon after the commencement of the Admiralty Action, he received a telephone call from Horan informing him that Jay and Steve had just come to Horan's office with a twenty pound bag full of emeralds (the "20 lb. group") and that Horan did not believe they had come from the site. Hearing Tr. 7 at 15. Horan described the stones as "fairly small," "not any bigger than your fingernail," and "bright green." Hearing Tr. 1 at 73. According to Horan, Jay and Steve told him that these emeralds had been found at the site and would have to be included in the *res*, but that they hadn't told him about them before because "they were still worried about Spain coming in and they had held these back so that if Spain came in, they would still have something left." *Id.* However, Horan initially "did not believe those emeralds had been recovered by them because based upon my dives on the site, they would have been underneath about a four-inch overburden of very light like mud and crushed up shells and things like this and it would take, to [his] recollection, something like a year of being on the bottom, much less being 60 feet deep, to recover that number of small emeralds. And [he] did not believe they came from the site." *Id.* at 73–74. Horan testified that he told Jay and Steve he didn't believe that they came from the site, but they explained that "they did come from the site and that there were certain concentrations of them that they found that were on the bottom that were kind of like in little holes and they could recover a very large number of them in a very short period of time." *Id.* at 74–75.

Horan testified that he called Silverstein and Sullivan about this incident, and expressed his concerns that Jay and Steve might be "attempting to supplement their recovery or something to that effect." *Id.* at 75. Silverstein testified that at that point he told Horan "to do whatever investigation he needed to do to be satisfied that these emeralds came from the site, and he was the admiralty attorney so it was his responsibility to make sure it was being done right." Hearing

Tr. 7 at 20. Horan responded that he would follow through. *Id.* Horan does not recall whether these emeralds were included in the *res*, Hearing Tr. 1 at 75, but according to Silverstein, both Horan and Jay each told Silverstein on separate telephone calls that this 20 lb. group had been deposited in the safe-deposit box that contained the *res*. Hearing Tr. 7 at 28. Silverstein testified that he believed Horan "had done his diligence and was satisfied that the emeralds had come from the site" after all. *Id.* at 22. Sullivan testified that this incident showed him that Jay and Steve had come around and started to trust in the court process. Hearing Tr. 10 at 123.

On September 30, 2011, Horan filed a Status Report on behalf of JTR. DE #7. This status report advised that a safe-deposit box had been leased in Key West and that "the majority of the recovered items are in those boxes. The remaining recovered items are in a bank vault in New York and arrangements are being made to transport them to a bank in South Florida." *Id.* The report further stated that thirty-six of the stones were at the Smithsonian. Following this Status Report, Horan filed the Report of Duncan R. Mathewsson, discussed above, which had opined that the emeralds "clearly represent[ed] a cargo loss at sea" and that an approximate date range for the site could be from 1570–1700, though "more research is required before a more definite date can be determined." DE #19 at 9.

Also, as discussed previously, on October 16, 2011, Motivation filed its Verified Claim (DE #10) asserting a potential interest in the emeralds on the *Atocha* "floating barrel" theory. Horan testified that he "did not believe [Motivation's] claim to be valid with regard to it floating over in a barrel from the *Atocha* and *Margarita* wreck site." Hearing Tr. 1 at 139. In an October 29, 2011, email to Silverstein, Sullivan, and Scott, Horan advised that Motivation was just "looking for cover from dissatisfied investors and are inviting them on a fishing expedition." Silverstein Ex. 13. Silverstein responded to Horan that same day, saying "in Delaware, we could move to dismiss for failure to state a claim (if we believe we have a basis for such a motion, and get discovery stayed pending resolution of the dismissal motion" and asked "[i]s that a viable

option in the admiralty proceeding?" *Id.* On December 1, 2011, Horan filed JTR's Motion to Dismiss Motivation's claim arguing that its fatally flawed legal basis and facially implausible factual allegations doomed the claim. DE #40.

### g. Indications of Epoxy

Prior to filing the Admiralty Action, Horan advised JTR to retain the services of a professional salvage company (*see* Motivation Ex. M1-7) to assist with the recovery and marketing of the emeralds, Hearing Tr. 1 at 81, and, as discussed previously, Jay and Steve began to get advice on the subject from salvage company Odyssey Marine. On November 9, 2011, at the request of Odyssey, Horan and Daniel McAllister, an emerald consultant Odyssey recommended, went to the bank in Key West at which the emeralds were being kept and examined the stones. *Id.* at 82. Mr. McAllister said that he believed he'd be able to determine which emerald mining region in Colombia the emeralds came from, and he selected several stones to be forwarded to the Ecole National Superieure de Geologie de Nancy (the "French Lab") and to Laboratoire Gemtec (the "Swiss Lab") so the labs could determine their mining origin and age. *Id.* McAllister selected these labs, and later described them in an email to Horan and Sullivan as "the world's best gemological labs specializing in colored stones, emeralds specifically." Motivation Ex. M1-18 at 3. Odyssey Marine paid for this testing. Hearing Tr. 1 at 148.

On November 23, 2011, Horan filed a Stipulation for an Agreed Order (DE #37), which, among other things, stated that testing was being done on a number of the stones ("fewer than 50") in France, Switzerland, and Colombia, and that the stones would be returned to Key West after testing was completed. The Court entered this Stipulation as an Order on December 1, 2011. DE #38. That same day, Horan filed JTR's Motion to Dismiss (DE #40).

On December 1, 2011, McAllister called Horan and informed him of issues the labs had communicated to him: "The Swiss and the French laboratories were having some difficulty and

34

were actually asking him whether he was trying to play a trick on them because they had—they indicated that there was some type of an enhancement or coating on the emeralds." Hearing Tr. 1 at 83. Horan was shocked at this information, *id.* at 147, and called Mr. Silverstein and others and informed them of these findings, who were similarly surprised. Hearing Tr. 10 at 127. As discussed previously, the Smithsonian had examined a number of the emeralds in July and September of 2010 and did not discover any residue on the emeralds. Silverstein Ex. 1. And the December 9, 2010, GAL analysis specifically stated that each and every stone it had examined was "Untreated – No Evidence of Oil or Resin." Silverstein Ex. 2. No report disclosing these results was filed with the Court at this time.

