# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY ___ABM___

Deputy Clerk

**Aug 28, 2017**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. **MIA**

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 28, 2017

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  15-14132-DD
Case Style: JTR Enterprises, LLC v. Motivation, Inc.
District Court Docket No: 4:11-cv-10074-JLK

Enclosed is the Bill of Costs.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  James O'Donnell Delaney
Phone #:  404-335-6113

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**
_____

No. 15-14132
_____

District Court Docket No.
4:11-cv-10074-JLK

JTR ENTERPRISES, LLC,
a Delaware Limited Liability Company,

Plaintiff - Appellee,

YOUNG CONOWAY STARGATT & TAYLOR,
BRUCE L. SILVERSTEIN,
PAUL D SULLIVAN,

Interested Parties - Appellees
Cross Appellants,

CLAWDB LLC, et al.,

Intervenor Plaintiffs,

versus

COLUMBIAN EMERALDS,
An Unknown Quantity, Amethysts and Quartz Crystals
located within 3,000 yards of a point located at coordinates
24 57 79 North Latitude and 81 55 54 West Longitude, et al,

Defendants,

MOTIVATION, INC.,

Claimant - Appellant
Cross Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: June 23, 2017
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

ISSUED AS MANDATE 08/28/2017

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14132
_____

D.C. Docket No. 4:11-cv-10074-JLK

JTR ENTERPRISES, LLC,
a Delaware Limited Liability Company,

Plaintiff - Appellee,

YOUNG CONOWAY STARGATT & TAYLOR,
BRUCE L. SILVERSTEIN,
PAUL D SULLIVAN,

Interested Parties - Appellees
Cross Appellants,

CLAWDB LLC, et al.,

Intervenor Plaintiffs,

versus

COLUMBIAN EMERALDS,
An Unknown Quantity, Amethysts and Quartz Crystals
located within 3,000 yards of a point located at coordinates
24 57 79 North Latitude and 81 55 54 West Longitude, et al,

Defendants,

MOTIVATION, INC.,

Claimant - Appellant
Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 23, 2017)

Before ED CARNES, Chief Judge, FAY, and PARKER,[*] Circuit Judges.

PARKER, Circuit Judge:

JTR Enterprises, LLC ("JTR"), a company run by Jay Miscovich that was ostensibly engaged in treasure hunting, brought an admiralty action in the Southern District Court of Florida seeking title to emeralds that Miscovich and his diving partner, Steve Elchlepp, allegedly discovered in international waters in the Gulf of Mexico. The emeralds discovery was fake and Miscovich was a fraud. After that determination by the district court, Motivation, Inc., the owner of a shipwreck in the same general area that had also claimed title to the emeralds, sought sanctions for bad-faith litigation pursuant to the district court's inherent powers. The sanctions were sought against JTR's outside general counsel, his law firm, and one

_____

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

of JTR's advisors. The district court denied sanctions and Motivation appeals. We affirm.

## I.

In September 2011, JTR filed a claim in admiralty alleging that it had discovered an unknown quantity of emeralds from an 18th-century shipwreck. D.E. 1.[1] In October 2011, Motivation filed the only other claim for the emeralds, contending that the gems could have migrated 40 miles across the ocean floor from a 17th-century Spanish shipwreck site it controlled. (*Sic*). D.E. 10. Deep into discovery in the case, JTR revealed in a status report to the court that the emeralds had epoxy on them. Epoxy is a 20th-century substance used to enhance the clarity of emeralds. The epoxy findings meant that the emeralds discovered by Miscovich and Elchlepp were not ancient stones worth millions of dollars. D.E. 82. Motivation subsequently moved for sanctions alleging that JTR, Miscovich, and others had deliberately attempted to defraud the court throughout the admiralty litigation.

The district court severed the sanctions motion and proceeded to trial on JTR's admiralty claim in December 2012. It ultimately denied JTR's claims to the emeralds, finding that it could not determine whether Miscovich and Elchlepp had

---

[1] As the district court explains: "The standard procedure for admiralty cases in the Southern District of Florida is for finders/salvors to file suit in admiralty and bring the subject material into custody of the Court to establish in rem jurisdiction over the material. A warrant for an arrest of the res issues, a substitute custodian is appointed, and after publication of a plaintiff's claim is made, anyone having a claim may so state and be heard at trial." D.E. 568 at 2.

legitimately discovered the gems or planted them. In January 2014, the district court proceeded with a trial to the court on Motivation's motion for sanctions against JTR and Miscovich. There, Miscovich's fraud unraveled. Motivation adduced evidence that Miscovich had purchased the emeralds from a dealer in Jupiter, Florida, planted them in the ocean, and then falsely represented to the court that he had "discovered" them in order to obtain a judgment establishing ownership of the jewels, extinguishing other claims and exponentially increasing the value of the stones. The district court granted Motivation's sanctions motion in part, concluding that Miscovich was responsible for "a flagrant abuse of the judicial process." D.E. 445 at 19.