Within a couple days of receiving the first indications of modern enhancements on the stones, Silverstein had a telephone conversation with Horan in which Silverstein asked Horan if he would be willing to "do another dive to retrieve emeralds that [Horan] selected in the water . . . bring them out of the water in seawater, encapsulated in seawater, and send them to the GIA to be examined." Hearing Tr. 7 at 30–31; Hearing Tr. 1 at 154. Silverstein had informed CBS of the French and Swiss lab results, and had gotten CBS to agree to pay for further testing by the Gemological Institute of America ("GIA"). Motivation Ex. M1-18 at 2–3. The emeralds that the Smithsonian had were uncleaned and had also been encapsulated in seawater. Motivation Ex. M1-18. Horan agreed to dive for new samples. On December 8, 2011, Silverstein sent an email to Horan, copying Jay, Steve, Scott, Sullivan, Davis, and Livingston, saying:

> I, too, am troubled by what I am told the Swiss and French labs have found, most of which I still have not seen. I am not, however, convinced that what I have heard is dispositive proof that Jay has been untruthful regarding anything stated in the verified filings in the admiralty proceeding, or in the filings in Delaware or the Settlement Agreement in Delaware, for that matter. That is why I have in courage Jay, you [Horan], and CBS to conduct further examination by the GIA of either or both of (i) the uncleaned material provided to the Smithsonian or (ii) a new batch of material to be salvaged from the site.
>
> Unless and until we are presented with conclusive proof that Jay has been untruthful in the statements made in the court filings, it would be a gross violation

of professional responsibility, as well as a breach of the attorney-client privilege, if either of us [Silverstein or Horan] were to make any disclosure of what we currently know (or believe we know) about the French and Swiss labs to any person who is not under a non-disclosure agreement with Jay or JTR. Needless to say, it would be grossly inappropriate for either of us to disparage Jay to others without regard to what a further investigation might reveal.

I intend to discuss the current situation further with CBS, and see what, if anything, they can do to facilitate the next level of testing. If further investigation discloses that Jay has been untruthful (which I do not believe to be the case), we should provide full cooperation with CBS to uncover that fact. In the meantime, we all need to be careful to avoid doing or saying anything to anybody that interferes with the ongoing investigation into the facts and/or which wrongfully impairs the interests of Jay or JTR. Otherwise, there may be serious consequences if it turns out that Jay has been truthful in his court declarations.

Motivation Ex. M1-15.

Silverstein testified that, on the afternoon of December 13, 2011, he and Sullivan had a telephone conversation with Jay and Steve at Horan's request. Hearing Tr. 7 at 25. That evening, Silverstein sent an email to Horan, copying Jay, Steve, Scott, Sullivan, Davis, and Livingston, summarizing the contents of that telephone conversation. M1-16. According to Silverstein's email, "[Sullivan] and I explained to Jay and Steve that there are serious consequences resulting from making false statements to a federal court." *Id.* Silverstein testified that, though he doesn't recall the precise questions he and Sullivan asked of Jay and Steve, the phone call "was akin to a cross-examination of a witness in a trial. I was trying to nail down the facts and I was trying as best I could, also, to do it in a way that wouldn't lead them to the right answers. I wanted to actually trip them up if possible to find out if there were inconsistencies in their story." Hearing Tr. 7 at 27. Silverstein's email summary of the conversation states that

Jay and Steve both stated/confirmed the following (among other things):

1.  All material that is currently in JTR's safe deposit boxes at Centennial Bank (the "Admiralty Res"), including the entirety of the 20 Pound Group, came from the Treasure Reef Site. As both Jay and Steve put it, "Every bit of it came from the site."

2.  Neither Jay nor Steve placed any of the Admiralty Res at the Treasure Reef Site. In other words, they did not "salt" the site.

3. Neither Jay nor Steve has any knowledge of any one else having placed the Admiralty Res at the Treasure Reef Site for Jay and Steve to "find." In other words, they know of nobody else having salted the site.

4. Neither Jay nor Steve (nor anyone else to their knowledge) has enhanced the Admiralty Re or otherwise treated it after it was discovered, other than by cleaning the Admiralty Res in the manner that Jay and Steve have previously explained. Namely, Jay and Steve cleaned the Admiralty Res using water, detergent, and paint thinner and/or mineral spirits in a basin or tub at Steve's house in Key West.

Motivation Ex. M1-16 at 1.

Silverstein then repeated his suggestion that, as the source of the epoxy remains a mystery, the emeralds at the Smithsonian be sent to the GIA for testing, and that Horan dive the site and bring up new, uncleaned emeralds to be sent for testing at the GIA, which would also test a random sampling of previously salvaged material. *Id.* at 2.

In an email dated December 16, 2011, McAllister recommended to Horan that the test results be disclosed publicly "very soon, tomorrow or the day after." Motivation Ex. M1-18 at 5. He also stated, "I endorse the decision taken to resend further samples to the GIA lab in New York but whatever kind of results they might produce, the European results so far are, by all technical standards, rock solid." *Id.* On December 18, 2011, Silverstein responded to McAllister's email, with copies to Horan and Sullivan, among others. *Id.* at 2–3. Silverstein stated that Jay had agreed to work exclusively with CBS Broadcasting regarding his emerald story, and that they had informed CBS of the "probable results from the French and Swiss labs" and "requested their assistance in getting to the bottom of this 'mystery.'" *Id.* at 3. He told McAllister of the plan to send emeralds to the GIA from the Smithsonian and from a new dive, as well as their intent to have the French and Swiss lab emeralds sent to the GIA. *Id.* Silverstein's email closed with a request that the French and Swiss labs cease their current testing, as those emeralds would be submitted to the GIA for analysis. *Id.*

The next day, on December 19, 2011, Silverstein sent McAllister a final email to correct a "mistake in [the December 18, 2011,] email" which could have caused the intention of that email to "have been misconstrued." *Id.* at 1. Silverstein stated that, rather than ceasing testing as the previous day's email had requested,

> Jay and JTR do want for the Swiss and French labs to complete their analyses and prepare a final written report of their analyses. . . . Also, when the Swiss and French labs are finished [sic] their analyses and have prepared their reports, Jay and JTR do not want the emeralds sent back to JTR. Rather, they want the emeralds to be sent directly to the GIA, so that the GIA also can perform its on analyses upon the same material and reach its own conclusions.