Motivation then moved for sanctions against others involved in the litigation: Appellees Bruce Silverstein Esq., who was JTR's general outside counsel; Silverstein's law firm, Young Conaway Stargatt & Taylor LLP ("YCST"); and Paul Sullivan, an advisor to JTR. Motivation contended that each either knew about the fraud or willfully ignored the obvious "red flags" that a massive fraud was being perpetrated. Because no one denied that a fraud occurred, the principal issue before the court was whether the red flags were sufficiently conspicuous such that the Appellees knew or should have known about the fraud and responded appropriately.

4

After a thirteen-day trial, the district court declined to impose additional sanctions. It concluded that while there were red flags that could have been heeded, there was also evidence that the discovery was legitimate. Accordingly, the court held that Motivation failed to prove with the required clear and convincing evidence that Appellees should be sanctioned. At the close of Motivation's case at the sanctions trial, the district court dismissed Sullivan and YCST, finding that "Motivation failed to present sufficient evidence *at that time* on (i) Sullivan's substantial involvement in the underlying litigation, or (ii) either Sullivan's or YCST's substantial interest in the outcome of the litigation." D.E. 568 at 1 n.1 (emphasis in original). Because we conclude that the district court did not abuse its discretion, we affirm the denial of sanctions.

## II.

The district court found that Miscovich's fraud was a massive one, spanning several years that involved duping lawyers, business associates, private investors, elected officials, gemologists, the Smithsonian Institute, and local and national media sources, including the CBS News Program "60 Minutes." D.E. 568 at 2-3. Miscovich was obviously culpable as the perpetrator of the fraud. The primary issue in this appeal is whether Silverstein, who controlled the admiralty litigation where the authenticity of the emeralds was a dispositive issue, Silverstein's firm, and Sullivan are culpable.

5

A history of the fraud, drawn from the record developed at the sanctions trials, follows, with an emphasis on the purported "red flags." This record is unusually robust. It contains otherwise privileged attorney-client communications available because the trial court ruled that the crime-fraud exception applied. In this narrative, the truth is, indeed, stranger than fiction.

### A.   2010: Formation of JTR and roles of Silverstein, YCST, and Sullivan

In January 2010, diving partners Miscovich and Elchlepp "discovered" a trove of emeralds on the floor of the Gulf of Mexico. Soon after the discovery, they attracted approximately three-quarters of a million dollars from investors as well as the attention of the CBS Program "60 Minutes," whose producers agreed to do a segment on the discovery. M41 (December 4, 2012, Miscovich Testimony in Admiralty Trial).

Miscovich and Elchlepp formed JTR Enterprises, LLC, as a vehicle for outside investment, along with Silverstein. Silverstein, a corporate lawyer who had been practicing for 28 years, was retained as JTR's general counsel. D.E. 546 (Second Sanctions Hearing Tr., Day 6) at 112-13. Pursuant to a retainer agreement with JTR's eventual admiralty counsel, Silverstein personally had to authorize all legal services performed in the case. M25 (Miscovich-Horan Legal Services Agreement) at ¶ 4. In addition, Silverstein invested $80,000 of his own money in JTR.  D.E. 549 (Second Sanctions Hearing Tr., Day 9) at 37.

Silverstein was a senior partner at YCST. The firm represented Miscovich and Elchlepp in a lawsuit brought by New York investors in an earlier corporation of Miscovich's in the Delaware Court of Chancery (the "Delaware Litigation"). The investors alleged that they were entitled to the emeralds, thought at the time to be worth millions of dollars.  M8 (August 28, 2014, Affidavit of Bruce Silverstein) at ¶ 11. YCST was also an investor in JTR, receiving a 5% interest in the emeralds for representing JTR in the Delaware Litigation. D.E. 549 at 16.