*Id.* at 1.

Essentially, Silverstein was seeking to avoid the appearance that there was any sort of "cover-up" of the test results. *Id.* at 2. His email went on to state that, "[o]bviously, one does not work with CBS News and 60 Minutes with any expectation that the results of that investigation would not be made public once the investigation is properly concluded," and "[o]nce we have all the facts, we intend to disclose them to the Court through an appropriate filing. Until that time, and until all the facts are in, it would be inappropriate for any of us to comment publicly." *Id.* at 2-3.

As previously discussed, on January 6, 2012, Horan filed JTR's Second Status Report (DE #54) which did not reveal to the Court that epoxy had been found on the emeralds, but did disclose that the testing referred to in the Stipulation for an Agreed Order (DE #37) was ongoing, that further testing was being done, and that the test results would be produced and filed with the Court. The Second Status Report stated, in relevant part, that:

> JTR has submitted samples of the emeralds for analysis by the Smithsonian Institute, the Gemological Institute of America, and laboratories in France and Switzerland. JTR is currently awaiting final reports of the analyses from France, Switzerland and the GIA. The samples analyzed by the French and Swiss labs have been sent to GIA for further analysis. JTR is also sending further samples of the emeralds to the GIA once they are recovered by the undersigned [Horan] from the Discovery Site. Samples previously sent to the Smithsonian Institute have been sent to GIA for analysis. Once all of these analyses are completed, and JTR

is in possession of final reports from each of the GIA and French and Swiss labs,
JTR intends to file a copy of those final reports with this Court in connection with
a further Status Report.

DE #54 at ¶5.

According to Silverstein, "[n]o one ever doubted that at some point in time there was going to be full public disclosure of all the information. The question was, when do you make that disclosure and how much information should you have in your hands before that disclosure was made." Hearing Tr. 6 at 218.

On January 18, 2012, Horan once again dove the discovery site, with Steve and salvaged twenty emeralds. Hearing Tr. 1 at 154; Silverstein Ex. 25. These emeralds were brought up in seawater and sent to the GIA for analysis. *Id*. JTR did not receive written reports from the French or Swiss labs until February 12, 2012. Soon after receiving the French and Swiss lab reports Horan began to prepare a draft of a Third Status Report that would be submitted to the Court to reveal the results of the ongoing testing, including that epoxy had been found on some of the emeralds. Motivation Ex. M1-27 at 2, February 28, 2012, email from Horan to Silverstein, Sullivan, Steve, Scott, and Jay. Silverstein responded to Horan's email later that day and pointed out that the GIA results had not yet been received, and the Second Status Report told the Court that a Third Report would be filed once all test results were received, and questioned whether the report was even required. *Id*. at 1. Horan felt strongly that the Court needed to be told of the epoxy results because of the previously filed report of Dr. Mathewsson that opined these emeralds could be of ancient origin. *See* Motivation Ex. M1-3, March 1, 2012, email from Horan to Silverstein. Silverstein, however, was not in favor of immediate disclosure. Motivation Ex. M1-27 at 1.  In addition to waiting for the results of all testing before disclosure, on March 26, 2012, in an email to Horan and John Siracusa, (who had been retained as new admiralty counsel to JTR in March of 2012) Silverstein suggested that "the best time to file [the Third Status

Report] would be on the Friday afternoon before the broadcast of the *60 Minutes* segment." Motivation Ex. M2-9.

On April 17, 2012, JTR received the testing results from a lab Sullivan had retained called Matco. DE #82 at 16. The next day, April 18, 2012, JTR filed its Third Status Report, which for the first time revealed to the Court that modern epoxies had been found on some of the emeralds months before, and that the salvaged material might have come from a more "modern" shipwreck. DE #82. Prior to the final version being filed, Silverstein edited and circulated several drafts (*see* Motivation Ex. M2-9, March 26, 2012, email chain between Silverstein, Horan and Siracusa), and expressed in no uncertain terms that Horan did "not have authority to file" the Third Status Report until he (JTR's general outside counsel) and Jay "signed off." Motivation Ex. M2-44, April 18, 2012, email chain between Silverstein, Horan, Siracusa, Jay, and others.

### h. Horan's Withdrawal As JTR's Attorney

The record reflects that as early as December 8, 2011, Silverstein understood that Horan was "considering withdrawing from representing JTR in the admiralty case," and that Horan believed he needed to inform the Court of the results of the Swiss and French lab test results and of his doubts as to Jay's truthfulness. Motivation Ex. M1-1 at 3. Moreover, it is apparent that this was not the first time Horan had considered withdrawing. *See id.* ("I further understand that you are, once again, considering withdrawing . . .").

On February 28, 2012, Horan emailed Silverstein and others to tell them that 1) the Swiss and French labs agree that epoxy resin was present on the emeralds; 2) he was drafting a third status report to the Court; and 3) Judge King must get the information about the tests from them—not from CBS, the Fishers, or anyone else. Motivation Ex. M1-27 at 14.

Silverstein responded, observing that 1) they had yet to receive a report from the GIA; 2) they were not required to submit a third status report yet; 3) the second status report represented they would file a third once all results were in; and 4) the Court need not necessarily learn about

the tests from them (as opposed to from someone else). *Id.* Silverstein also wrote that, in the absence of new investment in JTR, there were no funds to continue to pay Horan under his current agreement as of March 1. *Id.* Silverstein commented that Horan may elect to withdraw or to renegotiate the terms of his engagement, but that if Horan elected to withdraw they would need to have substitute counsel in place, which substitution Silverstein said he believed could be accomplished by the end of that week or sooner if necessary. *Id.* "Unless and until a decision is made as to who is going to be representing JTR in the admiralty proceedings," Silverstein continued, "there should be no activity, whatsoever, that is not mandated by the Court (or applicable Court rules.)" *Id.* JTR then retained the West Palm Beach, Florida admiralty law firm of Janssen & Siracusa as co-admiralty counsel with Horan.   Notice of Appearance of John Siracusa, DE #73, March 9, 2012.