Paul Sullivan, a friend of Miscovich's brother, became an advisor to JTR and also invested in the company. D.E. 546 at 9. At Miscovich's request, Sullivan traveled in 2010 and 2011 to meet with the president of Colombia regarding the emeralds discovery. He hoped Colombia would claim the emeralds and take control of the treasure site and name Miscovich and his investors and partners as salvors of the emeralds in exchange for a share of the treasure. D.E. 550 (Second Sanctions Hearing Tr., Day 10) at 112-13.

### B.   Late 2010-early 2011: Silverstein given evidence of the emeralds' legitimacy

From late 2010 to early 2011, Silverstein reviewed Miscovich's records in connection with his work on the pending Delaware Litigation. He took considerable comfort in the fact that several well-qualified experts attested to the genuineness of the emeralds' discovery. First, Jeffrey Post of the Smithsonian Institute inspected the emeralds, believed they had legitimately been discovered,

and expressed to Miscovich that the Smithsonian was interested in a five-year loan of the emeralds for a "major display" alongside the Hope Diamond. D.E. 546 at 133, 163. Second, the Gemological Appraisal Laboratory of America (the "GAL") examined the stones and estimated that the retail value of twenty of the emeralds was approximately $120,000, a price indicating that the gems were genuine. DX2 (Appraisal Report by Josh Lents, dated December 9, 2010). Significantly, the GAL also described each stone it examined as "Untreated – No evidence of oil or resin." *Id.* Finally, Silverstein personally brought a sample of the emeralds to Sotheby's in New York City, where he met with the president and its head gemologist. D.E. 546 at 174. According to Silverstein, the head gemologist estimated the value of one emerald he examined to be between $25,000 and $40,000. *Id.*

### C.    Early 2011: The "Mike Cunningham map" story

Motivation argues that the first red flag that should have caused Silverstein to doubt the veracity of the discovery occurred while Silverstein worked on the Delaware Litigation. In early 2011, Miscovich told Silverstein that he found the emeralds by following a lead from a map that he purchased from an old acquaintance, Mike Cunningham, a destitute handyman from Pennsylvania. D.E. 199 at 1. Miscovich told Silverstein that he paid $500 for the map and then paid Cunningham an additional $50,000 to renounce any claim to the gems he might have. Miscovich also claimed that Cunningham's agreement to do so was

8

documented in a release drafted by an associate at Proskauer Rose LLP ("Proskauer") in New York City. D.E. 549 at 13, 94.

Motivation argues that the circumstances surrounding the map story were sufficiently suspicious that Silverstein should have inquired more closely than he did. Nevertheless, Silverstein did not ask Miscovich to see the release or any bank records, or do any further investigation. *Id.* at 96, 118.

### D.    August 2011: Silverstein warned by Peter Tobia

The next so-called red flag involved a series of conversations between Silverstein and Peter Tobia, a friend of Miscovich's who had a 3% ownership interest in the emeralds. In August 2011, while the Delaware Litigation was pending, Tobia told Silverstein that he "knew information that [Silverstein] should have about [Miscovich] and his discovery, and it was important that [Silverstein] understood it." D.E. 546 at 180; DX10 (Emails between Silverstein and Tobia, dated August 20, 2011 through September 8, 2011) at 4. Tobia stated that Miscovich and Elchlepp "had not discovered . . . the emeralds in the Gulf of Mexico" as they claimed, but "discovered [them] on land in Florida." DX10 at 2. Tobia then insisted on a larger ownership percentage in the emeralds as a condition for providing additional information about what he had learned.  D.E. 546 at 180.

Motivation argues that Silverstein should have immediately investigated Tobia's serious accusation that the emerald discovery was fraudulent. Instead, the

same day that Tobia approached Silverstein, Silverstein encouraged the filing of an admiralty claim for the emeralds because "the filing, combined with the expected press coverage . . . will produce legitimate investors with meaningful investments." DX9 (Silverstein Email to Horan, dated August 19, 2011). For Silverstein's part, because he thought Tobia was untrustworthy and "an extortionist," he concluded that an investigation into Tobia's claim was unnecessary. D.E. 546 at 181-82.

### E.   Late August 2011-September 2011: The "non-Spanish coins" and "20 pound bag" stories

Motivation next offers as red flags a series of untruthful stories that Miscovich told JTR's admiralty lawyer, David Horan. (As Silverstein was a corporate lawyer, he insisted that JTR hire an admiralty lawyer.)[2] In the weeks leading up to filing the admiralty claim, Horan discussed with Silverstein, Miscovich, and Elchlepp where JTR should file the claim. Miscovich was told that because his discovery was made in international waters, he could litigate ownership for the emeralds in the United States or a foreign country. While discussing the advantages and disadvantages of a U.S. filing, Horan warned of a prior similar discovery of valuable items near a Spanish shipwreck which Spain claimed and vigorously pursued.  M1-7 (August 18, 2011, Email of David Horan).