Horan took exception to Silverstein's comment that the Court need not necessarily learn about the tests from them. On March 1, 2012, Horan emailed Silverstein and told him that, in Horan's mind, failure to advise the Court of the French, Swiss, and GIA enhancement reports would be equivalent to an affirmative misrepresentation in violation of his professional responsibilities as a lawyer. Motivation Ex. M1-3 at 17. He cited relevant ethical rules. *Id.* He explained that he would wait until a final testing report was issued, but that if Silverstein attempts to "delay the disclosure of this relevant issue to the court," then Horan would "withdraw and inform the court." *Id.* Horan also wrote, "[s]ometime ago you made the mistake of threatening me with litigation. I hope I made myself clear on that point." *Id.* Silverstein responded that while he agreed that Horan could "withdraw at any time if you have lost confidence in your clients," Horan's proposed course of action "would be actionable in Delaware." *Id.* at 16. Silverstein cautioned him not to reveal confidential information, ending with, "this is not a threat of litigation. It is simply a straight-forward statement of where things stand." *Id.* In the instant proceedings, when asked on cross-examination if Horan threatened to

withdraw if the epoxy results were not released to the court, Silverstein said he was "not sure that's accurate." Hearing Tr. 9 at 105: 5–9.

On August 22, 2012, Siracusa emailed Silverstein to tell him that Horan was likely going to withdraw that day. Motivation Ex. M2-24; Hearing Tr. 9 at 146:18–20. Silverstein wrote back that "[t]here is absolutely no reason for David [Horan] to withdraw now, as he is not required to do anything." *Id.* at 68. Silverstein continued: "Someone other than me needs to talk sense into David. Alternatively, he needs to be threatened with sanctions and/or a suit for malpractice – and remind him that he contractually consented to personal jurisdiction in Delaware in the event of any dispute with the client." *Id.*

Sometime after this email exchange (between late August and early October of 2012), Silverstein went down to Key West and spoke with Horan. Hearing Tr. 9 at 147:13–17, 150:4–7. The reasons Horan was withdrawing, as far as Silverstein understood, were "the coins and the 20-pound bag," and the epoxy findings. *Id.* at 150:13–19.[9] Silverstein characterized the interaction as cordial, with only a brief moment of tension when, after he re-stated his position that Horan's withdrawal would be actionable, Horan misunderstood that Silverstein was threatening him with a malpractice suit. *See id.* at 158. Horan indeed testified that he "took that as a threat," and that they "did not have a physical altercation, but it was close." Hearing Tr. 1 at 125:14–16.

Horan ultimately moved to withdraw on October 8, 2012 (DE #138), which the Court granted two days later (DE #141). Silverstein testified that Horan's withdrawal did not create any doubt in his mind about the genuineness of the find. *Id.* at 152:21–24.

---

[9]     Silverstein stated that Horan had been expressing his desire to withdraw "since February or March when he stopped receiving his retainer (i.e. when Silverstein told him he would no longer receive it in response to Horan's insistence on filing the Third Status Report), and he had been raising those issues from time to time." *Id.* at 150:23–25.

### i.   $50,000.00 Payment for Treasure Map

Silverstein doesn't remember exactly when the subject of Jay's acquisition of the map and the subsequent release he claimed to have secured from its seller came up, but says it was "[w]ithin the first 30 to 60 days of our representation of Jay Miscovich in the Delaware litigation." Hearing Tr. 9 at 12:14–15. Silverstein's memory of what Jay told him is that after Jay found the emeralds, Jay called his brother Scott, who called a friend of his named Dean Barr. *Id.* at 12:16–20. "Dean Barr then set Jay up with Dean Barr's accountant, Neil Ash, and Mr. Ash and Mr. Barr set Jay Miscovich up with Proskauer Rose in New York City." *Id.* at 12:21–23. The Proskauer Rose attorneys, Barr, and Ash asked Jay to obtain a release from Mike Cunningham. *Id.* at 21:24–13:7.

Silverstein remembers Jay telling him that he was in Latrobe, Pennsylvania, when "a young associate from the Proskauer firm dictated a release to him over the telephone – I think he said it was a pay phone – and Jay wrote it down and then typed it up and then at some point met with" Cunningham. *Id.* at 13:14. Jay said he paid $50,000 for the release with money that had been provided to him. Silverstein did not receive a copy of the release (nor did he ask Jay for a copy of it) until November 18, 2011. *Id.* at 94:12–21. Silverstein does not remember whether he knew the name Mike Cunningham before he received a copy of the release. *Id.* at 94:22–24. This is the release:

JTL EX. 29

## AGREEMENT

I, Mike Cunningham, do hereby release, relinquish and convey to Jay Miscovich, all right, title, claim or interest I may have in a map of the ocean and any claim of any nature whatsoever in any jewels, stones, coins, antiquities, gold or silver bars, muskets, weapons, collectibles, or any other item of worth that may arise from the use of said map. This release is made for and in consideration of the payment of fifty thousand dollars, the receipt of which is hereby acknowledged by the undersign's execution here of. This release is to act as a full, final and complete release of all rights and claims the undersigned may have of any nature, whether at law or in equity. The payment of the sum of $50,000 is payment in full and is accepted as payment in full by the undersigned for any claim or cause of action the undersigned may have against Jay Miscovich, his agents, employees, successors, or assigns. Therefore, intending to be legally bound hereby and in acknowledgement of the receipt of fifty thousand dollars, Mike Cunningham does hereby execute this release and conveyance this the 20TH day of April, 2010.