---

[2] Before he agreed to be retained, Horan, an experienced diver, conducted what he called a "sanity check" dive. D.E. 543 (Second Sanctions Hearing Tr., Day 1) at 142. Because he found emeralds on his initial dive, he believed the emeralds discovery was legitimate and agreed to represent JTR. *Id.* This was further proof to Silverstein that the emeralds discovery was real.

Horan advised JTR that if there was a possibility that the emeralds found by Miscovich and Elchlepp came from a Spanish shipwreck, Spain would, in all likelihood, aggressively litigate ownership with JTR. *Id.*

After Horan's warning about the possibility of Spanish interference, Miscovich and Elchlepp arrived at Horan's office with a number of Danish, English, and French coins. They asked Horan, "well, would this prove that this is not a Spanish Galleon or have anything to do with Spain?" D.E. 543 at 64-65. When Horan confronted them, they admitted the coins did not come from the discovery site. *Id.* at 70-71. Horan reported this incident to Silverstein and Sullivan. *Id.*

Motivation argues that Miscovich and Elchlepp's false statements to Horan should have caused Silverstein to become skeptical about his clients' veracity. Silverstein admitted that although the story made him skeptical, it ultimately did not cause him to conclude that his clients' account of the discovery was false. M8 at ¶ 157. Consequently, Silverstein encouraged Horan to file the admiralty claim, which Horan did in the Southern District of Florida on September 8, 2011.

Three days later, Silverstein, Horan, Miscovich, Elchlepp, and crew members from CBS News and "60 Minutes" traveled to the discovery site for another test dive. D.E. 552 (Second Sanctions Hearing Tr., Day 11) at 8. Silverstein did not dive, but witnessed Horan and Elchlepp dive and resurface with

a number of emeralds. *Id.* This finding reassured Silverstein that Miscovich and Elchlepp's discovery was legitimate. M8 at ¶ 157.

Later that month, Horan told Silverstein that Miscovich and Elchlepp had arrived at Horan's office with a 20-pound bag of emeralds that they claimed to have found at the discovery site and had kept for themselves in the event that Spain was awarded title to the treasure. D.E. 547 (Second Sanctions Hearing Tr., Day 7) at 15; D.E. 543 at 73. Horan did not believe the emeralds came from the site because he estimated that it would have taken a year to recover that amount of emeralds. *Id.* at 73-74. At that time Horan expressed to Silverstein and Sullivan his concerns that Miscovich and Elchlepp were untruthful. *Id.* at 75. Silverstein instructed Horan to investigate. D.E. 547 at 20. Silverstein later testified that he believed Horan "had done his diligence" and Silverstein "was satisfied that the emeralds had come from the site." *Id.* at 22. Motivation argues that, in light of the previous false statements by Miscovich and Elchlepp, Silverstein's unwillingness to investigate further is evidence of willful blindness to fraudulent conduct.

### F.    Late 2011-early 2012: Epoxy findings and delayed disclosure to the court; JTR's admiralty counsel's withdraws

The most significant red flag relied on by Motivation was the dramatic news that Silverstein received from two gemological labs that samples of the emeralds were coated with epoxy. Motivation argues that Silverstein's delay in informing the court of the epoxy findings was telling evidence of bad faith.

12

In November 2011, Horan advised JTR to have the emeralds examined to determine their mining origin and age. D.E. 543 at 82. JTR hired an emeralds consultant, who arranged to send a selection of the emeralds to the premier gemological laboratories specializing in emeralds: the Ecole National Superieure de Geologie de Nancy (the "French Lab") and Laboratoire Gemtec (the "Swiss Lab"). *Id.*

In December 2011, the French and Swiss Labs informed Horan that the samples they tested were coated with epoxy, a substance not invented until the twentieth century. This revelation cast serious doubts on the provenance of the stones. *Id.* at 83. Horan informed Silverstein and others of the findings. D.E. 550 at 127. Horan was "shocked" by the results, and others were similarly surprised. *Id.* Silverstein's response was that neither the Smithsonian nor GAL, which had examined a sample of emeralds, had found any substances on the emeralds, so he suggested Horan dive for more emeralds and have them tested. M1-18 (December 19, 2011, Email of Bruce Silverstein). Silverstein also informed CBS of the French and Swiss lab results, and secured an agreement from CBS to pay for further testing. *Id.*