Mike Cunningham

*Mike Cunningham* (signature)

SIGNED AND SWORN

(signature)

Jay E Miscovich

(signature)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Stacey Lee Wolf, Notary Public
City of Latrobe, Westmoreland County
My Commission Expires May 19, 2012
Member, Pennsylvania Association of Notaries

(signature)

I WILL NEVER DISCLOSE MIKE CUNNINGHAMS NAME TO THE PUBLIC. IF I DO SO THIS AGREEMENT IS VOID

(signature)

(notary seal)

Motivation Ex. M-27.

Silverstein was told that the handwritten addendum was added at Cunningham's request. Hearing Tr. 9 at 98:5–6. Even after seeing the release, Silverstein believed Jay's story about the Proskauer Rose attorney dictating the release. *Id.* at 95:14–19. Silverstein had no suspicion at all

that a Proskauer Rose attorney might not have dictated the release. *Id.* at 96:19–22.[10] Silverstein did not ask Jay which Proskauer attorneys he worked with or call anyone at Proskauer Rose to inquire after Jay's story. *Id.* at 96:16–97:2.[11] Silverstein also failed to ask Jay for bank records or other documents to confirm that he had paid $50,000 to Cunningham. *Id.* at 118:11–15. Silverstein stated that, as far as he understood, the release "had nothing to do with . . . anything that was going on in Florida." *Id.* at 97:1–23.

The subject of the release came up approximately two weeks before the admiralty trial, in a chain of emails between Silverstein, Miscovich, Janssen, and Siracusa.[12] Janssen pressed Jay for bank statements indicating that he withdrew $50,000 from his PNC bank account. Motivation Ex. M2-54 at 9. As far as Janssen could tell, the withdrawals leading up to the date of the Cunningham release only added up to $43,193 *Id.* at 8 ("we really need the identification of the withdrawals that add up to $50k. A contorted explanation is not going to fly with the Court . . . ."). Siracusa chimed in, stating that "the money going out of your [Jay's] account leading up to your agreement with Mike [Cunningham] is not enough to pay Mike the $50K and your expenses for that month. If you did not pay $50K to Mike, its critical we know now before we go to trial – we cannot properly represent you if we did not know this." *Id.* at 7. Jay responded, explaining that he kept a lot of cash at home, enough to have paid the difference, because of his worry that if he kept a lot of money at the bank, various creditors or potential creditors would be able to get it. *Id.* at 4. Janssen fired back: "Then why did you have no issue leaving the 10k in the bank at the end of the month when you had less than $100 at the start?

---

[10]     Silverstein testified that Jay told him the reason the release was dictated, rather than drawn up and sent to him, was because Jay "was living from place to place, he didn't have a place to live, he couldn't afford a phone, he didn't have a working printer or computer, and that was the way it had to be done." *Id.* at 96:10–13.

[11]     Silverstein said it would have been inappropriate for him to do so because Jay, Scott, and Steve were contemplating bringing legal action against Proskauer. *Id.* at 97:3–9.

This type of tale will not fly at trial." *Id.* Jay's response: "it [is] not a tale...............its not a tale..........you can all go f*** yourselves." *Id.*

Janssen wrote to Silverstein and Siracusa: "He [Jay] needs to realize that he can't just muddle through this. He has lied to us in the past about this case, and has changed his story several times to fit whatever new facts we discover." *Id.* at 3. Silverstein pressed Janssen and others repeatedly to tell him what Jay had lied about, but Janssen wouldn't say, responding, "it is nothing that I wish to put in writing, and nothing that would affect anyone's testimony in the case." Motivation Ex. M2-55 at 16.

Silverstein testified that he did not understand, from reading these emails, that Janssen and Siracusa thought the map story and the payment were untrue; rather, he understood that Janssen and Siracusa "were concerned that they didn't have enough proof to present that in court."  Hearing Tr. 9 at 163:2–6. When asked on cross examination, Silverstein acknowledged that Janssen and Siracusa were saying that "the bank records did not support Jay's account." Hearing Tr. 10 at 22:18–20.

At the admiralty trial, Jay testified generally to the same story about Mike Cunningham that Silverstein says he heard from Jay, though at trial Jay provided much more detail than the record shows Silverstein to have been aware of previously. Jay revealed Mike Cunningham's name over objection, and described him as illiterate, with psychological problems, often on the verge of homelessness or actually homeless, with no family, Motivation Ex. M41 at 134:24–135:10, whose contact information is unknown, and who would call Jay every few weeks for twenty years from unknown sources. (Jay testified that his cell phone would always show "withdrawn" when Cunningham called). Cunningham's twenty-year tradition of bi-weekly anonymous calls ceased after Jay paid him the $50,000, at a bar in Latrobe, Pennsylvania, and got him to sign the release; Jay hadn't heard from him since. *Id.* at 130:1–3.

---

[12]     Plaintiff JTR new counsel, hired after Mr. Horan withdrew.

As to the $50,000, Jay testified that he "got $50,000 from a bank over a period of several days," *Id.* at 16:20, starting in early April 2010, over a period of four weeks, from PNC banks in and around Latrobe, Pennsylvania. *Id.* at 16:21–17:3. *See also id.* at 17:4–15, 18:7–9. In response to a direct question about how much money he withdrew, Jay responded, "$50,000." *Id.* at 18:12–13.

Jay made no mention of the release being dictated, even in the face of questions by the Court about how the New York lawyers "gave [him] a document," *Id.* at 130:25–131:4, or "gave [him] the paperwork . . . ." *Id.* at 133:8–9. As for the notary who notarized the release in the bar where Jay met Cunningham to give him the money, Jay first said he didn't know who she was. *Id.* at 131:7–12. He later clarified that he arranged for the notary: "She, at the time, was a notary for an attorney that I didn't know, but he had done some real estate closings for other parties. . . . I didn't know this lawyer at all." *Id.* at 137:15–22. When asked for the attorney's name he said "I believe" his name was Alan (or Alen) Roth. *Id.* at 138:5–6. Jay testified that he thought someone had told him that the notary moved to Chicago. *Id.* at 137:24. It was only when Jay stated (in response to the Court's questioning) that the release was unavailable that Siracusa interjected, informed the Court that Plaintiff did have a copy of it, and produced it. *Id.* at 139:23–140:20.