A few days later, at Horan's request, Silverstein and Sullivan then confronted Miscovich and Elchlepp about the epoxy findings. Silverstein and Sullivan explained that "there are serious consequences resulting from making

13

false statements to a federal court." M1-16 (December 13, 2011, Email of Bruce Silverstein) at 1. Silverstein described the phone call as "akin to a cross-examination of a witness in a trial" in which he was "trying to nail down the facts" and "find out if there were any inconsistencies in their story." D.E. 547 at 27. After his conversation with Miscovich and Elchlepp, Silverstein concluded that the source of the epoxy on the emeralds "remained a mystery." M1-16 at 2. Motivation argues that, at this point, Silverstein was willfully blind to the fraud, as he had previous indications that Miscovich and Elchlepp were untrustworthy and had received proof from the labs that the emeralds were not ancient stones worth millions of dollars, but nevertheless chose to proceed with the admiralty claim.

The next red flag offered by Motivation is Horan's conduct after he became aware of the epoxy findings. In contrast to Silverstein, Horan considered withdrawing from representing JTR. MD1-1 (December 8, 2011, Email of Bruce Silverstein) at 3. He also expressed to Silverstein his doubts as to Miscovich's truthfulness. *Id.* Horan further told Silverstein that they should inform the court about the epoxy findings and the two had "heated discussions" over the subject. D.E. 372 (First Sanctions Hearing Tr., Day 2) at 136.

During this time, the parties were engaging in discovery in the admiralty case and were required to file periodic status reports with the court. Silverstein strongly discouraged Horan from disclosing the epoxy findings in an upcoming

14

status report, contending that they had no obligation to do so until CBS had completed its testing. M2-9 (March 26, 2013, Email of David Horan). Consequently, in January 2012, at Silverstein's strong recommendation, Horan filed a status report with the court which did not reveal that epoxy had been found on the emeralds. M1-17 (December 18, 2011, Email of Bruce Silverstein) at 5; D.E. 54 (Second Status Report, Dated January 6, 2012).

However, by April 2012, Horan insisted on informing the court of the epoxy results. He filed another status report on behalf of JTR, which for the first time revealed to the court that months earlier epoxy had been found on the emerald samples. D.E. 82 (Third Status Report, dated April 18, 2012).

After the court reviewed the status report, it ordered JTR to produce the emeralds for inspection by Motivation. D.E. 117. After examining the emeralds, Motivation's expert concluded that they were not "of high quality" and did not have any of the characteristics of other emeralds recovered from its 17th-century shipwrecks. D.E. 118.

Motivation moved to withdraw its claim to the emeralds. *Id.* Motivation also moved for sanctions against JTR, Miscovich, and others for filing the admiralty claim in bad faith. D.E. 123. The district court denied Motivation's motion to withdraw, ordering Motivation to remain in the litigation in order to have an advocate for sanctions. D.E. 546 at 77; D.E. 121. The district court severed

Motivation's sanctions claims and proceeded to trial on JTR's admiralty claim. D.E. 172.

Horan then withdrew as admiralty counsel. D.E. 138. He told Silverstein that he was withdrawing because "the [non-Spanish] coins and the 20-pound bag and the epoxy findings" caused him to doubt the genuineness of Miscovich and Elchlepp's discovery. D.E. 549 at 150. Motivation argues that Horan's withdrawal was a clear sign to Silverstein that his clients' story was fabricated. For his part, Silverstein later testified at the sanctions hearing that Horan's withdrawal "did not create doubts in his mind about the genuineness of the discovery." D.E. 543 at 152.

### H.    December 2012: the "Mike Cunningham map" story unravels and JTR loses admiralty claim at trial

After Horan's withdrawal, JTR retained new admiralty lawyers, John Siracusa Esq. and Joe Janssen Esq., who began to prepare for the upcoming admiralty trial. During trial preparation, they too became concerned about Miscovich's veracity. Specifically, they believed Miscovich was untruthful about buying a map from Cunningham and paying him $50,000 for a release after their investigation revealed that Miscovich had not withdrawn such funds from his bank account during the relevant time period. M2-54 (November 24, 2012, Email of Bruce Silverstein) at 4-9. Motivation offers this evidence as another red flag which Silverstein ignored.