Bruce Silverstein was a sequestered witness during the admiralty trial. He was not present for Jay's testimony. However, Silverstein received a transcript of Jay's testimony at some point, though he couldn't remember when. Silverstein's best recollection of when he received the transcript was March, April, or May of 2013. Hearing Tr. 10 at 17:13–17. Silverstein testified that he did not read it carefully: "I don't recall what Jay said during his testimony in the trial. I read the transcript. I skimmed the transcript when I received it and I do not recall what Mr. Miscovich said in his testimony." Hearing Tr. 9 at 160:25–161:5. Silverstein stated the following in an affidavit: "When I read the trial transcript [of Jay's testimony], I did not understand or

believe that anything that Jay had said under oath to have constituted perjury." Motivation Ex. M-8 at 70.

As we now know, Jay's story about Mike Cunningham was fiction. Within weeks of Jay's revealing Cunningham's name at the admiralty trial, Motivation found Cunningham and deposed him. Silverstein learned in January 2013 that Motivation had found a Mike Cunningham, who had worked for Jay in Latrobe, Pennsylvania. It turned out that Cunningham was in prison at the time the release was purportedly executed on April 20, 2010. Hearing Tr. 10 at 15:25–16. Faced with this information, Jay asserted that there were actually two persons named Mike Cunningham who worked for him in Latrobe, Pennsylvania, and that Motivation had the wrong one. Silverstein testified that he believed this—or as he clarified a moment later, "I had no reason to disbelieve that he had and I didn't form a conclusion one way or the other. That's actually what I remember." *Id.* at 16:21–17:2; *see also id.* at 55:7–16. Silverstein testified that he wasn't curious about the contents of Cunningham's deposition testimony. *Id.* at 53:10–13.

Moreover, in investigations leading up to Judge Moore's sanctions trial, Siracusa's investigation revealed that there was yet another executed "release" from Mike Cunningham. Siracusa says he had a conversation with Tobia over the telephone that led to his withdrawal. Hearing Tr. 2 at 49:7–11. Tobia told him that there was an earlier agreement (prior to the $50,000 agreement) between Jay and Cunningham. This was the first Siracusa had heard of it. *Id.* at 49:12–20. He confronted Jay, who admitted the existence of the agreement, but denied having a copy or knowing where one was. *Id.* at 49:17–20. Tobia also claimed not to have a copy, but directed Siracusa to another associate of Jay's, Scott Heimdal. Siracusa convinced Heimdal to give him a copy. *Id.* at 49:21–50:3. Siracusa received it in October 2013. *Id.* at 50:24–51:1. Siracusa testified that "this [was] the first time that I had personally caught Jay [in] just a boldfaced lie." *Id.* at 51:4–5.

Siracusa then called Silverstein and told him that they had to withdraw for ethical reasons. *Id.* at 54:19–24. Siracusa (and his law firm) moved to withdraw as counsel on October 17, 2013 (DE #287). Judge Moore denied the motion upon considering that Plaintiff lacked additional counsel of record. *See* DE #291. Judge Moore noted that, "Before a renewed motion will be granted as to Plaintiff, replacement counsel must file a notice of appearance," but JTR did not obtain replacement counsel. *Id; see also* Hearing Tr. 2 at 55:11–14. Siracusa later testified that, upon hearing Rodriguez's testimony, he knew he had really been fooled; but when he moved to withdraw on October 12, 2013, in his mind he had reached a point where he knew or should have known that something was wrong and that he had an ethical obligation at that point to withdraw. *Id.* at 83:22–84:2. Not that he necessarily believed the find to be false, but he did believe that the Cunningham story was made up, "which certainly cut against the actual find itself." *Id.* at 84:5–10.

Ultimately, after the fraud on the court was revealed, Judge Moore allowed Janssen & Siracusa to withdraw. DE #433. Janssen & Siracusa settled "any potential settlement claims" with Motivation on February 28, 2014. DE #406.

## III. Conclusions of Law

### A. <u>Legal Standard</u>

#### a. <u>The Nature and Scope of Inherent Powers</u>:

No statutory mechanism authorizes monetary sanctions against Silverstein, a non-party who was not subject to a Court order and was not counsel of record in the underlying action. The Court's ability to sanction Silverstein can derive only from its "inherent powers."

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to

> impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also *Ex parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962).

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991). "Invocation of a court's inherent power requires a finding of bad faith." *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir. 1995). An attorney acts in bad faith where he, e.g., knowingly or recklessly[13] pursues a frivolous claim or needlessly obstructs the litigation of a non-frivolous claim. *Amlong & Amlong, P.A. v. Denny's, Inc.,* 500 F.3d 1230, 1242 (11th Cir. 2006). As a sanction for bad faith conduct, the Court may assess attorneys' fees.

> [A] court may assess attorney's fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" . . . In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, *Universal Oil, supra,* 328 U.S., at 580, 66 S.Ct., at 1179, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," *Hutto,* 437 U.S., at 689, n. 14, 98 S.Ct., at 2573, n. 14. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy." *Ibid.*

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46 (1991) (footnote omitted). Such an assessment of attorneys' fees is an exception to the American Rule, which generally prohibits fee-shifting. The exception's purpose is punitive. *Id.* at 53 (internal quotation marks omitted) (quoting *Hall,* 412 U.S. at 4–5).

---

[13]   The parties have also highlighted the doctrine of willful blindness, under which "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposely contrives to avoid learning of it." *Williams v. Obstfeld,* 314 F.3d 1270, 1278 (11th Cir. 2002).

Just because a Court can assess attorneys' fees for bad-faith conduct under its inherent power does not mean that it should. "Because of their very potency, inherent powers must be exercised with restraint and discretion. . . . A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. The extent of a court's inherent powers "must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Degen v. United States*, 517 U.S. 820, 823 (1996). "Principles of deference counsel restraint in resorting to inherent power . . . and require its use to be a reasonable response to the problems and needs that provoke it." *Id.* at 823–24. Of course, the court "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* at 50.