Trial to the court on JTR's admiralty claim commenced on December 4, 2011, before Judge James Lawrence King in the Southern District of Florida. During trial, Miscovich testified about purchasing the map from Cunningham, for the first time revealing Cunningham's name to the parties. M41 (December 4, 2012, Miscovich Testimony in Admiralty Trial) at 134.

At the conclusion of the trial, the court determined that JTR was not entitled to any title or salvage award with respect to the emeralds, holding:

> When all is said and done, there are two options: Jay and Steve legitimately found lost stones on the floor of the Gulf, or Jay and Steve placed stones acquired elsewhere on the ocean floor in order to "find" them and thereby establish an ancient provenance and greatly enhance the value of the stones and the reputation of the men as treasure salvors. There is just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them. The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds. Each story represents one possible interpretation of entirely circumstantial evidence, and neither persuades the Court.

D.E. 199 at 22.

JTR appealed the district court's denial of its admiralty claim and several other ancillary orders. We granted Motivation's motion to dismiss the appeal as frivolous, in light of the "egregious conduct that gave rise to the current state of this case." D.E. 435 at 3.

After the trial, Motivation continued to investigate the authenticity of the emeralds. Motivation located Cunningham and deposed him. Cunningham testified

and Motivation's subsequent investigation confirmed that Cunningham was in prison at the time he allegedly signed the release. D.E. 550 at 15. Moreover, Motivation located and deposed counsel from Proskauer who purportedly had prepared the release. He testified that his firm did not prepare the release, nor, for that matter, did it provide any legal services to JTR. M36 (May 15, 2013, Deposition of Ivan Talback) at 10-11, 20. At this point, in what Motivation argues is evidence of willful blindness, Silverstein apparently still maintained his belief that Miscovich was truthful and that the discovery was legitimate. M8 at ¶ 70.

In October 2013, Siracusa told Silverstein that for ethical reasons he and Janssen were withdrawing as counsel, another red flag offered by Motivation. Siracusa testified later at the sanctions hearing that he withdrew because he "had reached a point where I knew or should have known that something was wrong." D.E. 544 (Second Sanctions Hearing Tr., Day 2) at 54, 83-84.

On October 29, 2013, Miscovich committed suicide.

## I. January 2014: Motivation's first sanctions motion against JTR and Miscovich's estate

Following the admiralty trial, discovery proceeded on Motivation's severed sanctions motion against JTR and Miscovich's estate. A trial to the court commenced in January 2014 before Judge K. Michael Moore in the Southern District of Florida and lasted three days. On the last day of trial, in true Perry Mason fashion, Jorge Rodriguez, the owner of a jewelry store in Jupiter, Florida,

appeared and testified that Miscovich and Elchlepp's discovery never happened. Rodriguez testified that Miscovich purchased eighty pounds of emeralds from him in March, May, August and September 2010 for $80,000. D.E. 373 (First Sanctions Hearing Tr., Day 3) at 70. Motivation claims Rodriguez's testimony was the last of a long line of red flags that Silverstein chose to ignore. On the other hand, Silverstein claims that this testimony marked the first time he knew that the discovery had been fabricated. D.E. 552 at 72.

Following trial, the court imposed sanctions against JTR for failing to timely disclose the epoxy findings and Miscovich's estate for committing "a flagrant abuse of the judicial process." D.E. 445 at 19. The district court then granted Motivation leave to file an amended sanctions motion against other parties Motivation thought were responsible for committing the fraud, including Silverstein, YCST, and Sullivan. The court further found that the crime-fraud exception to the attorney-client communications privilege applied and compelled the production of email and other communications between and among JTR, its members, and its counsel.

## J. Motivation's second sanctions motion against Silverstein, YCST, and Sullivan

A second trial to the court on Motivation's sanctions motion commenced in January 2015 before Judge King and lasted thirteen days. Motivation contended that the numerous red flags which appeared during the course of Silverstein's

representation of JTR should have alerted any reasonable attorney to Miscovich's fraud. The thrust of Silverstein's defense was that he was fulfilling his obligation to zealously advocate on behalf of JTR and that numerous indicia that the emeralds discovery was authentic caused him to overlook the purported red flags.

At the conclusion of the evidence, the court analyzed the "red flags" and concluded:

> Whether Silverstein's continuing to act in the case after a given red flag or series of them was reckless or demonstrated willful blindness to [Miscovich's] fraud depends upon viewing the red flag not with the benefit of hindsight but in light of the universe of facts known at the time each red flag occurred… The Court has exhaustively analyzed these events, and indeed the entire record of these proceedings, and finds that the evidence presented by Motivation does not meet the standard of clear and convincing evidence required to sanction Bruce Silverstein, either when viewed individually or when taken cumulatively.