### b.  The Court's Inherent Power to Sanction Non-Parties:

Mr. Silverstein, who was neither counsel of record nor a party, argues that the Court lacks the inherent power to sanction him. The Court disagrees. Although *Chambers* does not directly address whether, under its holding, courts have the inherent power to assess monetary sanctions against non-parties, existing Supreme Court precedent supports the conclusion that courts have the inherent power to do so.

In affirming sanctions for a party's bad-faith litigation conduct, the *Chambers* Court explained that "[t]he imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus . . . 'vindicat[ing] judicial authority . . . .'" *Id.* at 46 (alterations in original). This inherent power of the Court to police itself and to vindicate judicial authority extends to non-parties under *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). There the Supreme Court established that "[a] court has the power to conduct an independent investigation in order

to determine whether it has been the victim of a fraud." *Chambers*, 501 U.S. at 44 (citing

*Universal Oil*, 328 U.S. at 580). The *Universal Oil* Court explained the scope of this power:

> The power to unearth such a fraud is the power to unearth it effectively.
> Accordingly, a federal court may bring before it by appropriate means all those
> who may be affected by the outcome of its investigation. . . . No doubt, if the
> court finds after a proper hearing that fraud has been practiced upon it, or that the
> very temple of justice has been defiled, the entire cost of the proceedings could
> justly be assessed against the guilty parties.

*Universal Oil*, 328 U.S. at 580. Thus, the Supreme Court expressly authorizes a court to bring

non-parties ("all those who may be affected by the outcome of its investigation") before it by

appropriate means. The Court's conclusion that "the entire cost of the proceedings could justly

be assessed against the guilty parties," when read in context, clearly embraces non-parties (that

is, the Court did not use "guilty parties" as a term of art). *Chambers* does not depart from

*Universal Oil*. Rather, *Chambers* reaffirmed its validity, as has the Eleventh Circuit. *See In re*

*E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996). This Court is

bound by those decisions.

Further supporting the Court's inherent power to sanction non-parties is the fact that

*Chambers* affirmed sanctions against Chambers for acts he committed before he became a party

or was subject to any court order, and mentioned without comment that the district court had also

sanctioned non-parties. *Chambers*, 501 U.S. at 40 n.5. And the Eleventh Circuit recently

affirmed a district court's imposition of sanctions on a non-party. *Sciarretta v. Lincoln Nat. Life*

*Ins. Co.*, — F.3d —, No. 13-12559, 2015 WL 795593 (11th Cir. 2015). And while the Eleventh

Circuit, in *In re Novak*, held that a district court lacked the inherent power to compel an

employee of a non-party insurance company to attend a settlement conference where to do so

was "neither authorized by Congress nor necessary for the court to perform its duties." 932 F.2d

1397 (11th Cir. 1991). That decision implies that a court may exercise its inherent power over

non-parties in the absence of congressional authorization where to do so is "necessary for the

court to perform its duties," an implication consistent with *Chambers*'s admonition[14] that available statutory mechanisms should be used before a court resorts to its inherent power. *Chambers*, 501 U.S. at 50.

A court's inherent power "is both broader and narrower than other means of imposing sanctions. . . . [W]hereas each of the other mechanisms reach only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." *Id.* at 46. In these proceedings, Motivation alleges that Silverstein, through direct and indirect influence in the underlying litigation, perpetrated a fraud on the Court. If these allegations are proven, the Court's ability to vindicate its authority, to hold responsible those who defiled the temple of justice, reaches him. That he is a non-party means only that the power to sanction him falls within those "interstices" between mechanisms otherwise available to the Court. *See, e.g., Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 979 F. Supp. 2d 1270, 1272 (M.D. Fla. 2013) (sanctioning treasure salvage company Plaintiff's general counsel pursuant to 28 U.S.C. § 1927 where general counsel had made an appearance in the case on Plaintiff's behalf and was found to have vexatiously multiplied proceedings in underlying litigation).

### c.  Heightened Burden of Proof:

Motivation's burden to prove its allegations is heightened in two respects. First, because Silverstein is a non-party, he is protected by two procedural hurdles. In *Helmac Products Corp. v. Roth (Plastics) Corp.*, the Eastern District of Michigan devised a two-part test: "To be subject to the Court's inherent power to sanction, a non-party not subject to court order must (1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered." 150 F.R.D. 563, 568 (E.D. Mich. 1993). Some courts in the Southern District of Florida have applied this test. *See, e.g., Feldman v. Davidson*, No. 05-

---

[14]      *In re Novak* was decided one day after *Chambers* and does not cite it.

61760-CIV, 2009 WL 995473, at *2 (S.D. Fla. Apr. 13, 2009). Indeed, Judge Moore applied the *Helmac* test in assessing sanctions against Jay Miscovich (DE #45 at 20 n.19) and Motivation acquiesced in it here (DE #407). This Court will apply the *Helmac* standard in evaluating the instant motion.

Second, Motivation must prove its allegations by clear and convincing evidence. *See Barash v. Kates*, 585 F. Supp. 2d 1347, 1365 (S.D. Fla. 2006) (holding the movant to a clear and convincing evidence standard of proof of conduct that warrants attorneys' fees as sanctions pursuant to the court's inherent power); *cf. In re BellSouth Corp.*, 334 F.3d 941, 963 n.19 (11th Cir. 2003) (noting that courts require a "heightened showing" in order for a court to exercise its inherent authority to suspend or disbar an attorney from practicing before it). "The 'intermediate standard of clear and convincing evidence' lies 'between a preponderance of the evidence and proof beyond a reasonable doubt.'" *Kenyeres v. Ashcroft*, 538 U.S. 1301, 1305 (2003) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)).

The Court therefore decrees that Motivation must prove by a standard of clear and convincing evidence the allegations of its Motion for Sanctions.

**B. Discussion and Conclusions of Law**

  **a.  Silverstein, a non-party, can be reached by this Court under *Helmac***

As a preliminary matter, the Court finds that Motivation has established that though technically a non-party, and an attorney who did not formally appear in this case, Silverstein is within reach of this Court's inherent power to sanction bad-faith litigation conduct, if Motivation proves such conduct.