D.E. 568 at 56-57. This appeal followed.

## III.

We review a district court's decision to impose or deny sanctions under its inherent power for an abuse of discretion. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991). The key to invoking a court's inherent power to sanction is a finding of bad faith. *See In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995). Bad faith exists where an attorney knowingly or recklessly pursues a frivolous claim or needlessly obstructs the litigation of a non-frivolous claim. *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1242 (11th Cir. 2006). Under the doctrine of willful

blindness, "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposely contrives to avoid learning of it." *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002).

As a threshold issue, Silverstein argues that he is outside the reach of the court's inherent power to sanction him, as he was not an attorney of record in the admiralty litigation. We disagree. *Chambers* establishes the district court's "inherent powers" to sanction Silverstein, even though he was not counsel of record. *See* 501 U.S. at 46 ("[W]hereas each of the [statutory and rule] mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses."). Under *Chambers*, a court's inherent power to sanction must nevertheless "comply with the mandates of due process." *Id.* at 50. Here, there is no question that due process requirements were satisfied, as Silverstein does not dispute that he was served, had actual notice of the proceeding, and participated in it.

Turning to the merits, Motivation's main contention is that the red flags should have caused Silverstein to "meaningfully" investigate and "expose the fraud," and that his failure to do so constitutes bad faith. Motivation App. Br. at 42-44. Our review of the record convinces us that the district court did not abuse its discretion in concluding that Motivation failed to adduce clear and convincing evidence of bad faith. There is no doubt that there were red flags and that, with the

benefit of hindsight, certain of them were conspicuous. However, we do not believe that the district court abused its discretion in concluding that the "red flags" were not dispositive of bad faith. As the district court concluded, evidence existed on the basis of which Silverstein could have concluded that the discovery was legitimate. This evidence included: (1) the fact that gemologists from the Smithsonian and Sotheby's believed the emeralds to be legitimate; (2) the report from the GAL that the emeralds it tested did not show traces of epoxy; (3) Silverstein's belief that Tobia should not be trusted; (4) the fact that Horan, who was an expert diver and respected admiralty lawyer, dove several times on the discovery site and retrieved emeralds he believed to ancient stones worth millions of dollars; (5) the interest of producers at "60 Minutes" in the project and their willingness to finance further testing the emeralds; and (6) the district court's finding at the conclusion of the admiralty trial that Miscovich's story was as equally plausible as it was not.

In view of the conflicting evidence and testimony which the district court thoroughly and painstakingly reviewed, we see no error in its finding that Motivation failed to demonstrate Silverstein's bad faith by clear and convincing evidence. As the Supreme Court has instructed: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985); *see also*

*Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1268 (10th Cir. 1995) (same) (affirming denial of sanctions for alleged fraud on the court). Similarly, we believe that the court acted well within its broad discretion in declining to sanction Silverstein.

At the end of the day, Motivation asks us to draw different inferences from the evidence and to make different credibility assessments and findings of fact than did the district court. We are not permitted to do this. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses[,]…a trial judge's choice of whom to believe is conclusive on the appellate court.") (citations omitted) (emphasis in original).

Accordingly, we affirm the district court's denial of sanctions.

## IV.

Motivation also challenges the district court's failure to award sanctions against Silverstein's firm, YCST, and Sullivan. Motivation did not prove that any basis existed for sanctioning YCST. Motivation did not prove that Silverstein should be sanctioned, nor did it prove that YCST was otherwise involved in the fraud. The fact that Silverstein was a partner at YCST is insufficient. *See, e.g.*, *Wolters Kluwer Fin. Servs., Inc.* v. *Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (lawyer's bad faith could not be "visited" upon his employer law firm); *accord*

Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27 (4th ed. 2012) ("Bad faith is personal to the offender. One person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as respondeat superior or vicarious liability").