The evidence shows that Mr. Silverstein invested at least $80,000 of his own money and owned a 1.5% equity interest in JTR himself, and that YCST, the law firm of which Mr. Silverstein is a partner, had a 5% equity interest in JTR. The Court finds that Mr. Silverstein's investment and his equity interests in JTR, both personally and through his law firm, gave Mr.

Silverstein a substantial interest in the outcome of the litigation sufficient to meet the first prong of *Helmac*.

Further, the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions in these proceedings. For starters, the retainer agreement between Jay, JTR, and Horan designates Silverstein as JTR's "general outside counsel," and requires Horan to seek "specific authorization" from both Jay and "general outside counsel" (i.e., Silverstein) before undertaking any of a litany of tasks necessary to the maintenance of the instant action. Motivation Ex. M-25. Moreover, and as detailed throughout the Court's Findings of Fact, *supra*, countless emails from Silverstein to JTR's admiralty counsel demonstrate that he was substantially in control of this litigation. From forbidding the filing of various reports in this case, to drafting and revising pleadings and motions in this case, to participating in trial strategy discussions, Silverstein's control is plain. The Court therefore finds that Silverstein's conduct in this case was more than sufficient to meet the second prong of *Helmac*.

Accordingly, Bruce Silverstein can be reached by this Court's inherent power to sanction bad-faith litigation conduct, should Motivation prove such conduct by clear and convincing evidence.

### b.  <u>Motivation has not met its burden of proving sanctionable conduct</u>

Having found that Silverstein can be reached by the Court's inherent power, the Court will now address whether Motivation has proved by clear and convincing evidence that Silverstein should be sanctioned. After nearly twelve days of taking evidence, including the testimony of eight witnesses and thousands of pages of documentary evidence,[15] Motivation has been unable to present any evidence that Silverstein had actual knowledge of Jay's scheme to

---

[15]     Most of this documentary evidence took the form of confidential e-mail communications believed to be covered by the attorney-client privilege at the time they were made, the future piercing of which privilege by application of the crime-fraud exception could not reasonably have been foreseen at the time.

commit a fraud upon the Court prior to that scheme being revealed on January 13, 2014, the first day of the sanctions hearing in front of Judge Moore. Therefore, the Court must turn to Motivation's "Red Flags" in order to determine whether Silverstein acted in bad faith—i.e., that he acted recklessly or with willful blindness to Jay's fraud yet persisted in participating in the prosecution of this case. As set forth below, the Court finds that Motivation has not established by clear and convincing evidence that Bruce Silverstein acted recklessly or with willful blindness to Jay's fraud.

### i.  Red Flags analysis:

The Court finds, and Motivation concedes, DE #560 at 2, that when Silverstein first began representing Jay in January of 2011, he did not know that Jay's story was a fraud. In fact, Silverstein had been presented with circumstantial evidence that seemed to support Jay's story of discovery of a valuable find that the genuineness of the find. In arguing that Silverstein's conduct amounted to bad faith, therefore, Motivation identifies numerous "red flags" which occurred during the course of Silverstein's representation of JTR and Jay both before and after this case was filed.

Whether Silverstein's continuing to act in the case after a given red flag or series of them was reckless or demonstrated willful blindness to Jay's fraud depends upon viewing the red flag not with the benefit of hindsight but in light of the universe of facts known at the time each red flag occurred. Though they take umbrage with much of Silverstein's conduct in this case, Motivation chiefly relies on six events in their claim that Silverstein acted in bad faith: (1) Silverstein's encounter with Peter Tobia at the settlement of the Delaware Litigation and the offer Silverstein conveyed to him afterwards; (2) Jay and Steve's attempt to thwart any claim by Spain by lying about recovering non-Spanish coins from the treasure site; (3) the 20 lb. group of emeralds Jay and Steve held initially held back from the Court; (4) the entire epoxy episode, from his first learning of the results through their eventual disclosure to the Court; (5) Jay's story

of how he came to purchase the map and subsequent $50,000 payment for a release from Mike Cunningham, and that story's unravelling prior to the Admiralty Trial; and (6) the withdrawal of JTR's attorneys and the events leading up to their decisions to withdraw. The Court has exhaustively analyzed these events, and indeed the entire record of these proceedings, and finds that the evidence presented by Motivation does not meet the standard of clear and convincing evidence required to sanction Bruce Silverstein, either when viewed individually or when taken cumulatively.

As set forth above, the Court finds that Motivation has not established by clear and convincing evidence either that Silverstein knew of the scheme to defraud the court, or that he acted in bad faith by continuing his involvement with the case recklessly or with willful blindness to the fraud. Accordingly, Motivation having failed to meet their burden, the Court will not sanction Silverstein.

### IV. CONCLUSION

Whether civilly in this action, another civil action, or criminally in a future action, there is no question that anyone who knowingly or recklessly participated in the attempted fraud upon the United States District Courts should be called to account. However, at present, the Court has before it only the limited question raised in the Amended Motion for Sanctions and the limited evidence presented by Claimant in these proceedings. Thus, through this Order, the Court only makes a determination of whether Claimant proved Respondent's participation in the fraud by clear and convincing evidence. The Court concludes that Claimant did not meet this burden. However, Claimant's failure neither establishes Respondent's innocence nor forecloses the possibility of future civil or criminal liability. Moreover, given the limited nature of this proceeding, this Order does not foreclose the possibility that other actors, against whom no sanctions were sought, can be held accountable for the attempted fraud upon the Court. Indeed, these proceedings have left unanswered many questions.

Therefore, it is **ORDERED, ADJUDGED, AND DECREED** that Motivation's Amended Motion for Sanctions **(DE #407)** be, and the same is hereby **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that this matter is **REFERRED** to the United States Attorney for the Southern District of Florida, for such action as in his discretion he deems appropriate.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami-Dade, Florida, this 16th day of March, 2015.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

Copies furnished to:
Chief Judge K. Michael Moore

Wifredo A. Ferrer, United States Attorney

All Counsel of Record