The district court denied sanctions against Sullivan on the ground that Motivation did not present sufficient evidence that Sullivan substantially participated in the litigation. We agree. Even though Sullivan was a member of JTR's advisory board, had traveled to Colombia at Miscovich's request, was copied on a number of email chains, and participated in a number of discussions about litigation strategy, the evidence presented at trial failed to establish that Sullivan, who was not an attorney and did not control the litigation, acted in bad faith. Thus, we see no abuse of discretion and therefore affirm the district court's denial of sanctions against YCST and Sullivan.[3]

## V.

Appellees Silverstein and YCST cross-appeal orders of the district court: (1) denying their motion to quash on grounds that Motivation lacked standing to move for sanctions; (2) awarding sanctions to Motivation against JTR and

---

[3] Appellees Silverstein and YCST's Motion for Sanctions against Motivation is denied. Appellee Sullivan's Motion to Strike New Arguments and Evidence in Motivation's Reply Brief is also denied.

Miscovich; and (3) compelling the disclosure of attorney-client communications under the crime-fraud exception.

This cross appeal has no merit. We agree with the district court that Motivation had standing to bring a sanctions motion, as it was clearly injured by the fraud. Because neither Silverstein nor YCST were aggrieved by the sanctions imposed on JTR and Miscovich's estate, neither may appeal the order granting them. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003) ("Only a litigant who is aggrieved by the judgment or order may appeal.") (internal citations and quotation marks omitted).

We also agree that the district court had more than sufficient basis to invoke the crime-fraud exception. There can be no serious dispute with the court's finding of a "massive fraud of the court." The district court was authorized to compel discovery which would reveal existence of the fraud as well as efforts to conceal it. *In re Grand Jury Investigation*, 842 F.2d 1223 (11th Cir. 1987) (holding crime-fraud exception applied to testimony of attorney and accountant, who prepared his client's tax returns during grand jury investigation for tax evasion); *see also In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 367 (11th Cir. 1996) ("Every district court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.") (internal citation and quotation marks omitted).

## VI.

Appellee Sullivan cross-appeals the district court's finding that it had personal jurisdiction over him. He also cross-appeals the denial of his motion for sanctions against Motivation. Sullivan first argues that the district court lacked personal jurisdiction over him because FED. R. CIV. P. 4.1(a) limits service to "the state where the district court is located"–in this case, Florida–but Sullivan was served at his home in Hawaii. We find no merit in this argument. As explained above, the district court had personal jurisdiction over Sullivan, just as it did over Silverstein, under the court's inherent powers. *See Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (finding personal jurisdiction over nonparties in connection with contempt proceedings); *see also Chambers*, 501 U.S. at 46.

Second, Sullivan argues that Motivation lacked a good faith basis for alleging that he was liable for sanctions. We disagree. The record reflects that Sullivan had a significant involvement with JTR. He had a 1.5% interest in the emeralds, served as an advisor to JTR, and communicated with the Colombian government about the emeralds at Miscovich's request. Most importantly, he was copied on many of the communications sent by JTR's attorneys. Based on the these factors, even though Motivation ultimately did not meet its burden to prove sanctionable conduct against Sullivan by clear and convincing evidence, the motion was not in bad faith.

In conclusion, the judgments of the district court are **AFFIRMED**.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 23, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-14132-DD
Case Style: JTR Enterprises, LLC v. Motivation, Inc.
District Court Docket No: 4:11-cv-10074-JLK

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Sandra Brasselmon, DD at (404) 335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs

## UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
### Bill of Costs

Court of Appeals Docket No. ___15-14132-DD___

JTR Enterprises, LLC _____ vs. Motivation, Inc. _____

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs. FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

### INSTRUCTIONS

The appellate docketing fee is set in the fee schedule issued pursuant to 28 U.S.C. § 1913. However, the $5 fee for filing a notice of appeal is recoverable as a cost in the district court. In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Appellate Docketing Fee | — | — | — | — | — | | |
| Appellant's Brief | | | | | | | |
| Appendix | | | | | | | |
| Appellee's Brief | X | | 64 | 9 | 576 | 86.40 | 86.40 |
| Reply Brief | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | TOTAL | $86.40 REQUESTED | $ 86.40 ALLOWED | |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: _[signature]_

Date Signed: 6/27/17

Attorney Name: Stephen F. Rosenthal
(Type or print your name)

Attorney for: Appellee Paul Sullivan
(Type or print name of client)

E-mail: srosenthal@podhurst.com

Phone: 305-358-2800

Street Address/City/State/Zip: One S.E. 3rd Avenue, Suite 2700, Miami, Florida 33131

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ ___$86.40___ against ___Appellant___

and are payable directly to ___Appellee___

David J. Smith, Clerk of Court

Issued on: _____   By: ___Tresa Porter___   DATE: July 12, 2017
Deputy Clerk

BOC Rev.: 6/17

ISSUED AS MANDATE 08/28/2017